## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HOBBICO, INC., *et al.*,[1] | Case No. 18-10055 (KG) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS: (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION
EMPLOYEE CLAIMS, INCLUDING WAGES, SALARIES, AND OTHER
COMPENSATION; (II) AUTHORIZING PAYMENT OF CERTAIN EMPLOYEE
BENEFITS AND CONFIRMING RIGHT TO CONTINUE EMPLOYEE BENEFITS
ON POSTPETITION BASIS; (III) AUTHORIZING REIMBURSEMENT TO
EMPLOYEES FOR PREPETITION EXPENSES; (IV) AUTHORIZING PAYMENT
OF WITHHOLDING AND PAYROLL-RELATED TAXES; (V) AUTHORIZING
PAYMENT OF PREPETITION CLAIMS OWING TO ADMINISTRATORS
AND THIRD PARTY PROVIDERS; (VI) AUTHORIZING BANKS TO HONOR
PREPETITION CHECKS AND FUND TRANSFERS FOR AUTHORIZED PAYMENTS;
(VII) SCHEDULING A FINAL HEARING; AND (VIII) GRANTING RELATED RELIEF**

Hobbico, Inc. ("Hobbico") and its above-captioned affiliated debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors") hereby submit this motion (the "Motion") for the entry of interim and final orders, substantially in the forms attached hereto as Exhibit A (the "Proposed Interim Order") and Exhibit B (the "Proposed Final Order"), pursuant to sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), (A) authorizing, but not directing, the Debtors to: (i) pay accrued prepetition employee wages, salaries, and other compensation; (ii) pay accrued prepetition compensation of independent contractors; (iii) reimburse employees for business expenses incurred prepetition on behalf of the Debtors in the ordinary course of

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Hobbico, Inc. (9545); Axial R/C Inc. (0233); Estes-Cox Corp. (2196); Great Planes Model Manufacturing, Inc. (5259); Revell Inc. (8545); Tower Hobbies, Inc. (5185); and United Model, Inc. (5302).  The Debtors' headquarters are located at 2904 Research Road, Champaign, Illinois 61822.

business; (iv) honor prepetition obligations in respect of, and continue in the ordinary course of business, the Debtors' paid time off policies, and employee benefits programs and plans (all as described more fully below, the "Employee Benefits"); (v) pay all prepetition payroll taxes and other deductions and withholdings; (vi) continue their Workers Compensation Programs (as defined below) and honor obligations related thereto; and (vii) pay any prepetition claims of third-party payroll and other administrators (items (i) through (vii), and any additional obligations to employees not expressly included herein, collectively, the "Employee Obligations"); (B) authorizing and directing banks and other financial institutions (the "Banks") to honor and pay all checks and transfers drawn on the Debtors' accounts related to the foregoing obligations; and (C) granting such other and further relief as the Court deems just and proper.    The facts and circumstances supporting this Motion are set forth in the concurrently filed Declaration of Tom S. O'Donoghue, Jr. In Support of Chapter 11 Petitions and First Day Motions (the "First Day Declaration").[2]    In further support of this Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASE

1.    On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.    On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief.    Additional information about the Debtors' business and the events leading to the commencement of these chapter 11 cases can be found in the First Day Declaration, which is incorporated herein by reference.

---

[2]    Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

2.      The Debtors are continuing in possession of their respective properties and are continuing to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in these cases.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "Amended Standing Order").  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory and legal predicates for the relief sought herein are sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.  Pursuant to Local Rule 9013-1(f), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND FOR RELIEF REQUESTED

### A.      The Debtors' Employees

7.      The Debtors' employees constitute their most valuable asset and are essential to the Debtors' business and the sale process.  The employees are central to preserving the Debtors' customer and vendor relationships, maintaining brand value, contributing to the integrity of the Debtors' products, and building commercial relationships in the Debtors' highly competitive

industry.  If the Debtors' payroll is interrupted, or the Debtors cannot promptly pay the prepetition Employee Obligations and continue to honor their Employee Benefits as described in this Motion, employees may seek employment elsewhere, potentially with the Debtors' competitors.  Absent the requested relief, many employees will suffer undue hardship and in many instances, face serious financial duress.  The negative impact on employee morale, and the potential loss of employees at this critical juncture, would have a material adverse impact on the Debtors' business and ability to maximize value through the sale process.

8.      The Debtors and their non-debtor affiliates employ approximately 417 employees (the "Employees").

9.      The vast majority of the Employees work at facilities in Illinois, Nevada, Colorado, and California.  Approximately 239 of the Employees are hourly (the "Hourly Employees") and approximately 178 are salaried (the "Salaried Employees"), including those on leave.[3]

10.     None of the Employees are unionized.

11.     The Debtors also employ, independent contractors (the "Independent Contractors") for, among other things, finance, accounting, IT, design, and engineering.  As of the Petition Date, the Debtors retained ten Independent Contractors (including six outside the US).  Finally, the Debtors employ temporary workers (the "Temporary Workers") for to perform various functions due to operation needs and resource availability.  As of the Petition Date, the Debtors retained one Temporary Worker.

