## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HOBBICO, INC., *et al.*,[1] | Case No. 18-10055 (KG) |
| Debtors. | Jointly Administered |
| | **Objection Deadline**: March 7, 2018 at 4:00 p.m. (ET) (Requested) |
| | **Hearing Date**: March 9, 2018 at 10:00 a.m. (ET) (Requested) |

**DEBTORS' MOTION FOR (I) AN ORDER (A) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF ALL, OR SUBSTANTIALLY ALL, OF THE DEBTORS' ASSETS; (B) APPROVING POTENTIAL BID PROTECTIONS; (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) APPROVING FORM AND MANNER OF THE SALE, CURE AND OTHER NOTICES; AND (E) SCHEDULING AN AUCTION AND A HEARING TO CONSIDER THE APPROVAL OF THE SALE; (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF CLAIMS, LIENS AND ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) CERTAIN RELATED RELIEF**

Hobbico, Inc. ("Hobbico") and its above-captioned debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors") hereby submit this motion (the "Motion") pursuant to sections 105, 363, 364, 365 and 503 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"), and rules 2002, 6006, 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (each a "Bankruptcy Rule," and collectively, the "Bankruptcy Rules"), for (I) an order (the "Bidding Procedures Order") substantially in the form attached hereto as **Exhibit 1** (A) approving the Debtors' proposed auction (the "Auction")

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Hobbico, Inc. (9545); Arrma Durango Limited; Axial R/C Inc. (0233); Estes-Cox Corp. (2196); Great Planes Model Manufacturing, Inc. (5259); Revell Inc. (8545); Tower Hobbies, Inc. (5185); and United Model, Inc. (5302).  The Debtors' headquarters are located at 2904 Research Road, Champaign, Illinois 61822.

and bidding procedures (as the same may be amended, supplemented, or otherwise modified from time to time, the "Bidding Procedures") in substantially the form attached as an exhibit to the Bidding Procedures Order to govern the sale (the "Sale") of all or substantially all of the Debtors' assets (the "Assets"); (B) approving certain bid protections in connection therewith, including potential overbid protections and a break-up fee, provided certain requirements are met, all as described in greater detail below; (C) establishing procedures for the assumption and assignment of executory contracts and unexpired leases; (D) approving the form and manner of notice of the Sale, the notice of assumption and assignment of executory contracts and unexpired leases, including the form and manner of notice of proposed cure amounts (the "Cure Notice") and the other notices set forth herein; and (E) scheduling the Auction and a hearing before this court (the "Sale Hearing") to consider approval of the Sale; and (II) an order in substantially the form attached as **Exhibit 2** hereto (the "Sale Order") authorizing (A) the Sale of the acquired Assets to the bidders with the highest or otherwise best bid (the "Successful Bidders") pursuant to potential Stalking Horse Agreements, and/or Modified Asset Purchase Agreements (as defined below), in each case free and clear of all claims, liens and encumbrances as provided therein upon the consummation of such Sale and payment in full of all consideration under the Asset Purchase Agreements; and (B) the Debtors' assumption and assignment of the applicable executory contracts and/or unexpired leases to the Successful Bidder; and (III) certain related relief.[2]  In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      Headquartered in Champaign, Illinois, with global operations, the Debtors and their non-Debtor affiliates (collectively, the "Company") comprise one of the world's largest

---

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures, as applicable.

designers, manufacturers and distributors of radio control ("R/C") and general hobby products, including radio control vehicles, drones, model rockets, model kits, and general hobby products. The Company markets and sells thousands of these products across more than 250 brands, many of which are proprietary, including industry-leaders Axial, ARRMA, Revell, Estes, Great Planes Model Manufacturing, DuraTrax, and Top Flite.

2.      In order to support the financial requirements of several acquisitions over the years, the Debtors incurred and began carrying a heavy debt load.  Beginning in 2016, the Debtors' businesses began to struggle due to a number of factors which included a lack of investment in product innovation and its core ecommerce platform coupled with a systemic shift in the drone market.  In the second half of 2016, these challenges became more acute with the disruption of the Debtors' supply chain in Asia due to the financial distress of multiple key suppliers.  These factors all combined to negatively impact the Debtors' sales and profitability and, in conjunction with elevated debt service obligations, resulted in defaults under their debt obligations and a sharp decrease in liquidity and financial flexibility.

3.      In March 2016, the Debtors' lenders initially declared a default under the Debtors' secured debt facilities.  While searching for additional sources of financing to supply working capital liquidity, the Debtors negotiated a series of amendments to, and forbearance periods with respect to, their senior and subordinated secured debt obligations.  The Debtors also engaged in a thorough review of strategic alternatives with the advice and guidance of experienced financial and legal advisors including, but not limited to, the Debtors' investment banker, Lincoln Partners Advisors ("Lincoln"), who were retained in April 2017.  Based upon that review of available options and taking into consideration the liquidity constraints of the Debtors, which worsened in the Fall of 2017, the Debtors concluded that pursuing a going-

concern sale of substantially all the assets of the Company was the optimal course by which to maximize the value of the Company's businesses.

4.     Like all retail and consumer products businesses, the Debtors' vendor, customer and employee relationships are critical to the value of the enterprise.  To preserve those relationships, Lincoln initiated a sale process (the "Sale Process") in late November 2017 to identify a stalking horse that provides a clear path through and out of chapter 11 (the "Chapter 11 Case" or "Bankruptcy Proceedings").  The Sale Process has provided the Debtors with ample time to run a robust marketing process for the Debtors' assets and maximize value for stakeholders, while ensuring the business emerges from the restructuring proceedings in a reasonable time frame.

5.     Specifically, pursuant to the Sale Process and the sale process for substantially all of the assets of Estes-Cox Corp. (the "Estes Sale Process") conducted by Lincoln in the fall of 2017, Lincoln has contacted a total of 432 potentially interested parties of which 184 entered into confidentiality agreements with the Debtors and received a confidential information memorandum.  Subsequent to distributing the confidential information memorandum, Lincoln received a meaningful number of indications of interests for substantially all the assets of the Debtors or material business units of the Debtors and have conducted numerous telephonic and in person management presentations.  Subsequent to management presentations, Lincoln has received a number of refined proposals and continues to work with these parties and others to conduct due diligence, develop potential stalking horse proposals and otherwise facilitate interest in the auction in order to ensure that the highest and best bids are achieved for the Debtors' assets.

6.      Based on discussions with various of the proposed purchasers described below, the Debtors believe that, prior to the proposed Auction described below, they may be able to enter into one or more agreements (the "<u>Stalking Horse Agreements</u>") for the going-concern sale (the "<u>Stalking Horse Sale</u>") of the Assets with one or more potential purchasers (each, a "<u>Potential Stalking Horse Purchaser</u>").  The Debtors would not enter into such agreements, or grant the bid protections that the Debtors expect the Potential Stalking Horse Purchasers to request, unless such purchasers meet certain well-defined minimum requirements, as described in further detail below.  Any such Stalking Horse Agreements would have the effect of setting a floor for the sale of the Debtors' assets, thus maximizing the return for the Debtors' stakeholders.

7.      In sum, the Sale process described herein provides for, among other things, (1) repayment of certain claims held by the Debtors' secured creditors, (2) the assumption by the purchaser(s) of certain pre- and postpetition liabilities of the Debtors, and (3) the continued operation of the Debtors' business as a going concern under new ownership post-closing.  Given the Debtors' challenged operating performance, among other factors, leading up to the commencement of the Bankruptcy Proceedings, this proposed sale process presents the best option for maximizing the value of the Debtors' estates and stakeholder recoveries.

**<u>JURISDICTION AND VENUE</u>**

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "<u>Amended Standing Order</u>").  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and pursuant to Local 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.      Venue of this proceeding and this Motion is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The statutory predicates for the relief sought herein are in Bankruptcy Code sections 105, 363, 364, 365 and 503 and Bankruptcy Rules 2002, 6004, 6006, 9006, 9007 and 9014.