---

[3]      Unless otherwise specified herein, the employee data contained herein represents figures as of December 31, 2017.

B.     **Prepetition Wages and Related Obligations**

(i)     **Wages, Salaries and Other Compensation**

12.     The Employees perform a broad spectrum of functions for the Debtors, including customer service, product distribution, research and development, sales, marketing and administrative functions.  For the past twelve (12) months, the Debtors' average gross monthly Employee compensation (including wages and salaries) totals approximately $1.6 million ("Employee Wages").

13.     The Debtors retain Automatic Data Processing, Inc. ("ADP") as their third party payroll processor to manage all of the Debtors' payroll functions.  ADP administers the payroll to Employees via direct deposit, ACH transfer or check.  As of the Petition Date, the Debtors maintain the following payroll cycles:

> All of the Employees are paid every other Friday.  Each paycheck covers the hours worked during the previous two-week period ending on Saturday prior to the pay date.

14.     As of the Petition Date, the Debtors estimate that the aggregate amount of accrued Employee Wages (including the Employee share of Payroll Taxes and Deductions, defined and discussed below) earned prior to the Petition Date that remain unpaid (collectively, the "Unpaid Wages") totals approximately $580,000.

15.     By this Motion, the Debtors request authority to pay all Unpaid Wages to their Employees in the ordinary course of business.  The Debtors have made careful inquiries and have taken diligent steps to ensure that no more than one of their Employees are owed more than $12,850 for Unpaid Wages as of the Petition Date.  Accordingly, the Debtors believe that no individual Employee will be paid more than the statutory cap in Unpaid Wages if this Court grants the requested relief, and will not honor Unpaid Wages in excess of $12,850 without further Order of the Court if they subsequently discover otherwise.

16.     As noted above, the Debtors routinely engage Independent Contractors and Temporary Workers.  Upon information and belief, the Debtors believe that no Independent Contractor or Temporary Worker is individually owed, or has outstanding invoices in excess of, $12,850 as of the Petition Date.  By this Motion, the Debtors request authority to pay any and all prepetition amounts owing to Independent Contractors or Temporary Workers, either directly or through the applicable staffing agencies, but no individual Independent Contractor or Temporary Worker will be paid more than $12,850 pursuant to such authority without further order of the Court.

(ii)     **Employee Business Expenses**

17.     Given the size and geographical reach of the Debtors' operations, Employees occasionally travel between company locations for a variety of purposes.  In addition, members of the Debtors' sales and marketing teams often travel to meet with customers and brand partners, or for promotional events. As a result, in the ordinary course of their business, the Debtors reimburse Employees for certain expenses incurred on behalf of the Debtors within the scope of their employment (the "Reimbursable Expenses").  The Reimbursable Expenses typically include expenses for air travel, lodging, ground transportation, meals and other similar charges.

18.     The Debtors maintain a corporate credit account with Bank of Montreal Diners Club for some of their Employees.  As part of this corporate credit account, Employees use Bank of Montreal Diners Club credit cards (the "Corporate Cards") for Reimbursable Expenses and Bank of Montreal Diners Club provides monthly credit card statements to the Employees.  The Debtors pay the credit card invoices through accounts payable after the Employees submit and obtain approval of their expenses.  Some Employees do not have a Corporate Card.  As a result, some Employees incur Reimbursable Expenses on behalf of the Debtors through the use of their

personal cards.  The Debtors reimburse these Employees through accounts payable after the Employees submit and obtain approval of their expenses.  The employees are reimbursed through ADP.  Based on expenses incurred in the preceding 4 months, the Debtors spend, on average, approximately $20,000 per month on Reimbursable Expenses.

19.     Because Employees do not always submit expense reports on a regular basis, the Debtors are unable to determine precisely the aggregate amount of outstanding Reimbursable Expenses at any given time.  Based on historical payments, the Debtors estimate that, as of the Petition Date, no more than $20,000 in Reimbursable Expenses have been incurred and remain unpaid.

20.     The Employees incurred all of the Reimbursable Expenses on the Debtors' behalf and with the understanding that they would be reimbursed.  To avoid harming the individual Employees who have incurred such costs, the Debtors request authority to pay the Reimbursable Expenses, including paying any and all unpaid Reimbursable Expenses that accrued prepetition or relate to the prepetition period, subject to a cap of $20,000 without further order of the Court.

**(iii)     Prepetition Withholdings and Deductions**

21.     ADP processes and forwards the employer share of payroll taxes due in connection with the Debtors' payroll (the "Payroll Taxes") to the appropriate authorities at the same time that it administers the Debtors' payroll checks and direct deposits.  As of the Petition Date, accrued and unpaid prepetition Payroll Taxes total less than approximately $50,000.