## BACKGROUND

### A.      General

11.     On January 10, 2018 (the "Petition Date"), the Debtors other than Arrma Durango Limited each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On the Petition Date, the Debtors other than Arrma Durango Limited also jointly filed motions or applications seeking certain typical "first day" relief.  Debtor Arrma Durango Limited filed its voluntary petition and similar "first day" relief on January 26, 2018.

12.     The Debtors are continuing in possession of their respective properties and are continuing to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13.     No request has been made for the appointment of a trustee or examiner.  On January 22, 2018, the United States Trustee appointed an official committee of unsecured creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code..

14.     On February 14, 2018, the Court entered that certain Order Authorizing Debtors to: (A) Use Cash Collateral on a Final Basis; (B) Incur Postpetition Debt on a Final Basis; and (C) Grant Adequate Protection and Provide Security and Other Relief to Wells Fargo Bank, National Association, As Agent, and the Other Secured Parties [Docket No. 163] (the "DIP Financing Order"), pursuant to which the Court, among other things, authorized the Debtors to

enter into that certain Debtor-in-Possession Credit Agreement dated as of January 12, 2018 (the "DIP Credit Agreement").

**B.     The Potential Stalking Horse Agreements and Proposed Sale**

15.    As noted above, the Debtors believe that they may be able to enter into one or more Stalking Horse Agreements with one or more Potential Stalking Horse Purchasers before the Auction, described in more detail below.  Because the Stalking Horse Agreements would have the effect of setting a floor and maximizing the potential proceeds of the Sale, the Debtors believe that granting certain bid protections (collectively, the "Bid Protections") to such potential purchasers would be warranted.  To ensure that any Bid Protections have the intended effect of maximizing recoveries from the Sale, the following terms represent the minimum required terms of any Stalking Horse Agreements that the Debtors may, in their discretion, enter into, subject to the Bidding Procedures.

(a)    **Qualified Bid:**  The Stalking Horse Agreement(s) must qualify as a "Qualified Bid," as that term is defined in the Bidding Procedures.

(b)    **Non-Insider**:  The Stalking Horse Bidder may not be an insider of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code.

(c)    **Limited Closing Conditions**:    In addition to customary closing conditions, including Court approval and certain regulatory matters, the obligation of the Potential Stalking Horse Purchaser(s) to consummate the transactions contemplated by the Stalking Horse Agreement(s) will be subject to the satisfaction of only the following conditions:  (i) no breach of representations and warranties; (ii) no breach of covenants; (iii) sellers shall have used commercially reasonable efforts to cause the purchaser to receive duly executed assignments, patent assignments, general trademark assignments, bills of sale or certificates of title, dated as of the Closing Date, in form and substance reasonably satisfactory to Purchaser; (iv) assumption and assignment of the designated contracts having been authorized by the Court; and (v) all designated third party consents or waivers thereof having been obtained.

(d)    **Limited Termination Rights**:  The Stalking Horse Agreement(s) must provide for the termination thereof by the purchaser only under the following circumstances:  (a) the consummation of the Sale has not

occurred (other than through failure of seller to comply fully with its obligations under the agreement) on or before [●]; (b) any Seller files a motion to sell all or part of the Acquired Assets to a third party other than Purchaser and shall thereafter consummate such sale; (c) any Seller's Chapter 11 Case is converted to one under Chapter 7 of the Bankruptcy Code; or (d) a Seller commits a material, unwaived, and uncured breach of any provision of the Stalking Horse Agreement or any related transition services agreement.

(e)   **Limited Bid Protections.**  The Potential Stalking Horse Purchaser would be entitled to a combined break-up fee and expense reimbursement of no more than 4% of the purchase price.  Neither the break-up fee or the expense reimbursement would be payable if the transaction is not consummated due to a default by the Buyer(s).

## C.    Bidding Procedures

16.    The Debtors' ability to successfully emerge from the Bankruptcy Proceedings depends on the coordinated going-concern sale of the enterprise as contemplated herein.

17.    Towards that end, and to ensure that the Debtors receive the maximum value for the Assets, the Debtors will conduct an Auction, and any Stalking Horse Agreements will be subject to higher or better offers.  The Bidding Procedures will govern the conduct of the Auction for the Chapter 11 Cases, and is subject to approval by this Court.  As discussed further below, the Debtors propose conducting a hearing with this Court to seek approval of the Auction and the Bidding Procedures as well as, ultimately, the Sale itself.

18.    While all interested bidders should read the Bidding Procedures in their entirety, the following is a summary of their salient features:[3]

(a)   **Provisions Governing Qualification of Bids and Bidders:**  To be eligible to participate in the Auction, each Bid, and each Bidder must, respectively, be reasonably determined by the Sellers and the Agents, in

---

[3]    The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern.  Unless otherwise defined in the summary set forth in the accompanying text or elsewhere in this Motion, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

consultation with the Consultation Parties, to satisfy each of the following conditions, among others:

- *Good Faith Deposit:*  Each Bid must be accompanied by a cash deposit of at least five percent (5%) of the purchase price (the "<u>Good Faith Deposit</u>").

- *Higher and Better Terms:*  Each Bid must be on terms that the Sellers determine are higher and better for the Sellers on a cash (or cash equivalent) basis than the terms of any Stalking Horse Agreements. In the absence of a Stalking Horse Agreement for the applicable Assets, the Debtors, with the consent of the Agents, and in consultation with the Consultation Parties, shall determine which bid(s) are the highest and best bids for the Acquired Assets.

- *Executed Agreement:*  Each Bid must be based on the form asset purchase agreement attached hereto as **Exhibit 3** (the "<u>Form APA</u>") or, if applicable, any Stalking Horse Agreement for the relevant Acquired Assets, and such Bid must include, among other things, binding, executed, irrevocable transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (a "<u>Modified Asset Purchase Agreement</u>").

- *Scope of Bid / Lots:*  A Bid must be for all or substantially all of the Acquired Assets or for one or more subsets of assets defined in the Bidding Procedures (each, a "<u>Lot</u>").

- *Minimum Bid:*  A Bid must have a purchase price that includes a combination of cash and the assumption of postpetition liabilities and cure costs associated with the relevant Lot, and subject to any post-closing adjustments typical of similar transactions, that, in the Sellers' reasonable business judgment (after consultation with the Consultation Parties), has a value equal to or greater than the following, subject to the terms of these Bidding Procedures:

    (a)    For substantially all of the Acquired Assets:  $38 million;

    (b)    For the U.S. Assets Lot:  $32 million;

    (c)    For the Hobby Business Lot:  $22 million;

    (d)    For the Global Mass Market Lot:  $16 million;

    (e)    For the Global Revell Lot:  $10 million;

    (f)    For the Revell Germany Lot:  $8 million; and

(g)    For the Estes-Cox Lot:  $6 million.

- *Designation of Assigned Contracts and Leases; Cure Costs:*  A Bid must specifically (a) identify the executory contracts and unexpired leases with respect to which the Bidder seeks assignment from the Sellers and (b) provide for the Bidder's payment in full in cash of all of the cure costs related to any such executory contracts and unexpired leases.

- *Designation of Assumed Liabilities:*  A Bid must identify all liabilities which the Bidder proposes to assume.

- *Corporate Authority:*  A Bid must include written evidence demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction.

- *Disclosure of Identity of Bidder:*  A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets.

- *Proof of Financial Ability to Perform:*  A Bid must include detailed, written evidence that demonstrates that the Bidder has and will continue to have the necessary financial ability to consummate the Alternate Transaction and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction.

- *Regulatory and Third Party Approvals:*  A Bid must set forth (a) each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction, (b) the time period within which the Bidder expects to receive such regulatory and third-party approvals, (c) those actions the Bidder will take to ensure receipt of such approvals as promptly as possible, and (d) a detailed description of any steps the Bidder will take to address any delay in obtaining such approvals (e.g. transition services agreement).