22.     During each applicable pay period, ADP, in processing the Debtors' payroll, also deducts other amounts from certain paychecks, which ADP or the Debtors remit to various third party recipients.  These deductions include: (a) garnishments, child support, and similar deductions; and (d) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed below (e.g., an Employee's share of health care benefits,

insurance premiums, or 401(k) contributions, as applicable) (collectively, the "Deductions").  The

Debtors seek authority to continue processing the Deductions in the ordinary course of business,

and to forward the prepetition Deductions to the applicable third-party recipients.

### C.    Employee Benefits and Programs

23.    In the ordinary course of business, the Debtors provide their full-time Employees

directly or indirectly, with a number of employee benefits, including but not limited to: (a) a

range of medical, dental, vision, long and short-term disability and life insurance coverage,

flexible spending accounts and dependent care spending accounts (collectively, the "Health Care

Programs"); (b) vacation, holiday, sick, and other leave benefits (collectively the "PTO

Benefits"); and (c) certain retirement savings plans, including a 401(k) plan for certain

Employees (the "Retirement Benefits" and together with the Health Care Programs, the PTO

Benefits, and the EAPs, the "Employee Benefit Programs").[4]  Employee contributions for the

Employee Benefit Programs, where applicable, are processed through payroll deductions from

the participating Employees.

24.    In fiscal 2017, the Debtors paid approximately $258,000 per month in the

aggregate for the Employee Benefit Programs.

25.    By this Motion, the Debtors seek authority to: (a) continue to provide the

Employee Benefit Programs for their Employees in the ordinary course of business; (b) continue

to honor obligations under the Employee Benefit Programs, including any premiums and

administrative fees; and (c) pay any amounts owed under the Employee Benefit Programs to the

extent that they remain unpaid as of the Petition Date.  The Employee Benefit Programs include:

---

[4]    Where required under applicable non-bankruptcy law, including COBRA, the Debtors provide eligible
Employees with the opportunity to continue participating in the applicable Employee Benefit Programs
following their termination by the Debtors.  The Debtors intend for the relief requested herein to apply to
such former employees consistent with the Debtors' prepetition practices and the requirements of
applicable law.

*(a)    Health Care Programs*

26.    The Debtors offer Health Care Programs to their full-time Employees and their eligible dependents.  The Health Care Programs include coverage for medical (the "Medical Plans"), dental (the "Dental Plans"), vision (the "Vision Plans"), long and short-term disability, and life and accidental death insurance (together, the "Income Protection Plans"), and flexible spending accounts (the "Flexible Spending Accounts").

27.    Medical Plans.  The Debtors offer Medical Plans administered by Health Alliance Medical Plans, NationCare, Anthem Blue Cross and Blue Shield, Prominence, and TPA Benefit Planning Consultants, Inc.  The Medical Plans offer an array of coverage options, which include among other things, preventative care, in-patient and out-patient services, prescription drug coverage, and urgent care.  Approximately 310 Employees participate in the Medical Plans. The estimated monthly payment by the Debtors for the Medical Plans totals $210,000.  The Debtors estimate that as of the Petition Date they owe no accrued prepetition liabilities for the Medical Plans, which are paid in advance.

28.    Dental Plans.  The Debtors offer Dental Plans administered by TPA Guardian. Approximately 298 Employees participate in the Dental Plans.  The estimated monthly payment by the Debtors for the Dental Plans totals $20,000.  The Debtors estimate that as of the Petition Date they owe no accrued prepetition liabilities for the Dental Plans, which are paid in advance.

29.    Vision Plans.  The Debtors Vision Plans through Fidelity Security Life Insurance Company administered by EyeMed.  Approximately 188 Employees participate in the Vision Plans.  The estimated monthly payment by the Debtors for the Vision Plans totals $2,000.  The Debtors estimate that as of the Petition Date they owe no accrued prepetition liabilities for the Vision Plans, which are paid in advance.

30.    <u>Income Protection Plans.</u>  The Debtors maintain certain Income Protection Plans for the Employees, including voluntary short term disability, voluntary long term disability, and management long term disability through The Lincoln National Life Insurance Company, and basic life insurance and voluntary life insurance through Hartford Life and Accident Insurance Company.  All regular Employees who work 30 or more hours per week may participate in the short term disability, long term disability, basic life insurance, and voluntary life insurance programs.  All Employees with a salary grade of at least 14 and "manager" in their title may participate in the management long term disability programs (with the exception of a few employees who were grandfathered into the program).   The Income Protection Plans, in aggregate, cost the Debtors approximately $20,000 per month.  The Debtors estimate that as of the Petition Date they owe no accrued prepetition liabilities for the Income Protection Plan., which is paid in advance.

31.    <u>Flexible Spending Accounts.</u>   The Debtors provide Employees with Flexible Spending Accounts through TPA Benefit Planning Consultants, Inc.  The Flexible Spending Accounts work similar to a savings account: each pay period, funds are deducted from eligible Employees' pay on a pre-tax basis and deposited into the Employees' FSAs.  On average, the Debtors have deducted approximately $6,000 per month from Employees' pay on a pre-tax basis for deposit into Employee's FSAs.  The Debtors do not make contributions to the FSAs, but the Debtors seek authority herein to continue to provide the FSAs and to make the necessary pay-period deductions in the ordinary course of business.