- *Contact Information and Affiliates:*  A Bid must provide the identity and contact information for the Bidder and full disclosure of any affiliates of the Bidder.

- *Contingencies:*  Each Bid (a) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Sellers than those set forth in any applicable Stalking Horse Agreement and (b) may not be conditioned on obtaining financing, any internal approvals or

credit committee approvals, or on the outcome or review of due diligence.

- *Irrevocable:*  Each Bid must be irrevocable until at least ten (10) business days after the conclusion of the Sale Hearing.

- *Compliance with Diligence Requests:*  The Bidder submitting the Bid must have complied with reasonable requests for additional information and due diligence access from the Sellers.

- *As-Is, Where-Is:*  Each Bid must include a written acknowledgement and representation that the sale will be on an "as is," "where is" basis and that the Bidder had an opportunity to conduct and is relying solely on its own diligence in making its Bid.

- *Confidentiality Agreement:*  To the extent not already executed, the Bid must include an executed Confidentiality Agreement.

- *Termination Fees:*  The Bid (other than a Bid pursuant to (a) a Stalking Horse Agreement or (b) the written agreement of Sellers and Agents after consultation with the Consultation Parties) must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement.

- *Adherence to Bidding Procedures:*  Each Bidder agrees to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

- *Closing Date:*  The Bid must include a commitment to consummate the transactions contemplated by the Modified Asset Purchase Agreement by no later than April 5, 2018 (the "Outside Date").  In no event shall the consummation of the Sale occur later than April 5, 2018 without the written consent of the Debtors and Agents (the "Extended Outside Date").

- *Time Frame for Closing:*  The Bid must be reasonably likely to be consummated within a time frame acceptable to the Sellers and the Agents.

- *No Late Bids*:  Unless otherwise ordered by a Court, the Sellers will not consider any Bids submitted after the conclusion of the Auction.

(b)    **Auction, Auction Procedures and Overbids**:   The Auction shall be conducted according to the following procedures, subject to the terms of the Bidding Procedures:

- *Participation:*   Only the Sellers, the Consultation Parties, the Agents and the Lenders, and each of their respective counsel and advisors, any Stalking Horse Purchasers and any other Qualified Bidder, in each case, along with their representatives and counsel, may attend the Auction (such attendance to be in person) and only Stalking Horse Purchasers and any such other Qualified Bidders will be entitled to make any Bids at the Auction; provided, however, that any other material creditor may attend (but not participate in) the Auction if it provides the Sellers written notice of its intention to attend the Auction on or before the Bid Deadline. Such written notice must be sent to counsel for the Sellers via electronic mail to Nicholas M. Miller (nmiller@nge.com) and Curtis Miller (cmiller@MNAT.com).

- *Auction Baseline Bids*:  Prior to commencement of the Auction, the Sellers may provide each Qualified Bidder participating in the Auction with a copy of the Modified Asset Purchase Agreement that is the highest and otherwise best Qualified Bid for the applicable Acquired Assets as determined by the Sellers, with the consent of the Agents, and in consultation with the Consultation Parties (such highest and otherwise best Qualified Bid, the "Auction Baseline Bid").   In addition, at the start of the Auction, the Sellers may describe the terms of the Auction Baseline Bids.

- *Terms of Overbids:*   Any Overbid after and above the Auction Baseline Bid shall be made in increments valued at not less than such amount as shall be announced at the Auction (in an amount greater than any approved bid protections or sale-related administrative expenses), in cash or in cash equivalents or, once the cash (or cash equivalent) amount of such Overbid exceeds the cash (or cash equivalent) amount of the next highest Bid, other forms of consideration acceptable to the Sellers in consultation with the Consultation Parties.

- *Scope of Bid / Lots:*  A Bid must be for all or substantially all of the Acquired Assets or for one or more of the Lots.

- *Remaining Terms Are the Same as for Qualified Bids:*  Subject to the Bidding Procedures, an Overbid at the Auction must comply with the conditions for a Qualified Bid.

- *Announcement of Overbids:*  The Sellers will announce at the Auction the material terms of each Overbid.

- *Consideration of Overbids:*  Subject to the deadlines set forth herein, the Sellers reserve the right to make one or more continuances of the Auction to, among other things:  facilitate discussions between the Sellers and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; modify or supplement any or all of the Auction procedures or rules; or give Qualified Bidders the opportunity to provide the Sellers with such additional evidence as the Sellers in their reasonable business judgment may require.

(c)   **Additional Procedures***:*  The Sellers (after consulting with the Consultation Parties) may establish at or any time prior to the Auction other or additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or any Stalking Horse Agreements.

(d)   **Backup Bidder:**  Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction with respect to some or substantially all of the Acquired Assets, as determined by the Sellers, in the exercise of their business judgment with the consent of the Agents and after consulting with the Consultation Parties, will be designated as a backup bidder (a "Backup Bidder").  A Backup Bidder shall be required to keep its last submitted Bid (the "Backup Bid") open and irrevocable until the earlier of the consummation of the transaction with the Successful Bidder or the Extended Outside Date.

- *Closing with Backup Bidder:*  Following the Sale Hearing, if a Successful Bidder fails to consummate the purchase of the Acquired Assets, the Sellers may deem the Backup Bidder for such assets to have the new Successful Bid, and the Sellers will be authorized, without further order of the Court, to consummate the transaction with such Backup Bidder at the price of its last bid.  The Sellers, on their behalf and on behalf of each of their respective estates, specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

(e)   **Alteration of Procedures:**  The Sellers reserve the right (after consulting with the Consultation Parties) to modify the Bidding Procedures and implement other or additional procedural rules that the Sellers determine,

in their business judgment will better promote the goals of the bidding process and discharge the Sellers' fiduciary duties; provided however that any modification or additions to the Bidding Procedures shall not be inconsistent with the Stalking Horse Agreements, the Bidding Procedures Order or any other Order of the Court, unless agreed in writing by the applicable Stalking Horse Purchaser or otherwise ordered by the Court.

19.     Subject to the execution of acceptable Confidentiality Agreements, the Debtors will permit existing interested parties and any new prospective purchaser to perform reasonable due diligence with respect to the Assets and will assist them with such efforts.

**D.     Applicable Notices**

20.     Contemporaneously herewith, the Debtors have filed a motion (the "Motion to Expedite") to schedule an expedited hearing on the Bidding Procedures Order on or before **March 9, 2018** (the "Bidding Procedures Hearing").

21.     Under Bankruptcy Rule 2002(a) and (c), the Debtors must notify their creditors of the proposed Sale, including disclosure of the time and place of the Auction and the Sale Hearing, the terms and conditions of the Sale, the Bidding Procedures and the deadline for filing any objections thereto.  Accordingly, the Debtors have served a copy of this Motion and the proposed Bidding Procedures Order and Sale Order, as well as the Motion to Expedite (the "Notice of Motion") in the manner set forth below.  Consistent with Local Rule 6004-1(b)(iv)(C), the Debtors have highlighted elsewhere in this Motion all provisions of the proposed Sale Order to be highlighted.  In addition, paragraphs 14 and 15 of the Sale Order provide for mutual releases for the Debtors and the Successful Purchaser upon the Closing, which releases are intended to ensure that the estate achieves finality at the conclusion of the Sale Process.