32.    <u>Dependent Care Spending Accounts.</u>  The Debtors also provide Employees with Dependent Care Spending Accounts through Benefit Planning Consultants.  The Dependent Care Spending Accounts work similar to a savings account: each pay period, funds are deducted from

eligible Employees' pay on a pre-tax basis and deposited into the Employees' Dependent Care Spending Accounts. On average, the Debtors have deducted approximately $490 per month from Employees' pay on a pre-tax basis for deposit into the Employees' Dependent Care Spending Accounts.  The Debtors do not make contributions to the Dependent Care Spending Accounts, but the Debtors seek authority herein to continue to provide the Dependent Care Spending Accounts and to make the necessary pay-period deductions in the ordinary course of business.

*(b)    PTO Benefits*

33.    The Debtors provide their Employees with general paid time off (the "Paid Time" or "PTO").  The amount of Paid Time that full-time Employees may accrue varies based on the Employee's length of employment with the Debtors.  Paid Time can be carried over from year to year, but effective January 1, 2018, Employees stop accruing once their annual accrual maximum is reached.  Annual accrual maximums are determined based on length of employment with the Debtors, not to exceed 400 hours.[5]  Only full-time employees can earn Paid Time.  Employees also receive paid holiday time, in an approximate amount of eight holidays per year (the "Holiday Pay").

34.    In addition to the primary leave policies discussed above, the Debtors offer additional leave policies to certain of their Employees (the "Additional Leave Policies" and together with the Paid Time, Sick Pay Accrual and Holiday Pay, the "Leave Pay").  Depending on the situation, the Debtors provide benefits and/or pay for the Employees on leave.  By this Motion, the Debtors request authority to continue to honor their Leave Pay policies in the ordinary course of business and to honor all prepetition obligations related thereto.

---

[5]    Employees of Axial have an annual accrual maximum of 360 hours.

35.     Employees may be required by applicable state law to receive a cash payment on account of certain of their accrued PTO Benefits upon separation from the Company, and the Debtors honor these obligations when they arise.  Other than upon termination, the Debtors do not pay Employees cash in lieu of time off on account of PTO Benefits.  The Debtors estimate that the total amount of accrued PTO Benefits for all Employees as of the Petition Date is approximately $1.6 million.  All terminated employees are paid their accrued but unused PTO balances upon termination.

36.     The Debtors herein request authority to continue to provide the PTO Benefits, consistent with current policies, in the ordinary course of business, and to honor accrued PTO Benefits in the ordinary course, provided that the Debtors only seek to make cash payments upon separation where payment of such PTO obligations is required by applicable state law, and then only to the extent of the amount left available under the $12,850 statutory cap per employee.

(c)     *Retirement Programs*

37.     The Debtors provide a 401(k) retirement savings plan (the "401(k) Plan") for eligible Employees of all the Debtors.

38.     The Debtors maintain the 401(k) Plan through TPA Principal in accordance with section 401 of the Internal Revenue Code.  Eligible Employees may contribute to the 401(k) Plan on a pre- or post-tax basis, up to the IRS annual limit.  The first 3% of these employee contributions are subject to a 100% employer match and the next 2% of employee contributions are subject to a 50% employer match.  The employer match is made to the ESOP and is allocated in the form of Hobbico stock.  The Employee decides how their contributions are invested. There are a number of investment options available.  Approximately 378 active Employees participate in the 401(k) Plan and there are a total of 462 accounts with a balance in the 401(k) Plan.

39.     As of the Petition Date, the Debtors believe that they are up to date on all payments under the 401(k) Plan.  The Debtors request authority, but not direction, to maintain the 401(k) Plan in the ordinary course during the administration of these chapter 11 cases.

**D.      Workers Compensation Programs**

40.     The laws of various states require the Debtors to maintain workers compensation insurance (the "Workers Compensation Programs") to provide their Employees with coverage for injury claims arising from or related to their employment with the Debtors.  The Debtors request authority to continue their Workers Compensation Programs in the ordinary course and to honor any payments owed related thereto, including policy premiums, regardless of when such obligations arose.

41.     The Debtors maintain a worker's compensation benefits program through Bitco Insurance Company (for the corporate worker's compensation policy) and Pinnacol Assurance (for the Estes worker's compensation policy) (together, the "Worker's Compensation Policies"), which were renewed on October 1, 2017.  The annual premium on the Worker's Compensation Policies totals $323,683.  As of the Petition Date, $4,932 of outstanding premium payment to Pinnacol are due.  The next premium payment of $27,650 to Bitco is due February 2018

42.     The corporate worker's compensation policy has a $1,000 medical deductible for Illinois only.  The Estes worker's compensation policy has a $500 deductible.  The Debtors may also be liable for deductibles or other claim amounts under previous workers' compensation policies (collectively, the "Workers' Compensation Claims").