22.     The Debtors also propose, within three (3) days after the entry of the Bidding Procedures Order, or as soon thereafter as practicable (the "Mailing Date"), to serve a copy of the Bidding Procedures Order and the Bidding Procedures by first-class mail, postage prepaid, or

by email, where available, upon (a) all entities known to have expressed a *bona fide* interest in a transaction with respect to the Assets within the past two years; (b) all entities known to have asserted any lien, claim or encumbrance in or upon any of the Assets; (c) all federal, state and local environmental, regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (d) the U.S. Trustee; (e) counsel to any Stalking Horse Purchaser; (f) counsel to the Prepetition Agent and the Postpetition Agent for the Prepetition Lenders and Postpetition Lenders, respectively; (g) the Internal Revenue Service; (h) the SEC; (i) the U.S. Attorney for the District of Delaware; and (j) all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

23.　　In addition, on the Mailing Date, or as soon thereafter as practicable, the Debtors (or their agents) will serve by first-class mail, postage prepaid, the notice of the sale, substantially in the form attached to the Bidding Procedures Order (the "Sale Notice"), upon all other known creditors of the Debtors and all counterparties to the Debtors' executory contracts and unexpired leases.

24.　　Finally, on the Mailing Date or as soon as practicable thereafter, the Debtors will cause the Sale Notice to be published on one occasion in *USA Today* and the *Champaign News-Gazette*.

**E.　　Assumption and Assignment of the Executory Contracts and Unexpired Leases**

25.　　In accordance with the proposed Bidding Procedures Order, on or before the Mailing Date the Debtors will file with this Court and serve on each non-Debtor counterparty to

an executory contract or unexpired lease related to the Assets the Cure Notice, substantially in the form attached to the Bidding Procedures Order.[4]  The Cure Notice shall:

(a)     state the cure amounts, if any, that the Debtors believe are necessary to assume such contracts or leases pursuant to section 365 of the Bankruptcy Code (the "Cure Amount");

(b)     notify the non-Debtor counterparty that such party's contract(s) or lease(s) may be assumed and assigned to the Successful Bidder of the Assets at the conclusion of the Auction;

(c)     state the date of the Sale Hearing and that objections to any Cure Amount or to assumption and assignment will be heard at the Sale Hearing, or at a later hearing, as determined by the Debtors;

(d)     state the Contract Rejection Deadline (as defined below) by which the non-Debtor counterparty shall file an objection to the Cure Amount(s) or to the assumption and assignment of the applicable contract(s) and/or lease(s) (such objection, a "Contract Objection"); provided, however, that the inclusion of a contract, lease or agreement on the Cure Notice shall not constitute an admission that such contract, lease or agreement is an executory contract or unexpired lease or that it will, in fact, be assumed and assigned in connection with the Sale of the Assets.  If no Cure Amount is listed, the Debtors believe that no amount to cure defaults under the respective executory contract or unexpired lease is owed by it thereunder.  The Debtors reserve all of their rights, claims and causes of action with respect to the contracts, leases and agreements listed on the Cure Notice; and

26.     All Contract Objections must be filed and served so as to be received by **March 21, 2018 at 4:00 p.m. (prevailing Eastern Time)** (the "Contract Objection Deadline").

27.     The Debtors propose that any Contract Objection must be in writing and filed with the Clerk of the Court, 824 Market St. N, 3rd Floor, Wilmington, Delaware 19801, and served so as to be received by the Contract Objection Deadline, on the following parties (collectively, the "Notice Parties"):  **The Sellers**, 2904 Research Road, Champaign, Illinois

---

[4]     The Debtors intend to serve Cure Notices on the non-Debtor counterparty to an executory contract or unexpired lease related to the Assets as soon as possible after filing their schedules and statements of financial affairs.  The Debtors anticipate that they will have served the Cure Notices prior to the hearing on the present Motion.

61822, Attention: Tom O'Donoghue (tom.odonoghue@cr3partners.com); **Counsel to the Sellers**, Neal Gerber & Eisenberg, LLP, 2 N. LaSalle Street, Suite 1700, Chicago, Illinois 60602, Attention: Nicholas M. Miller (nmiller@nge.com) and Mark A. Berkoff (mberkoff@nge.com); and Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, Delaware 19899, Attention: Curtis Miller (cmiller@MNAT.com) and Robert J. Dehney (rdehney@MNAT.com); **Financial advisor to the Sellers**, Lincoln Partners Advisors LLC, 633 West Fifth Street, Suite 6650, Los Angeles, California 90071, Attention: Alexander W. Stevenson (AStevenson@lincolninternational.com) and Sherman Guillema (SGuillema@lincolninternational.com); **Counsel to Wells Fargo Bank, National Association, in its capacity as Prepetition Agent and Postpetition Agent (in such capacities, the "**Agents**") for the Prepetition Lenders and the Postpetition Lenders (collectively, the "**Lenders**"), respectively**, Goldberg Kohn Ltd., 55 East Monroe Street, Suite 3300, Chicago, Illinois 60603, Attention: Randall L. Klein (randall.klein@goldbergkohn.com) and Zachary J. Garrett (zachary.garrett@goldbergkohn.com), and Burr & Forman LLP, 1201 Market Street, Suite 1407, Wilmington, Delaware 19801, Attention: J. Cory Falgowski (jfalgowski@burr.com); **Financial advisor to the Agent**, Focus Management Group USA, Inc., 5001 West Lemon Street, Tampa, Florida 33609, Attention: Robert O. Riiska (r.riiska@focusmg.com) and Samuel M. Williams (s.williams@focusmg.com); **counsel to the Official Committee of Unsecured Creditors** (the "Committee"), Cullen and Dykman LLP, The Legal Center, One Riverfront Plaza, Newark, NJ 07102, Attention: S. Jason Teele (steele@cullenanddykman.com), and Whiteford Taylor Preston LLC, The Renaissance Center, Suite 500, 405 North King Street, Wilmington, Delaware 19801, Attention: Christopher M. Samis (CSamis@wtplaw.com); and **financial advisor to the Committee**, Emerald Capital

Advisors, 70 E. 55th Street, 17th Floor, New York, NY 10022, Attention: John P. Madden (jpm@emeraldcapitaladvisors.com).

28.    Any Contract Objection must state (a) the basis for such objection, including objections regarding any Stalking Horse Purchaser's ability to provide adequate assurance of future performance under any executory contract or unexpired lease, and (b) with specificity what Cure Amount(s) the non-Debtor counterparty to the relevant executory contract(s) or unexpired lease(s) believes is required (in all cases with appropriate documentation in support thereof).

29.    Any Contract Objection solely to the Cure Amount(s) may not prevent or delay the Debtors' assumption and assignment of assumed and assigned contract(s) or lease(s).  If a party objects solely to Cure Amount(s), the Debtors may, with the consent of the relevant Successful Bidder, hold the claimed Cure Amount(s) in reserve pending further order of the Court or mutual agreement of the parties.  So long as the Cure Amount(s) are held in reserve, and there are no other unresolved objections to assumption and assignment of the applicable assumed and assigned contract(s) or lease(s), the Debtors can, without further delay, assume and assign such contract(s) or lease(s).  Under such circumstances, the objecting non-Debtor counterparty's recourse is limited to the funds held in reserve.

30.    If no objection to the Cure Amount(s) is timely received, the Cure Amount(s) set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any assigned contract(s) or lease(s) or other document(s) as of the date of the Cure Notice.

31.    As soon as reasonably practicable after receiving the schedule from any Stalking Horse Bidder or other Qualified Bidder, the Debtors will prepare and file a list of those executory contracts and unexpired leases that such bidders elect to have assumed and assigned

(the "Designated Contracts") at Closing pursuant to section 365 of the Bankruptcy Code, subject to any right to add or delete executory contracts or unexpired leases in accordance with the applicable Stalking Horse Agreement.

32.    As soon as reasonably practicable thereafter, the Debtors will post on the website for the Bankruptcy Proceedings (the "Case Website") (a) the list of any Designated Contracts, which the Debtors will update as and when executory contracts or unexpired leases are added or deleted by any such Bidders and (b) a description of the Bidders and information as to the Bidders' ability to perform the Debtors' obligations under the relevant Designated Contracts.