43.     As of the Petition Date, the Debtors estimate that there are approximately $1,405,451 in outstanding claims asserted under the Workers' Compensation Programs, in the aggregate.  The Debtors believe all such claims are covered under the Workers Compensation Programs and that their exposure is not more than $11,000.  The Debtors seek authorization to

settle and/or pay prepetition amounts in respect of the Workers Compensation Programs in an amount not to exceed $11,000 in the aggregate, and to continue to pay postpetition costs of the Workers Compensation Programs in the ordinary course of business during the pendency of these Chapter 11 Cases.

44.     The Debtors seek authority, but not direction, to pay the prepetition insurance premium in the ordinary course.

### E.     Employee Administrator Obligations

45.     The Debtors contract with ADP to process their payroll and reimbursements and coordinate the payment of Withholding Obligations.   The ongoing services of ADP are imperative to the smooth functioning of the Debtors' payroll system.  The Debtors pay ADP on a per check basis.  The Debtor pay ADP, on average, $4,824 per month for its services.

46.     The Debtors also use time and attendance systems provided by BanKoe CeleriTime ("CeleriTime") to assist in recording and processing time entries of the Debtors' Employees (the systems and services of ADP and CeleriTime collectively referred to as the "Payroll  Administrator Obligations").

47.     The Debtors seek authority, but not direction, to pay the Payroll Administrator Obligations in the ordinary course.

### F.     Non-Insider Bonus and Other Incentive Programs

48.     The Debtors maintain a number of bonus programs for non-insider Employees across all lines of business.   These bonus plans include the Debtors' SPIFF program, PIP program, short term equity incentive plan, long term equity incentive plan, and facility consolidation bonus program (collectively, the "Bonus Programs").

49.     SPIFF and PIP Bonuses.  SPIFF bonuses are almost always ad hoc and used to encourage sales persons to push particulate products.  PIP bonuses are used to encourage sales

persons to upsell or cross-sell customers.  Participation in the short term and long term equity
incentives plans is limited to certain employees of the Company.  For all of the Employees who
receive them, the bonuses are an important aspect of their overall compensation.  Maintaining the
historical prepetition practices with regard to the bonuses is essential to ensuring that the Debtors
can retain their Employees and continue to operate their businesses and maximize value through
the sale process.  The Debtors estimate that the total amount of accrued, unpaid SPIFF and PIP
bonuses for all Employees as of the Petition Date is approximately $5,000.

50.    <u>Facility Consolidation Bonus</u>.  The Debtors also implemented a prepetition bonus
program in connection with their cost-saving efforts to close a central warehouse and distribution
center in Reno, Nevada (the "<u>Reno Facility</u>"), and consolidate it with an existing facility located
in Champaign, Illinois.  Once fully implemented, this facility consolidation plan will reduce the
Debtors' distribution expenses by more than $2.3 million and generate $1.2 million to
$1.7 million in annual savings.

51.    The Debtors operate the Reno Facility with 32 hourly employees and two non-
insider managers (collectively, the "<u>Eligible Employees</u>") whose responsibilities include, among
other things, picking, packing, material handling equipment operators, team leader, traffic
management and warehouse manager.  The average annual income of the Eligible Employees is
$32,500, and the average tenure of the Eligible Employees is 9.9 years.

52.    To earn the facility consolidation bonus, Eligible Employees must:  (1) sign a
release, waiver, and covenant not to sue the Company; (2) not resign before the end of the
Performance Period proposed by the Company; (3) not be terminated for misconduct or poor
performance; and (4) satisfactorily perform the tasks and responsibilities assigned to the Eligible
Employee until the end of the performance period proposed by the Company, which is expected

to be between 2 and 8 weeks, depending on the Eligible Employee and tasks to be performed. The estimated cost of the facility consolidation bonus program, assuming all Eligible Employees remain employed through their designated performance periods, is $66,500 which represents an average of $1,236 per Eligible hourly Employee and $13,466 for the managers.  Approximately $ 40,000 of the facility consolidation bonus payments will be due and owing within 30 days after the Petition Date.

53.     The Debtors do not believe that there are any cash Bonus Program payments owed to senior management or insiders.  The Debtors seek authority, but not direction, to honor their obligations under the applicable Bonus Programs and to maintain all Bonus Programs in the ordinary course of the Debtors' business during these chapter 11 cases, other than any bonus obligations to senior management or "insiders."[6]

## RELIEF REQUESTED

54.     By this Motion, the Debtors request the Court enter the interim and final orders under sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of the Bankruptcy Code to: (a) honor their prepetition Employee Obligations; (b) continue their Employee Benefit Plans and their Workers Compensation Programs on a postpetition basis, including honoring prepetition amounts related thereto; and (c) pay all fees and costs related thereto, including to ADP.