33.    To the extent that any non-Debtor counterparty wishes to object to the adequate assurance of future performance by a Qualified Bidder (other than a Stalking Horse Bidder) under the applicable executory contract(s) or unexpired lease(s) (an "Adequate Assurance Objection" and together with a Contract Objection, an "Objection"), then such non-Debtor counterparty shall file a written Adequate Assurance Objection with the Court and serve such objection on the Debtors, the Notice Parties and the applicable Qualified Bidder(s) so that such Adequate Assurance Objection is received on or before **12:00 p.m. (prevailing Eastern Time) on Tuesday, March 27, 2018** (the "Adequate Assurance Objection Deadline").  An Adequate Assurance Objection shall be filed on or before the Adequate Assurance Objection Deadline in accordance with, and subject to, the Contract Objection Procedures set forth above.

34.    To the extent that any non-Debtor counterparty does not timely file and serve an Objection as set forth above, such counterparty will be:  (i) deemed to have consented to the Cure Amount(s), if any, set forth in the Cure Notice; (ii) barred, estopped and enjoined from asserting any additional Cure Amount(s) under the assumed and assigned executory contract(s) or unexpired lease(s); (iii) barred from objecting to the assumption and assignment of the

applicable assumed and assigned executory contract(s) or unexpired lease(s) to the Successful Bidder, and (iv) barred from objecting to adequate assurance of future performance by the Successful Bidder.

**F.      Request to Set a Date for the Sale Hearing and Sale Objection Deadline**

35.    The Debtors intend to present the Successful Bid for approval by Court at the Sale Hearing currently proposed on **March 28, 2018** at 10:00 a.m.  The Debtors shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.

36.    All objections to the Sale (a "Sale Objection") must be in writing and filed on and served so as to be received by **March 21, 2018** at 4:00 p.m. (prevailing Eastern Time) (the "Sale Objection Deadline") with the Clerk of the Court, 824 Market St. N, 3rd Floor, Wilmington, Delaware 19801. In addition, any Sale Objection must be served on the Notice Parties so as to be received on the Sale Objection Deadline. Notwithstanding the foregoing, any Sale Objection of any Agent or any Lender shall be in writing, filed with the Court, and served so as to be received by the Notice Parties on or before 4:00 p.m. (prevailing Eastern Time) on the later of (a) **March 27, 2018** or (b) if the Sale Hearing is adjourned or otherwise rescheduled, the day prior to the date of the Sale Hearing.

**G.      Table of Relevant Dates**

37.    The following table summarizes the proposed dates requested in  connection with the Sale Process:

| | |
|---|---|
| Bidding Procedures Objection Deadline | March 7, 2018 |
| Bidding Procedures Hearing | March 9, 2018 |
| Service of Sale Notice | March 12, 2018 |
| Publication of Sale Notice | March 12, 2018 |
| Service of Cure Notice | March 12, 2018 |
| Publication of Designated Contracts | March 12, 2018 |
| Contract Objection Deadline / Sale Objection Deadline | March 21, 2018 |
| Bid Submission Deadline | March 23, 2018 |

| Auction | March 26, 2018 |
| Adequate Assurance Objection Deadline | March 27, 2018 |
| Sale Hearing | March 28, 2018 |

## BASIS FOR RELIEF

**H.   The Bidding Procedures Are Fair and Reasonable**

38.   In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by auction.   In accordance with the Bidding Procedures, the Debtors seek to market the Assets through a competitive bidding process to maximize value and avoid the further deterioration of the Debtors' business through a prompt sale of the Assets.   Consequently, the Debtors believe that good cause exists to expose their assets to sale at auction and to approve the procedures proposed herein.   An auction conducted substantially in accordance with the Bidding Procedures will enable the Debtors to obtain the highest and best offers for the Assets.

39.   The Debtors believe that the Bidding Procedures are appropriate under sections 105 and 363 of the Bankruptcy Code to ensure that the bidding and sale process is conducted fairly and will yield the highest value for their estates and creditors.   The Bidding Procedures are designed to facilitate a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids for Assets as provided in the Bidding Procedures.   The Bidding Procedures also provide potential bidders with sufficient notice and opportunity to acquire information necessary to submit a timely and informed bid.   Thus, the Debtors and all parties in interest can be assured that the consideration for the Assets will be fair and reasonable.   At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select, in their reasonable business judgment, and after consultation with the Consultation Parties, the highest and best offer for the Assets.

40.     The Debtors believe that the Bidding Procedures provide an appropriate framework for the sale of the Assets that will enable the Debtors to review, analyze and compare, in a relatively uniform fashion, all offers received to determine which offer is the highest and best and in the best interests of the Debtors' estates and creditors.  The Debtors believe that the proposed deadlines and milestones for noticing, marketing and selling the Assets offer potential bidders ample opportunity to prepare and submit Qualified Bids.  Accordingly, the Debtors believe the Court should approve the Bidding Procedures.  Similar procedures have been routinely approved, including in the context of asset sales involving debtor assets in the United States.  See, e.g., In re Phoenix Brands, LLC, et al., Case No. 16-11242 (BLS) (Bankr. D. Del. June 7, 2016); In re Nortel Networks Inc., et al., Case No. 09-10138 (Bankr. D. Del. Mar. 3, 2009); In re the Great Atlantic & Pacific Tea Company, Inc., Case No. 15-23007 (SCC) (Bankr. S.D.N.Y. Aug. 11, 2015); In re Delia's, Inc., Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Feb. 10, 2015); In re Synagro Technologies, Inc., Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013); In re ICL Holding Company, Inc. (f/k/a LCI Holding Company, Inc.), Case No. 12-13319 (KG) (Bankr. D. Del. Jan. 25, 2013).

I.     **Approval of the Sale is Warranted Under Bankruptcy Code Section 363(b)**

41.     Compelling business justifications exist for the proposed Sale.  Absent the transactions contemplated by the Sale Process and the DIP Credit Agreement, the Debtors would have run out of money and might have been forced to liquidate.  The Sale Process provides adequate opportunity to market the business without lingering unnecessarily in bankruptcy.  Given the significant value of the Company's brands, and the negative impact the proceedings may have on its brands, the Debtors cannot afford to linger in bankruptcy.  As a result, and cognizant of their fiduciary obligation to maximize distributable value for all creditors, the Debtors believe that a sale of substantially all of their assets offers the best available alternative

for the business and the Debtors' stakeholders.  Accordingly, the Debtors have determined that they should pursue the Sale of the Assets as set forth in the Bidding Procedures.

42.    The Sale pursuant to section 363 of the Bankruptcy Code will enable the expeditious transfer of the Assets, an approach necessary to maximize and preserve the going-concern value of such Assets.  Section 363 of the Bankruptcy Code provides that "[t]he [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . ."  11 U.S.C. § 363(b)(1).  "It is a well-established principle of bankruptcy law that the . . . Debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate."  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992).  Following the decision in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986), courts have used the "sound business purpose" standard for approving sales pursuant to section 363.  See, e.g., In re ICL Holding Co. Inc., 802 F.3d 547, 551 (3d Cir. 2015); Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Lionel Corp., 722 F.2d 1063, 107071 (2d Cir. 1983); In re Gulf Coast Oil Corp., 404 B.R. 407, 417-18 (Bankr. S.D. Tex. 2009); Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999).

43.    "In evaluating whether a sound business purpose justifies sale of property under Section 363, courts consider a variety of factors, which essentially represent a 'business judgment' test."  In re Culp, 550 B.R. 683, 697 (Bankr. D. Del. 2015).  The "sound business purpose" test requires a debtor to establish:  "(1) a sound business purpose exists; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser

has acted in good faith." In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing Del. & Hudson Ry. Co., 124 B.R. at 176).

44.     As discussed above, the Debtors have concluded that, in light of the nature of the Debtors' business and the liquidity problems they face, the Sale of the Assets presents the best alternative for the Company and maximizes stakeholder recoveries.  Pursuing the Sale through the proposed Bidding Procedures will ensure that the Debtors can complete a transaction within a reasonable time, thereby preserving the value of the Debtors' brands and limiting the time and cost spent during the course of the Bankruptcy Proceedings.  Consequently, the proposed Sale of the Assets in accordance with the Bidding Procedures satisfies the "sound business purpose" test for the sale of assets outside the ordinary course of business under Bankruptcy Code section 363(b).