## BASIS FOR RELIEF REQUESTED

55.     The Debtors request interim and final authority, as applicable, to pay the aforementioned obligations to their Employees and all related expenses in the ordinary course of their business.  Any delay in paying the Debtors' Employees and Independent Contractors could severely disrupt the Debtors' relationship with their Employees and dedicated non-employee

---

[6]     By this Motion, the Debtors are not requesting authority to make any postpetition bonus payments to "insiders."  The Debtors reserve their right to request authority from this Court to make such payments in the event that such payments are justified by the facts and circumstances of these chapter 11 cases.

personnel and irreparably harm morale at the very time that Employee dedication, confidence, support and cooperation is most critical.  At this stage, the Debtors cannot risk the substantial disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure, or worse, inability to pay or honor, the Wages, Employee Benefits, and related obligations described herein.

56.    In addition, absent payment of the Wages and Employee Benefits, Employees and Independent Contractors would suffer hardship and, in many instances, financial duress.  The Debtors' workforce depends on its employment income to meet personal financial obligations.

**A.    Significant Portion of the Employee Obligations is Entitled to Priority Treatment**

57.    Section 507(a)(4)(A) of the Bankruptcy Code grants priority status to up to $12,850 for employee claims for "wages, salaries, or commission, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date.  11 U.S.C. § 507(a)(4)(A).  Similarly, section 507(a)(5) of the Bankruptcy Code grants priority to contributions to employee benefit plans, up to an aggregate amount of $12,850 multiplied by the number of employees covered, less any amounts paid to such employees under section 507(a)(4) of the Bankruptcy Code.

58.    Indeed, "[w]age priority has been a feature of the bankruptcy law since 1898. In re Garden Ridge Corp., No. 04-10324 (KJC), 2006 WL 521914, at *2 (Bankr. D. Del. Mar. 2, 2006) (citing 4 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 507.05[1] (15th ed. 2005)).  Its purpose is to "alleviate hardship on workers . . . who may have no other source of income and "to encourage employees to stand by an employer in financial difficulty. " Id. (citing Collier on Bankruptcy ¶ 507,05[1].    This priority extends to certain other benefits that are considered akin to compensation, such as vacation, severance and sick leave pay." Id.

59.     The Debtors believe that a substantial portion of the Employee Obligations relating to the period prior to the Petition Date constitutes priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code.  Amounts that are paid on account of priority claims for the majority of the Employee Obligations would not otherwise be available for distribution to unsecured creditors.  Therefore, the Debtors' unsecured creditors will not be prejudiced by permitting priority obligations to be satisfied in the ordinary course of business during these chapter 11 cases rather than at the conclusion of the cases.  Indeed, the Debtors submit that payment of Employee Obligations at this time enhances value for the benefit of the Debtors and all interested parties by retaining the Debtors' Employees.

60.     Notwithstanding anything to the contrary contained herein, any payment made or to be made under the Order, any authorization contained in the Order, or any claim for which payment is authorized hereunder, shall be subject to (a) the requirements imposed on the Debtors under any orders of this Court approving any debtor-in-possession financing for, or any use of cash collateral by, the Debtors (such order, the "DIP Order") and any budget in connection therewith and (b) any orders of this Court pertaining to the Debtors' maintenance of any cash or treasury management systems and procedures.

**B.     The Debtors Should be Authorized to Pay the Employee Obligations Under Sections 1107(a) and 1108 of the Bankruptcy Code**

61.     The Debtors, operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  In re CoServ, LLC, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). "Implicit in the duties" of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." Id.

62.    Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim."  Id.  The CoServ court specifically noted that preplan satisfaction of prepetition claims is a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate."  Id.  The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim is a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim.  Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

Id. at 498.

63.    Payment of the Employee Obligations as set forth herein meets each element of the CoServ court's standard.  The Debtors' operations are complex, and rely on the skill and expertise of their Employees.  Many Employees possess unique knowledge regarding specific aspects of the Debtors' operations, which would be virtually irreplaceable should such Employees be lost through a failure to pay their obligations.  In addition, any failure by the Debtors to pay the Employee Obligations as set forth herein would negatively impact employee morale at a critical time for the Debtors and their businesses.  The Employees are also critical to the Debtors' ability to maintain their operations consistent with past practices, which would be impossible without the Employees' continued efforts.  The damage to the value of the Debtors' business and, hence, the costs to creditors as a whole, would be immediate and irreparable if the Employee Obligations were not met.  In short, the potential harm and economic disadvantage

that would stem from the failure to pay the Employee Obligations as set forth herein greatly outweighs the amount of any prepetition claims that the Debtors are seeking authorization to pay.

64.      The Debtors have determined in their business judgment that to avoid significant disruption to their business operations there exists no practical or legal alternative to the payment of the Employee Obligations as set forth herein.  Therefore, the Debtors can meet their fiduciary duties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code only by payment of the Employee Obligations as set forth herein.

**C.      Payment of the Employee Obligations is Warranted Pursuant to Sections 105(a) and 363 of the Bankruptcy Code**

65.      Sections 105(a) and 363(b) of the Bankruptcy Code authorize the requested relief. Section 105(a) of the Bankruptcy Code allows the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code.]" 11 U.S.C. § 105(a).  It permits a bankruptcy court to take whatever action "is appropriate or necessary in aid of the exercise of its jurisdiction." 2 COLLIER ON BANKRUPTCY ¶ 105.01, at 105-6 (15th ed. rev. 2008).  Similarly, section 363(b)(1) of the Bankruptcy Code authorizes a debtor to use property of the estate other than in the ordinary course of business after notice and a hearing.  11 U.S.C. § 363(b)(1).