45.     While the Debtors are confident that the Purchase Prices set forth in any Stalking Horse Agreements would represent fair and reasonable consideration for the Assets, adequate "market exposure" and the auction process — the best means for establishing whether a fair and reasonable price is being paid — will provide additional support.

46.     In addition to a fair and reasonable value offered by the Successful Bidders for the Assets, the Sale will be the product of vigorous arms'-length, good faith negotiations between the relevant parties.  In particular, the negotiations of any Stalking Horse Agreements will have involved substantial time and energy by the Sellers and such Stalking Horse Purchasers and their respective professionals, and any Stalking Horse Agreements would reflect a give-and-take, with substantial compromises and concessions made by all sides.

47.     Accordingly, the Debtors submit that the Sale of the Assets as contemplated herein and in the Bidding Procedures is in the best interests of the Debtors, their estates and creditors, and should be approved.

**J.      The Acquired Assets Should be Sold Free and Clear of Claims, Liens and Encumbrances Under 11 U.S.C. § 363(1)**

48.     The Debtors also submit that, subject to the consummation of the Sale and payment in full of all of the consideration under the Asset Purchase Agreements, the Sale of the Assets that are acquired pursuant to the Asset Purchase Agreements should be free and clear of any and all claims, liens and encumbrances under Bankruptcy Code section 363(f) (other than Assumed Liabilities and Permitted Encumbrances as provided in any Asset Purchase Agreements submitted by Qualified Bidders).  Bankruptcy Code section 363(f) permits a debtor to sell property free and clear of third-party interests only if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Since section 363(f) of the Bankruptcy Code is written in the disjunctive, any of the five conditions provides authority to sell free and clear of claims, liens and encumbrances.  See In re Pacific Energy Resources Ltd., et al., Case No. 09-10785 (KJC) D. Del. Aug. 18, 2009); In re Flying J Inc., et al., Case No. 08-1334 (MFW) (Bankr. D. Del. July 27, 2009); In re Dundee Equity Corp., 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992); In re Collins, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995).

49.     The Debtors submit that each lien that is not an assumed liability or permitted encumbrance under any Asset Purchase Agreements submitted by Qualified Bidders satisfies at

least one of the five conditions of section 363(f) of the Bankruptcy Code.  If an entity with liens on the Assets does not consent to the proposed Sale of such assets, the Debtors intend to demonstrate at the Sale Hearing their satisfaction of the requirements of section 363(f) of the Bankruptcy Code.  Alternatively, the Debtors may, subject to the consummation of the Sale and payment in full of all of the consideration under the Asset Purchase Agreements, sell the Assets that are acquired pursuant to the Asset Purchase Agreements free and clear of any other interests under section 363(f)(5) of the Bankruptcy Code because the liens on any assets sold will attach to the proceeds of the Sale in their order of priority and entities holding such interests could be compelled to accept money satisfaction in legal or equitable proceedings.  Accordingly, pursuant to Bankruptcy Code section 363, the Debtors may sell the Assets that are acquired pursuant to any Asset Purchase Agreements free and clear of all claims, liens and encumbrances upon the consummation of such Sale.

50.    Moreover, the Debtors will send the Sale Notice to any purported lienholders.  If such lienholders do not object to the proposed Sale, then their consent should reasonably be presumed.  Accordingly, the Debtors request that unless a party asserting a lien on any of the Assets (other than with respect to Assumed Liabilities and Permitted Encumbrances) timely objects to this Motion, such party shall be deemed to have consented to any Sale approved at the Sale Hearing.  See Hargave v. Twp. of Pemberton, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

51.    Subject to the consummation of the Sale and payment in full of all of the consideration under the Asset Purchase Agreements, it is also appropriate to sell the Assets that are acquired pursuant to the Asset Purchase Agreements free and clear of successor liability

relating to the Debtors' businesses. Such limitations on successor liability ensure that any Successful Bidder is protected from claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors. Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business. See, e.g., In re Tran World Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); In re Leckie Smokeless Coal Co., 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); In re Ormet, 2014 WL 3542133 (Bankr. D. July 17, 2014) (permitting a sale free and clear of successor liability claims relating to an underfunded pension plan); In re Insilco Techs., Inc., 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory).

52.     The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, potential bidders may choose not to participate in the Auction or, if they did, would submit reduced bid amounts. To that end, the Successful Bidder(s) should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Assets that are acquired pursuant to the applicable Asset Purchase Agreement free and clear upon consummation of such Sale.

**K.     A Successful Bidder Should be Entitled to the Protections of Bankruptcy Code Section 363(m)**

53.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir. 1986); Miami Ctr. Ltd. P'ship v. Bank of New York, 838 F.2d 1547, 1554 (11th Cir. 1988); In re Mark BellFurniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Congoleum Corp., Case No. 03-51524, 2007 WL 1428477 (Bankr. D.N.J. May 11, 2007); In re Temtechco, Inc., 1998 WL 887256, at *4 (D. Del. 1998).

54.     As noted above, any Asset Purchase Agreement executed by a Successful Bidder will have been negotiated at arm's-length and in good faith in accordance with the Bidding Procedures, with each of the parties represented by its own advisors and counsel.  Accordingly, the Debtors request that the Sale Order include a provision that any Successful Bidder for the Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors maintain that providing the Successful Bidders with such protection will ensure that the maximum price will be received by the Debtors for the Assets.

**L.     Assumption and Assignment of Certain Executory Contracts and Unexpired Leases**

55.     To enhance the value of the Debtors' estates (by curtailing further administrative liability and eliminating substantial rejection claims), the Debtors request authority under section 365 of the Bankruptcy Code to assume and assign the executory contracts and/or unexpired leases associated with the Subject Assets to the Successful Bidder.  The Debtors further request that the Sale Order provide that the assigned executory contracts and/or unexpired leases will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder(s) notwithstanding any provisions in such assigned contracts and/or leases, including

those described in Bankruptcy Code sections 365(b)(2), (f)(1) and (f)(3), that prohibit such assignments.

56.     The Debtors may, subject to Court approval, assume and assign executory contracts and unexpired leases under Bankruptcy Code section 365.  11 U.S.C. § 365(a).  Courts routinely approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that a debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.  See, e.g., In re Fleming Co. Inc., 499 F.3d 300, 305 (3d Cir. 2007); Cinicola v. Scharffeberger, 248 F.3d 110, 120 (3d Cir. 2001); L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.), 209 F.3d 291, 298 (3d Cir. 2000); In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992); Sharon Steel National Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 39-40 (3d Cir. 1989); In re NII Holdings, Inc., Case No. 14-12611 (SCC) (Bankr. S.D.N.Y. Apr. 20, 2015); In re Delia's, Inc., Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Dec. 24, 2014); In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003).  The assumption and assignment of the executory contracts and/or unexpired leases related to the Assets is an integral component of the Sale, without which the Sale would not be a viable option.

57.     Section 365(b)(1) of the Bankruptcy Code requires that, if there has been a default in a debtor's unexpired lease or executory contract, other than certain nonmonetary defaults as set forth in the statute, such unexpired lease or executory contract may not be assumed unless, at the time of the assumption, (i) such default is cured or there is adequate assurance that such default will be cured, (ii) compensation or adequate assurance of compensation is provided for any actual pecuniary loss resulting from such default and (iii) adequate assurance of future performance under the lease is provided.  11 U.S.C. § 365(b)(1)(A)-(C).