66.      Courts have routinely authorized debtors to pay prepetition wage and employee claims pursuant to sections 105 and 363 of the Bankruptcy Code where such payment was necessary to ensure the debtor's continued, uninterrupted operation.  See, e.g., Mich. Bureau  of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 288 (S.D.N.Y. 1987) (affirming a bankruptcy court decision to authorize the debtor to pay prepetition wages, salaries and various employee benefits); In re Ionosphere Clubs, Inc., 98 B.R. 174, 177

(Bankr. S.D.N.Y. 1989) (authorizing debtor to pay employee prepetition wages, salaries and benefits).

67.     The well-settled "necessity of payment" doctrine also supports the requested relief.  This rule authorizes postpetition payment of prepetition obligations were necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.  <u>See</u>, <u>e.g.</u>, <u>Miltenberger v. Logansport, C. & S.W. Ry. Co.</u>, 106 U.S. 286, 311 (1882) (articulating legal theory later termed the "doctrine of necessity' or the "'necessity of payment' doctrine" and holding that payment of pre-receivership claim prior to reorganization was permitted to prevent stoppage of crucial business relations); <u>In re Boston & Maine Corp.</u>, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtors' continued operation); "doctrine of necessity' or the "'necessity of payment' doctrine" (granting approval to pay prepetition claims of certain trade vendors which were critical to the debtors' reorganization); <u>In re Columbia Gas Sys., Inc.</u>, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (noting that the debtors may pay prepetition claims that are essential to continued operation of business).

68.     Debtors frequently invoke the necessity of payment doctrine early in a chapter 11 case when preservation of the estate proves most critical and often extremely difficult.  For that reason, bankruptcy courts routinely invoke their equitable powers to authorize a debtor to pay certain critical prepetition claims under section 105(a) if "authorizing the payment of the prepetition debt creates 'the greatest likelihood . . . payment of creditors in full and at least proportionately,'" <u>In re Structurelite Plastics Corp.</u>, 86 B.R. 922,932 (Bankr. S.D. Ohio 1998); <u>see also</u>, <u>In re Eagle-Picher Indus., Inc.</u>, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (stating that "to justify payment of a prepetition unsecured creditor, a debtor must show that the payment

is necessary to avert a serious threat to the [c]hapter 11 process); In re Ionosphere Clubs, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) ("necessity of payment" rule "recognizes the existence of the judicial power to authorize a debtor in a chapter 11 case to pay prepetition claims where such payment is essential to the continued operation of the debtor").

69.     Courts have recognized that the "necessity of payment rule" squarely applies where a debtor's employees must be paid on time to assure their continued service and loyalty during a chapter 11 case.  See, e.g., Ionosphere Clubs, 98 B.R. at 174 (permitting Eastern Air Lines to pay its employees' prepetition wages, salaries, medical benefits and business expense claims under the "necessity of payment" doctrine).  This Court, in other cases, has routinely approved the payment of prepetition claims of employees and independent contractors for wages, salaries, expenses and benefits, on the grounds that the payment of such claims was necessary to a successful chapter 11 outcome.  See, e.g., In re The Wet Seal, Inc., Case No. 1510081 (CSS) (Bankr. D. Del. Jan. 20, 2015) (Docket No. 96); In re Deb Stores Holding LLC, et al., No. 14-12676 (MFW) (Bankr. D. Del. Dec. 5, 2014) (Docket No. 50); In re Unitek Global  Services, Inc., et al., No. 14-12471 (PJW) (Bankr. D. Del. Nov. 4, 2014) (Docket No. 64); In re  Smurfit-Stone Container Corp., Case No. 09-10235 (BLS) (Bankr. D. Del. Jan. 26, 2009); In re  Nortel Networks, Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Jan. 14, 2009).

**D.     Payment of Certain Withholding Obligations is Appropriate Under Section 541 of the Bankruptcy Code**

70.     The Debtors submit that further cause exists to authorize the payment to the appropriate entities of the Payroll Taxes and Deductions (together, the "Third Party Funds"). The Third Party Funds principally comprise Employee earnings that governments, Employees, and judicial authorities have designated for deduction from pay.  The Debtors do not believe that such amounts are property of the Debtors' estates under section 541 of the Bankruptcy Code,

and, therefore, such funds are not available for general distribution to the Debtors' creditors.  See 11 U.S.C. § 541(b)(7) (amounts withheld from employee paychecks by employer for contribution to employee benefit plan are not property of the estate).

71.    In addition to causing undue hardship to certain Employees, the failure to pay the Third Party Funds may result in the Debtors being inundated with inquiries from taxing authorities and garnishors regarding their failure to submit, among other things, taxes and child support and alimony payments, which are not the Debtors' property, but have been withheld from Employee paychecks.  Moreover, if the Debtors cannot remit these amounts, the affected Employees may face legal action and/or imprisonment due to the Debtors' failure to submit these payments.