58.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  EBG Midtown South Corp. v. McLaren/Hart Env. Eng' g Corp. (In re Sanshoe Worldwide), 139 B.R. 585, 593 (S.D.N.Y. 1992); see also In re Fleming Co. Inc., 499 F.3d 300, 305 (3d Cir. 2007); Cinicola v. Scharffeberger, 248 F.3d 110, 120 (3d Cir. 2001).

59.     As set forth above, pursuant to the terms of the proposed Bidding Procedures Order, the Debtors will send the Cure Notice to all counterparties to the executory contracts and unexpired leases notifying such counterparties of the potential assumption by the Debtors and assignment to the Successful Bidder of such contracts and/or leases.  The Cure Notice will also set forth the Cure Amount, if any, owing for each such contracts and/or leases according to the Debtors' books and records.

60.     Counterparties to such contracts and/or leases will be given sufficient time (as set forth herein and in the proposed Bidding Procedures Order) to object to the proposed Cure Amounts, if any, set forth in the Cure Notice.  If no objection is filed with regard to a particular Cure Amount, such Cure Amount shall be binding on the Debtors, the Successful Bidder(s) and the applicable non-Debtor counterparty.  The payment of the Cure Amounts specified in the Cure Notice (or a different amount, either agreed to by the Debtors or resolved by this Court as a result of a timely-filed objection by the relevant non-Debtor counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under the applicable executory contract(s) and/or lease(s) pursuant to Bankruptcy Code section 365(b)(1), unless the Debtors determine, before the Sale Hearing, that a particular lease or contract is not truly executory, and does not need to be cured to transfer the Assets to the Successful Bidder.

61.     Bankruptcy Code section 365(f)(2)(B) states that a debtor may assign its unexpired leases and executory contracts if, *inter alia,* the assignee provides "adequate assurance of future performance."   11 U.S.C. § 365(f)(2)(B).   If necessary, the Successful Bidder must submit, among other things, written evidence of the ability to provide adequate assurance of future performance under the applicable contracts or leases as set forth above and in the Bidding Procedures Order.   The affected non-Debtor counterparties will also be able to challenge the ability of the Successful Bidder to provide adequate assurance as provided in the Bidding Procedures Order.

62.     Any assumption and assignment of an assigned contract and/or lease will be subject to all of the provisions of such contract and/or lease, to the extent required by applicable law and in accordance with applicable provisions of the Bankruptcy Code.   The Bidding Procedures are designed to ensure that any Successful Bidder is financially able and prepared to undertake all of the relevant obligations under the assigned contracts and/or leases.   The Debtors, together with the relevant Successful Bidder, will establish, as necessary, at the Sale Hearing, the requisite adequate assurance of future performance pursuant to Bankruptcy Code section 365 with respect to the potential assumption and assignment of the applicable assigned contracts and/or leases.   Consequently, assumption and assignment of the assigned executory contracts and/or leases in connection with the Sale of the Assets is appropriate under the circumstances.

**M.     Holders of Prepetition Debt and Postpetition Debt Are Allowed To Credit Bid Their Claims**

63.     Pursuant to the Bidding Procedures, and as provided in the DIP Financing Order, the Prepetition Agent and the Postpetition Agent, for and on behalf of the Prepetition Lenders and the Postpetition Lenders, respectively, are entitled to credit bid any amounts outstanding in

respect of the Prepetition Debt and the Postpetition Debt (as such terms are defined in the DIP Financing Order).

64.    Bankruptcy Code section 363(k) states: "[a]t a sale under subsection (b) of [Section 363] of property that is subject to a lien that secures an allowed claim, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Based upon this provision of the Bankruptcy Code, "[i]t is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k)." Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.), 432 F.3d 448, 459 (3d Cir. 2006); see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 132 S. Ct. 2065 (2012) (upholding a secured creditor's right to credit bid, stating that it "helps to protect . . . against the risk that its collateral will be sold at a depressed price"). In addition, district and bankruptcy courts in this and other circuits have endorsed credit bidding in the full amount of the secured creditor's claim. See, e.g., In re SubMicron Systems Corp., 432 F.3d 448, 459-60 (3d Cir. 2006) ("It is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k). . . The Third Circuit has held that 'logic demands that § 363(k) be interpreted this way; interpreting it to cap bids at the economic value of the underlying collateral is nonsensical."); In re Radnor Holdings, Corp., 353 B.R. 820, 846 (Bankr. D. Del. 2006) (finding a credit bit valid where the bid was to the fullest extend allowed by § 363(k), namely, the full amount of the claim, plus post-petition interest and expenses that constituted obligations under the agreement); In re Morgan House Gen. P'ship, Nos. 96-MC-184 & 96-MC-185, 1997 WL 50419, at *1 (E.D. Pa. Feb. 7, 1997) (holding that secured creditors may bid "to the extent of [their] claim" under § 363(k)); In re Midway Invs., Ltd., 187 B.R. 382, 391 n. 12 (Bankr. S.D. Fla. 1995) ("[A]

secured creditor may bid in the full amount of the creditor's allowed claim, including the secured portion and any unsecured portion thereof' (citing legislative history) (alteration in original) (internal quotation marks omitted)); <u>In re Realty Invs., Ltd. V,</u> 72 B.R. 143, 146 (Bankr. C.D. Cal. 1987) (same); <u>see also Criimi Mae Servs. Ltd. P'ship v. WDH Howell, LLC (In re WDH Howell, LLC),</u> 298 B.R. 527, 532 n. 8 (Bankr. D.N.J. 2003).    Accordingly, holders of the Prepetition Debt and the Postpetition Debt can bid all or any portion of such obligations to the fullest extent permitted by the DIP Financing Order and the section 363(k) of the Bankruptcy Code.

**N.**    **The Potential Bid Protections Are Fair and Reasonable and Should Be Approved**

65.    Approval of bid protections in connection with the sale of significant assets is analyzed under the business judgment standard and courts routinely deem bid protections appropriate in chapter 11 cases.    <u>See</u> <u>In re Integrated Res., Inc.</u>, 147 B.R. 650, 657-58 (S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); <u>In re 995 Fifth Ave. Assoc., L.P.</u>, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (holding that the business judgment standard protects break-up fees and other provisions negotiated in good faith).    The Third Circuit has held that there is no "compelling justification for treating an application for a break-up fee and expenses under § 503(b) differently from other applications for administrative expenses under the same provision."    <u>See</u>, <u>e.g.</u>, <u>Reliant Energy Channelview LP v. Kelson  Channelview LLC (In re Reliant Energy Channelview LP)</u>, 594 F.3d 200, 206 (3d Cir. 2010).

66.    Accordingly, the Third Circuit has found that bid protections must meet the standard set forth in the administrative expense provisions of the Bankruptcy Code §503(b), which is generally satisfied if such bid protections provide some benefit to the Debtor's estate.

Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999).  Benefits to the Debtor's estate may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would had been limited" and where the availability of the break-up fees and expenses "were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely . . . increasing the likelihood that the price at which the debtor is sold will reflect true worth." Id. at 537.

67.     Courts in this Circuit and elsewhere routinely approve protections in the form of a break-up fee and expense reimbursement, finding such protections to satisfy the business judgment rule and/or the administrative expense standard, as applicable.   In re Point Blank Solutions Inc., et al., Case No. 10-11255 (PJW) (Bankr. D. Del., Oct. 5, 2011); In re Champion Enterprises, et al., Case No. 09-14019 (KG) (Bankr. D. Del. Feb. 8, 2010); In re Filene's Basement, Inc., et al., Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009); In re Western Nonwovens, Inc., et al., Case No. 08-11435 (Bankr. D. Del. July 28, 2009); See also In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537 (explaining that approval of break-up fees and other forms of bid protection in connection with the sale of significant assets pursuant to section 363 is an established practice in chapter 11 cases).