72.    Further, many federal, state and local taxing authorities impose personal liability on the officers and directors of entities responsible for collecting taxes from employees to the extent any such taxes are collected but not remitted.  Accordingly, if these amounts remain unpaid, there is a risk that the Debtors' officers and directors may be subject to lawsuits on account of any such nonpayment during the pendency of these chapter 11 cases.  Such lawsuits obviously would constitute a significant distraction for officers and directors at a time when they should be focused on the Debtors' sale efforts.  To avoid the serious disruption of the Debtors' reorganization efforts that could result from the nonpayment of any withholding taxes, the Debtors seek authority to remit all Withholdings collected on behalf of the Employees, including prepetition Withholdings, to the applicable taxing authorities to the extent that they have not already been remitted.

E.     **The Court Should Authorize Applicable Banks and Other Processors to Honor Checks and Electronic Fund Transfers in Accordance with the Motion**

73.     In connection with the foregoing, the Debtors respectfully request that the Court (a) authorize all applicable Banks to receive, process, honor, and pay all checks and transfers issued by the Debtors in accordance with this Motion, without regard to whether any checks or transfers were issued before or after the Petition Date; (b) provide that all Banks may rely on the representations of the Debtors with respect to whether any check or transfer issued or made by the Debtors before the Petition Date should be honored pursuant to this Motion (such Banks having no liability to any party for relying on such representations by the Debtors provided for herein); and (c) authorize the Debtors to issue replacement checks or transfers to the extent any checks or transfers that are issued and authorized to be paid in accordance with this Motion are dishonored or rejected by the Banks.

## SATISFACTION OF BANKRUPTCY RULE 6003

74.     Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within twenty-one days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm." As set forth throughout this Motion, the Debtors' failure to honor their Employee Obligations and continued their Employee Benefit Plans as provided herein would substantially diminish or impair the Debtors' efforts in these chapter 11 cases to preserve and maximize the value of their estates.

75.     For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

76.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As set forth throughout this Motion, failure to honor their Employee Obligations and continue their Employee Benefit Plans would be detrimental to the Debtors, their creditors and estates, and would impair the Debtors' ability to optimize their business performance at this critical time as they begin the chapter 11 process.

77.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Order.

## RESERVATION OF RIGHTS

78.     Nothing in the Proposed Order or this Motion (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates in the chapter 11 cases, (ii) shall impair, prejudice, waive or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority or amount of any claim against the Debtors and their estates, or (iii) shall be construed as a promise to pay a claim.

## NOTICE

79.     Notice of this Motion has been provided to:  (i) the Office of the United States Trustee; (ii) the Internal Revenue Service; (iii) the Securities and Exchange Commission; (iv) the Delaware Secretary of State; (v) the Delaware Secretary of the Treasury; (vi) the Debtors' thirty (30) largest unsecured creditors; (vii) counsel to Wells Fargo Bank, N.A., as administrative agent to the prepetition and postpetition lenders; (viii) counsel to Cyprium Investors IV AIV I

LP; (ix) counsel to GreatBanc Trust Company, trustee of the Hobbico, Inc. Employee Stock Ownership Plan; and (x) all parties requesting notice pursuant to Bankruptcy Rule 2002. Notice of this Motion and any order entered hereon will be served in accordance with Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **NO PRIOR REQUEST**

80.     No prior motion for the relief requested herein has been made to this or any other court.

## <u>CONCLUSION</u>

WHEREFORE, the Debtors request entry of the Proposed Interim and Final Orders,

granting the relief requested herein and such other and further relief as is just and proper.

Dated:   January 10, 2018                    MORRIS, NICHOLS, ARSHT & TUNNELL LLP
         Wilmington, Delaware


                                             */s/ Curtis Miller*
                                             Robert J. Dehney (No. 3578)
                                             Curtis Miller (No. 4583)
                                             Matthew O. Talmo (No. 6333)
                                             1201 N. Market Street, 16th Floor
                                             P.O. Box 1347
                                             Wilmington, Delaware  19899-1347
                                             Telephone: (302) 658-9200
                                             Facsimile: (302) 658-3989
                                             rdehney@mnat.com
                                             cmiller@mnat.com
                                             mtalmo@mnat.com

                                             - and –

                                             NEAL, GERBER & EISENBERG LLP
                                             Mark A. Berkoff (pro hac vice pending)
                                             Nicholas M. Miller (pro hac vice pending)
                                             Thomas C. Wolford (pro hac vice pending)
                                             Two North LaSalle Street, Suite 1700
                                             Chicago, Illinois  60602
                                             Telephone:  (312) 269-8000
                                             Facsimile:  (312) 269-1747
                                             mberkoff@nge.com
                                             nmiller@nge.com
                                             twolford@nge.com

                                             *Proposed Co-Counsel to the Debtors and
                                             Debtors in Possession*