68.     Here the potential Bid Protections would be reasonable and appropriate under both the business judgment rule and the administrative expense standard in light of the size and nature of the transactions contemplated herein, the efforts that will have been expended by any Stalking Horse Purchasers in connection therewith, the circumstances of these Chapter 11 Cases, and the value contributed to the Debtor's estate.   Therefore, the Bid Protections should be approved.   Moreover, the Bid Protections here are a necessary incentive to ensure that any

potential Stalking Horse Bidders are committed to the Sale process and to purchasing the Acquired Assets and assuming the Assumed Liabilities for what the Debtors believe is fair consideration.  Without the Bid Protections, potential Stalking Horse Bidders may not be willing to enter into a Stalking Horse Agreement.  The bid protections are further necessary to induce the potential Stalking Horse Bidders to research the value of the Debtor and to commit to a stalking horse bid, in order to ensure the price at which the Debtor is sold will reflect its true worth. Further, payment of the Bid Protections will not diminish the value of the Debtors' estates, as the Debtors do not intend to terminate or breach the Stalking Horse Agreements and pay the Bid Protections, unless doing so would permit the Debtors to accept a higher or better Bid.  Finally, in light of the minimum price thresholds, maximum Bid Protection Amounts, and the limitations on closing conditions and termination rights set forth herein, the Debtors are assured that the Bid Protections granted to any Stalking Horse Bidder would be reasonable compensation for the floor that such Stalking Horse Bid would set for the Debtors' Assets through the Stalking Horse Agreement.

69.    Pursuant to the proposed Bidding Procedures Order, in the absence of a breach by the Sellers, the Bid Protections would be payable in accordance with the terms of the Stalking Horse Agreements.  Upon payment by Sellers of the Bid Protections, any Stalking Horse Purchaser would be precluded from pursuing any other remedy against the Sellers.

**O.    The Form, Manner and Extent of Notice of the Motion and the Proposed Sale are Appropriate and Adequate Under the Circumstances**

70.    The Debtors will serve the Sale Notice and the Cure Notice in accordance with the Bidding Procedures Order, and have served the Notice of Motion as set forth above.  The notice of the proposed Sale to be provided by the Debtors as set forth herein sufficiently describes the terms and conditions of the proposed Sale.

71.     Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the sufficiency of notice and adequacy of service. As discussed below, the content and manner of service of this Motion and the related notices satisfy all such requirements:

(a)     <u>Section 363 Notice</u> — Bankruptcy Code section 363 provides that a trustee may sell property "after notice and hearing." Under Section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). As set forth above, creditors have been provided notice of the salient details regarding this Motion and the Sale Hearing. Accordingly, notice is sufficient under Bankruptcy Code section 363.

(b)     <u>Bankruptcy Rule 2002</u> — Bankruptcy Rule 2002 requires twenty-one (21) days' notice of the proposed sale of property other than in the ordinary course of business, "unless the court for cause shown shortens the time or directs another method of giving notice." In addition, Bankruptcy Rule 2002 provides that notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002. As set forth above, the notice of this Motion that has been and will be provided by the Debtors satisfies each of these requirements.

(c)     <u>Bankruptcy Rules 6004 and 6006</u> — Bankruptcy Rule 6004 requires that notice of sales of property out of the ordinary course of business complies with Bankruptcy Rule 2002. As set forth above, the Debtors have complied with Bankruptcy Rule 2002. Bankruptcy Rule 6006 requires notice of a motion to assume and assign an executory contract or unexpired lease to be served on the non-Debtor counterparty to such contract or lease, as well as on other parties in interest as the Court may direct. The Sale Notice and the Cure Notice have been or will be served on counterparties to the Assigned Contracts, thereby satisfying this requirement.

(d)     <u>Procedural Due Process</u> — The notices of this Motion that are being provided as described herein, including the notice being provided by publication as set forth above, are "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. <u>See</u> <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306 (1950). Parties in interest have been and should be found to have been afforded adequate notice of this Motion, the Sale(s), the Bidding Procedures and the other relief requested herein.

72.     The Debtors submit that the notice they have provided and intend to provide as outlined above with respect to the proposed Sale, the Bidding Procedures, the Bid Protections, and the Cure Amounts, as applicable, is reasonable and appropriate and constitutes good and adequate notice of the sale of the Assets and the procedures and proceedings related thereto and therefore should be approved by this Court.

**P.     The Stay of the Sale Order Should be Waived**

73.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), an order authorizing the sale of property or the assignment of an unexpired lease is stayed for fourteen (14) days after the entry of an order unless the Court orders otherwise.

74.     The Debtors request that this Court order that such stay is not applicable with respect to the sale of the Assets and assignment and assumption of the related executory contracts and/or unexpired leases.  To require the Debtors to effectively be liable under the applicable executory contracts and/or unexpired leases for an extra fourteen (14) days and to delay the closing and the resulting reductions of the Debtors' secured obligations and related adequate protection obligations will burden the estates and require unnecessary expenditures of the Debtors' limited resources.  The Debtors note that similar requests to waive the stay imposed under Bankruptcy Rules 6004(h) and 6006(d) are routinely granted.  In re Radioshack Corp., Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 10, 2015); In re Dendreon Corp., No. 14-12515 (LSS) (Bankr. D. Del. Feb. 20, 2015); In re Delia's, Inc., Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Feb. 10, 2015); In re Trump Entertainment Resorts, Inc., Case No. 14-12103 (KG) (Bankr. D. Del. Jan. 30, 2015); In re Midway Games Inc., Case No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); In re Nortel Networks Inc., et al., Case No. 09-10138 (Bankr. D. Del. Mar. 3, 2009); 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999) (noting that the 10-day stay period

should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure).

**Q.      Consumer Privacy Ombudsman**

75.      The Debtors have consulted with the U.S. Trustee regarding the Sale Process and the potential implications such sale has with respect to the Debtors' privacy policies.  As a result thereof, the Debtors and the U.S. Trustee have agreed to the appointment of Lucy Thomson as a consumer privacy ombudsman ("CPO"), who, the Debtors understand, will be appointed in the near term.   The Debtors intend to work cooperatively with the CPO on the timeline contemplated. .

## NO PRIOR REQUEST

76.      No prior request for the relief sought herein has been requested from this Court or any other court.

## NOTICE

77.      Notice of this Motion has been provided to: (a) all entities known to have expressed a *bona fide* interest in a transaction with respect to the Assets at any time; (b) all entities known to have asserted any lien, claim or encumbrance in or upon any of the Assets; (c) all federal, state and local environmental, regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (d) the U.S. Trustee; (e) counsel to the Prepetition Agent and the Postpetition Agent for the Prepetition Lenders and the Postpetition Lenders; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the U.S. Attorney for the District of Delaware; and (i)  all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

78.     The Debtors submit that, under the circumstances, no other or further notice is required.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and grant the Debtors such other and further relief as this Court deems just and proper.

Dated:   February 26, 2018          MORRIS, NICHOLS, ARSHT & TUNNELL LLP
         Wilmington, Delaware


                                    /s/ Matthew O. Talmo
                                    Robert J. Dehney (No. 3578)
                                    Curtis Miller (No. 4583)
                                    Matthew O. Talmo (No. 6333)
                                    1201 N. Market Street, 16th Floor
                                    P.O. Box 1347
                                    Wilmington, Delaware  19899-1347
                                    Telephone: (302) 658-9200
                                    Facsimile: (302) 658-3989
                                    rdehney@mnat.com
                                    cmiller@mnat.com
                                    mtalmo@mnat.com

                                              - and –

                                    NEAL, GERBER & EISENBERG LLP
                                    Mark A. Berkoff (admitted pro hac vice)
                                    Nicholas M. Miller (admitted pro hac vice)
                                    Thomas C. Wolford (admitted pro hac vice)
                                    Two North LaSalle Street, Suite 1700
                                    Chicago, Illinois  60602
                                    Telephone:  (312) 269-8000
                                    Facsimile:   (312) 269-1747
                                    mberkoff@nge.com
                                    nmiller@nge.com
                                    twolford@nge.com

                                    *Co-Counsel to the Debtors and Debtors in Possession*