## EXHIBIT A

**Stalking Horse Agreement**

27604848.3

# ASSET PURCHASE AGREEMENT

## BY AND BETWEEN

### ESTES-COX CORP.
as Seller

## AND

### ESTES INDUSTRIES, LLC
as Purchaser

**March 23, 2018**

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS ............................................................................................ 1
    1.1        Definitions ................................................................................... 1

ARTICLE II       SALE AND PURCHASE OF ASSETS ............................................... 7
    2.1        Sale and Purchase of Assets ........................................................ 7
    2.2        Excluded Assets ......................................................................... 10
    2.3        Assumed Liabilities ................................................................... 11
    2.4        Excluded Liabilities ................................................................... 12
    2.5        Purchase Price ............................................................................ 13
    2.6        Deposit ....................................................................................... 14

ARTICLE III      CLOSING; CONDITIONS TO CLOSING ....................................... 14
    3.1        Closing ....................................................................................... 14
    3.2        Court Approval Required ............................................................ 14
    3.3        Conditions to Obligations of Purchaser ..................................... 14
    3.4        Conditions to Obligations of Seller ........................................... 15
    3.5        Delivery of Possession of Assets ............................................... 16

ARTICLE IV      REPRESENTATIONS AND WARRANTIES OF SELLER ............ 16
    4.1        Organization, Good Standing and Power .................................... 16
    4.2        Authority Relative to this Agreement; Execution and Binding Effect ............ 16
    4.3        No Defaults ................................................................................ 17
    4.4        Governmental and Other Consents ............................................ 17
    4.5        No Brokers .................................................................................. 17

ARTICLE V       REPRESENTATIONS AND WARRANTIES OF PURCHASER .................. 17
    5.1        Organization, Good Standing and Power .................................... 18
    5.2        Authority Relative to this Agreement; Execution and Binding Effect ............ 18
    5.3        No Defaults ................................................................................ 18
    5.4        Governmental and Other Consents ............................................ 18
    5.5        Financial Ability ........................................................................ 18
    5.6        No Brokers .................................................................................. 19

ARTICLE VI      COVENANTS ................................................................................... 19
    6.1        Operation of Business ................................................................ 19
    6.2        Bidding Procedures Order .......................................................... 19
    6.3        Approval Order ........................................................................... 19
    6.4        Break-Up Fee ............................................................................. 20
    6.5        Access to Real Property and Information ................................... 21
    6.6        Further Assurances ..................................................................... 22
    6.7        Employee Matters ...................................................................... 22
    6.8        Tax Matters ................................................................................ 23
    6.9        Transition Services Agreement .................................................. 24
    6.10       Transaction-Related Documents ................................................ 24

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 6.11 | Procedure for Additional Prepaid Expenses | 25 |
| 6.12 | Remittance of Misdirected Amounts | 25 |
| **ARTICLE VII** | **TERMINATION; EFFECT OF TERMINATION** | 25 |
| 7.1 | Termination | 25 |
| 7.2 | Effect of Termination | 26 |
| 7.3 | Deposit | 26 |
| **ARTICLE VIII** | **GENERAL PROVISIONS** | 26 |
| 8.1 | "As Is", "Where Is", and "With all Faults" Transaction | 26 |
| 8.2 | Transaction Expenses | 27 |
| 8.3 | Certain Interpretive Matters and Definitions | 27 |
| 8.4 | Termination of Representations and Warranties | 27 |
| 8.5 | Amendment | 27 |
| 8.6 | Waiver | 27 |
| 8.7 | Notices | 27 |
| 8.8 | Jurisdiction | 28 |
| 8.9 | Governing Law | 28 |
| 8.10 | Damages | 28 |
| 8.11 | Time is of the Essence | 29 |
| 8.12 | Severability | 29 |
| 8.13 | Titles and Headings | 29 |
| 8.14 | Assignment; Successors and Assigns | 29 |
| 8.15 | No Third-Party Rights | 29 |
| 8.16 | Confidentiality Agreement | 29 |
| 8.17 | Entire Agreement | 29 |
| 8.18 | Execution of this Agreement | 30 |

Schedules

| | | |
|---|---|---|
| 1.1(i) | Certain Permitted Liens | |
| 1.1(ii) | Prepaid Expenses | |
| 1.1(iii) | Specified Commercial Tort Claims | |
| 2.1(a) | Real Property | |
| 2.1(b) | Personal Property | |
| 2.1(c) | Accounts Receivable | |
| 2.1(d) | Inventory | |
| 2.1(e) | Purchased Causes of Action | |
| 2.1(g) | Intellectual Property | |
| 2.1(h) | Executory Contracts and Unexpired Leases | |
| 2.1(i) | Governmental Authorizations | |
| 2.1(j) | Employee Benefit Plans | |

# TABLE OF CONTENTS

**SCHEDULES** (Cont'd)

| | |
|---|---|
| 2.2(b) | Bank Accounts |
| 2.2(c) | Certain Excluded Contracts |
| 2.2(r) | Other Excluded Assets |
| 2.3(a) | Certain Excluded Liabilities Under Assigned Contracts |
| 2.3(d) | Certain Assumed Post-Petition Liabilities |
| 2.3(f) | Certain Assumed Employee Obligations |
| 2.3(h) | Other Excluded Liabilities |
| 3.3(c) | Relinquishment Letters |
| 4.3 | Identified Defaults |
| 4.4 | Consents |
| 6.7(a) | Transferred Employees |

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made and entered into this 23nd day of March, 2018, by and between **ESTES-COX CORP.**, a Delaware corporation ("Seller"), and **ESTES INDUSTRIES, LLC**, a Delaware limited liability company ("Purchaser").

**WHEREAS**, Seller, a wholly owned subsidiary of Hobbico, Inc., an Illinois corporation ("Hobbico"), is in the business of manufacturing and distributing model rockets and related hobby products (the "Business");

**WHEREAS**, on January 10, 2018 (the "Petition Date"), Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which case is being jointly administered with cases arising under similar voluntary petitions of Hobbico and certain of Seller's other affiliates as Case No. 1:18-bk-10055 (the "Chapter 11 Case");

**WHEREAS**, Seller continues in the possession and control of its assets and properties in accordance with §§1107 and 1108 of the Bankruptcy Code; and

**WHEREAS**, pursuant to the terms and conditions of this Agreement, Seller desires to sell to Purchaser substantially all of Seller's assets that are used in connection with the conduct of the Business, and Purchaser desires to purchase and acquire such assets from Seller (the "Acquisition"), in accordance with §§363 and 365 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the foregoing premises, the representations, warranties, covenants and agreements contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     **Definitions**.

As used herein, the following terms shall have the following meanings:

"Accounts Receivable" shall mean all accounts receivable of Seller and other receivables of Seller in existence as of the Closing Date (whether or not billed).

"Acquired Assets" has the meaning assigned to that term in Section 2.1.

"Acquisition" has the meaning assigned to that term in the Recitals.

"Affiliate" means, as to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and

"under common control with") shall mean possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

"Agreement" has the meaning assigned to that term in the Preamble.

"Ancillary Agreements" means any certificate, agreement, document or other instrument to be executed and delivered in connection with this Agreement.

"Approval Order" has the meaning assigned to that term in Section 6.3(a).

"Assigned Contracts" has the meaning assigned to that term in Section 2.1(h).

"Assumed Liabilities" has the meaning assigned to that term in Section 2.3.

"Avoidance Actions" means all avoidance claims or causes of action under the Bankruptcy Code or applicable Law (including, without limitation, any preference or fraudulent conveyance), and all other claims or causes of action under any other provision of the Bankruptcy Code or applicable laws relating to the Acquired Assets and/or Assumed Liabilities, including, without limitation, all actions relating to vendors and service providers used in the Business that are counterparties to Assigned Contracts or relating to Assumed Liabilities.

"Bankruptcy Code" has the meaning assigned to that term in the Recitals.

"Bankruptcy Court" has the meaning assigned to that term in the Recitals.

"Bankruptcy Petition" means a voluntary bankruptcy petition filed by Seller with the Bankruptcy Court on the Petition Date.

"Bidding Procedures Order" has the meaning assigned to that term in Section 6.2.

"Break-Up Fee" has the meaning assigned to that term in Section 6.4.

"Business" has the meaning assigned to that term in the Recitals.

"Business Day" means any day on which commercial banking institutions are open for business in Wilmington, Delaware.

"Causes of Action" shall mean any and all causes of action, defenses, and counterclaims accruing to Debtor or that is property of the Estate, based upon facts, circumstances and transactions that occurred prior to the Closing Date. All such Causes of Action against Transferred Employees of which Seller's Chief Restructuring Officer currently has actual knowledge after due inquiry are described in ***Schedule 1.1(i)***.

"Chapter 11 Case" has the meaning assigned to that term in the Recitals.

"Closing" has the meaning assigned to that term in Section 3.1.

"Closing Date" has the meaning assigned to that term in Section 3.1.

"Commercial Tort Claims" has the meaning given to it in Section 9-102(13) of the Uniform Commercial Code as in effect in the State of Illinois, and includes, without limitation, the Specified Commercial Tort Claims.

"Confidentiality Agreement" has the meaning assigned to that term in Section 8.16.

"Contracts" means all agreements, contracts, leases, consensual obligations, promises or undertakings, other than Employee Benefit Plans.

"Cure Amounts" means all amounts, costs and expenses required by the Bankruptcy Court to cure all defaults under the Assigned Contracts so that they may be assumed and assigned to Purchaser pursuant to §§363 and 365 of the Bankruptcy Code.

"Debtor" shall mean Seller.

"Deposit" has the meaning assigned to that term in Section 2.6.

"DIP Financing Order" means that certain order entered by the Bankruptcy Court in the Chapter 11 Case on February 14, 2018 at Docket No. 162, as amended or otherwise modified from time to time.

"Employee Benefit Plans" shall mean (i) all "employee benefit plans" (as defined in §3(3) of ERISA), including any employee pension benefit plans; (ii) all employment, consulting, non-competition, employee non-solicitation, employee loan or other compensation agreements, and (iii) all bonus or other incentive compensation, equity or equity-based compensation, stock purchase, deferred compensation, change in control, severance, leave of absence, vacation, salary continuation, medical, life insurance or other death benefit, educational assistance, training, service award, dependent care, pension, welfare benefit or other material employee or fringe benefit plans, policies, agreements or arrangements, whether written or unwritten, qualified or unqualified, funded or unfunded and all underlying insurance policies, trusts and other funding vehicles, in each case currently maintained by or as to which Seller has or could reasonably be expected to have any obligation or liability, contingent or otherwise, thereunder for current or former employees, directors or individual consultants of Seller.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and regulations and formal guidance issued thereunder.

"Escrow Agent" has the meaning assigned to that term in Section 2.6.

"Escrow Agreement" has the meaning assigned to that term in Section 2.6.

"Estate" shall mean the estate of Debtor created by §541 of the Bankruptcy Code upon the filing of the Bankruptcy Petition.

"Estate Causes of Action" shall mean any and all Causes of Action except for (i) Causes of Action that relate to an Assigned Contract, (ii) Causes of Action arising from breaches of warranty relating to the Acquired Assets, (iii) Avoidance Actions and other Causes of Action against past and present trade vendors or customers of Seller which are counterparties to Assigned Contracts, and (iv) Avoidance Actions and other Causes of Action against Transferred Employees (other than any Commercial Tort Claims against any directors or duly-elected corporate officers, none of whom, to Seller's knowledge after due inquiry, is a Transferred Employee); for the avoidance of doubt, "Estate Causes of Action" shall include (and "Purchased Causes of Action" shall not include), without limitation, (A) all Avoidance Actions other than as expressly provided above, (B) all Causes of Action against any director, officer or other insider of Seller who is not a Transferred Employee, and (C) all Causes of Action against any administrative or other agent, lender or secured party related to any credit facility existing at any time whether prior to or after the filing of the Bankruptcy Petition, including, without limitation, the Secured Parties (as such term is defined in the DIP Financing Order).

"Excluded Assets" has the meaning assigned to that term in Section 2.2.

"Executory Contracts and Unexpired Leases" has the meaning assigned to that term in Section 2.1(h).

"Final Order" means an order of the Bankruptcy Court that has not been appealed, reversed, modified, amended or stayed and the time to appeal from or to seek review or rehearing of such order has expired.

"Governmental Authorization" means any consent, franchise, license, registration, permit, order or approval issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law, including, as the context may require, any declarations or filings with, or expiration of waiting periods imposed by, any such Governmental Body.

"Governmental Body" means any (i) nation, state, county, city, town, borough, village, district or other jurisdiction, (ii) federal, state, local, municipal, foreign or other government, (iii) governmental or quasi-governmental body of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers), (iv) multinational organization or body, (v) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, or (vi) official of any of the foregoing.

"Hobbico" has the meaning assigned to that term in the Recitals.

"Intellectual Property" means all trademarks, trade names, corporate names, company names, business names, product or brand names, service marks, patents, copyrights (including but not limited to moral rights), and any applications for or registrations of any of the foregoing, works of authorship, know-how, logos, proprietary information, protocols, schematics, specifications, software, software code (in any form, including source code and

executable or object code), subroutines, techniques, user interfaces, URLs, domain names, social media accounts, web sites, works of authorship and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing, such as instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries) inventions, trade secrets and any other intellectual property or intangible property that are used in the Business as presently conducted and any rights relating to any of the foregoing.

"Inventory" means all supplies, goods, materials, work in process, inventory and stock in trade owned by Seller exclusively for use or sale in the ordinary course of Business, but specifically excluding (1) goods which belong to sublessees, licensees or concessionaires of Seller, and (2) goods held by Seller on memo, on consignment, or as bailee.

"Law" means any applicable federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

"Liability" means any and all obligations, liabilities, debts and commitments, whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, due or to become due, whenever or however arising (including, without limitation, whether arising out of any contract or tort based on negligence, strict liability, or otherwise) and whether or not the same would be required by GAAP to be reflected as a liability in financial statements or disclosed in the notes thereto.

"Lien" means any mortgage, deed of trust, lien, pledge, charge, title defect, security interest, pledge, leasehold interest or other legal or equitable encumbrance of any kind.

"Lincoln" has the meaning assigned to that term in Section 4.5.

"Material Adverse Change" means any change, event, condition, circumstance, occurrence and/or effect, individually or in the aggregate, as shall have arisen after the date on which this Agreement shall have been executed by all parties hereto and prior to the Closing that have or could reasonably be expected to have a materially adverse effect on (a) the properties, business, operations, assets (tangible and intangible) or condition (financial or otherwise) of the Business or the Acquired Assets, in either case, taken as a whole, or (b) the ability of any of the parties hereto to consummate the transactions contemplated by this Agreement; provided, however, that any change, event, condition, circumstance, occurrence or effect that arises out of, results from or relates to the conduct of the Chapter 11 Case shall not be considered in determining whether a Material Adverse Change has occurred and, in addition, no change, event, effect, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and except as set forth in the final proviso below, none of the following shall be taken into account in determining whether there has been, a Material Adverse Change: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the Seller operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America; (ii) financial, banking or securities markets (including any disruption

thereof or any decline in the price of securities generally or any market or index), ; (iii) any change in GAAP or Law; (iv) compliance with this Agreement or any related agreement, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; (v) any change directly attributable to the announcement of this Agreement, including by reason of the identity of Purchaser or any of its Affiliates or any communication by Purchaser or any of its Affiliates of their plans or intentions regarding the operation of the Business; (vi) any act of God or other force majeure event; or (vii) in the case of Seller, any failure to meet or exceed any projection or forecast provided to or reviewed by the Purchaser; provided, however, that in the case of clauses (i), (ii), (iii) and/or (vi), any such change, event, condition, circumstance, occurrence and/or effect shall be considered in determining whether a Material Adverse Change has occurred to the extent that such change, event, condition, circumstance, occurrence and/or effect has or could reasonably be expected to have a disproportionate adverse effect on the properties, business, operations, assets (tangible and intangible) or condition (financial or otherwise) of the Business or the Acquired Assets, taken as a whole, relative to the adverse effect that such change, event, condition, circumstance, occurrence and/or event has or could reasonably be expected to have on other companies in the industry in which the Seller operates.

"Permitted Liens" means (i) Liens for Taxes, assessments and other governmental levies, fees or charges that are not yet due and payable, (ii) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation, (iii) Liens which constitute mechanics', carriers', workmens', repairmens', agricultural or other like Liens arising or incurred in the ordinary course of business for which amounts are not delinquent, (iv) Liens arising out of operating leases with third parties, (v) with respect to the Real Property, any easements, rights of way, covenants, conditions, restrictions, declarations, leases, licenses, and other similar matters or imperfections of title as reflected on any title policy that Purchaser receives with respect to the Real Property, (vi) Liens created by Purchaser, and (vii) those Liens set forth on **_Schedule 1.1(ii)_**.

"Person" means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

"Personal Property" has the meaning assigned to that term in Section 2.1(a).

"Petition Date" has the meaning assigned to that term in the Recitals.

"Prepaid Expenses Amount" means the aggregate of (i) those certain amounts listed on **_Schedule 1.1(iii)_** identified as amounts paid to third parties by Seller prior to the date hereof, or identified on such Schedule as amounts currently scheduled to be paid following the date hereof and prior to the Closing, in either case with respect to goods or services to be received by Purchaser following the date hereof pursuant to an Assigned Contract, plus (ii) such additional amounts as shall have been paid to any third party by Seller following the date hereof and prior to the Closing with respect to goods or services to be received by Purchaser following the Closing in accordance with the procedure set forth in Section 6.11.

"Prospective Additional Prepaid Amount" has the meaning assigned to that term in Section 6.11.

"Purchase Price" has the meaning assigned to that term in Section 2.5.

"Purchased Causes of Action" means any and all Causes of Action other than the Estate Causes of Action.

"Purchaser" has the meaning assigned to that term in the Preamble.

"Real Property" has the meaning assigned to that term in Section 2.1(a).

"Real Property Liens" means those certain Liens affecting the Real Property, as shown in the records of the County of Fremont, Colorado, in favor of (i) Cyprium Investors IV AIV I LP (as reflected in the Deed of Trust from Seller for the use of Cyprium Investors IV AIV I LP, a Delaware limited partnership, to secure $30,000,000.00 dated July 11, 2014 recorded July 15, 2014 at Reception No. 918886; and a Financing Statement from Seller, as debtor(s) in favor of Cyprium Investors IV AIV I LP, secured party, recorded July 15, 2014 at Reception No. 919887); (ii) Wells Fargo Bank National Association (as reflected in the Deed of Trust from Seller for the use of Wells Fargo Bank National Association, to secure $45,000,000.00 dated March 17, 2010 recorded March 23, 2010 at Reception No. 872877; First Amendment to deed of Trust recorded January, 26, 2017 at Reception No. 946886; and a Financing Statement from Seller, as debtor(s) in favor of Wells Fargo Bank, secured party, recorded October 19, 2016 at Reception No. 943946 and amended by instrument recorded September 7, 2017 at Reception No. 953976); and (iii) Western States Fire Protection Company (recorded February 5, 2018 at Reception No. 958595, in the amount of $15,650.43).

"Rights in Transaction-Related Privileges" has the meaning assigned to such term in Section 2.2(l).

"Seller" has the meaning assigned to that term in the Preamble.

"Specified Commercial Tort Claims" means those specific commercial tort claims listed on *Schedule 1.1(iv)* which constitute all of the Commercial Tort Claims of which Seller's Chief Restructuring Officer currently has actual knowledge after due inquiry.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, custom duties, capital stock, franchise, profits, withholding, social security (or similar excises), unemployment, disability, ad valorem, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not, by any Governmental Body responsible for imposition of any such tax (domestic or foreign).

"Transaction-Related Documents" has the meaning assigned to such term in Section 2.2(m).

"Transactions" has the meaning assigned to that term in Section 2.4.

"Transferred Employees" has the meaning assigned to that term in Section 6.7(a).

"Transition Services Agreement" has the meaning assigned to that term in Section 6.9.

"Trustee" means any trustee or fiduciary appointed to act on behalf of Debtor or as successor to Debtor.

"WARN" has the meaning assigned to such term in Section 2.3.

## ARTICLE II
## SALE AND PURCHASE OF ASSETS

2.1    **Sale and Purchase of Assets**.  On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Purchaser shall purchase from Seller, and Seller shall sell, assign, transfer, convey and deliver to Purchaser, all of Seller's right, title and interest in and to all assets, properties, rights, interests, benefits and privileges of whatever kind or nature, both tangible and intangible, real and personal, wherever located, whether owned or leased, that are used by Seller in connection with the operation of the Business (except for the Excluded Assets), to the extent transferable under applicable Law, the Bankruptcy Code or otherwise, as those assets, properties, rights, interests, benefits and privileges exist on the Closing Date, free and clear of any Lien other than Permitted Liens.  Without limiting the foregoing, the assets, properties, rights, interests, benefits and privileges sold, assigned, transferred, conveyed and delivered by Seller hereunder (collectively, the "Acquired Assets") shall include all of Seller's right, title and interest in and to the following except to the extent any of the following are expressly included within Excluded Assets:

(a)    all of Seller's interests in real property, including, without limitation, as set forth on ***Schedule 2.1(a)***, together with all plants, buildings, structures, fixtures and improvements of all kinds situated thereon, and all privileges, rights, easements, hereditaments and appurtenances belonging to or for the benefit of such real property (collectively, "Real Property");

(b)    all of Seller's supplies (including packaging materials), materials, machinery, equipment (including equipment that is subject to a capital lease, but only to the extent that Purchaser assumes such capital lease as an Assigned Contract), tools, vehicles, furniture, fixtures, furnishings, leasehold improvements, goods, and other tangible personal property owned by Seller, including, but not limited to, any owned computer hardware and software including, without limitation, as set forth on ***Schedule 2.1(b)***, (collectively, "Personal Property");

(c)    all of Seller's Accounts Receivable and all prepaid expenses, advances and deposits, including, without limitation, as set forth on ***Schedule 2.1(c)***, excluding (i) Accounts Receivable and prepaid expenses, advances and deposits allocable to Executory Contracts and Unexpired Leases that are not Assigned Contracts, and (ii) any deposits, security

retainers paid to professionals or other prepaid amounts referred to in Section 2.2(a) or Section 2.2(h) below;

(d)     all of Seller's Inventory, including, without limitation, as set forth on *__Schedule 2.1(d)__*;

(e)     all of Seller's rights in Purchased Causes of Action, including, without limitation, as set forth on *__Schedule 2.1(e)__*;

(f)     all of Seller's books and records relating to the Acquired Assets, including production records, accounting records, Tax records, financial records, property records, mailing lists, employee records of Transferred Employees, and customer and vendor lists, provided that Seller may obtain and retain, at its own expense, copies of any or all such books and records before their transfer to Purchaser;

(g)     all of Seller's rights in Intellectual Property to the extent assignable, including, without limitation, all such Intellectual Property set forth on *__Schedule 2.1(g)__*, together with all goodwill associated with the Business or the Acquired Assets, and all advertising, marketing and promotional materials, studies, reports and all other printed or written materials relating solely and exclusively to the Business;

(h)     all of Seller's Contracts, agreements, licenses, leases, warranties, commitments, and purchase and sale orders with respect to Personal Property, Intellectual Property, Real Property or otherwise, including, without limitation, as set forth on *__Schedule 2.1(h)__* (collectively, "Executory Contracts and Unexpired Leases"), solely to the extent that such Executory Contracts and Unexpired Leases are designated by Purchaser to Seller in writing, within five (5) days following the execution hereof (but in no event later than two (2) days prior to the auction conducted pursuant to the Bidding Procedures Order), to be assumed and assigned on the Closing Date in accordance with the Bidding Procedures Order and provided further that Purchaser shall have provided adequate assurance of future performance under §365(b)(1)(C) of the Bankruptcy Code with respect to any designated contract (collectively, "Assigned Contracts"), together with the right to receive income in respect of such Assigned Contracts on and after the Closing Date, and the right to bring any causes of action which may be brought by Seller relating to past or current breaches of the Assigned Contracts;

(i)     all of Seller's Governmental Authorizations, including, without limitation, as set forth on *__Schedule 2.1(i)__*, and all of Seller's pending applications therefor or renewals thereof, in each case to the extent transferable to Purchaser after compliance with all legal requirements and approvals applicable to such a transfer, and excluding Governmental Authorizations or pending applications therefor required for the continued operation of an Excluded Asset;

(j)     all of Seller's rights with respect to those certain Employee Benefit Plans set forth on *__Schedule 2.1(j)__*, solely to the extent that such Employee Benefit Plans are assignable by Seller and designated by Purchaser to Seller in writing, within five (5) days following the execution hereof (but in no event later than two (2) days prior to the auction

conducted pursuant to the Bidding Procedures Order) (as so designated by Purchaser, collectively, the "Assigned Employee Benefit Plans"), to be assumed and assigned on the Closing Date in accordance with the Bidding Procedures Order, together with the right to receive income, if any, in respect of such Assigned Employee Benefit Plans on and after the Closing Date, and the right to bring any causes of action which may be brought by Seller relating to past or current breaches of such Assigned Employee Benefit Plans;

(k)    all of Seller's rights, to the extent they are transferable, to make claims, and to receive the proceeds of any such claims, (i) under property or casualty insurance policies maintained by or on behalf of Seller for any loss to an Acquired Asset occurring prior to Closing that is covered by such policies, and (ii) under liability insurance policies maintained by or on behalf of Seller with respect to any Assumed Liability;

(l)    all telephone and telephone facsimile numbers and other directory listings used exclusively in connection with the Business; and

(m)    all rights of Seller under non-disclosure or confidentiality, non-disparagement, non-compete, or non-solicitation agreements.

2.2    **Excluded Assets**. Notwithstanding the provisions of Section 2.1 or any other provision of this Agreement, the Acquired Assets do not include, and Seller shall not transfer to Purchaser, any of the following assets, properties, rights, interests, benefits and privileges (collectively, the "Excluded Assets"):

(a)    all cash, bank deposits, securities and cash equivalents, including for this purpose (i) all cash and cash equivalents if credited to Seller's bank account(s) prior to the Closing Date, and (ii) all deposits and other prepaid amounts arising outside of the ordinary course of Seller's business, including without limitation all such amounts held by Seller's landlords, utility providers, vendors, attorneys, accountants, investment bankers, restructuring advisors, notice and claims agents, public relations advisors, and other professional advisors;

(b)    Seller's rights with respect to the bank accounts and lockbox arrangements relating to the Business, including, without limitation, the bank accounts and lockbox arrangements listed or described on ***Schedule 2.2(b)***;

(c)    all Contracts, agreements, licenses, leases, warranties, commitments, and purchase and sale orders that are not assignable or are listed on ***Schedule 2.2(c)***, and the rights associated therewith, but not including the Executory Contracts and Unexpired Leases assumed and assigned to Purchaser as provided in Section 2.1(h);

(d)    any equity interests, or interests convertible into or exchangeable for equity interests, held by Seller;

(e)    all corporate minute books and records of internal corporate proceedings, stock transfer ledgers, blank stock certificates, corporate seals, tax and accounting records and work papers related solely and exclusively to Excluded Assets, and other records relating to the organization or maintenance of the legal existence of Seller;

(f)     any books, records or other information related solely and exclusively to the Excluded Assets;

(g)     all records that Seller is required by Law to retain;

(h)     all refunds, credits or deposits of Taxes with respect to the period prior to the Closing Date, including without limitation any refunds, credits or deposits of Taxes arising as a result of Seller's operation of the Business or ownership, operation, utilization or maintenance of the Acquired Assets prior to the Closing Date;

(i)     all Estate Causes of Action;

(j)     all rights to receive mail and other communications addressed to Seller that do not relate to the Acquired Assets or the Assumed Liabilities;

(k)     the corporate franchise of Seller and any and all prepaid expenses and deposits in respect of franchise Taxes and the like;

(l)     all property, rights and assets arising from and relating to the defense, release, compromise, discharge or satisfaction of any of the Liabilities which are not Assumed Liabilities;

(m)     all documents, emails and other communications relating to the transactions contemplated hereby or any preparations or planning with respect thereto, including without limitation all such materials consisting of this Agreement, the Ancillary Agreements, memoranda, research, analysis, planning, due diligence reports, quality of earnings reports, agreements with financial advisors, investment bankers, accountants or legal counsel, whether or not subject to any attorney-client privilege, work product privilege, or any other privilege (the "Transaction-Related Documents"), and Seller's right to exercise or waive any attorney-client privilege, work product privilege or other privilege with respect to the transactions contemplated hereby or any of the Transaction-Related Documents (the "Rights in Transaction-Related Privileges");

(n)     all rights of Seller arising under this Agreement, the Ancillary Agreements, and under any other agreement between Seller and Purchaser entered into in connection with this Agreement;

(o)     all good faith or other bid deposits submitted by any third party under the terms of the Bidding Procedures Order;

(p)     all insurance policies of the Seller for directors', managers', and officers' liability and all rights of any nature with respect thereto, including all insurance recoveries, prepaid premiums, and unearned premiums thereunder and rights to assert claims with respect to any such insurance recoveries;

(q)     all Commercial Tort Claims of the Seller; and

(r)     all assets, properties and rights identified on ***Schedule 2.2(r)***.

2.3     **Assumed Liabilities**.  Upon the terms and subject to the conditions set forth herein, at the Closing, Purchaser shall assume and shall timely perform and discharge in accordance with their respective terms (a) all Liabilities of Seller under the Assigned Contracts, other than Liabilities incurred as a result of a breach or violation by Seller, except in each case as expressly set forth on *Schedule 2.3(a)*, (b) Cure Amounts with respect to the Assigned Contracts listed on *Schedule 2.1(h)*, (c) all Liabilities (including for any Tax) that arise on or after the Closing Date with respect to Purchaser's ownership or operation of the Acquired Assets on and after the Closing, (d) all post-petition accounts payable and accrued post-petition expenses of Seller for work done in the ordinary course of Business (excluding any expenses incurred with respect to the administration of the Bankruptcy Case unless such expenses are incurred as a result of Purchaser delaying the Closing) which would qualify as administrative priority expenses under §503(b) of the Bankruptcy Code, all as set forth on *Schedule 2.3(d)* and as incurred in the ordinary course of Business consistent with past practices as of or after the date of this Agreement and before Closing, (e) all Liabilities with respect to Assigned Employee Benefit Plans that are set forth on Schedule 2.1(j), (f) all Liabilities for wages, salaries, compensation, employment-related expense reimbursement, overtime, workers' compensation, sick pay, vacation, paid time off and personal days for Transferred Employees, including all associated payroll taxes, deductions and withholdings, in each case (i) as further described on *Schedule 2.3(f)*, (ii) which remain accrued but unpaid as of the Closing, and (iii) which have been incurred by Seller in the ordinary course of Business consistent with past practices following the date of this Agreement and before Closing, (g) all Liabilities of Seller under the Workers Adjustment and Retraining Notification Act ("WARN") and similar state laws, and (h) such other Liabilities of Seller set forth on *Schedule 2.3(h)* (collectively "Assumed Liabilities").  For avoidance of doubt, Purchaser's Assumed Liability with respect to matters described in clause (f) of this Section 2.3 is expressly limited to (A) a maximum of the total compensation amount payable to all of the Transferred Employees as a group during one (1) payroll period (which total amount is set forth on the first page of Schedule 2.3(f)), to the extent that such compensation has not yet been paid by Seller in the ordinary course of business consistent with past practice because payroll for such period is not yet due and payable on the Closing Date, *plus* (B) the total accrued paid time off (PTO) in the amount set forth on the second page of Schedule 2.3(f), and as may continue to accrue in the ordinary course of business consistent with past practice after the date of this Agreement and until the Closing.  To the extent that Seller or any of its Affiliates shall pay or discharge any of the Assumed Liabilities described in Section 2.3(f) (as clarified in the preceding sentence) within fifteen (15) days after Closing, Purchaser shall reimburse Seller or such Affiliate promptly following delivery to Purchaser of written notice thereof clearly identifying the type and amount of such Assumed Liabilities and providing reasonable documentary evidence thereof.

2.4     **Excluded Liabilities**.  Purchaser, by its execution and delivery of this Agreement and the Ancillary Agreements and its performance of the transactions contemplated by this Agreement and the Ancillary Agreements (the "Transactions"), shall not assume or otherwise be responsible for any Liability other than the Assumed Liabilities.  For the avoidance of doubt, the Assumed Liabilities shall not include any of the following:

(a)     any Liability of Seller or its directors, officers, stockholders or agents (acting in such capacities), arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing

Date, including, without limitation, all finder's or broker's fees and expenses and any and all fees and expenses of any representatives of Seller;

(b)      except as set forth in Section 2.3, any Liability relating to (i) events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, (ii) the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Acquired Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business) or (iii) the Chapter 11 Case;

(c)      any Liability for post-petition accounts payable or accrued post-petition expenses of Seller (i) arising outside of the ordinary course of Business which would fail to qualify as an administrative priority expense under §503(b) of the Bankruptcy Code, or (ii) arising before the date of this Agreement and not listed in Schedule 2.3(d);

(d)      except as set forth in Section 2.3, any Liability to any Person at any time employed by Seller or its predecessors-in-interest at any time or to any such Person's spouse, children, other dependents or beneficiaries, with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such Person's employment by Seller or its predecessors-in-interest, whenever such claims mature or are asserted;

(e)      any Liability relating to the Acquired Assets based on events or conditions occurring or existing prior to the Closing Date and connected with, arising out of or relating to: (i) Hazardous Substances or Environmental Laws, (ii) claims relating to employee health and safety, including claims for injury, sickness, disease or death of any Person or (iii) compliance with any requirement under Law relating to any of the foregoing;

(f)      except as provided in Section 6.7(a), any Liability for Taxes attributable to periods ending on or prior to the Closing Date;

(g)      any Liability incurred by Seller or its directors, officers, stockholders, agents or employees (acting in such capacities) after the Closing Date;

(h)      any Liability of Seller to any Person on account of any legal action or proceeding, to the extent such legal action or proceeding either exists as of Closing or relates to a period ending on or prior to the Closing Date;

(i)      any Liability relating to or arising out of the ownership or operation of an Excluded Asset;

(j)      any Liability relating to or arising out of Employee Benefit Plans of Seller, including without limitation, such Employee Benefit Plans set forth on Schedule 2.1(j), that are not expressly designated by Purchaser as Assigned Employee Benefit Plans;

(k)      any Liability with respect to the Prepetition Debt (as defined in the DIP Financing Order) or Postpetition Debt (as defined in the DIP Financing Order); and

(l)      any Liability identified on ***Schedule 2.4(l)***.

2.5      **Purchase Price**.  The aggregate consideration payable to Seller for the sale and transfer of the Acquired Assets shall be (a) the amount equal to (i) Six Million Dollars ($6,000,000.00), plus (ii) the Prepaid Expenses Amount, minus (iii) the sum of (A) the amount of accrued and unpaid real estate taxes with respect to the Real Property for 2017 as shown in the public record, *plus* (B) the  amount of accrued and unpaid real estate taxes with respect to the Real Property for 2018 (assuming it will be the same as the amount of the real estate taxes with respect to the Real Property for 2017) multiplied by a fraction, the numerator of which is the number of days for the 2018 tax year preceding the date of Closing, and the denominator of which is 365) (the "Purchase Price"), and (b) the assumption by Purchaser of the Assumed Liabilities.  At the Closing, Purchaser shall deliver the Purchase Price (less the Deposit) to Seller by wire transfer of immediately available funds to one or more accounts designated in writing by Seller.

2.6      **Deposit**.  Within three (3) Business Days of the execution of this Agreement by Purchaser and Seller, Purchaser shall deposit with Delaware Trust Company, as escrow agent (the "Escrow Agent"), pursuant to an escrow agreement in form and substance to be mutually agreed to by and among the Escrow Agent, Purchaser and Seller acting reasonably (the "Escrow Agreement"), Three Hundred Thousand Dollars ($300,000.00) (the "Deposit") by cashier's check or wire transfer.  The Deposit shall be credited against the Purchase Price at the Closing if Purchaser is the successful bidder for the Acquired Assets.  If this Agreement is terminated for any reason, then the Deposit shall be forfeited to Seller or returned to Purchaser as provided in Article VII.

## ARTICLE III
## CLOSING; CONDITIONS TO CLOSING

3.1      **Closing**.  Subject to the terms and conditions of this Agreement, the closing (the "Closing") of the sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities shall take place on or before April 13, 2018 at a location to be specified by Seller. The time and date upon which the Closing occurs is referred to herein as the "Closing Date." All transactions at the Closing shall be deemed to take place simultaneously and none shall be deemed to have taken place until all shall have taken place.

3.2      **Court Approval Required**.  Purchaser and Seller acknowledge and agree that the Bankruptcy Court's entry of the Approval Order shall be required in order to consummate the Transactions, and that the requirement that the Approval Order has been entered is a condition that cannot be waived by any party.

3.3      **Conditions to Obligations of Purchaser**.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may, except for the condition set forth in Section 3.2, be waived by Purchaser in its sole discretion:

(a)      Representations and Warranties.  The representations and warranties of Seller set forth in Article IV of this Agreement, and the Schedules hereto provided by Seller,

shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on the date hereof and on and as of the Closing Date, as though made or provided on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)  Agreements and Covenants.  Seller shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by it under this Agreement at or before the Closing in all material respects.

(c)  Deliveries at Closing.  Purchaser shall have received from Seller all duly executed and notarized, as applicable, instruments or documents, including, without limitation, a patent assignment, a general trademark assignment, domain name assignment, a bill of sale, and certificates of title, each dated as of the Closing Date, in form and substance reasonably satisfactory to Purchaser, as Purchaser may reasonably request to fully effect the transfer to Purchaser of all of Seller's right, title and interest in and to the Acquired Assets and to otherwise consummate the Transactions, provided however that Seller shall not have any duty to make any payment or incur any material expense in connection therewith.  In addition to the foregoing, Purchaser shall have received from Seller a duly executed document or letter with respect to each of the Governmental Authorizations specifically identified on ***Schedule 3.3(c)*** in such form as Purchaser may reasonably require (each, a "Relinquishment Letter"), pursuant to which Seller shall confirm its relinquishment of all of its rights and privileges under such Governmental Authorization; provided however that in no event shall any Relinquishment Letter include any term or provision by which Seller or any of its Affiliates shall (i) make or confirm any representation or warranty to Purchaser or to any third party, or (ii) undertake any duty or obligation of any type to Purchaser or any third party, including without limitation any such duty or obligation in the nature of defense or indemnification obligations.

(d)  Real Property.  Without limiting the generality of Section 3.3(c), Purchaser shall have received: (i) from Seller or, at Purchaser's sole cost and expense, from Old Republic National Commercial Title Services (the "Title Company"), as applicable, duly executed and acknowledged quitclaim deeds in respect of the owned Real Property in recordable form, along with customary certificates of non-foreign status, an owner's title affidavit in form reasonably acceptable to Seller and Purchaser, and such other transfer, recordation and deed intake forms required to convey to Purchaser all of Seller's right, title and interest in and to the owned Real Property in the jurisdiction in which the owned Real Property is located; and (ii) from the Administrative Agent on behalf of the Secured Parties (as such terms are defined in the DIP Financing Order), executed deeds of reconveyance, UCC termination statements, lien releases, and terminations or other suitable releases, in recordable form and as otherwise reasonably requested by Purchaser or the Title Company, with respect to any security interests granted as to the Real Property as security for payment of indebtedness and other obligations of Seller to the Secured Parties.

(e)  Assumption and Assignment of Assigned Contracts.  Seller shall have assigned to Purchaser the Assigned Contracts to which it is a party by virtue of the Approval Order.

(f)     <u>Transition Services Agreement</u>.  Seller shall have executed and delivered to Purchaser the Transition Services Agreement.

(g)     <u>No Material Adverse Change</u>.  There shall not have occurred a Material Adverse Change.

3.4     **Conditions to Obligations of Seller**.  The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may, except for the condition set forth in Section 3.2, be waived by Seller in its sole discretion:

(a)     <u>Representations and Warranties</u>.  The representations and warranties of Purchaser set forth in Article V of this Agreement shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)     <u>Agreements and Covenants</u>.  Purchaser shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by it under this Agreement at or before the Closing in all material respects.

(c)     <u>Receipt of Purchase Price</u>.  Seller shall have received (i) the Purchase Price (less the Deposit) from Purchaser, and (ii) the Deposit from the Escrow Agent.

(d)     <u>Deliveries at Closing</u>.  Seller shall have received from Purchaser all fully executed instruments or documents as Seller may reasonably request to fully effect the transfer of the Acquired Assets and assumption of the Assumed Liabilities and to otherwise consummate the Transactions.

(e)     <u>Transition Services Agreement</u>.  Purchaser shall have executed and delivered to Seller the Transition Services Agreement

3.5     **Delivery of Possession of Assets**.  Right to possession of all Acquired Assets shall transfer to Purchaser at the Closing.  Purchaser shall bear all risk of loss with respect to the Acquired Assets from and after the Closing.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser that the statements contained in this Article IV are true and correct as of the date hereof and will be true and correct in all material respects on the Closing Date (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects).

4.1     **Organization, Good Standing and Power**.  Seller is legally formed and in good standing under the laws of the State of its incorporation.  Subject to the applicable provisions of the Bankruptcy Code, Seller has the power to own its properties and carry on its

business as now being conducted and is qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would result in a Material Adverse Change.

      4.2    **Authority Relative to this Agreement; Execution and Binding Effect**. Seller has full power and authority to execute and deliver this Agreement and the Ancillary Agreements and, subject to receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code, to consummate the Transactions. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by the board of directors of Seller, and, except for Bankruptcy Court approval or as set forth on ***Schedule 4.4***, no other proceedings or approvals on the part of Seller are necessary to approve this Agreement and the Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by Seller. Assuming due authorization, execution and delivery by Purchaser, this Agreement constitutes, and each of the Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Seller, enforceable against Seller in accordance with their terms, except as such enforcement may be limited by (a) the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, or (b) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

      4.3    **No Defaults**. Subject to receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code and except as set forth on ***Schedule 4.3***, the execution and delivery by Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions do not and will not (a) with or without the giving of notice or the lapse of time, or both, conflict with, or result in the breach of or constitute a default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or violate any (i) provision of Law, or (ii) agreement, Employee Benefit Plan, Contract, lease, power of attorney, commitment, instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injunction to which Seller is subject or a party or by which it is bound (or with respect to which its properties or assets are subject or bound), except for any breach, default, modification, cancellation, lapse, termination, limitation, curtailment or violation that would not result in a Material Adverse Change; or (b) violate the certificate of incorporation or bylaws of Seller.

      4.4    **Governmental and Other Consents**. Except for the receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code or as set forth on ***Schedule 4.4***, no consent, notice, authorization or approval of, or exemption by, or filing with or notifications to any Governmental Body or any other Person, whether pursuant to contract or otherwise, is required in connection with the execution and delivery by Seller of this Agreement and the Ancillary Agreements and its consummation of the Transactions.

      4.5    **No Brokers**. Except for the representation of Seller by Lincoln Partners Advisors LLC ("Lincoln"), pursuant to that certain order entered by the Bankruptcy Court on January 30, 2018 and the obligation of Seller and/or Hobbico to pay Lincoln a commission, fees and expenses at Closing in accordance with the terms and provisions of such order, Seller

has not incurred nor will incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of Seller or Hobbico, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and delivery by Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions.  For avoidance of doubt, Purchaser will not be responsible for any amounts that Lincoln may be entitled to receive in connection with the Transactions.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller that the statements contained in this Article V are true and correct as of the date hereof and will be true and correct in all material respects on the Closing Date (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects).

5.1     **Organization, Good Standing and Power**.  Purchaser is legally formed and in good standing under the laws of the state of its formation.  Purchaser has the power to own its properties and carry on its business as now being conducted and is qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would result in a Material Adverse Change.

5.2     **Authority Relative to this Agreement; Execution and Binding Effect**. Purchaser has full power and authority to execute and deliver this Agreement and the Ancillary Agreements and to consummate the Transactions.   The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by all necessary action of Purchaser and no other proceedings or approvals (shareholder, member or otherwise) on the part of Purchaser are necessary to approve this Agreement and the Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by Purchaser. Assuming due authorization, execution and delivery by Seller, this Agreement constitutes, and each of the Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with their terms, except as such enforcement may be limited by (a) the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, or (b) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

5.3     **No Defaults**.  The execution and delivery by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the Transactions do not and will not (a) with or without the giving of notice or the lapse of time, or both, conflict with, or result in the breach of or constitute a default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or violate any (i) provision of Law, or (ii) agreement (including without limitation any loan or financing agreement), Contract, lease, power of attorney, commitment, instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injunction to which Purchaser is subject or a party or by which it is bound (or with respect to which its properties or assets are subject or bound), except for any breach,

default, modification, cancellation, lapse, termination, limitation, curtailment or violation that would not result in a Material Adverse Change; or (b) violate the certificate of formation or operating agreement of Purchaser.

5.4  **Governmental and Other Consents**.  Except for the receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code, no consent, notice, authorization or approval of, or exemption by, or filing with or notifications to any Governmental Body or any other Person, whether pursuant to contract or otherwise, is required in connection with the execution and delivery by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the Transactions.

5.5  **Financial Ability**.  Purchaser has cash available that is sufficient to enable it to pay the Deposit, the Purchase Price and any of its obligations under the Transition Services Agreement as well as all other amounts (including Cure Amounts) otherwise payable to consummate the Transactions pursuant to and in accordance with this Agreement.

5.6  **No Brokers**.   Purchaser has not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of Purchaser, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and delivery by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby.

**ARTICLE VI**
**COVENANTS**

6.1  **Operation of Business**.   Subject to the requirements of, and the obligations imposed upon, Seller as debtor-in-possession and pursuant to the Bankruptcy Code and except as otherwise contemplated by this Agreement or the Bidding Procedures Order or as required to comply with debtor-in-possession financing obtained by Seller, from the date hereof and until the Transactions shall have been consummated or abandoned as contemplated herein, Seller shall operate the Business in the ordinary course (relative to that in effect immediately prior to the execution of the Agreement) and, consistent with such operation and the budget set forth in Seller's debtor-in-possession credit agreement, and consistent with acting as a debtor-in-possession in a Chapter 11 bankruptcy case, shall use commercially reasonable efforts to maintain the goodwill associated with the Business and the relationships with the employees, customers and suppliers of the Business.

6.2  **Bidding Procedures Order**.  The purchase and sale of the Acquired Assets will be subject to competitive bidding in accordance with (and only in accordance with) the terms of the order of the Bankruptcy Court approving sale and bidding procedures set forth in Exhibit A (the "Bidding Procedures Order").  Within a reasonable period of time after entering into this Agreement, Seller shall seek the entry of an order approving the Break-Up Fee in Section 6.4 below.  In addition, if requested by Purchaser, Seller shall use its best efforts to have Purchaser designated as a Qualified Bidder (as defined in the Bidding Procedures Order).

6.3    **Approval Order**.

(a)    Prior to the Closing, and subject to the provisions of this Agreement, Purchaser and Seller shall use their commercially reasonable efforts to obtain entry of an order or orders by the Bankruptcy Court pursuant to §§363 and 365 of the Bankruptcy Code (the "Approval Order"), which shall approve of this Agreement and the transactions described herein without change to Purchaser's rights hereunder or any change to the terms of this Agreement except as shall have been approved in writing by each of Seller and Purchaser, and which shall contain the following provisions in terms reasonably acceptable to the parties (it being understood that certain of such provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Approval Order):

(i)    that Seller may sell, transfer and assign the Acquired Assets and assume and assign the Assigned Contracts to Purchaser pursuant to this Agreement and Bankruptcy Code §§105, 363 and 365, as applicable, and that any Executory Contract or Unexpired Lease not assigned to Purchaser is rejected;

(ii)    the transfers of the Acquired Assets by Seller to Purchaser (A) vest or will vest Purchaser with all right, title and interest of Seller in and to the Acquired Assets, free and clear of all Liens other than Permitted Liens, with an express provision that the transfers of the Acquired Assets by Seller to Purchaser vest or will vest Purchaser with all right, title and interest of Seller in and to the Acquired Assets, including but not limited to, the Real Property, free and clear of all Real Property Liens, and that all such Real Property Liens attach to the proceeds of the sale of the Acquired Assets to the same extent, priority and validity they applied to the Acquired Assets, and (B) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the State of Delaware;

(iii)    the transactions contemplated by this Agreement are undertaken by Purchaser and Seller at arm's length, without collusion and in good faith within the meaning of section 363(m) of the Bankruptcy Code, and such parties are entitled to the protections of section 363(m) of the Bankruptcy Code;

(iv)    a determination that selling the Acquired Assets free and clear of all Liens other than Permitted Liens is in the best interest of Seller's Estate; and

(v)    that Purchaser shall not assume any of the Excluded Liabilities.

(b)    If the Approval Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), each party hereto agrees to use commercially reasonable efforts to obtain an expedited resolution of such appeal; provided, however, that nothing herein shall preclude the parties hereto from consummating the Transactions if the Approval Order shall have been entered and has not been stayed in which event Purchaser shall be able to assert the benefits of §363(m) of the Bankruptcy Code.

6.4    **Break-Up Fee**.

(a)    Subject to approval of the Bankruptcy Court, Seller shall pay or, if applicable in accordance with clause (b), cause to be paid to Purchaser a break-up fee equal to One Hundred Eighty Thousand Dollars ($180,000.00) (the "Break-Up Fee") if (i) Purchaser is not the winning bidder for the Acquired Assets, and does not purchase the Acquired Assets as the "Backup Bidder" in accordance with the Bidding Procedures Order, (ii) a Bankruptcy Court order is entered that approves a sale of all or substantially all of the Acquired Assets to any Person other than Purchaser (an "Alternative Transaction"), or (iii) this Agreement is terminated as a result of a failure by Seller to consummate the Closing within a reasonable period of time after the Approval Order shall have been entered and all of the conditions to Seller's obligation to consummate the transaction contemplated herein shall have been satisfied or waived by Seller, and Purchaser shall have notified Seller in writing that Purchaser is ready, willing and able to tender payment of the Purchase Price and proceed with the Closing; provided that Purchaser will not be entitled to the Break-Up Fee if the Purchaser has materially breached its obligations under this Agreement.

(b)    The Break-Up Fee shall be promptly paid by wire transfer of immediately available funds to an account designated in writing by Purchaser. If the Break-Up Fee shall be payable in connection with the closing of an Alternative Transaction, then the Break-Up Fee shall be paid directly to Purchaser out of the purchase price paid by the winning bidder for all or substantially all of the Acquired Assets at the closing of such Alternative Transaction, and Seller shall cause such winning bidder's duty to make such payment directly to Purchaser to be made a term of such winning bidder's purchase transaction.

(c)    If and to the extent that the Break-Up Fee shall not have been paid to Purchaser as provided in Section 6.4(b), Purchaser's claim in respect to the Break-Up Fee shall constitute a super-priority administrative claim, senior to all other administrative claims against Seller, as administrative expenses under Sections 503, 507, 363 and 364 of the Bankruptcy Code in the Chapter 11 Case bankruptcy proceeding; provided that such claim in respect to the Break-Up Fee shall be subordinate to the Carve-Out and the administrative expense claims granted to, or in respect of, the Secured Parties and the Aggregate Debt (as each of such terms in this proviso are defined in the DIP Financing Order) pursuant to the DIP Financing Order.

(d)    Each of the parties acknowledges that:

(i)    the agreements set forth in this Section 6.4 are an integral part of the transactions contemplated by this Agreement;

(ii)    the Break-Up Fee is not a penalty, but rather liquidated damages in a reasonable amount that will compensate Purchaser in the circumstances in which the Break-Up Fee is payable for the efforts and resources expended by Purchaser and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transaction contemplated hereby, which amount otherwise would be impossible to calculate with precision;

(iii)    Purchaser would not have entered into this Agreement in the absence of the Seller's obligations to pay or cause to be paid the Break-Up Fee; and

(iv)    to the extent that all amounts due in respect to the Break-Up Fee have not actually been paid to Purchaser, Purchaser shall have additional recourse against Seller for any liabilities relating to or arising from this Agreement.

6.5    **Access to Real Property and Information**.

(a)    If Purchaser shall have been selected as the winning bidder for the Acquired Assets in accordance with the Bidding Procedures Order, then Seller shall permit representatives of Purchaser to have reasonable access during regular business hours and upon reasonable notice, and in a manner so as not to interfere with the normal business operations of Seller, to all of the Acquired Assets which are under Seller's control (provided that Seller shall have the right to have a representative present in connection with Purchaser's access to the Real Property, and in any event any representatives of Purchaser shall be subject to the confidentiality obligations under the Confidentiality Agreement or otherwise agree in writing to be bound by the terms of such Confidentiality Agreement applicable to Purchaser thereunder).

(b)    From the Closing Date through and including the second anniversary of the Closing Date, Purchaser shall grant Seller, each Trustee, and their respective representatives reasonable access to the books and records transferred to Purchaser pursuant to this Agreement during regular business hours and upon reasonable notice for the purpose of allowing Seller or its successor, such Trustee, or their respective representatives to perform the duties necessary for the liquidation of Debtor's Estate.  To the extent reasonably required by Seller, Purchaser shall make its employees available to Seller to assist in Seller's wind-down of its Estate, provided that such access does not unreasonably interfere with the conduct of the Business by Purchaser.

6.6    **Further Assurances**.  Purchaser and Seller agree to take such further actions and execute such other documents as may be reasonably required to fulfill the conditions to Closing and, after Closing, to fully effect the transactions contemplated by this Agreement and the Ancillary Agreements and further secure to each party the rights intended to be conferred hereby and thereby.

6.7    **Employee Matters**.

(a)    Purchaser shall make offers of employment to all employees of Seller (or one of its Affiliates) set forth in ***Schedule 6.7(a)*** effective as of the Closing, subject to Purchaser's right to require successful completion of customary employee background checks and drug testing prior to offering employment to any such employee (such employees who are hired by Purchaser, the "Transferred Employees").  Seller or such Affiliate shall terminate the employment of all Transferred Employees as of immediately prior to the Closing and reasonably assist Purchaser in effecting the change of employment of such Transferred Employees as of the Closing in an orderly fashion.  Purchaser's obligations under this Agreement are not conditioned upon any particular employees agreeing to employment with Purchaser.

(b)    Purchaser may, to the extent permitted by Law, replace benefits provided with respect to a Transferred Employee under any Assigned Employee Benefit Plan assumed by Purchaser pursuant to Section 2.1 with benefits provided under an employee benefit plan maintained by Purchaser, provided that Purchaser shall recognize the service of Transferred Employees with Seller or such Affiliate prior to the Closing Date as service with Purchaser in connection with any employee pension benefit plan and employee welfare benefit plan and policy (including vacations and severance policies) maintained by Purchaser which is made available following the Closing Date by Purchaser for purposes of any waiting period, vesting, eligibility and benefit entitlement (provided that Purchaser is not required to count such service of the Transferred Employees with Seller or such Affiliate prior to the Closing Date in calculating the amount of that employee's benefit under Purchaser's plan or policy and provided further that such crediting shall not result in the duplication of benefits with respect to any Transferred Employee).    In addition, Purchaser shall (i) waive, or cause its insurance carriers to waive, all limitations as to pre-existing conditions, if any, with respect to participation and coverage requirements applicable to Transferred Employees under any employee welfare benefit plan (as defined in §3(1) of ERISA) which is made available to Transferred Employees following the Closing Date by Purchaser and (ii) provide credit to Transferred Employees for any co-payments, deductibles and out-of-pocket expenses paid by such employees under the employee benefit plans, programs and arrangements of Seller during the portion of the relevant plan year including the Closing Date.

(c)    Purchaser and Seller agree to use the alternative procedure set forth in Revenue Procedure 2004-53 with respect to wage reporting for the Transferred Employees. Seller, as the predecessor employer, shall have no employment tax reporting responsibilities for the Transferred Employees following the Closing.

(d)    Purchaser and Seller shall execute all documents and take all actions necessary to transfer the Assigned Employee Benefit Plans and their related liabilities to Purchaser as provided hereunder.  Seller shall provide Purchaser with all documents, employee data or other information relating to such Assigned Employee Benefit Plans, provided that Purchaser shall execute any confidentiality documents or other similar agreements as necessary to comply with applicable laws protecting the confidentiality of such documents, data and information.

(e)    Nothing in this Agreement shall constitute any commitment, Contract or understanding (expressed or implied) of any obligation on the part of Purchaser to a post-Closing employment relationship of any fixed term or duration or upon any terms or conditions other than those that Purchaser may establish pursuant to individual offers of employment. Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Purchaser to terminate, reassign, promote or demote any of the Transferred Employees after the Closing or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, future benefits, other compensation or terms or conditions of Purchaser's employment of such employees.

(f)    If any of the arrangements described in this Section 6.7 are determined by any Governmental Body to be prohibited by applicable Law, Purchaser and Seller shall modify such arrangements to as closely as possible reflect their expressed intent and retain the

allocation of economic benefits and burdens to the parties contemplated herein in a manner that is not prohibited by applicable Law.

(g)     Notwithstanding anything in this Section 6.7 to the contrary, nothing contained herein, whether express or implied, shall be treated as an amendment or other modification of any Assigned Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its affiliates, or shall limit the right of Purchaser to amend, terminate or otherwise modify any Assigned Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its affiliates following the Closing Date. If (i) a party other than the parties hereto makes a claim or takes other action to enforce any provision in this Agreement as an amendment to any Assigned Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its affiliates, and (ii) such provision is deemed to be an amendment to such Assigned Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its affiliates even though not explicitly designated as such in this Agreement, then, solely with respect to the Assigned Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its affiliates at issue, such provision shall lapse retroactively and shall have no amendatory effect with respect thereto.

6.8     **Tax Matters**.

(a)     All sales, use, transfer, stamp, conveyance, value added or other similar Taxes, duties, excises or governmental charges imposed by any Tax authority, domestic or foreign, and all recording or filing fees, notarial fees, escrow fees and other similar costs, in each case payable in connection with the transfer of the Acquired Assets and assumption of Assumed Liabilities will be borne by Purchaser.

(b)     Purchaser and Seller shall act reasonably and negotiate in good faith, on or prior to the Closing Date, a reasonable allocation of the Purchase Price among the Acquired Assets in accordance with the requirements of Section 1060 of the Internal Revenue Code and the Treasury Regulations promulgated thereunder; *provided, however*, that if the Purchaser and Seller are not able to reach such an agreed allocation before the Closing despite their good faith efforts acting reasonably, then within sixty (60) days after the Closing Purchaser shall deliver to Seller for Seller's review and approval, such approval not to be unreasonably withheld, an allocation schedule (the "Allocation Schedule") allocating the Purchase Price, including the Assumed Liabilities that are liabilities for federal income Tax purposes, among the Acquired Assets in accordance with the terms hereof. On or before the twentieth (20th) Business Day following its receipt of the Allocation Schedule from Purchaser, Seller shall either agree to such Allocation Schedule and deliver an executed copy thereof to Purchaser or, in the event that Seller shall have objections to all or any portion of the Allocation Schedule, Seller shall deliver to Purchaser a written objection to such Allocation Schedule, which written objection shall set forth in reasonable detail the basis for the objection of Seller thereto. If Seller shall neither execute and deliver a copy of such Allocation Schedule nor deliver such a written objection to such Allocation Schedule by such date, then Seller shall be deemed to have agreed to such Allocation Schedule. In the event that Seller shall deliver a written objection to the Allocation Schedule, Seller and Purchaser shall thereafter work in good faith to resolve any and all objections set forth therein, and upon the resolution of all such objections, Seller and Purchaser shall execute a signed copy of such agreed upon Allocation Schedule. Purchaser and

Seller shall each file all Tax returns (and IRS Form 8594, if applicable) on the basis of such agreed upon allocation, as it may be amended by Purchaser and Seller in writing, and no party shall thereafter take a Tax return position inconsistent with such allocation unless such inconsistent position shall arise out of or through an audit or other inquiry or examination by the Internal Revenue Service or other Governmental Body responsible for Taxes.

6.9 **Transition Services Agreement.** At the Closing, Seller and Purchaser shall execute and deliver to one another a transition services agreement in the form of Exhibit B attached hereto (the "Transition Services Agreement").

6.10 **Transaction-Related Documents**. In light of the fact that all Transaction-Related Documents are Excluded Assets, and notwithstanding any other provision hereof, Seller and its designated representative shall have the right to cause the removal of any and all Transaction-Related Documents which may exist in any of the files of Seller or on any of its computer systems. The parties hereto acknowledge that notwithstanding the foregoing, certain Transaction-Related Documents may inadvertently be or remain resident in the files or computer systems of Seller following the Closing. Accordingly, Purchaser covenants and agrees that it shall not seek to access, review or copy any of such Transaction-Related Documents which may remain in any of the files of Seller or on any of its computer systems, including without limitation its back-up, business continuity or archive systems, at any time, and shall promptly delete or destroy any of such Transaction-Related Documents of which it may become aware. In addition, at the written request of Seller from time to time for so long as the Chapter 11 Case shall not have been discharged, Purchaser shall permit Seller and its designated representatives reasonable access to Purchaser's facilities and systems, including without limitation its back-up, business continuity or archive systems, upon reasonable notice and during business hours, as necessary to access Transaction-Related Documents or other Acquired Assets for the limited purpose of removing or destroying any such Transaction-Related Documents or otherwise taking action necessary or appropriate in connection with the Chapter 11 Case, and shall cooperate with Seller in connection therewith, and Seller agrees to exercise such right in a manner reasonably designed to protect the confidentiality of Purchaser's information and to minimize interference with the operation of its business.

6.11 **Procedure for Additional Prepaid Expenses**. If at any time following the execution of this Agreement and prior to the Closing Seller shall deem it to be appropriate in the conduct of the Business to make any payment to any third party with respect to goods or services to be received by Purchaser following the Closing pursuant to an Assigned Contract (a "Prospective Additional Prepaid Amount"), then Seller shall provide notice to Purchaser identifying the identity of such third party, the nature of such goods or services, and the amount of such Prospective Additional Prepaid Amount. If Purchaser shall approve in writing any such Prospective Additional Prepaid Amount and Seller shall pay such Prospective Additional Prepaid Amount to such third party prior to the Closing, then the amount of such Prospective Additional Prepaid Amount shall be added to and included in the term "Prepaid Expenses Amount" pursuant to the definition thereof in Section 1.1. If Purchaser shall not authorize Seller to pay such Prospective Additional Prepaid Amount to such third party, then Seller shall not pay such amount to such third party.

6.12   **Remittance of Misdirected Amounts**.  If at any time following the Closing Seller or an Affiliate of Seller shall collect or receive from any third party any amount with respect to any Accounts Receivable included within the Acquired Assets or otherwise relating to Purchaser's operation of the Business after Closing, then Seller or such Affiliate shall be deemed to be holding such amount in trust for the benefit of Purchaser and shall promptly remit such amount to Purchaser in accordance with such instructions as Purchaser shall provide to Seller in writing.

**ARTICLE VII**
**TERMINATION; EFFECT OF TERMINATION**

7.1   **Termination**.  This Agreement may, by notice given prior to or at the Closing, be terminated:

      (a)    by mutual consent of Purchaser and Seller;

      (b)    by Purchaser or Seller in the event the Closing has not occurred (other than through failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before April 30, 2018;

      (c)    by Seller if, incident to the Bidding Procedures Order, Seller accepts and closes on a competing bid for the purchase of all or part of the Acquired Assets;

      (d)    by Purchaser if (i) Seller shall file a motion to sell all or part of the Acquired Assets to a third party other than Purchaser and shall thereafter consummate such sale, (ii) Seller's Chapter 11 Case is converted to one under Chapter 7 of the Bankruptcy Code, or (iii) the Bankruptcy Court does not, on or before March 27, 2018, or such later date to which the Bid Deadline may hereafter be extended, enter an order approving the Break-Up Fee set forth in Section 6.4 and payment of such Break-Up fee upon the conditions set forth in that section; or

      (e)    by the non-breaching party upon a material breach of any provision of this Agreement or the Transition Services Agreement (including without limitation Purchaser's failure to pay any amount due from Purchaser under the Transition Services Agreement), provided that such breach has not been waived by the non-breaching party and has continued after notice to the breaching party by the non-breaching party without cure for a period of five (5) Business Days (provided that the non-breaching party shall have an immediate right to terminate if the breaching party has willfully breached any provision of this Agreement or the Transition Services Agreement, which breach is not cured).

7.2   **Effect of Termination**.  If this Agreement is terminated pursuant to Section 7.1, (a) Purchaser shall have no Liability or obligations under this Agreement except for the possible forfeiture of the Deposit on the terms and conditions set forth in Section 7.3, and (b) Seller shall not have any Liabilities under this Agreement other than the payment of the Break-Up Fee as provided in Section 6.4; provided, however, that the obligations of each of Purchaser and Seller set forth in Article VIII shall survive.

7.3     **Deposit**.  If Seller terminates this Agreement pursuant to Section 7.1(e) with respect to a breach by Purchaser, then the Deposit shall be forfeited to Seller.   If this Agreement is terminated pursuant to Section 7.1 for any other reason, the Deposit (together with any interest and income thereon) shall be returned to Purchaser.

## ARTICLE VIII
## GENERAL PROVISIONS

8.1     **"As Is", "Where Is", and "With all Faults" Transaction.**  PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN ARTICLE IV, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS, INCLUDING (A) FINANCIAL PROJECTIONS, REVENUES, PROFITS OR INCOME TO BE DERIVED OR COSTS OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE ACQUIRED ASSETS, (B) THE PHYSICAL CONDITION OF ANY ACQUIRED ASSETS, (C) THE ENVIRONMENTAL CONDITION OR OTHER MATTERS RELATING TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, (D) THE ZONING OF THE REAL PROPERTY, (E) THE VALUE OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF, (F) THE TRANSFERABILITY OF THE ACQUIRED ASSETS, (G) THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, (H) TITLE TO ANY OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF, (I) THE MERCHANTABILITY OR FITNESS OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF FOR ANY PARTICULAR PURPOSE, OR (J) ANY OTHER MATTER OR THING RELATING TO THE ACQUIRED ASSETS OR ANY PORTION THEREOF.  PURCHASER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF ALL ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS PURCHASER DEEMS NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION IV, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.  ACCORDINGLY, PURCHASER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

8.2     **Transaction Expenses**.  Except as expressly provided for herein, each party shall pay all fees, costs and expenses incurred by it with respect to this Agreement, whether or not the transactions contemplated by this Agreement are consummated.

8.3     **Certain Interpretive Matters and Definitions**.  Unless the context requires, (a) references to the plural include the singular and references to the singular include the plural, (b) references to any gender includes the other gender, (c) the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation", (d) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular

provision of this Agreement, and (e) all references to Sections, Articles, Exhibits or Schedules are to Sections, Articles, Exhibits or Schedules of or to this Agreement.

8.4    **Termination of Representations and Warranties**.  The representations and warranties of the parties set forth in this Agreement shall terminate and be of no further force or effect after the Closing.

8.5    **Amendment**.  This Agreement may be amended or modified in whole or in part at any time by an agreement in writing among the parties.

8.6    **Waiver**.  The waiver by a party of a breach of any covenant, agreement, condition or undertaking contained herein shall be made only by a written waiver in each case. No waiver of any breach of any covenant, agreement, condition or undertaking contained herein shall operate as a waiver of any prior or subsequent breach of the same covenant, agreement, condition or undertaking or as a waiver of any breach of any other covenant, agreement, condition or undertaking.

8.7    **Notices**.  All notices, requests and other communications hereunder will be deemed to have been duly given if delivered personally, by an established overnight delivery company, or by certified or registered mail, postage prepaid, return receipt requested, as follows:

|     |     |     |
| --- | --- | --- |
| (a) | If to Seller: | Mr. Thomas O'Donoghue<br>Chief Restructuring Officer<br>Estes-Cox Corp.<br>c/o Hobbico, Inc.<br>2904 Research Road<br>Champaign, Illinois 61822 |
|     | with a copy to: | Bruce A. Fox, Esq.<br>Neal, Gerber & Eisenberg LLP<br>2 North LaSalle Street, Suite 1700<br>Chicago, Illinois 60602 |
| (b) | If to Purchaser: | Estes Industries, LLC<br>13111 Moss Ranch Lane<br>Fairfax, Virginia 22033 |
|     | with a copy to: | Harold Freilich, Esq.<br>Steptoe & Johnson LLP<br>1330 Connecticut Avenue, NW<br>Washington, DC 20036 |
|     | and to: | Danielle Fern, Esq.<br>Steptoe & Johnson LLP<br>633 West Fifth Street, Suite 700<br>Los Angeles, CA 90071 |

or to such other address as may hereafter be designated by a party by the giving of notice in accordance with this Section 8.7. All notices, requests or other communications shall be deemed given when actually delivered if delivered personally or by an established overnight delivery company or upon actual receipt if delivered by certified or registered mail, postage prepaid, return receipt requested.

8.8 **Jurisdiction**. The parties agree that the Bankruptcy Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or breach hereof.

8.9 **Governing Law**. To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of laws.

8.10 **Damages**. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS, LOSS OF PRODUCTION OR OTHER DAMAGES ATTRIBUTABLE TO BUSINESS INTERRUPTION) ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT.

8.11 **Time is of the Essence**. Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

8.12 **Severability**. If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby.

8.13 **Titles and Headings**. Titles and headings of sections of this Agreement are for convenience of reference only and shall not affect the construction of any provision of this Agreement.

8.14 **Assignment; Successors and Assigns**. This Agreement and the rights, duties and obligations hereunder may not be assigned by any party without the prior written consent of the other party, and any attempted assignment without consent shall be void. Subject to this Section 8.14, this Agreement and the provisions hereof shall be binding upon each of the parties, their successors and permitted assigns.

8.15 **No Third-Party Rights**. The parties do not intend to confer any benefit hereunder on any Person other than the parties hereto.

8.16 **Confidentiality Agreement**. The parties acknowledge that the Confidentiality Agreement dated as of January 1, 2018, between Langford Industries, LLC, an Affiliate of Purchaser, and Hobbico (the "Confidentiality Agreement") shall remain in full force and effect during the term specified therein subject to the Closing. The parties further acknowledge that, upon the Closing, Purchaser's obligations under the Confidentiality Agreement shall be of no further force or effect with respect to information pertaining solely and exclusively to the

Business operated by Seller, but shall remain in full force and effect with respect to any and all information of Hobbico and its other Affiliates including, without limitation, information relating to their vendors, operations and customers.    Subject to the requirements of the Bankruptcy Code or as otherwise required by applicable law, for a period of two (2) years following the Closing:  (a) Seller shall, and shall cause its Affiliates to, hold in confidence all confidential and proprietary information relating to the Business or the Acquired Assets, including without limitation all such information consisting of trade secrets, customer lists, marketing plans, proposed plans, developments, concepts, designs and pricing information; (b) if Seller or any of its Affiliates shall be legally compelled to disclose any such information, then Seller shall provide Purchaser with prompt written notice of such requirements so that Purchaser may seek protective order or other remedies; and (c) if any such protective order or other remedy is not obtained, Seller shall, and shall cause its Affiliates to, furnish only such information as it is legally required to provide.

8.17    **Entire Agreement**.    This Agreement, the Ancillary Agreements and the Confidentiality Agreement constitute the entire agreement between the parties regarding the subject matter hereof and no extrinsic evidence whatsoever may be introduced in any proceeding involving this Agreement, the Ancillary Agreements or the Confidentiality Agreement.

8.18    **Execution of this Agreement**.    This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.  The exchange of copies of this Agreement and of signature pages by electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties transmitted by electronic transmission shall be deemed to be their original signatures for all purposes.

*(Signatures appear on following page)*

IN WITNESS WHEREOF, the parties have caused their duly authorized officers to execute this Agreement as of the day and year first written above.

**SELLER:**

ESTES-COX CORP.,
  a Delaware corporation

By: _Thomas S. O'Donoghue Jr._
Name: _Thomas S. O'Donoghue, Jr._
Title: _CHIEF RESTRUCTURING OFFICER_


**PURCHASER:**

ESTES INDUSTRIES, LLC
  a Delaware limited liability company

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties have caused their duly authorized officers to execute this Agreement as of the day and year first written above.

**SELLER:**

ESTES-COX CORP.,
  a Delaware corporation

By:_____
Name:_____
Title:_____


**PURCHASER:**

ESTES INDUSTRIES, LLC
  a Delaware limited liability company

By:_____
Name:_____Robert Ellis Langford_____
Title:_____Manager_____

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

# EXHIBIT A

**Bidding Procedures Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>HOBBICO, INC., *et al.*,[1]<br><br>                       Debtors. | Chapter 11<br><br>Case No. 18-10055 (KG)<br><br>Jointly Administered |

### ORDER (A) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF ALL, OR SUBSTANTIALLY ALL, OF THE DEBTORS' ASSETS; (B) APPROVING BID PROTECTION PROCEDURES; (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) APPROVING FORM AND MANNER OF THE SALE, CURE AND OTHER NOTICES; AND (E) SCHEDULING AN AUCTION AND A HEARING TO CONSIDER THE APPROVAL OF THE SALE

Upon the motion ("Motion")[2] of the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or the "Company") pursuant to sections 105, 363, 364, 365 and 503 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"), and rules 2002, 6004, 6006, 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (each a "Bankruptcy Rule," and collectively, the "Bankruptcy Rules"), for (I) an order (the "Bidding Procedures Order") (A) approving the Debtors' proposed auction (the "Auction") and the bidding procedures (as the same may be amended, supplemented, or otherwise modified from time to time, the "Bidding Procedures") to be employed in connection with the proposed sale (the "Sale") of all, or substantially all, of the Debtors' assets (the "Assets"); (B) approving certain potential bid protections in connection therewith; (C) establishing procedures for the assumption and assignment of executory contracts and

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Hobbico, Inc. (9545); Arrma Durango Limited; Axial R/C Inc. (0233); Estes-Cox Corp. (2196); Great Planes Model Manufacturing, Inc. (5259); Revell Inc. (8545); Tower Hobbies, Inc. (5185); and United Model, Inc. (5302). The Debtors' headquarters are located at 2904 Research Road, Champaign, Illinois 61822.

[2]     Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion.

unexpired leases; (D) approving the form and manner of notice of the Sale, the notice of assumption and assignment of executory contracts and unexpired leases, including the form and manner of notice of proposed cure amounts (the "Cure Notice") and the other notices set forth herein; and (E) scheduling the Auction and a hearing before the court (the "Sale Hearing") to consider approval of the Sale (collectively, (I) (A) through (E) above, the "Bidding Procedures Relief"); and (II) an order (the "Sale Order") authorizing (A) the Sale of the Assets to the bidder(s) with the highest or otherwise best bid(s) (the "Successful Bidder") free and clear of all claims, liens and encumbrances as provided therein; and (B) the Debtors' assumption and assignment of the applicable executory contracts and/or unexpired leases to the Successful Bidders; and (III) certain related relief; and the Court having considered that portion of the Motion seeking the Bidding Procedures Relief, and the arguments of counsel made and the evidence adduced, at the hearing held on that portion of the Motion (the "Bidding Procedures Hearing"); and due and sufficient notice of the Bidding Procedures Hearing and the relief sought therein having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the Bidding Procedures Relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation thereon and good and sufficient cause appearing therefor, it is hereby:

**FOUND, CONCLUDED AND DETERMINED THAT:[3]**

A.    This Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363, 364, 365, 503 and Bankruptcy Rules 2002, 6004, 6006 and 9014.

B.  The relief granted herein is in the best interests of the Debtors, their estates and creditors, and other parties in interest.

C.  The Debtors have articulated good and sufficient business reasons for the Court to (i) approve the Bidding Procedures, Bid Protection Procedures, the Assumption and Assignment Procedures, the form and manner of the Sale Notice, the Cure Notice and the other notices of the Motion, the Auction and the Sale Hearing as set forth herein, (ii) set the date for the Auction, the Sale Hearing, and the other dates set forth herein and (iii) grant the relief requested in the Motion as provided herein.

D.  Due, sufficient and adequate notice of the Bidding Procedures Hearing and the relief granted in this Order has been given in light of the circumstances and the nature of the relief requested, and no other or further notice thereof is required. The Debtors' notice of the Motion and the relief requested in the Motion for which approval was sought at the Bidding Procedures Hearing is appropriate and reasonably calculated to provide all interested parties with timely and proper notice under Bankruptcy Rules 2002, 4001, 6004 and 6006, and no other or further notice of, or hearing on, this Bidding Procedures Order and that portion of the Motion being approved hereby is required.

E.  The Debtors' Sale Notice, Cure Notice and other notices with respect to the Sale, the Auction, the assumption and assignment procedures set forth in section E of the Motion (the "Assumption and Assignment Procedures"), and the Sale Hearing are appropriate and

3

reasonably calculated to provide all interested parties with timely and proper notice thereof and no further notice of each is necessary or required.

F.      The Bidding Procedures, substantially in the form attached as Exhibit A, and incorporated herein by reference as if fully set forth herein, and the Bid Protection Procedures are fair, reasonable and appropriate, were negotiated in good faith and represent the best method for maximizing the value of the Debtors' estates in connection with the Sale.

G.      The Bid Protections, to the extent payable under any Stalking Horse Agreements and the terms and restrictions of this Order, shall be deemed (i) an actual and necessary cost of preserving the Debtors' estates within the meaning of Bankruptcy Code section 503(b), (ii) of substantial benefit to the Debtors' estates, and (iii) reasonable and appropriate in light of the size and nature of the transactions.

H.      The Assumption and Assignment Procedures are reasonable and appropriate.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      Those portions of the Motion seeking approval of the Bidding Procedures Relief are GRANTED, as set forth herein.

2.      Any objection to the portions of the Motion seeking approval of the Bidding Procedures Relief or any other relief granted in this Order, to the extent not resolved, waived or withdrawn, and all reservations of rights included therein, is hereby overruled and denied on the merits.

3.      The form agreement attached hereto as Exhibit B and incorporated herein by reference as if fully set forth herein (the "Form APA") is hereby approved as the Form APA for purposes of serving as a Stalking Horse Agreement or, if no Stalking Horse Agreement exists, a Baseline Bid at the Auction, and is appropriate and reasonably calculated to enable the Debtors

and other parties in interest to easily compare and contrast the differing terms of the Bids presented at the Auction.

A.    **Bidding Procedures**

4.    The Bidding Procedures in the form attached hereto as Exhibit A and incorporated herein by reference as if fully set forth in this Order are hereby APPROVED. The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures. The failure to specifically include or reference any particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such procedures, it being the intent of this Court that the Bidding Procedures be authorized and approved in their entirety.

B.    **The Bid Deadline**

5.    As further described in the Bidding Procedures, a potential Bidder who desires to make a Bid for the Assets that satisfies the bidding requirements set forth in the Bidding Procedures shall deliver its Bid, so as to be received by no later than **5:00 p.m. (prevailing Central Time)** on **March 23, 2018** (the "Bid Deadline") to (the parties in paragraph 5(a) through 5(vii) collectively, the "Notice Parties"):

(i)    **The Sellers**, 2904 Research Road, Champaign, Illinois 61822, Attention: Tom O'Donoghue (tom.odonoghue@cr3partners.com);

(ii)    **Counsel to the Sellers**, Neal Gerber & Eisenberg, LLP, 2 N. LaSalle Street, Suite 1700, Chicago, Illinois 60602, Attention: Nicholas M. Miller (nmiller@nge.com), Mark A. Berkoff (mberkoff@nge.com) and Bruce A. Fox (bfox@nge.com); and Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, Delaware 19899, Attention: Curtis Miller (cmiller@MNAT.com) and Robert J. Dehney (rdehney@MNAT.com);

(iii)    **Financial advisor to the Sellers**, Lincoln Partners Advisors LLC, 633 West Fifth Street, Suite 6650, Los Angeles, California 90071, Attention: Alexander W. Stevenson (AStevenson@lincolninternational.com) and Sherman Guillema (SGuillema@lincolninternational.com);

(iv)     **Counsel to Wells Fargo Bank, National Association, in its capacity as Prepetition Agent and Postpetition Agent (in such capacities, the "Agents") for the Prepetition Lenders and the Postpetition Lenders (collectively, the "Lenders"), respectively,** Goldberg Kohn Ltd., 55 East Monroe Street, Suite 3300, Chicago, Illinois 60603, Attention: Randall L. Klein (randall.klein@goldbergkohn.com) and Zachary J. Garrett (zachary.garrett@goldbergkohn.com), and Burr & Forman LLP, 1201 Market Street, Suite 1407, Wilmington, Delaware 19801, Attention: J. Cory Falgowski (jfalgowski@burr.com);

(v)     **Financial advisor to the Agent,** Focus Management Group USA, Inc., 5001 West Lemon Street, Tampa, Florida 33609, Attention: Robert O. Riiska (r.riiska@focusmg.com) and Samuel M. Williams (s.williams@focusmg.com);

(vi)     **counsel to the Official Committee of Unsecured Creditors** (the "Committee"), Cullen and Dykman LLP, The Legal Center, One Riverfront Plaza, Newark, NJ 07102, Attention: S. Jason Teele (steele@cullenanddykman.com) and ; and Whiteford Taylor Preston LLC, The Renaissance Center, Suite 500, 405 North King Street, Wilmington, Delaware 19801, Attention: Christopher M. Samis (CSamis@wtplaw.com); and

(vii)     **financial advisor to the Committee,** Emerald Capital Advisors, 70 E. 55th Street, 17th Floor, New York, NY 10022, Attention: John P. Madden (jpm@emeraldcapitaladvisors.com).

**C.    Notices of Sale, Bidding Procedures, Bid Protections and the Sale Hearing**

6.     The notices described below are hereby approved, and the service or publication thereof (as applicable) as described below constitutes proper, timely, adequate and sufficient notice of the Sale, the Bidding Procedures, and the Sale Hearing, and no other or further notice shall be required.

7.     Within three (3) Business Days after the entry of this Order, or as soon thereafter as practicable, the Debtors (or their agents) shall serve this Order and the Bidding Procedures by first-class mail, postage prepaid, or by email, where available, upon the following parties (collectively, the "Supplemental Notice Parties"):

(a)     all entities known to have expressed a *bona fide* interest in a transaction with respect to the Assets within the past two years;

6

    (b)    all entities known to have asserted any lien, claim or encumbrance in or upon any of the Assets;

    (c)    all federal, state and local environmental, regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion;

    (d)    the U.S. Trustee;

    (e)    the Agents;

    (f)    the Internal Revenue Service;

    (g)    the Securities and Exchange Commission;

    (h)    the U.S. Attorney for the District of Delaware; and

    (i)    all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

8.    On March 9, 2018, as set forth in the certificate of service filed on March 12, 2018 [Docket No. 237], the Debtors (or their agents) served by first-class mail, postage prepaid, a notice of sale (the "Sale Notice") upon all known creditors of the Debtors and all counterparties to the Debtors' executory contracts and unexpired leases. Such notice is deemed sufficient and proper notice of the Sale to such creditors and contract counterparties.

9.    On or about March 14, 2018, the Debtors shall publish the Sale Notice on one occasion in *USA Today* and the *Champaign News-Gazette*. Such publication notice is deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

10.    The Sale Hearing to approve the Sale shall be held on **March 28, 2018 at 10:00 a.m. (prevailing Eastern Time),** at the United States Bankruptcy Court for the District of Delaware, 824 Market St. N, 3rd Floor, Wilmington, Delaware 19801, before the Honorable Kevin Gross.

11.     All objections to the Sale (a "Sale Objection") must be in writing and filed on and served so as to be received by **March 21, 2018 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline") with the Clerk of the Court, 824 Market St. N, 3rd Floor, Wilmington, Delaware 19801.  In addition, any Sale Objection must be served on the Notice Parties and counsel to any Stalking Horse Purchasers (at the addresses identified in any pleadings filed with the court by such Stalking Horse Purchaser) so as to be received on the Sale Objection Deadline; provided however, that any objections to the conduct of the Auction or selection of the Successful Bid or Back-Up Bids (a "Supplemental Objection") shall be in writing, filed with the Court, together with proof of service, and served so as to be received by the Notice Parties and any Stalking Horse Purchasers, on or before **4:00 p.m. (prevailing Eastern Time)** on **March 27, 2018.**  Notwithstanding anything in this Order, the Sale Order, or the Sale Notice to the contrary, any Sale Objection or Supplemental Objection of any Agent or any Lender shall be in writing, filed with the Court, and served so as to be received by the Notice Parties on or before 4:00 p.m. (prevailing Eastern Time) on the later of (a) March 27, 2018 or (b) if the Sale Hearing is adjourned or otherwise rescheduled, the day prior to the date of the Sale Hearing.

12.     Failure to file and serve a Sale Objection or Supplemental Objection as aforesaid shall be deemed to be consent to the Sale for purposes of section 363(f) of the Bankruptcy Code.

13.     The Sale Hearing may be adjourned by the Debtors, in consultation with the Consultation Parties, from time to time without further notice to creditors or other parties in interest either by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of the court, in each case subject to the Bidding Procedures; provided however, that the Sale Hearing may not be adjourned to a date later than **March 29, 2018** without the prior written consent of the Agents.

**D.      The Auction**

14.      The Debtors are authorized, in consultation with the Consultation Parties and subject in all respects to the terms of this Order and the Bidding Procedures, to conduct the Auction with respect to the Assets. The Auction shall take place on **March 26, 2018 at 10:00 a.m. (prevailing Central Time)** at the offices of Neal Gerber & Eisenberg, LLP, 2 N. LaSalle Street, Suite 1700, Chicago, Illinois 60602, or such other place and time as the Debtors shall notify all Qualified Bidders and each of their respective counsel and advisors, and the Consultation Parties. The Debtors are authorized, subject to the terms of this Order and the Bidding Procedures, to take actions reasonably necessary, in the discretion of the Debtors, to conduct and implement the Auction.

15.      Only the Debtors, the Consultation Parties, individual Committee members, the Agents, the Lenders, and the Qualified Bidders, in each case, along with their respective representatives and counsel, may attend the Auction (such attendance to be in person) and only Stalking Horse Purchasers and such other Qualified Bidder(s) will be entitled to make any Bids at the Auction; provided, however, that any material creditor may attend the Auction if it provides the Debtors with written notice of its intention to attend the Auction on or before the Bid Deadline. Such written notice must be sent to counsel for the Sellers via electronic mail to Nicholas M. Miller (nmiller@nge.com) and Curtis Miller (cmiller@MNAT.com). The Debtors and their professionals shall direct and preside over the Auction, and the Auction shall be transcribed.

16.      Each Stalking Horse Purchaser (in its capacity as a Qualified Bidder) and each other Qualified Bidder participating in the Auction must confirm that it has (a) not engaged in any collusion with respect to the bidding or Sale of the Assets, (b) reviewed, understands and accepts the Bidding Procedures and (c) consented to the core jurisdiction of the Court.

17.     Subject to the rights of parties in interest to (i) challenge the Sale or the Sale Process, (ii) challenge the Debtors' decisions with respect to the Sale Process, (iii) argue that such decisions are not governed by the "business judgment" standard or (iv) such other rights as such parties may have under applicable law, the Debtors may, in each case pursuant and subject to, and in accordance with, the Bidding Procedures, (a) determine, in their business judgment, which Qualified Bid is the highest and best proposal for the Assets and which is the next highest and best proposal for the Assets and (b) reject any bid that, in the Debtors' business judgment, is (x) inadequate or insufficient, (y) not in conformity with the requirements of the Bidding Procedures, the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules or (z) contrary to the best interests of the Debtors and their estates.

18.     Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures, the Stalking Horse Purchasers shall be Qualified Bidders.

**E.     The Stalking Horse Agreements and Bid Protection Procedures**

19.     The Debtors may, in their discretion, with the consent of the Agents and in consultation with the Consultation Parties, enter into one or more Stalking Horse Agreement(s) for the sale of any Assets, in accordance with the terms of this Order and the Bidding Procedures.

20.     Subject to the terms of this Order and the Bidding Procedures, the Debtors may, in their discretion, with the consent of the Agents and in consultation with the Consultation Parties, offer each Stalking Horse Bidder Bid Protections, subject to the procedures described herein (the "Bid Protection Procedures").

21.     Upon entry into a Stalking Horse Agreement, the Debtors shall contact chambers to ascertain the Court's availability for an expedited hearing ("Expedited Hearing"), should one become necessary pursuant to the terms of this Order.

22.     Upon entry into a Stalking Horse Agreement, the Debtors shall file with the Court, serve on the Notice Parties and the Supplemental Notice Parties (via email or facsimile transmission if available, or by overnight delivery), and cause to be published on the website maintained by JND Corporate Restructuring, the Debtors' claims and noticing agent in these chapter 11 cases, located at www.jndla.com/cases/hobbico (the "JND Website"), a notice (a) setting forth the material terms of such Stalking Horse Agreement, including the terms of the applicable Bid Protections (each, a "Stalking Horse and Bid Protection Notice"), (b) identifying the date of the potential Expedited Hearing (the "Expedited Hearing Date"), (c) identifying the deadline, which shall be at least 48 hours after the Debtors file and serve the Stalking Horse and Bid Protection Notice, by which objections to the Stalking Horse Agreement or Bid Protections must be filed (the "Stalking Horse and Bid Protections Objection Deadline"), and (d) attaching the proposed Stalking Horse Agreement.

23.     Stalking Horse and Bid Protection Objections shall (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (c) state with specificity the legal and factual bases thereof, and (d) be filed on or before the Stalking Horse and Bid Protections Deadline.

24.     If no timely Stalking Horse and Bid Protection Objection is filed and served in accordance with this Order, then the Debtors' entry into such Stalking Horse Agreement and the provision of Bid Protections through such agreement shall be deemed authorized and approved without further order of the Court and without the need for an Expedited Hearing.

11

25.    If a timely Stalking Horse and Bid Protection Objection is filed and served with respect to a Stalking Horse Agreement in accordance with this Order, then the Court will conduct the Expedited Hearing to consider whether to authorize the Debtors to enter into the Stalking Horse Agreement and provide any proposed Bid Protections.

26.    Pursuant to sections 105, 363, 364 and 503 of the Bankruptcy Code, the Debtors are hereby authorized to pay the Bid Protections pursuant to and subject to the terms and conditions set forth in the Stalking Horse Agreements, to the extent such Stalking Horse Agreements are approved pursuant to the Bid Protection Procedures or any other order of the Court.

27.    Any Bid Protections approved pursuant to the Bid Protection Procedures shall constitute a superpriority administrative expense of the Debtors with priority over any and all administrative expenses of any kind, including those specified in sections 503(b) or 507(b) of the Bankruptcy Code, but shall be subordinate only to the Carve-Out and to the administrative expense claims granted to, or in respect of, the Secured Parties and the Aggregate Debt (as such terms are defined in the DIP Financing Order) pursuant to the DIP Financing Order.

28.    The Bid Protections shall be the sole remedy of the Stalking Horse Purchasers if the applicable Stalking Horse Agreement is terminated under circumstances where the Bid Protections are payable.

F.    **Contract Assumption and Assignment Procedures**

29.    The Assumption and Assignment Procedures as set forth in the Motion are hereby approved and made part of this Order as if fully set forth herein.    The Assumption and Assignment Procedures are appropriate and fair to all non-Debtor counterparties and comply in all respects with the Bankruptcy Code.

30.     The decision to assume and assign the applicable assumed and assigned contracts and/or leases to the Successful Bidder(s) is subject to Court approval and the consummation of a Sale of the Assets.  Accordingly, absent the consummation of such Sale, the applicable assumed and assigned contracts and/or leases shall not be deemed assumed and/or assigned and shall, in all respects, be subject to further administration under the Bankruptcy Code.

    (a)     **Cure Notice**

31.     On March 9, 2018, as set forth in the certificate of service filed on March 12, 2018 [Docket No. 237], the Debtors (or their agents) served by first-class mail, postage prepaid, Cure Notices upon all counterparties to the Debtors' executory contracts and unexpired leases and any other affected parties.  Such notice is (a) reasonably calculated to provide sufficient and effective notice to all non-Debtor counterparties to assumed and assigned contracts or leases and any other affected parties of the Debtors' intent to assume and assign some or all of such contracts or leases and to afford the non-Debtor counterparty to each such contract or lease the opportunity to exercise any rights affected by the Motion pursuant to Bankruptcy Rules 2002, 6004 and 6006, and (b) hereby approved.

32.     The inclusion of a contract on a Cure Notice shall not constitute or be deemed a determination or admission by the Debtors, the applicable Stalking Horse Purchaser, the Successful Bidder(s) or any other party in interest that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code or that such contract or lease will be assumed in connection with the Sale of the Assets.  The Debtors retain all of their rights, claims and causes of action with respect to the contracts or leases listed on the Cure Notice.

13

(b)      **Contract Objection Procedures**

33.      All Contract Objections must be filed and served so as to be received by **March 21, 2018 at 4:00 p.m. (prevailing Eastern Time)** (the "Contract Objection Deadline").

34.      Any Contract Objection must be in writing and filed with the Clerk of the Court, 824 Market St. N, 3rd Floor, Wilmington, Delaware 19801, and served so as to be received by the Contract Objection Deadline on the Notice Parties.

35.      Any Contract Objection must state (a) the basis for such objection and (b) with specificity what Cure Amount(s) the non-Debtor counterparty to the relevant executory contract(s) or unexpired lease(s) believes is required (in all cases with appropriate documentation in support thereof).

36.      Any Contract Objection solely to the Cure Amount(s) shall not prevent or delay the Debtors' assumption and assignment of assumed and assigned contract(s) or lease(s). If a party objects solely to Cure Amount(s), the Debtors may, with the consent of the relevant Successful Bidder, hold the claimed Cure Amount(s) in reserve pending further order of the Court or mutual agreement of the parties. So long as the Cure Amount(s) are held in reserve, and there are no other unresolved objections to assumption and assignment of the applicable assumed and assigned contract(s) or lease(s), the Debtors can, without further delay, assume and assign such contract(s) or lease(s). Under such circumstances, the objecting non-Debtor counterparty's recourse is limited to the funds held in reserve.

37.      If no objection to the Cure Amount(s) is timely received, the Cure Amount(s) set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any assigned contract(s) or lease(s) or other document(s) as of the date of the Cure Notice.

38.      As soon as reasonably practicable after receiving the schedule from any Stalking Horse Bidder or other Qualified Bidder, the Debtors will prepare and file a list of those

14

executory contracts and unexpired leases that such bidders elect to have assumed and assigned (the "Designated Contracts") at Closing pursuant to section 365 of the Bankruptcy Code, subject to any right to add or delete executory contracts or unexpired leases in accordance with the applicable Stalking Horse Agreement.

39.    As soon as reasonably practicable thereafter, the Debtors will post on the Case Website (a) the list of any Designated Contracts, which the Debtors will update as and when executory contracts or unexpired leases are added or deleted by any such Bidders and (b) a description of the Bidders and information as to the Bidders' ability to perform the Debtors' obligations under the relevant Designated Contracts.

40.    To the extent that any non-Debtor counterparty wishes to object to the adequate assurance of future performance by a Qualified Bidder under the applicable executory contract(s) or unexpired lease(s) (an "Adequate Assurance Objection" and together with a Contract Objection, an "Objection"), then such non-Debtor counterparty shall file a written Adequate Assurance Objection with the Court and serve such objection on the Debtors, the Notice Parties and the applicable Qualified Bidder(s) so that such Adequate Assurance Objection is received on or before **12:00 p.m. (prevailing Eastern Time) on Tuesday, March 27, 2018** (the "Adequate Assurance Objection Deadline"). An Adequate Assurance Objection shall be filed on or before the Adequate Assurance Objection Deadline in accordance with, and subject to, the Contract Objection Procedures set forth above.

41.    If any non-Debtor counterparty does not timely file and serve an Objection as set forth above, such counterparty will be: (i) deemed to have consented to the Cure Amount(s), if any, set forth in the Cure Notice; (ii) barred, estopped and enjoined from asserting any additional Cure Amount(s) under the assumed and assigned executory contract(s) or unexpired lease(s);

15

(iii) barred from objecting to the assumption and assignment of the applicable assumed and assigned executory contract(s) or unexpired lease(s) to the Successful Bidder, and (iv) barred from objecting to adequate assurance of future performance by the Successful Bidder.

**G.    Consumer Privacy Ombudsman**

42.    Pursuant to section 332(a) of the Bankruptcy Code, the Office of the United States Trustee for the District of Delaware is directed to appoint one (1) disinterested person (other than the U.S. Trustee) to serve as the consumer privacy ombudsman in these chapter 11 cases.

43.    Subject to further order of the Court, the consumer privacy ombudsman shall perform the functions set forth in section 332(b) of the Bankruptcy Code.

44.    The consumer privacy ombudsman shall at all times comply with section 332(c) of the Bankruptcy Code.

45.    The consumer privacy ombudsman shall be compensated pursuant to section 330 of the Bankruptcy Code upon approval by the Court of a request for compensation.

**H.    Related Relief**

46.    Nothing in this Order does or will modify or otherwise affect any of the terms of the DIP Financing Order or any other Postpetition Document (as defined in the DIP Financing Order), including, without limitation, any of the Sale Covenants (as defined in the Postpetition Loan Agreement (as defined in the DIP Financing Order)).

47.    The Debtors are hereby authorized and empowered to take such actions as may be reasonably necessary to implement and effect the terms and requirements established by this Order.

48.    This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

49.     The Debtors are authorized to proceed with the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

50.     This Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the Debtors' estates.

51.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7052, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

52.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

53.     Any and all objections to the Sale are hereby preserved and subject to the terms and deadlines set forth in this Order.

Dated: March 14, 2018
        Wilmington, Delaware

THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

## BIDDING PROCEDURES

These bidding procedures (the "Bidding Procedures") set forth the process by which Hobbico, Inc. and certain of its subsidiaries (collectively, the "Company" or the "Sellers")[1] shall conduct a sale (the "Sale") by auction (the "Auction") of some or substantially all of their assets.

On [•], 2018, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order (the "Bidding Procedures Order"), which, among other things, authorized the Sellers to determine the highest and otherwise best offer(s) for their assets, subject to the process and procedures set forth below.

The Court presides over the Sellers' jointly administered chapter 11 bankruptcy cases (the "Chapter 11 Cases") captioned *In re Hobbico, Inc.. et al.,* Ch. 11 Case No. 18-1055 (KG) (Bankr. D. Del. Jan. 10, 2018).

On February 26, 2018, the Sellers filed the *Motion for (I) an Order (A) Establishing Bidding Procedures for the Sale of All, or Substantially All, of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of the Sale, Cure and Other Notices; and (E) Scheduling an Auction and a Hearing to Consider the Approval of the Sale; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens and Encumbrances; and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* (the "Sale Motion").[2]   The Bidding Procedures Order and the order approving the Sale are referred to herein, collectively, as the "Sale Orders."

As referenced in the Sale Motion, the Sellers have been in active negotiations with numerous prospective buyers that may submit, or already have submitted, letters of intent and/or indications of interest to become a stalking horse purchaser for some or all of the Sellers' assets (collectively, the "Prospective Purchasers").  After consulting with their lenders, and to meet the various deadlines established in their postpetition credit facility, the Sellers sought and obtained court approval of procedures by which the Sellers may, in their discretion, with the consent of the Agents, enter into one or more stalking horse asset purchase agreements, each of which must qualify as a Qualified Bid (as defined below) (including all exhibits, schedules and ancillary agreements related thereto, and as amended and in effect, the "Stalking Horse Agreements"), with one or more Prospective Purchasers, each of which must qualify as a Qualified Bidder (as defined below) (collectively, the "Stalking Horse Purchasers"), which Stalking Horse Agreements contemplate a purchase and sale of some or substantially all of the Sellers' assets to the Stalking Horse Purchasers, on the terms and subject to the conditions provided therein.

---

[1]  The Sellers are as follows: Hobbico, Inc. (9545); Arrma Durango Limited; Axial R/C Inc. (0233); Estes-Cox Corp. (2196); Great Planes Model Manufacturing, Inc. (5259); Revell Inc. (8545); Tower Hobbies, Inc. (5185); and United Model, Inc. (5302).

[2]  Capitalized terms used but not defined herein have the meaning ascribed to them in the Sale Motion.

27471434.14

## I.    ASSETS TO BE SOLD

The Sale Motion contemplates one or a combination of multiple offers to purchase all or substantially all of the Sellers' assets (such assets that a Successful Bidder acquires pursuant to the terms of the applicable Stalking Horse Agreement or Modified Asset Purchase Agreement (as defined below) that is consummated in connection with the Successful Bid of such Successful Bidder, collectively, the "Acquired Assets"). A party may participate in the bidding process by submitting a Bid (as defined below) for all of the Acquired Assets or for smaller subsets of the Acquired Assets (as described in more detail below, the "Lots").

Subject to the terms of the Sale Orders, upon the consummation of the Successful Bid and payment of all consideration in accordance with the terms thereof, all of the Sellers' right, title and interest in and to the Acquired Assets shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Liens") except as otherwise provided in the Stalking Horse Agreement or Modified Asset Purchase Agreement (as defined below) submitted by a Successful Bidder (as defined below) (including any exhibits or schedules thereto), with such Liens to attach to the proceeds of the sale of the Acquired Assets with the same validity and priority as such Liens applied against the Acquired Assets immediately prior to the consummation of such Successful Bid.

## II.    THE CONSULTATION PARTIES

The Sellers will consult Wells Fargo Bank, National Association, in its capacity as Prepetition Agent and Postpetition Agent (in such capacities, collectively, "Agents") on behalf of the Prepetition Lenders and the Postpetition Lenders (collectively, the "Lenders"), respectively, and the other Secured Parties (as such terms are defined in the DIP Financing Order[3]), the official committee of unsecured creditors appointed to represent unsecured creditors in the Chapter 11 Cases pursuant to Bankruptcy Code Section 1102 (the "Committee"), and each of their respective counsel and advisors (each, a "Consultation Party" and collectively, the "Consultation Parties") as explicitly provided for in the Bidding Procedures; provided, however, that the Sellers shall not be required to consult with any Consultation Party during the Auction process to the extent such Consultation Party has submitted a Bid (as defined below) or has had a Bid submitted on its behalf for so long as such Bid remains open, if the Sellers determine, in their reasonable business judgment, that consulting with such Consultation Party regarding any issue, selection or determination would be likely to have a chilling effect on potential bidding or otherwise be contrary to the goal of maximizing value for the Sellers' estates from the sale process; provided, further, however, that the Committee shall not independently communicate with any Prospective Purchaser, Preliminary Interested Purchaser (as defined below), or Bidder (as defined below), in each case, without the prior written consent of Sellers.

To the extent the Bidding Procedures require the Sellers to consult with any Consultation Party in connection with making a determination or taking an action, or in connection with any

---

[3] Order Authorizing Debtors To: (A) Use Cash Collateral On A Final Basis; (B) Incur Postpetition Debt On A Final Basis; and (C) Grant Adequate Protection And Provide Security And Other Relief To Wells Fargo Bank, National Association, As Agent, And The Other Secured Parties (Docket No. 162) (the "DIP Financing Order").

other matter related to the Bidding Procedures or the Auction, the Sellers will do so in a regular and timely manner prior to making such determination or taking such action.

Subject to the terms of any Orders entered in the Chapter 11 Cases and except as otherwise provided in these Bidding Procedures (including, without limitation, in respect of the consent rights of the Agents provided herein), after consultation with the Consultation Parties, the Sellers shall have the right and obligation to make all decisions regarding Bids and the Auction as provided herein as they determine to be in the best interest of their estates, whether or not Consultation Parties agree with that decision.

## III.   BIDDING PROCESS

### A.   Overview

The Sellers and their advisors will, subject to the other provisions of these Bidding Procedures, including the consultation obligations and Agent consent rights set forth herein:

    1.    coordinate the efforts of Preliminary Interested Purchasers (as defined below) in conducting their due diligence investigations;

    2.    receive offers from Bidders (as defined below);

    3.    determine whether any person is a Qualified Bidder (as defined below); and

    4.    conduct the Auction and further negotiate any offers made to purchase the Acquired Assets.

### B.   Key Dates For Potential Competing Bidders

The Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Sellers and to submit competing bids for the Acquired Assets. The Sellers will assist Preliminary Interested Purchasers in conducting their respective due diligence investigations and will accept Bids until **March 23, 2018 at 5:00 p.m. (prevailing Central Time)** (the "Bid Deadline"), subject to any extension of the Bid Deadline in accordance with, and subject to, these Bidding Procedures.

The key dates for the Sale process are as follows:[4]

| March 23, 2018 at 5:00 p.m. CST | **Bid Deadline:** Due Date to submit a Qualified Bid and Good Faith Deposit (each as defined |

---

[4] These dates are subject to extension or adjournment as provided for herein with respect to one or more Lots (as defined below) or other applicable Acquired Assets, in each case, with the prior written consent of Agents and in consultation with the Consultation Parties, subject to the terms of the Postpetition Loan Agreement and the other Postpetition Documents (as such terms are defined in the DIP Financing Order).

| | below) |
|---|---|
| March 26, 2018 at 10:00 a.m. CST | **Auction**:   To be held at Neal, Gerber & Eisenberg, LLP, 2 N. LaSalle St., Suite 1700, Chicago, IL 60602 |
| March 28, 2018 at 10:00 a.m. EDT | **Sale Hearing**:  To be held at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom #3, Wilmington, Delaware 19801 |

C.    Access to Diligence Materials

To participate in the bidding process either as a Stalking Horse Bidder or to effectuate an alternate sale transaction for some or substantially all of the Acquired Assets (an "Alternate Transaction") and to receive access to due diligence materials (the "Diligence Materials"), a party must submit to the Sellers an executed confidentiality agreement in substantially the same form as that which was previously approved by Lincoln (as defined below) and the Agents and circulated to Prospective Purchasers, and otherwise in form and substance satisfactory to Lincoln and the Agents (a "Confidentiality Agreement"), and provide preliminary evidence satisfactory to the Sellers and their advisors and the Agents, in consultation with the Consultation Parties, of such party's financial wherewithal to consummate a transaction as a Stalking Horse Bidder or through an Alternate Transaction.

A party who executes such a Confidentiality Agreement for access to Diligence Materials, and provides such preliminary evidence of financial wherewithal, shall be a "Preliminary Interested Purchaser."   The Sellers will afford any Preliminary Interested Purchaser the time and opportunity to conduct reasonable due diligence in accordance with a diligence protocol determined by the Sellers and their advisors; provided, however, that the Sellers shall not be obligated to furnish any due diligence information after the Bid Deadline to any party that has not submitted a Qualified Bid (as defined below) on or before the Bid Deadline.

The Sellers reserve the right to withhold any Diligence Materials that the Sellers, in consultation with the Consultation Parties, determine are business-sensitive or otherwise not appropriate for disclosure to a Preliminary Interested Purchaser who is a competitor or customer of the Sellers or is affiliated with any competitor or customer of the Sellers.  Neither the Sellers nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Preliminary Interested Purchaser.

All due diligence requests must be directed to Lincoln Partners Advisors LLC ("Lincoln"), Attention: Alexander W. Stevenson (AStevenson@lincolninternational.com) and Sherman Guillema (SGuillema@lincolninternational.com).

D.    Due Diligence from Bidders

Each Preliminary Interested Purchaser and each Bidder shall comply with all reasonable requests for additional information and due diligence access by the Sellers or their advisors regarding such Preliminary Interested Purchaser or Bidder, as applicable, and its contemplated transaction.  Failure by a Preliminary Interested Purchaser or Bidder (other than any Stalking Horse Purchaser) to comply with requests for additional information and due diligence access may be a basis for the Sellers, with the consent of the Agents, to determine that such Bidder is not a Qualified Bidder in consultation with the Consultation Parties.

## IV.    AUCTION QUALIFICATION PROCESS

Qualifying Bids.  To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "Bid"), and each party submitting such a Bid (other than any party designated as a Stalking Horse Purchaser) (each, a "Bidder"), must be reasonably determined by the Sellers and Agents, in consultation with the Consultation Parties, to satisfy each of the following conditions:

    1.    Good Faith Deposit:  Each Bid must be accompanied by a cash deposit, paid by wire transfer of immediately available funds, in the amount of five percent (5%) of the purchase price (excluding any Assumed Liabilities) contained in the Modified Asset Purchase Agreement (as defined below), which deposit shall be held in an escrow account to be identified and established by the Sellers (the "Good Faith Deposit").

    2.    Higher and Better Terms:  In connection with any Bid for the Acquired Assets, such Bid must be on terms that the Sellers, in their business judgment and after consulting with the Consultation Parties, determine are higher and better for the Sellers on a cash (or cash equivalent) basis than the terms of any Stalking Horse Agreements.  In the absence of a Stalking Horse Agreement for the applicable Assets, the Debtors, with the consent of the Agents, and in consultation with the Consultation Parties, shall determine which bid(s) are the highest and best bids for the Acquired Assets.

    3.    Executed Agreement:  Each Bid must be based on the form asset purchase agreement attached hereto (the "Form APA") or, if applicable, any Stalking Horse Agreement for the relevant Acquired Assets, and such Bid must include binding, executed, irrevocable transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (a "Modified Asset Purchase Agreement").  A Bid must also include a copy of the Modified Asset Purchase Agreement (including all exhibits thereto) marked against the applicable Form APA or, if applicable, Stalking Horse Agreement to show all changes requested by the Bidder (including those related to purchase price and to remove any provisions that apply only to a Stalking Horse Purchaser, such as the expense reimbursement and break-up fee

provisions contained in any Stalking Horse Agreement, which terms shall not be in any Modified Asset Purchase Agreement).  Each Modified Asset Purchase Agreement must provide representations that the Qualified Bidder will (i) make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), if applicable, and (ii) submit and pay the fees associated with all necessary filings under the HSR Act as soon as reasonably practicable; provided, however, that the timing and likelihood of receiving HSR Act approval will be a consideration in determining the highest and best Bid. Each Modified Asset Purchase Agreement, unless submitted by any Agent or its designee, must exclude (a) any and all claims and causes of action of the Debtors against Agents, Lenders, and the other Secured Parties (as such terms are defined in the DIP Financing Order), (b) any and all Commercial Tort Claims (as defined in the Form APA) owned by the Debtors, including, without limitation, the Commercial Tort Claims described on Exhibit H of the Postpetition Security Agreement (as defined in the DIP Financing Order), and (c) except as otherwise provided in any Bid with the written consent of the Sellers and Agents, any and all Estate Causes of Action and other Excluded Assets (as such terms are defined in the Form APA).

4.    Scope of Bid / Lots:  A Bid must be for all or substantially all of the Acquired Assets or for one or more of the following Lots (or such other Lots as the Sellers and the Agents may otherwise agree to, in each case, in consultation with the Consultation Parties):[5]

(a)    substantially all of the Acquired Assets except the equity in or assets of Revell GmbH (the "U.S. Assets Lot");

(b)    substantially all of the assets of Hobbico, Inc., Tower Hobbies, Inc., Axial R/C Inc., Arrma Durango Ltd., and Great Planes Model Manufacturing, Inc. (the "Hobby Business Lot");

---

[5] Any Bid for the assets of Revell, Inc. that does not also include a bid for the Revell Germany Lot, and vice versa, must include a commitment to enter into an IP sharing agreement on substantially the same terms that exist today. Any bid for Lots 4(a), 4(c), or 4(d) in this Section IV, or for substantially all the Acquired Assets, must allocate the purchase price to each sub-lot included in such bid.  For example, a bid for the Global Mass Market Lot should include an allocation of value to the Estes-Cox Lot and the Revell Germany Lot.  Any other Lot that could be evaluated by the Debtors pursuant to Section X.E., below, should also include an allocation of value as described in this footnote.

6

(c)    substantially all of the assets of Estes-Cox Corp., Revell Inc., United Model, Inc. and 100% of the equity interests in Revell GmbH[6] (the "<u>Global Mass Market Lot</u>");

(d)    substantially all of the assets of Revell Inc. and 100% of the equity interests in Revell GmbH (the "<u>Global Revell Lot</u>");

(e)    100% of the equity interests in Revell GmbH (the "<u>Revell Germany Lot</u>"); and

(f)    substantially all of the assets of Estes-Cox Corp. (the "<u>Estes-Cox Lot</u>");

5.    <u>Minimum Bid</u>:  A Bid must have a purchase price that includes a combination of cash, in the amounts below, as well as the assumption of postpetition liabilities and cure costs associated with the relevant Lot,[7] and subject to any adjustments typical of similar transactions, that, in the Sellers' reasonable business judgment (after consultation with the Consultation Parties), has a value equal to or greater than the following, subject to the terms of these Bidding Procedures:

(a)    For substantially all of the Acquired Assets:  $38 million;

(b)    For the U.S. Assets Lot:  $32 million;

(c)    For the Hobby Business Lot: $22 million;

(d)    For the Global Mass Market Lot: $16 million

(e)    For the Global Revell Lot: $10 million

(f)    For the Revell Germany Lot: $8 million

(g)    For the Estes-Cox Lot: $6 million

6.    <u>Designation of Assigned Contracts and Leases; Cure Costs</u>:  A Bid must specifically (a) identify the executory contracts and unexpired leases with respect to which the Bidder seeks assignment from the Sellers and

---

[6] Bids for Lots that include 100% of the equity interests in Revell GmbH should contemplate the acquisition of such equity interests on a cash-free, debt-free basis (as reflected on the balance sheet of Hobbico Deutschland Holding GmbH).  The Minimum Bid values presented in subsection 5 of this Section IV are presented on this basis.  Bids for all other assets should be structured in a manner consistent with the Form APA and any deviations for such Form APA will be considered in determining whether a Bid is a Qualified Bid.

[7] A schedule of the post-petition liabilities for each lot and a schedule of estimated cure costs for executory contracts that could be assumed by any Bidder has been made available in the electronic dataroom that each Prospective Purchaser has access to.

(b) provide for the Bidder's payment in full in cash of all of the cure costs related to any such executory contracts and unexpired leases.

7.  Designation of Assumed Liabilities:  A Bid must identify all liabilities which the Bidder proposes to assume.

8.  Corporate Authority:  A Bid must include written evidence reasonably acceptable to the Sellers demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction; provided that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction then the Bidder must furnish written evidence reasonably acceptable to the Sellers of the approval of the Alternate Transaction by the equity holder(s) of such Bidder.

9.  Disclosure of Identity of Bidder:  A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets, including any equity holders in the case of a Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Bid (including any co-bidder or team bidder), and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.  A Bid must also fully disclose any connections or agreements with the Sellers, any Stalking Horse Purchaser or any other known, potential, prospective Bidder or Qualified Bidder, and/or any officer, director or equity security holder of the Sellers.

10. Proof of Financial Ability to Perform:  A Bid must include detailed, written evidence that the Sellers and the Agents may conclude, in consultation with their advisors and the Consultation Parties, demonstrates that the Bidder has and will continue to have the necessary financial ability to consummate the Alternate Transaction and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction.  Such information must include, *inter alia,* the following:

   (a) contact names and numbers for verification of financing sources;

   (b) evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor

of the Sellers in the amount of the cash portion of such Bid as are needed to consummate the Alternate Transaction;

(c)    the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Sellers;

(d)    a description of the Bidder's pro forma capital structure; and

(e)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Sellers and the Agents, in consultation with the Consultation Parties, demonstrating that such Bidder has the ability to consummate the Alternate Transaction.

11.    <u>Regulatory and Third Party Approvals</u>:  A Bid must set forth (a) each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction, (b) the time period within which the Bidder expects to receive such regulatory and third-party approvals, (c) those actions the Bidder will take to ensure receipt of such approvals as promptly as possible, and (d) a detailed description of any steps the Bidder will take to address any delay in obtaining such approvals (e.g. transition services agreement).

12.    <u>Contact Information and Affiliates</u>:  A Bid must provide the identity and contact information for the Bidder and full disclosure of any affiliates of the Bidder.

13.    <u>Contingencies</u>:  Each Bid (a) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Sellers than those set forth in any applicable Stalking Horse Agreement, as determined by the Sellers, in consultation with the Consultation Parties, in good faith, and (b) may not be conditioned on (i) obtaining financing, (ii) any internal approvals or credit committee approvals, or (iii) the outcome or review of due diligence, including with respect to any environmental, employee, vendor, labor, health and/or safety matters.

14.    <u>Irrevocable</u>:  Each Bid must be irrevocable until ten (10) business days after the conclusion of the Sale Hearing for the relevant Acquired Assets or Lot; <u>provided</u> that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable until the earlier of the consummation of the Sale of the relevant Acquired Assets or Lot or the Extended Outside Date (as defined below).

15.  <u>Compliance with Diligence Requests</u>:  The Bidder submitting the Bid must have complied with reasonable requests for additional information and due diligence access from the Sellers to the reasonable satisfaction of the Sellers, in consultation with the Consultation Parties.

16.  <u>As-Is, Where-Is</u>:  Each Bid must include a written acknowledgement and representation that the Bidder:  (i) has had an opportunity to conduct any and all due diligence regarding the applicable Acquired Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the applicable Acquired Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the applicable Acquired Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in any applicable Stalking Horse Agreement.

17.  <u>Confidentiality Agreement</u>:  To the extent not already executed, the Bid must include an executed Confidentiality Agreement.

18.  <u>Termination Fees</u>:  The Bid (other than a Bid pursuant to (a) a Stalking Horse Agreement or (b) the written agreement of Sellers and the Agents after consultation with the Consultation Parties) must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the Bid, the Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction.

19.  <u>Adherence to Bid Procedures</u>:  By submitting its Bid, each Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

20.  <u>Closing Date</u>:  The Bid must include a commitment to consummate the transactions contemplated by the Modified Asset Purchase Agreement by no later than **April 5, 2018** or such later date as Debtors and Agents may agree to in writing (the "<u>Outside Date</u>").  In no event shall the consummation of the Sale occur later than **May 4, 2018** without the written consent of Debtors and Agents (any such date, the "<u>Extended Outside Date</u>").  In the event the Bid contemplates an Extended Outside Date in order to address any antitrust, regulatory or permitting issues, the Bid must include a mechanism to cover any and all costs incurred after the Outside Date in a manner acceptable to the Sellers and Agents in consultation with the Consultation Parties.

21. <u>No Late Bids</u>:  Unless otherwise ordered by a Court, the Sellers shall not consider any Bids with respect to any Lot submitted after the conclusion of the Auction with respect to any such Lot, and any and all such bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

22. <u>Bid Notice</u>:  The following parties must receive a Bid in writing (in both PDF and Word format), on or before the Bid Deadline:

    (a)    The Sellers, 2904 Research Road, Champaign, Illinois 61822, Attention: Tom O'Donoghue (tom.odonoghue@cr3partners.com);

    (b)    Counsel to the Sellers, Neal Gerber & Eisenberg, LLP, 2 N. LaSalle Street, Suite 1700, Chicago, Illinois 60602, Attention: Nicholas M. Miller (nmiller@nge.com), Mark A. Berkoff (mberkoff@nge.com) and Bruce A. Fox (bfox@nge.com); and Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, DE 19899, Attention: Curtis Miller (cmiller@MNAT.com) and Robert J. Dehney (rdehney@MNAT.com);

    (c)    Financial advisor to the Sellers, Lincoln Partners Advisors LLC, 633 West Fifth Street, Suite 6650, Los Angeles, California 90071, Attention: Alexander W. Stevenson (AStevenson@lincolninternational.com) and Sherman Guillema (SGuillema@lincolninternational.com);

    (d)    Counsel to Wells Fargo Bank, National Association, in its capacity as Agents, Goldberg Kohn Ltd., 55 East Monroe Street, Suite 3300, Chicago, Illinois 60603, Attention: Randall L. Klein (randall.klein@goldbergkohn.com) and Zachary J. Garrett (zachary.garrett@goldbergkohn.com) and Burr & Forman LLP, 1201 Market Street, Suite 1407, Wilmington, Delaware 19801, Attention: J. Cory Falgowski (jfalgowski@burr.com);

    (e)    Financial advisor to the Agent, Focus Management Group USA, Inc., 5001 West Lemon Street, Tampa, Florida 33609, Attention: Robert O. Riiska (r.riiska@focusmg.com) and Samuel M. Williams (s.williams@focusmg.com);

    (f)    counsel to the Official Committee of Unsecured Creditors (the "<u>Committee</u>"), Cullen and Dykman LLP, The Legal Center, One Riverfront Plaza, Newark, NJ 07102, Attention: S. Jason Teele (steele@cullenanddykman.com),

and Whiteford Taylor Preston LLC, The Renaissance Center, Suite 500, 405 North King Street, Wilmington, Delaware 19801, Attention: Christopher M. Samis (CSamis@wtplaw.com).

(g)    financial advisor to the Committee, Emerald Capital Advisors, 70 E. 55th Street, 17th Floor, New York, NY 10022, Attention: John P. Madden (jpm@emeraldcapitaladvisors.com).

A Bid received from a Bidder before the Bid Deadline that meets all of the above requirements for the Acquired Assets shall constitute a "Qualified Bid" and such Bidder shall constitute a "Qualified Bidder"; provided that if the Sellers receive a Bid prior to the Bid Deadline that is not a Qualified Bid, the Sellers will promptly provide the Bidder with notice of the basis for the disqualification of such Bid and provide such Bidder with the opportunity to remedy any deficiencies prior to the Auction; provided, further, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Sellers to the satisfaction of the Sellers, then the Sellers, with the consent of the Agents, and in consultation with the Consultation Parties, may disqualify any Qualified Bidder and Qualified Bid, in the Sellers' discretion, and such Bidder shall not be entitled to attend or participate in the Auction. The Sellers will consult with the Consultation Parties to evaluate bids for non-conforming Lots on a case-by-case basis.

Any amendments, supplements or other modifications to any Bids (including pursuant to this paragraph) shall be delivered to the parties listed in paragraph 22 above as provided therein. All Qualified Bids will be considered, but the Sellers reserve their right to reject any or all bids, subject to the consent of the Agents and in consultation with the Consultation Parties. However, bids that are unconditional and contemplate sales that may be consummated on or soon after the Sale Hearing are preferred. Additionally, notwithstanding anything herein to the contrary, any Stalking Horse Agreement submitted by a Stalking Horse Purchaser shall be deemed a Qualified Bid, and any Stalking Horse Purchaser shall be deemed a Qualified Bidder. The Sellers will inform counsel to the Consultation Parties, counsel to the Stalking Horse Purchasers, and any Qualified Bidders whether the Sellers consider any Bid to be a Qualified Bid as soon as practicable but in no event later than one day before the Auction.

Each Qualified Bidder, by submitting a Bid, shall be deemed to acknowledge and agree that it is not relying upon any written or oral statements, representations, promises, warranties or guarantees of any kind whether expressed or implied, by operation of law or otherwise, made by any person or party, including the Sellers and their agents and representatives (other than as may be set forth in a definitive agreement executed by the Sellers), regarding the Sellers, any of the Acquired Assets, the Auction, these Bidding Procedures or any information provided in connection therewith.

Without the consent of the Sellers and the Agents, a Qualified Bidder may not amend, modify or withdraw its Bid, except for proposed amendments to increase the amount or otherwise improve the terms of the Bid, during the period that such Bid is required to remain irrevocable and binding.

Notwithstanding anything herein to the contrary, without any further action of any kind: (a) each Agent (and any designee of any Agent, including, without limitation, any entity that may be formed by or on behalf of any of the Lenders) is, and will be deemed to be, a Qualified Bidder for all purposes under and in connection with these Bidding Procedures and may credit bid all or any portion of the Aggregate Debt (as defined in the DIP Financing Order) in accordance with 11 U.S.C. § 363(k), and with respect to Prepetition Debt (as defined in the DIP Financing Order) subject to any potential Challenge as provided in paragraph 8 of the DIP Financing Order, including, without limitation, at any Auction; (b) any credit bid made by any Agent (or any such designee) is, and will be deemed to be, a Qualified Bid in each instance for all purposes under and in connection with the Bidding Procedures and will be deemed to be, and will be evaluated by the Sellers and the Consultation Parties as, a cash Qualified Bid (including, without limitation, for all purposes of Sections IV(A)(2), VI(E)(1), and VI(E)(2) hereof); and (c) subject to the proviso at the end of this sentence, none of the Agents (or any such designee) is or will be subject to any of the terms or conditions of the following subsections of this Section IV: 1, 5, 10, 11, 13(b)(ii), 15, or 17; provided, however, that any Agent (or any designee thereof) submitting a credit bid (y) will provide a Good Faith Deposit, provided that such Good Faith Deposit shall consist of a reduction in the applicable secured claim of such Agent in the Chapter 11 Cases and will not be payable in cash notwithstanding the terms of Section IV(A)(1) above and (z) must credit bid the amount of any Bid Protections in cash. These Bidding Procedures are subject to the terms and provisions of the DIP Financing Order, including, without limitation, Paragraphs 4(e), 6, 9, 10, and 12 thereof.

## V.    AUCTION

### A.    Auction

If multiple Qualified Bids (including any Stalking Horse Agreements) with respect to the same Acquired Assets or Lots are submitted by the Bid Deadline, the Sellers will conduct the Auction to determine the highest and otherwise best Qualified Bid with respect to such Acquired Assets or Lots.

### B.    Assessment Criteria

The Sellers' determination, with the consent of the Agents, of the highest and otherwise best Qualified Bid with respect to the Acquired Assets will take into account any factors the Sellers, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the estates and may include, but are not limited to, the following:

1.    the amount and nature of the consideration, including any assumed liabilities and retention of employees;

2.    the type and nature of any modifications to the Form APA or Stalking Horse Agreement, as applicable, requested by each Bidder in such Bidder's Modified Asset Purchase Agreement;

3.    the extent to which such modifications are likely to delay the consummation of the sale of the applicable asset(s) and the cost to the Sellers of such modifications or delay;

4.    the total consideration to be received by the Sellers and the net consideration to be received by the Sellers after taking into account any Stalking Horse Purchaser's Bid Protections with respect to each round of bidding;

5.    the likelihood of the Bidder's ability to consummate a transaction and the timing thereof, including the ability to obtain, or waive, as applicable, regulatory approvals;

6.    the net benefit to the Sellers' estates (collectively, the "Bid Assessment Criteria").

C.    Cancellation or Continuation of the Auction

If multiple Qualified Bids for the Acquired Assets or Lots have not been timely received, then the Auction for the Acquired Assets or Lots shall be rescheduled or canceled, in each case, with the consent of Agents.   If the only Qualified Bid for the relevant Acquired Assets is a Stalking Horse Bid, then the corresponding Stalking Horse Agreement shall be the Successful Bid for such Acquired Assets, and the Stalking Horse Purchasers shall be the Successful Bidders for such Acquired Assets.

## VI.    PROCEDURES FOR THE AUCTION

If multiple Qualified Bids for the Acquired Assets or Lots have been timely submitted by the Bid Deadline, then the Sellers will, after consulting the Consultation Parties, commence the Auction for such Acquired Assets or Lots on **March 26, 2018 at 10:00 a.m.** (prevailing Central Time) at the offices of Neal, Gerber & Eisenberg, LLP, 2 N. LaSalle St., Suite 1700, Chicago, Illinois 60602, or such other place and time as the Sellers shall notify all Qualified Bidders and the Consultation Parties, subject to these Bidding Procedures.

The Auction will be conducted according to the following procedures:

A.    Participation

Only the Sellers, the Consultation Parties, individual Committee members, the Agents and the Lenders, and each of their respective counsel and advisors, any Stalking Horse Purchasers and any other Qualified Bidder, in each case, along with their representatives and counsel, may attend the Auction (such attendance to be in person) and only Stalking Horse Purchasers and any such other Qualified Bidders will be entitled to make any Bids at the Auction; provided, however, that any other material creditor may attend (but not participate in) the Auction if it provides the Sellers written notice of its intention to attend the Auction on or before the Bid Deadline.   Such written notice must be sent to counsel for the Sellers via electronic mail to Nicholas M. Miller (nmiller@nge.com) and Curtis Miller (cmiller@MNAT.com).

14

B.    The Sellers Shall Conduct the Auction

The Sellers and their advisors shall direct and preside over the Auction, and the Auction shall be transcribed.  The Sellers (in consultation with the Consultation Parties) will conduct the Auction in the manner they reasonably determine will result in the highest and otherwise best Qualified Bid(s), including, without limitation, by requiring separate rounds of bulk and/or Lot bidding and sealed bidding, open outcry, or any other form of Bid submission (including in connection with any bulk or Lot bidding). The Sellers will consult in good faith with the Consultation Parties throughout the Auction process to the extent reasonably practicable. Any rules developed by the Sellers will provide that each Qualified Bidder will be permitted what the Sellers determine to be an appropriate amount of time to respond to the previous bid at the Auction in consultation with the Consultation Parties.

C.    Auction Baseline Bids

Prior to commencement of the Auction, the Sellers will provide each Qualified Bidder participating in the Auction with a copy of the Modified Asset Purchase Agreement that is the highest and otherwise best Qualified Bid for the applicable Acquired Assets as determined by the Sellers, with the consent of the Agents, in consultation with the Consultation Parties (such highest and otherwise best Qualified Bid, the "Auction Baseline Bid"). In addition, at the start of the Auction, the Sellers will describe the terms of the Auction Baseline Bids to the other Qualified Bidders.

D.    Joint Bidding and Anti-Collusion Representations

Each Qualified Bidder participating in the Auction must confirm that it (1) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (2) has reviewed, understands and accepts the Bidding Procedures and (3) has consented to the core jurisdiction of the Court.

Before submitting any Bid with co-bidding or team bidding arrangements, whether formal or informal, among a Qualified Bidder and any third party (including any other Preliminary Interested Purchaser or Qualified Bidder) (such a Bid, a "Joint Bid"), each Qualified Bidder must disclose such Joint Bid to the Sellers, and the Sellers may determine, with the consent of the Agents and upon consultation with the Consultation Parties, whether the Joint Bid constitutes a Qualified Bid for purposes of participating in the Auction. The identity of any and all co-bidders or team bidders involved in submitting any Joint Bid, if the Sellers determine that such Joint Bid constitutes a Qualified Bid, will be disclosed on the record at the Auction.

E.    Terms of Overbids

The Sellers will accept Overbids, as further described below.  An "Overbid" is any bid made at the Auction subsequent to the Sellers' announcement of the Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

1.    Minimum Overbid Increments:  Any Overbid after and above the Auction Baseline Bid shall be made in increments determined by the Sellers in

15

consultation with the Consultation Parties valued at not less than such amount as shall be announced at the Auction (in an amount greater than any approved bid protections or sale-related administrative expenses), in cash or in cash equivalents or, once the cash (or cash equivalent) amount of such Overbid exceeds the cash (or cash equivalent) amount of the next highest Bid, other forms of consideration acceptable to the Sellers and the Agents, in consultation with the Consultation Parties.

2.    Credit Bidding: Holders of Postpetition Debt and/or Prepetition Debt (as such terms are defined in the DIP Financing Order) shall be entitled to submit Overbids in cash, cash equivalents or other forms of consideration, as described above, or additional credit bid amounts (which credit bid amounts shall in each case be treated and considered as cash amounts for all purposes) up to the aggregate amount of any outstanding obligations under the Postpetition Documents in respect of the Postpetition Debt or the Prepetition Documents in respect of the Prepetition Debt (as such terms are defined in the DIP Financing Order), as applicable, including any accrued but unpaid prepetition interest, to the extent permitted by applicable law, and with respect to Prepetition Debt (as defined in the DIP Financing Order) subject to any potential Challenge as provided in paragraph 8 of the DIP Financing Order, provided that only a Stalking Horse Purchaser, if any, may credit bid the amount of any Bid Protections.

3.    Remaining Terms Are the Same as for Qualified Bids: Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the applicable Stalking Horse Agreement or Modified Asset Purchase Agreement, as the case may be, in connection therewith. Any Overbid must remain open and binding on the Bidder as provided herein.

At the Sellers' discretion with the consent of the Agents, to the extent not previously provided, a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Sellers), reasonably demonstrating such Bidder's ability to consummate the Alternate Transaction proposed by such Overbid.

F.    Announcement and Consideration of Overbids

1.    Announcement of Overbids: The Sellers will announce at the Auction the material terms of each Overbid, the total amount of consideration and form offered in each such Overbid (including the cash or cash equivalent component thereof), and the basis for calculating such total consideration. The Sellers also will provide the terms of each Overbid, including non-economic terms, to the Consultation Parties.

2.   <u>Consideration of Overbids</u>:  Subject to the deadlines set forth herein, the Sellers reserve the right, in their reasonable business judgment, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Sellers and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; modify or supplement any or all of the Auction procedures or rules; or give Qualified Bidders the opportunity to provide the Sellers with such additional evidence as the Sellers in their reasonable business judgment may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternate Transaction at the prevailing Overbid amount.   When comparing Overbids to the immediately preceding Qualified Bid, the Sellers will treat any credit bid as being made in cash or in cash equivalents.

G.   <u>Other Procedures</u>

1.   <u>Jurisdiction of the Court</u>:  All Qualified Bidders (including the Stalking Horse Purchasers) at the Auction shall be deemed to have consented to the core jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the marketing process, the determination of what constitutes a Qualified Bid and the procedures used to make that determination, the Auction, and the construction and enforcement of the Qualified Bidder's fully executed sale and transaction documents, as applicable.

2.   <u>Stalking Horse Purchaser Bid</u>:  Stalking Horse Purchasers, if any, shall be entitled to (a) credit bid all or a portion of their respective Bid Protections, consistent with these Bidding Procedures; and (b) submit additional bids and make modifications to the applicable Stalking Horse Agreement at the Auction consistent with these Bidding Procedures.

3.   <u>Additional Bids; Modifications</u>:  All Qualified Bidders, including any Stalking Horse Purchasers, shall have the right to submit additional bids and make additional modifications to any Stalking Horse Agreement or Modified Asset Purchase Agreement at the Auction, as applicable, provided that any such modifications to such Stalking Horse Agreement or Modified Asset Purchase Agreement on an aggregate basis and viewed in whole, shall not, in the Sellers' business judgment (in consultation with the Consultation Parties), be less favorable to the Sellers than the terms of such original agreement.

4.   <u>Subsequent Bids</u>:  Each Qualified Bidder must submit a subsequent Bid that satisfies the minimum bid increment in each round of bidding in order to continue participating in the Auction.  Qualified Bidders shall not be allowed to skip rounds of bidding on a particular Lot once they participate in the Auction for any given Lot.

### H.    Additional Procedures

The Sellers (after consulting with the Consultation Parties) may at any time establish, at or prior to the Auction, other or additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or any Stalking Horse Agreements. Any Auction rules adopted by the Sellers that would modify any of the terms of any Stalking Horse Agreements or the rights of the Stalking Horse Purchasers under the Bidding Procedures (as may be consensually modified at the Auction) requires the consent of the relevant Stalking Horse Purchaser.

### I.    Sale Is As Is/Where Is

Except as otherwise may be provided in a Stalking Horse Agreement, any Modified Asset Purchase Agreement, or any order by the Court approving any Sale of the Acquired Assets as contemplated hereunder, the Acquired Assets sold pursuant to the Bidding Procedures shall be conveyed upon the consummation of the purchase and sale in their then-present condition, **"AS IS, WHERE IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED."**

### J.    Closing the Auction

The Auction will continue in additional rounds of bidding until the Sellers select, with the consent of the Agents, and after consulting with the Consultation Parties, the Bid(s) that represent the highest and otherwise best offer(s) for the Acquired Assets (a "Successful Bid," and the Bidder(s) submitting such Successful Bid(s), a "Successful Bidder"). The Successful Bidders shall have the rights and responsibilities of the purchaser as set forth in the applicable Stalking Horse Agreement or Modified Asset Purchase Agreement. In selecting each Successful Bid, the Sellers, in consultation with the Consultation Parties, will consider the Bid Assessment Criteria.

The Sellers may close the Auction with respect to the relevant Acquired Assets or Lots when all Successful Bidder(s) submit fully executed sale and transaction documents memorializing the terms of the Successful Bid(s), in each case, in form and substance acceptable to Agents, and the Sellers announce the Successful Bid(s) and the Successful Bidder(s). Promptly after the Auction closes with respect to the relevant Acquired Assets or Lots, the Sellers will file with the Court a notice of the Successful Bid(s) and the Successful Bidder(s) with respect to the relevant Acquired Assets or Lots.

The Sellers shall not consider any Bids for any Lot submitted after the conclusion of the Auction with respect to such Lot.

### K.    Backup Bidder

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest and otherwise best Bid at the Auction with respect to some or substantially all of the Acquired Assets, as determined by the Sellers, in the exercise of their business judgment, with the consent of the Agents, and after consulting with the

Consultation Parties, will be designated as a backup bidder (a "Backup Bidder"). A Backup Bidder shall be required to keep its last submitted Bid (the "Backup Bid") open and irrevocable until the earlier of the consummation of the transaction with the Successful Bidder or the Extended Outside Date.

Following the Sale Hearing, if a Successful Bidder fails to consummate the purchase of the Acquired Assets, the Sellers may deem the Backup Bidder for such assets to have the new Successful Bid, and the Sellers will be authorized, without further order of the Court, to consummate the transaction with such Backup Bidder at the price of its last bid. Such Backup Bidder will be deemed to be the Successful Bidder and the Sellers will be authorized, but not directed, to effectuate a sale to such Backup Bidder subject to the terms of the Backup Bid without further order of the Court. All Qualified Bids (other than the Successful Bid and the Backup Bid) shall be deemed rejected by the Sellers on and as of the date that the Court approves the Bid as the Successful Bid. The Sellers, on their behalf and on behalf of each of their respective estates, specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

For the avoidance of doubt, in the event that there is a Successful Bidder (other than a Stalking Horse Purchaser) with respect to some or substantially all of the Acquired Assets, and the Stalking Horse Purchaser is the Backup Bidder, the Stalking Horse Purchaser will be deemed to be the Backup Bidder at the price of its last overbid with respect to such Acquired Assets and will be subject to the terms contained in the immediately preceding paragraph.

## VII.    BID PROTECTIONS

Each Stalking Horse Purchaser approved pursuant to the procedures set forth in the Bidding Procedures Order is entitled to the Bid Protections in the amounts set forth in, and in accordance with the terms of, the applicable Stalking Horse Agreement and the Bidding Procedures Order.

Pursuant to the Bidding Procedures Order, except for any Stalking Horse Purchasers approved pursuant to the procedures set forth in the Bidding Procedures Order, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, breakup fee, termination or similar fee or payment.

## VIII.    SALE HEARING

The Successful Bid and Backup Bid (or, if no Qualified Bid other than that of the Stalking Horse Purchasers is received, then the Stalking Horse Agreements) will be subject to approval by the Court. The sale hearing to approve the Successful Bids and any Backup Bids shall take place on **March 28, 2018** at 10:00 a.m. (EDT) before the Court (the "Sale Hearing").

Nothing herein or contemplated hereby constitutes, or will be deemed to constitute or otherwise result in, the consent or approval of any Consultation Party, any Agent, any Lender, or any other party in interest to the Sale, any Sale Order, or any Bid, or to any agreement or motion or other pleading relating thereto, or the waiver or modification of any of the terms of, or any rights under, any existing agreement, instrument or document, including, without limitation, any

19

Postpetition Document (as defined in the DIP Financing Order), or any default arising thereunder or relating thereto. Any and all rights of such parties and parties in interest to object or otherwise oppose any Sale, Sale Order, or Bid, or any agreement or pleading related thereto are hereby expressly preserved and reserved.

The Sale Hearing may be adjourned by the Sellers with respect to certain Acquired Assets or Lots, in consultation with the Consultation Parties and the Stalking Horse Purchasers, subject to the terms herein; provided, however, that the Sale Order must be entered on or before **March 29, 2018**, unless the Agent consents to the extension of such date in writing to the Sellers.

## IX.    RETURN OF GOOD FAITH DEPOSITS

The Good Faith Deposits of all Qualified Bidders (except the Stalking Horse Purchasers) shall be held in one or more escrow accounts by the Sellers, but shall not become property of the Sellers' estates absent further order of the Court or as expressly provided below. The Good Faith Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than three (3) business days after the conclusion of the Sale Hearing. The Good Faith Deposit of a Backup Bidder, if any, shall be returned to such Backup Bidder no later than seventy-two (72) hours after the consummation of the transaction with the Successful Bidder.   If the Successful Bidder timely consummates the winning transaction, its Good Faith Deposit shall be credited towards the applicable purchase price. If the Successful Bidder (or Backup Bidder, if applicable) fails to consummate an Alternate Transaction because of a breach or failure to perform on the part of such Successful Bidder (or Backup Bidder, if applicable), the Sellers will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder (or Backup Bidder, if applicable), and such Good Faith Deposit shall irrevocably become property of the Sellers. The Good Faith Deposit of any Stalking Horse Purchasers shall be held as provided in the Stalking Horse Agreements and shall be returned to the Stalking Horse Purchasers in accordance with any such Stalking Horse Agreements.

## X.    RESERVATION OF RIGHTS OF THE SELLERS

Notwithstanding anything to the contrary herein, the Sellers further reserve the right as they may reasonably determine to be in the best interest of their estates, in each case, with the consent of the Agents, and in consultation with the Consultation Parties, to:

A.    determine which Bidder(s) is a Qualified Bidder(s);

B.    determine which Bid(s) is a Qualified Bid(s);

C.    determine which Qualified Bid is the highest and best proposal for the Acquired Assets and which is the next highest and best proposal for the Acquired Assets;

D.    reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Sellers and their estates;

E.    determine any Lots and revise the minimum bid values above with respect to any Lot, in each case, with the agreement of Agents and in consultation with the Consultation Parties;

F.    impose additional terms and conditions with respect to all potential Bidders;

G.    extend the deadlines set forth herein; and

H.    modify the Bidding Procedures and implement additional procedural rules that the Sellers determine, in their business judgment, will better promote the goals of the bidding process and discharge the Sellers' fiduciary duties; provided however that any modification or additions to the Bidding Procedures shall not be inconsistent with the Stalking Horse Agreements, the Bidding Procedures Order or any other Order of the Court, unless agreed in writing by the applicable Stalking Horse Purchaser and Sellers or otherwise ordered by the Court.

**Exhibit B**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**HOBBICO, INC.**
**TOWER HOBBIES, INC.**
**GREAT PLANES MODEL MANUFACTURING, INC.**
**UNITED MODEL, INC.**
**REVELL INC.**
**ESTES-COX CORP.**
**AXIAL R/C INC.**
ARRMA DURANGO LIMITED

as Sellers

**AND**

**[●]**

as Purchaser

**[●], 2018**

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS................................................................................................. 1
  1.1    Definitions........................................................................................................ 1

ARTICLE II       SALE AND PURCHASE OF ASSETS ....................................................... 7
  2.1    Sale and Purchase of Assets............................................................................. 7
  2.2    Excluded Assets ................................................................................................ 9
  2.3    Assumed Liabilities ........................................................................................ 11
  2.4    Excluded Liabilities ........................................................................................ 11
  2.5    Purchase Price ................................................................................................ 11
  2.6    Deposit ............................................................................................................ 11

ARTICLE III      CLOSING; CONDITIONS TO CLOSING .................................................. 12
  3.1    Closing ............................................................................................................ 12
  3.2    Court Approval Required ................................................................................. 12
  3.3    Conditions to Obligations of Purchaser ......................................................... 12
  3.4    Conditions to Obligations of Sellers .............................................................. 13
  3.5    Delivery of Possession of Assets ................................................................... 14

ARTICLE IV       REPRESENTATIONS AND WARRANTIES OF SELLERS...................... 14
  4.1    Organization, Good Standing and Power........................................................ 14
  4.2    Authority Relative to this Agreement; Execution and Binding Effect ............... 14
  4.3    No Defaults ...................................................................................................... 15
  4.4    Governmental and Other Consents ................................................................. 15
  4.5    No Brokers ....................................................................................................... 15

ARTICLE V        REPRESENTATIONS AND WARRANTIES OF PURCHASER................ 15
  5.1    Organization, Good Standing and Power........................................................ 15
  5.2    Authority Relative to this Agreement; Execution and Binding Effect ............... 16
  5.3    No Defaults ...................................................................................................... 16
  5.4    Governmental and Other Consents ................................................................. 16
  5.5    Financial Ability .............................................................................................. 16
  5.6    No Brokers ....................................................................................................... 16

ARTICLE VI       COVENANTS ............................................................................................ 17
  6.1    Operation of Business...................................................................................... 17
  6.2    Bidding Procedures Order............................................................................... 17
  6.3    Approval Order ................................................................................................ 17
  6.4    Access to Facilities, Personnel, and Information............................................ 18
  6.5    Further Assurances.......................................................................................... 18
  6.6    Employee Matters ............................................................................................ 18
  6.7    Tax Matters ...................................................................................................... 20
  6.8    Transition Services Agreement........................................................................ 20

**TABLE OF CONTENTS**
(continued)

Page

6.9    Directors and Officers Liability Coverage ................................................ 20
6.10   Transaction-Related Documents ............................................................... 21

ARTICLE VII     TERMINATION; EFFECT OF TERMINATION ....................................... 21
7.1    Termination ............................................................................................. 21
7.2    Effect of Termination .............................................................................. 22
7.3    Deposit .................................................................................................... 22

ARTICLE VIII    GENERAL PROVISIONS .................................................................... 22
8.1    "As Is", "Where Is", and "With all Faults" Transaction ......................... 22
8.2    Transaction Expenses .............................................................................. 23
8.3    Certain Interpretive Matters and Definitions .......................................... 23
8.4    Termination of Representations and Warranties ...................................... 23
8.5    Amendment .............................................................................................. 23
8.6    Waiver ..................................................................................................... 23
8.7    Notices .................................................................................................... 23
8.8    Jurisdiction .............................................................................................. 24
8.9    Governing Law ........................................................................................ 24
8.10   Damages .................................................................................................. 24
8.11   Time is of the Essence ............................................................................ 24
8.12   Severability ............................................................................................. 24
8.13   Titles and Headings ................................................................................. 24
8.14   Assignment; Successors and Assigns ...................................................... 24
8.15   No Third-Party Rights ............................................................................. 24
8.16   Confidentiality Agreement ...................................................................... 25
8.17   Entire Agreement .................................................................................... 25
8.18   Execution of this Agreement ................................................................... 25

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made and entered into this [●] day of [●], 2018, by and between **HOBBICO, INC.**, an Illinois corporation ("Hobbico"), **TOWER HOBBIES, INC.**, an Illinois corporation ("Tower"), **GREAT PLANES MODEL MANUFACTURING, INC.**, an Illinois corporation ("Great Planes"), **UNITED MODEL, INC.**, an Illinois corporation ("United Model"), **REVELL INC.**, an Illinois corporation ("Revell-US"), **ESTES-COX CORP.**, a Delaware corporation ("Estes"), and **AXIAL R/C INC.**, a California corporation ("Axial"), **ARRMA DURANGO LIMITED**, a company organized under the laws of the United Kingdom ("ADL" and, collectively with Hobbico, Tower, Great Planes, United Model, Revell-US, Estes and Axial, "Sellers"), and **[PURCHASER]**, a [●] ("Purchaser").

**WHEREAS**, Sellers are collectively in the business of manufacturing and distributing radio-controlled ("R/C") and general hobby products, including without limitation (i) R/C surface vehicles, (ii) model rockets and related products, (iii) hobby drones, helicopters and related products, and (iv) model airplanes and related products (the "Business");

**WHEREAS**, on January 10, 2018 (the "Petition Date"), each Seller except ADL filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), consolidated as Case No. 1:18-bk-10055 (the "Chapter 11 Case");

**WHEREAS**, on January 26, 2018, ADL filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court, and such case has been consolidated into the Chapter 11 Case;

**WHEREAS**, each Seller continues in the possession and control of its assets and properties in accordance with §§1107 and 1108 of the Bankruptcy Code; and

**WHEREAS**, Sellers desire to sell to Purchaser substantially all of their assets that are used in connection with the conduct of the Business pursuant to the terms and conditions of this Agreement, and Purchaser desires to so purchase and acquire such assets from Sellers (the "Acquisition"), in accordance with §§363 and 365 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the foregoing premises, the representations, warranties, covenants and agreements contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    **Definitions**.

As used herein, the following terms shall have the following meanings:

"Accounts Receivable" shall mean all accounts receivable of Sellers and other receivables of Sellers in existence as of the Closing Date (whether or not billed).

"Acquired Assets" has the meaning assigned to that term in Section 2.1.

"Acquisition" has the meaning assigned to that term in the Preamble.

"ADL" has the meaning assigned to that term in Section 2.1(l).

"Agreement" has the meaning assigned to that term in the Preamble.

"Ancillary Agreements" means any certificate, agreement, document or other instrument to be executed and delivered in connection with this Agreement.

"Approval Order" has the meaning assigned to that term in Section 6.3(a).

"Assigned Contracts" has the meaning assigned to that term in Section 2.1(h).

"Assumed Liabilities" has the meaning assigned to that term in Section 2.3.

"Assumed Trade Payables" means bona fide trade payables of Sellers arising after the date of the Bankruptcy Petition and incurred in the ordinary course of business consistent with past practices through the Closing in respect of goods received or to be received after the date of the Bankruptcy Petition, and services rendered or to be rendered after the date of the Bankruptcy Petition.

"Avoidance Actions" means all avoidance claims or causes of action under the Bankruptcy Code or applicable Law (including, without limitation, any preference or fraudulent conveyance), and all other claims or causes of action under any other provision of the Bankruptcy Code or applicable laws relating to the Acquired Assets and/or Assumed Liabilities, including, without limitation, all actions relating to vendors and service providers used in the Business that are counterparties to Assigned Contracts or relating to Assumed Liabilities.

"Axial" has the meaning assigned to that term in the Preamble.

"Bankruptcy Code" has the meaning assigned to that term in the Preamble.

"Bankruptcy Court" has the meaning assigned to that term in the Preamble.

"Bankruptcy Petition" means a voluntary bankruptcy petition filed by a Seller with the Bankruptcy Court on the Petition Date.

"Bidding Procedures Order" has the meaning assigned to that term in Section 6.2.

"Business" has the meaning assigned to that term in the Preamble.

2

"Business Day" means any day on which commercial banking institutions are open for business in Wilmington, Delaware.

"Causes of Action" shall mean any and all causes of action, defenses, and counterclaims accruing to a Debtor or that is property of the Estate, based upon facts, circumstances and transactions that occurred prior to the Closing Date.

"Chapter 11 Case" has the meaning assigned to that term in the Preamble.

"Closing" has the meaning assigned to that term in Section 3.1.

"Closing Date" has the meaning assigned to that term in Section 3.1.

"Commercial Tort Claims" has the meaning given to it in Section 9-102(13) of the Uniform Commercial Code as in effect in the State of Illinois.

"Confidentiality Agreement" has the meaning assigned to that term in Section 8.16.

"Contracts" means all agreements, contracts, leases, consensual obligations, promises or undertakings, other than Employee Benefit Plans.

"Cure Amounts" means all amounts, costs and expenses required by the Bankruptcy Court to cure all defaults under the Assigned Contracts so that they may be assumed and assigned to Purchaser pursuant to §§363 and 365 of the Bankruptcy Code.

"D&O Insurer" has the meaning assigned to such term in Section 6.9.

"Debtor" shall mean a Seller.

"Deposit" has the meaning assigned to that term in Section 2.6.

"Employee Benefit Plans" shall mean (i) all "employee benefit plans" (as defined in §3(3) of ERISA), including any employee pension benefit plans; (ii) all employment, consulting, non-competition, employee non-solicitation, employee loan or other compensation agreements, and (iii) all bonus or other incentive compensation, equity or equity-based compensation, stock purchase, deferred compensation, change in control, severance, leave of absence, vacation, salary continuation, medical, life insurance or other death benefit, educational assistance, training, service award, dependent care, pension, welfare benefit or other material employee or fringe benefit plans, policies, agreements or arrangements, whether written or unwritten, qualified or unqualified, funded or unfunded and all underlying insurance policies, trusts and other funding vehicles, in each case currently maintained by or as to which a Seller has or could reasonably be expected to have any obligation or liability, contingent or otherwise, thereunder for current or former employees, directors or individual consultants of such Seller.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and regulations and formal guidance issued thereunder.

3

"Escrow Agent" has the meaning assigned to that term in Section 2.6.

"Escrow Agreement" has the meaning assigned to that term in Section 2.6.

"Estate" shall mean the estate of a Debtor created by §541 of the Bankruptcy Code upon the filing of the Bankruptcy Petition.

"Estate Causes of Action" shall mean any and all Causes of Action except for (i) Causes of Action that relate to an Assigned Contract, (ii) Causes of Action arising from breaches of warranty relating to the Acquired Assets, and (iii) Causes of Action against past and present vendors or customers of a Seller; for the avoidance of doubt, "Estate Causes of Action" shall include (and "Purchased Causes of Action" shall not include), without limitation, (A) Avoidance Actions, and (B) Causes of Action against any administrative or other agent, lender or secured party related to any credit facility existing at any time whether prior to or after the filing of the Bankruptcy Petition.

"Estes" has the meaning assigned to such term in the Preamble.

"Excluded Assets" has the meaning assigned to that term in Section 2.2.

"Executory Contracts and Unexpired Leases" has the meaning assigned to that term in Section 2.1(h).

"Final Order" means an order of the Bankruptcy Court that has not been appealed, reversed, modified, amended or stayed and the time to appeal from or to seek review or rehearing of such order has expired.

"Governmental Authorization" means any consent, franchise, license, registration, permit, order or approval issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law, including, as the context may require, any declarations or filings with, or expiration of waiting periods imposed by, any such Governmental Body.

"Governmental Body" means any (i) nation, state, county, city, town, borough, village, district or other jurisdiction, (ii) federal, state, local, municipal, foreign or other government, (iii) governmental or quasi-governmental body of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers), (iv) multinational organization or body, (v) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, or (vi) official of any of the foregoing.

"Great Planes" has the meaning assigned to such term in the Preamble.

"Hobbico" has the meaning assigned to that term in the Preamble.

"Hobbico Germany" has the meaning assigned to the term in Section 2.1(l).

4

"Intellectual Property" means all trademarks, trade names, corporate names, company names, business names, product or brand names, service marks, patents, copyrights (including but not limited to moral rights), and any applications for or registrations of any of the foregoing, works of authorship, know-how, logos, proprietary information, protocols, schematics, specifications, software, software code (in any form, including source code and executable or object code), subroutines, techniques, user interfaces, URLs, domain names, web sites, works of authorship and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing, such as instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries) inventions, trade secrets and any other intellectual property or intangible property that are used in the Business as presently conducted and any rights relating to any of the foregoing.

"Inventory" means all supplies, goods, materials, work in process, inventory and stock in trade owned by a Seller exclusively for use or sale in the ordinary course of Business, but specifically excluding (1) goods which belong to sublessees, licensees or concessionaires of such Seller, and (2) goods held by such Seller on memo, on consignment, or as bailee.

"Law" means any applicable federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

"Liability" means any and all obligations, liabilities, debts and commitments, whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, due or to become due, whenever or however arising (including, without limitation, whether arising out of any contract or tort based on negligence, strict liability, or otherwise) and whether or not the same would be required by GAAP to be reflected as a liability in financial statements or disclosed in the notes thereto.

"Lien" means any mortgage, deed of trust, lien, pledge, charge, title defect, security interest, pledge, leasehold interest or other legal or equitable encumbrance of any kind.

"Lincoln" has the meaning assigned to that term in Section 4.5.

"Material Adverse Change" means only such change, circumstance, or effect as shall have arisen after the date on which this Agreement shall have been executed by Sellers and prior to the Closing that has a materially adverse effect on (i) the operations, assets or properties of Sellers, taken as a whole, or (ii) the ability of any of the parties hereto to consummate the transactions contemplated by this Agreement; provided, however, that any change, circumstance, or effect that arises out of, results from or relates to the commencement or conduct of the Chapter 11 Case shall not be considered in determining whether a Material Adverse Change has occurred and, in addition, no change, event, effect, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Change: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the Sellers operate, whether or not pursuant to the

declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America, except to the extent that such change has a disproportionate adverse effect on the Sellers relative to the adverse effect that such changes have on other companies in the industry in which the Sellers operate; (ii) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), except to the extent that such change has a disproportionate adverse effect on the Sellers relative to the adverse effect that such changes have on other companies in the industry in which the Sellers operate; (iii) any change in GAAP or Law, except to the extent that such change has a disproportionate adverse effect on the Sellers relative to the adverse effect that such changes have on other companies in the industry in which the Sellers operate; (iv) compliance with this Agreement or any related agreement, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; (v) any change directly attributable to the announcement of this Agreement, including by reason of the identity of Purchaser or any of its Affiliates or any communication by Purchaser or any of its Affiliates of their plans or intentions regarding the operation of the Business; (vi) any act of God or other force majeure event, except to the extent that such change has a disproportionate adverse effect on the Sellers relative to the adverse effect that such changes have on other companies in the industry in which the Sellers operate; or (vii) in the case of Sellers, any failure to meet or exceed any projection or forecast provided to or reviewed by the Purchaser.

"Permitted Liens" means (i) Liens for Taxes, assessments and other governmental levies, fees or charges that are not yet due and payable, (ii) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation, (iii) Liens which constitute mechanics', carriers', workmens', repairmens', agricultural or other like Liens arising or incurred in the ordinary course of business for which amounts are not delinquent, (iv) Liens arising out of operating leases with third parties, (v) with respect to real property, encumbrances reflected on policies of title insurance related to such real property and all recorded encumbrances, covenants and restrictions with respect to such real property, (vi) Liens created by Purchaser,  (vii) any Lien that constitutes an Assumed Liability, and (viii) those Liens set forth on ***Schedule 1.1***.

"Person" means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

"Personal Property" has the meaning assigned to that term in Section 2.1(a).

"Petition Date" has the meaning assigned to that term in the Preamble.

"Purchase Price" has the meaning assigned to that term in Section 2.5.

"Purchased Causes of Action" means any and all Causes of Action other than the Estate Causes of Action.

"Purchaser" has the meaning assigned to that term in the Preamble.

"R/C" has the meaning assigned to that term in the Preamble.

"Real Property" has the meaning assigned to that term in Section 2.1(a).

"Revell Germany" has the meaning assigned to that term in Section 2.1(l).

"Revell-US" has the meaning assigned to that term in the Preamble.

"Rights in Transaction-Related Privileges" has the meaning assigned to such term in Section 2.2(k).

"Sellers" has the meaning assigned to that term in the Preamble.

"Tail Coverage" has the meaning assigned to that term in Section 6.9.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, custom duties, capital stock, franchise, profits, withholding, social security (or similar excises), unemployment, disability, ad valorem, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not, by any governmental authority responsible for imposition of any such tax (domestic or foreign).

"Tower" has the meaning assigned to such term in the Preamble.

"Transaction-Related Documents" has the meaning assigned to such term in Section 2.2(k).

"Transactions" has the meaning assigned to that term in Section 2.4.

"Transferred Employees" has the meaning assigned to that term in Section 6.6(a).

"Transition Services Agreement" has the meaning assigned to that term in Section 6.8.

"Trustee" means any trustee or fiduciary appointed to act on behalf of a Debtor or as successor to a Debtor.

"United Model" has the meaning assigned to such term in the Preamble.

"WARN" has the meaning assigned to such term in Section 2.3.

## ARTICLE II
## SALE AND PURCHASE OF ASSETS

2.1    **Sale and Purchase of Assets**.    On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Purchaser shall purchase from each Seller, and each Seller shall sell, assign, transfer, convey and deliver to Purchaser, all of such Seller's right, title and interest in and to all assets, properties, rights, interests, benefits and privileges of

7

whatever kind or nature, both tangible and intangible, real and personal, wherever located, whether owned or leased, that are used by such Seller in connection with the operation of the Business (except the Excluded Assets), to the extent transferable under applicable Law, the Bankruptcy Code or otherwise, as those assets, properties, rights, interests, benefits and privileges exist on the Closing Date, free and clear of any Lien other than Permitted Liens. Without limiting the foregoing, the assets, properties, rights, interests, benefits and privileges sold, assigned, transferred, conveyed and delivered by each Seller hereunder (collectively, the "Acquired Assets") shall include all of such Seller's right, title and interest in and to the following except to the extent any of the following are included within Excluded Assets:

(a)     all of such Seller's interests in real property, together with all plants, buildings, structures, fixtures and improvements of all kinds situated thereon, and all privileges, rights, easements, hereditaments and appurtenances belonging to or for the benefit of such real property (collectively, "Real Property");

(b)     all of such Seller's supplies (including packaging materials), materials, machinery, equipment (including equipment that is subject to a capital lease, but only to the extent that Purchaser assumes such capital lease as an Assigned Contract), tools, vehicles, furniture, fixtures, furnishings, leasehold improvements, goods, and other tangible personal property owned by such Seller, including, but not limited to, any owned computer hardware and software (collectively, "Personal Property");

(c)     all of such Seller's Accounts Receivable and all prepaid expenses, advances and deposits, excluding (i) Accounts Receivable and prepaid expenses, advances and deposits allocable to Executory Contracts and Unexpired Leases that are not Assigned Contracts, and (ii) any deposits, security retainers paid to professionals or other prepaid amounts referred to in Section 2.2(a) or Section 2.2(f) below[1];

(d)     all of such Seller's Inventory;

(e)     all of such Seller's rights in Purchased Causes of Action;

(f)     all of such Seller's books and records relating to the Acquired Assets, including production records, accounting records, Tax records, financial records, property records, mailing lists, and customer and vendor lists, provided that such Seller may obtain and retain, at its own expense, copies of any or all such books and records before their transfer to Purchaser;

(g)     all of such Seller's rights in Intellectual Property, to the extent assignable;

---

[1] If a bidder is proposing to acquire the equity interests in Hobbico Germany but excluding the U.S. assets of Hobbico and is domestic subsidiaries, then the Acquired Assets may also include Hobbico's rights under (i) that certain Unsecured and Subordinated Mezzanine Loan Facility dated February 9, 2012 between Hobbico and Hobbico Germany, and (ii) that certain Intecompany [sic] Revolving Credit Facility Agreement dated May 30, 2017 between Hobbico and Revell Germany (collectively, the "Intercompany Notes").

(h)     all of such Seller's Contracts, agreements, licenses, leases, warranties, commitments, and purchase and sale orders with respect to Personal Property, Intellectual Property, Real Property or otherwise (collectively, "Executory Contracts and Unexpired Leases"), solely to the extent that such Executory Contracts and Unexpired Leases are designated by Purchaser to be assumed and assigned on the Closing Date in accordance with the Bidding Procedures Order and provided further that Purchaser shall have provided adequate assurance of future performance under §365(b)(1)(C) of the Bankruptcy Code with respect to any designated contract (collectively, "Assigned Contracts"), together with the right to receive income in respect of such Assigned Contracts on and after the Closing Date, and the right to bring any causes of action which may be brought by such Seller relating to past or current breaches of the Assigned Contracts;

(i)     all of such Seller's Governmental Authorizations and all of such Seller's pending applications therefor or renewals thereof, in each case to the extent transferable to Purchaser and excluding Governmental Authorizations or pending applications therefor required for the continued operation of an Excluded Asset;

(j)     all of such Seller's rights with respect to Employee Benefit Plans;

(k)     all of such Seller's assets, properties and rights identified on *Schedule 2.1(k)*; and

(l)     solely with respect to Hobbico, all of the outstanding equity interests in its foreign subsidiary Hobbico Deutschland Holding GmbH, a company organized under the laws of Germany ("Hobbico Germany") which is in turn the sole owner of Revell GmbH, a company organized under the laws of Germany ("Revell Germany").[2]

2.2     **Excluded Assets**. Notwithstanding the provisions of Section 2.1 or any other provision of this Agreement, the Acquired Assets do not include, and no Seller shall transfer to Purchaser, any of the following assets, properties, rights, interests, benefits and privileges (collectively, the "Excluded Assets"):

(a)     all cash, bank deposits, securities and cash equivalents, including for this purpose (i) all cash and cash equivalents if credited to a Seller's bank account(s) prior to the Closing Date, and (ii) all deposits and other prepaid amounts arising outside of the ordinary course of a Seller's business, including without limitation all such amounts held by a Seller's landlords, utility providers, vendors, attorneys, accountants, investment bankers, restructuring advisors, notice and claims agents, public relations advisors, and other professional advisors;

(b)     all Contracts, agreements, licenses, leases, warranties, commitments, and purchase and sale orders with respect to Personal Property, Intellectual Property, Real Property

---

[2] It may be desirable for Purchaser to acquire the equity interests in one or both of Estes and ADL, rather than their assets. In such case, appropriate changes will be made regarding the identity of the selling parties, the Acquired Assets, and the Excluded Assets.

or otherwise and the rights associated therewith other than the Executory Contracts and Unexpired Leases assumed as provided in Section 2.1(h)[3];

(c)    except as set forth in Section 2.1(l), all shares of capital stock or other equity interests in any Seller held by any Seller, and all corporate minute books and records of internal corporate proceedings, stock transfer ledgers, blank stock certificates, corporate seals, tax and accounting records, work papers and other records relating to the organization or maintenance of the legal existence of a Seller;

(d)    any books, records or other information related solely and exclusively to the Excluded Assets;

(e)    all records that a Seller is required by law to retain;

(f)    all refunds, credits or deposits of Taxes with respect to the period prior to the Closing Date, including without limitation any refunds, credits or deposits of Taxes arising as a result of Seller's operation of the Business or ownership, operation, utilization or maintenance of the Acquired Assets prior to the Closing Date;

(g)    all Estate Causes of Action;

(h)    all rights to receive mail and other communications addressed to a Seller that do not relate to the Acquired Assets or the Assumed Liabilities;

(i)    the corporate franchise of any Seller and any and all prepaid expenses and deposits in respect of franchise Taxes and the like;

(j)    all property, rights and assets relating to an Excluded Asset or arising from and relating to the defense, release, compromise, discharge or satisfaction of any of the Liabilities which are not Assumed Liabilities;

(k)    all documents, emails and other communications relating to the transactions contemplated hereby or any preparations or planning with respect thereto, including without limitation all such materials consisting of this Agreement, the Ancillary Agreements, memoranda, research, analysis, planning, due diligence reports, quality of earnings reports, agreements with financial advisors, investment bankers, accountants or legal counsel, whether or not subject to any attorney-client privilege, work product privilege, or any other privilege (the "Transaction-Related Documents"), and any Seller's right to exercise or waive any attorney-client privilege, work product privilege or other privilege with respect to the transactions contemplated hereby or any of the Transaction-Related Documents (the "Rights in Transaction-Related Privileges");

(l)    all rights of Sellers arising under this Agreement, the Ancillary Agreements, and under any other agreement between Sellers and Purchaser entered into in connection with this Agreement;

---

[3] A bidder for the Hobbico assets that is not also seeking to acquire the equity interests in Hobbico Germany should reflect the Intercompany Notes as Excluded Assets.

(m)     all good faith or other bid deposits submitted by any third party under the terms of the Bidding Procedures Order;

(n)     all insurance policies of any of the Sellers and/or their subsidiaries for directors', managers', and officers' liability and all rights of any nature with respect thereto, including all insurance recoveries, prepaid premiums, and unearned premiums thereunder and rights to assert claims with respect to any such insurance recoveries;

(o)     all Commercial Tort Claims of the Sellers; and

(p)     all assets, properties and rights identified on **_Schedule 2.2(i)_**.

2.3     **Assumed Liabilities**.  Upon the terms and subject to the conditions set forth herein, at the Closing, Purchaser shall assume and shall timely perform and discharge in accordance with their respective terms (a) all Liabilities and Cure Amounts with respect to the Assigned Contracts, (b) all Liabilities (including for any Tax) that arise on or after the Closing Date with respect to Purchaser's ownership or operation of the Acquired Assets on and after the Closing, (c) all post-petition accounts payable and accrued post-petition expenses of any Seller for work done in the ordinary course of Business (excluding any expenses incurred with respect to the administration of the Bankruptcy Case unless such expenses are incurred as a result of Purchaser delaying the Closing) which would qualify as administrative priority expenses under §503(b) of the Bankruptcy Code, (d) all Liabilities with respect to Employee Benefit Plans, other than those relating to equity compensation under Hobbico's employee stock ownership plan, (e) all Liabilities for wages, salaries, compensation, bonuses, employment-related expense reimbursement, deferred compensation, overtime, workers' compensation, 401(k) matching, sick pay, vacation, paid time off, personal days and severance benefits for Transferred Employees, including without limitation all associated payroll taxes, deductions and withholdings, (f) all Liabilities under the Workers Adjustment and Retraining Notification Act ("WARN") and similar state laws; (g) all Liabilities with respect to Assumed Trade Payables, and (h) such other Liabilities of a Seller set forth on **_Schedule 2.3_** (collectively "Assumed Liabilities").

2.4     **Excluded Liabilities**.   Purchaser, by its execution and delivery of this Agreement and the Ancillary Agreements and its performance of the transactions contemplated by this Agreement and the Ancillary Agreements (the "Transactions"), shall not assume or otherwise be responsible for any Liability other than the Assumed Liabilities.

2.5     **Purchase Price**.  The aggregate consideration payable to Sellers for the sale and transfer of the Acquired Assets shall be (a) [●] Dollars ($[●]) (the "Purchase Price"), and (b) the assumption by Purchaser of the Assumed Liabilities.  At the Closing, Purchaser shall deliver the Purchase Price (less the Deposit) to Hobbico, as agent for Sellers, by wire transfer of immediately available funds to one or more accounts designated in writing by Hobbico.

2.6     **Deposit**.  Within three (3) Business Days of the execution of this Agreement by Purchaser and Sellers, Purchaser shall deposit with [●] as escrow agent (the "Escrow Agent"), pursuant to an escrow agreement in form and substance to be mutually agreed to by and among

the Escrow Agent, Purchaser and Sellers (the "Escrow Agreement"), [●] Dollars ($[●])[4] (the "Deposit") by cashier's check or wire transfer. The Deposit shall be credited against the Purchase Price at the Closing if Purchaser is the successful bidder for the Acquired Assets. If this Agreement is terminated for any reason, then the Deposit shall be forfeited to Sellers or returned to Purchaser as provided in Article VII.

# ARTICLE III
## CLOSING; CONDITIONS TO CLOSING

3.1    **Closing**. Subject to the terms and conditions of this Agreement, the closing (the "Closing") of the sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities shall take place on or before [●] at a location to be specified by Hobbico. The time and date upon which the Closing occurs is referred to herein as the "Closing Date." All transactions at the Closing shall be deemed to take place simultaneously and none shall be deemed to have taken place until all shall have taken place. Effective immediately upon the Closing, the Purchased Causes of Action against the directors, officers or other insiders of any Seller shall automatically be deemed waived by Purchaser without further action.

3.2    **Court Approval Required**. Purchaser and Sellers acknowledge and agree that the Bankruptcy Court's entry of the Approval Order shall be required in order to consummate the Transactions, and that the requirement that the Approval Order be entered is a condition that cannot be waived by any party.

3.3    **Conditions to Obligations of Purchaser**. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may, except for the condition set forth in Section 3.2, be waived by Purchaser in its sole discretion:

(a)    Representations and Warranties. The representations and warranties of Sellers set forth in Article IV of this Agreement, taken as a whole, shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)    Agreements and Covenants. Sellers shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by them under this Agreement at or before the Closing in all material respects.

(c)    Deliveries at Closing. Sellers shall have used commercially reasonable efforts to cause Purchaser to receive duly executed assignments, patent assignments, general trademark assignments, bills of sale or certificates of title, dated as of the Closing Date, in form and substance reasonably satisfactory to Purchaser, for the transfer to Purchaser of all of such Seller's right, title and interest in and to the material Acquired Assets free and clear of any Lien

---

[4]The Deposit amount will be ten percent (10%) of the Purchase Price.

other than Permitted Liens, provided however that Sellers shall not have any duty to make any payment or incur any material expense in connection therewith.

(d)  <u>Assumption and Assignment of Assigned Contracts</u>.  Each Seller shall have assigned to Purchaser the Assigned Contracts to which it is a party by virtue of the Approval Order.

(e)  <u>Consents</u>.  All consents, authorizations, or approvals required to be obtained from any Governmental Authority set forth on Schedule 4.4 shall have been obtained and be in full force.[5]

(f)  <u>Transition Services Agreement</u>.    Sellers shall have executed and delivered to Purchaser the Transition Services Agreement.

3.4    **Conditions to Obligations of Sellers**.    The obligation of each Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may, except for the condition set forth in Section 3.2, be waived by any Seller in its sole discretion:

(a)  <u>Representations and Warranties</u>.  The representations and warranties of Purchaser set forth in Article V of this Agreement shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)  <u>Agreements and Covenants</u>.  Purchaser shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by it under this Agreement at or before the Closing in all material respects.

(c)  <u>Receipt of Purchase Price</u>.  Hobbico, as agent for Sellers, shall have received (i) the Purchase Price (less the Deposit) from Purchaser, and (ii) the Deposit from the Escrow Agent.

(d)  <u>Orders</u>.  The Bankruptcy Court shall have entered the Approval Order and the Bidding Procedures Order, and such orders shall have become Final Orders.

(e)  <u>Deliveries at Closing</u>.  Sellers shall have received from Purchaser all fully executed instruments or documents as any Seller may reasonably request to fully effect

---

[5]Note that if and to the extent that Purchaser is not itself already in possession of all licenses and permits necessary for its operation of the Business following the Closing, then Purchaser may (i) purchase the equity interest in the applicable Seller and continue operations under its currently existing licenses and permits, with full responsibility for any compliance activities required by virtue of the change of control of such Seller, (ii) purchase all of the Acquired Assets at closing and assume full responsibility for all licensing and permitting obligations of the Business following the Closing, or (iii) propose a method of addressing such license or permit issue in accordance with law by means of a Transition Services Agreement acceptable to Sellers and all applicable governmental authorities.

the transfer of the Acquired Assets and assumption of the Assumed Liabilities and to otherwise consummate the Transactions.

(f)     Consents.   All consents, authorizations, or approvals required to be obtained from any Governmental Authority set forth on Schedule 4.4 shall have been obtained and be in full force.

(g)     Transition Services Agreement.   Purchaser shall have executed and delivered to Sellers the Transition Services Agreement and performed all obligations required to be performed or paid by it prior to the Closing under the Transition Services Agreement.

3.5     **Delivery of Possession of Assets**.   Right to possession of all Acquired Assets shall transfer to Purchaser at the Closing.   Purchaser shall bear all risk of loss with respect to the Acquired Assets from and after the Closing.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller represents and warrants to Purchaser, with respect to itself only, severally and not jointly, that the statements contained in this Article IV are true and correct as of the date hereof and will be true and correct in all material respects on the Closing Date (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects).

4.1     **Organization, Good Standing and Power**.   Such Seller is legally formed and in good standing under the laws of the State of its incorporation.   Subject to the applicable provisions of the Bankruptcy Code, such Seller has the power to own its properties and carry on its business as now being conducted and is qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would result in a Material Adverse Change.

4.2     **Authority Relative to this Agreement; Execution and Binding Effect**.   Such Seller has full power and authority to execute and deliver this Agreement and the Ancillary Agreements and, subject to receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code, to consummate the Transactions applicable to such Seller.   The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by the board of directors of such Seller, and, except for Bankruptcy Court approval or as set forth on Schedule 4.4, no other proceedings or approvals on the part of such Seller are necessary to approve this Agreement and the Ancillary Agreements and to consummate the Transactions.   This Agreement has been duly and validly executed and delivered by such Seller.   Assuming due authorization, execution and delivery by Purchaser, this Agreement constitutes, and each of the Ancillary Agreements at the Closing will constitute, the valid and binding obligation of such Seller, enforceable against such Seller in accordance with their terms, except as such enforcement may be limited by (a) the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, or (b) the rules governing the availability of specific

14

performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

4.3    **No Defaults**.  Subject to receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code and except as set forth on ***Schedule 4.3,*** the execution and delivery by such Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions do not and will not (a) with or without the giving of notice or the lapse of time, or both, conflict with, or result in the breach of or constitute a default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or violate any (i) provision of Law, or (ii) agreement, Employee Benefit Plan, Contract, lease, power of attorney, commitment, instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injunction to which such Seller is subject or a party or by which it is bound (or with respect to which its properties or assets are subject or bound), except for any breach, default, modification, cancellation, lapse, termination, limitation, curtailment or violation that would not result in a Material Adverse Change; or (b) violate the certificate of incorporation or bylaws of such Seller.

4.4    **Governmental and Other Consents**.  Except for the receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code or as set forth on ***Schedule 4.4,*** no consent, notice, authorization or approval of, or exemption by, or filing with or notifications to any Governmental Authority or any other Person, whether pursuant to contract or otherwise, is required in connection with the execution and delivery by such Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions.

4.5    **No Brokers**.  Except for the representation of Sellers by Lincoln Partner Advisors LLC ("Lincoln"), pursuant to that certain order entered by the Bankruptcy Court on [●] and the obligation of Sellers to pay Lincoln a commission, fees and expenses at Closing in accordance with the terms and provisions of such order, no Seller has incurred or will incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of such Seller, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and delivery by such Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to Sellers that the statements contained in this Article V are true and correct as of the date hereof and will be true and correct in all material respects on the Closing Date (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects).

5.1    **Organization, Good Standing and Power**.  Purchaser is legally formed and in good standing under the laws of the state of its formation. Purchaser has the power to own its properties and carry on its business as now being conducted and is qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would result in a Material Adverse Change.

5.2    **Authority Relative to this Agreement; Execution and Binding Effect**. Purchaser has full power and authority to execute and deliver this Agreement and the Ancillary Agreements and to consummate the Transactions.    The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by all necessary action of Purchaser and no other proceedings or approvals (shareholder, member or otherwise) on the part of Purchaser are necessary to approve this Agreement and the Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by Purchaser. Assuming due authorization, execution and delivery by each Seller, this Agreement constitutes, and each of the Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with their terms, except as such enforcement may be limited by (a) the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, or (b) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

5.3    **No Defaults**.  The execution and delivery by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the Transactions do not and will not (a) with or without the giving of notice or the lapse of time, or both, conflict with, or result in the breach of or constitute a default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or violate any (i) provision of Law, or (ii) agreement (including without limitation any loan or financing agreement), Contract, lease, power of attorney, commitment, instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injunction to which Purchaser is subject or a party or by which it is bound (or with respect to which its properties or assets are subject or bound), except for any breach, default, modification, cancellation, lapse, termination, limitation, curtailment or violation that would not result in a Material Adverse Change; or (b) violate the certificate of incorporation, bylaws or any comparable instruments of Purchaser.

5.4    **Governmental and Other Consents**.  Except for the receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code, no consent, notice, authorization or approval of, or exemption by, or filing with or notifications to any Governmental Authority or any other Person, whether pursuant to contract or otherwise, is required in connection with the execution and delivery by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the Transactions.

5.5    **Financial Ability**.  Purchaser has cash available that is sufficient to enable it to pay the Deposit, the Purchase Price and any of its obligations under the Transition Services Agreement as well as all other amounts (including Cure Amounts) otherwise payable to consummate the Transactions pursuant to and in accordance with this Agreement.

5.6    **No Brokers**.  Purchaser has not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of Purchaser, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and delivery by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby.

## ARTICLE VI
## COVENANTS

6.1 **Operation of Business**. Subject to the requirements of, and the obligations imposed upon, each Seller as debtor-in-possession and pursuant to the Bankruptcy Code and except as otherwise contemplated by this Agreement or the Bidding Procedures Order or as required to comply with debtor-in-possession financing obtained by such Seller, from the date hereof and until the Transactions shall have been consummated or abandoned as contemplated herein, each Seller shall operate the Business in the ordinary course (relative to that in effect immediately prior to the execution of the Agreement) and, consistent with such operation and the budget set forth in Seller's debtor-in-possession credit agreement, and consistent with acting as a debtor-in-possession in a Chapter 11 bankruptcy case, shall use commercially reasonable efforts to maintain the goodwill associated with the Business and the relationships with the employees, customers and suppliers of the Business.

6.2 **Bidding Procedures Order**. The purchase and sale of the Acquired Assets will be subject to competitive bidding in accordance with (and only in accordance with) the terms of an order of the Bankruptcy Court approving sale and bidding procedures substantially in the form set forth in Exhibit A (the "Bidding Procedures Order"). Within a reasonable period of time after entering into this Agreement, Sellers shall seek the Bidding Procedures Order from the Bankruptcy Court.

6.3 **Approval Order**.

(a) Prior to the Closing, and subject to the provisions of this Agreement, Purchaser and Sellers shall use their commercially reasonable efforts to obtain entry of an order or orders by the Bankruptcy Court pursuant to §§363 and 365 of the Bankruptcy Code (the "Approval Order"), which shall approve of this Agreement and the transactions described herein, and which shall contain the following provisions in terms reasonably acceptable to the parties (it being understood that certain of such provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Approval Order):

(i) that each Seller may sell, transfer and assign the applicable Acquired Assets and assume and assign the applicable Assigned Contracts to Purchaser pursuant to this Agreement and Bankruptcy Code §§105, 363 and 365, as applicable, and that any Executory Contract or Unexpired Lease not assigned to Purchaser is rejected;

(ii) the transfers of the Acquired Assets by each Seller to Purchaser (A) vest or will vest Purchaser with all right, title and interest of such Seller in and to the Acquired Assets, free and clear of all Liens other than Permitted Liens, and (B) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the State of Delaware;

(iii) the transactions contemplated by this Agreement are undertaken by Purchaser and Sellers at arm's length, without collusion and in good faith within the

17

meaning of section 363(m) of the Bankruptcy Code, and such parties are entitled to the protections of section 363(m) of the Bankruptcy Code;

(iv)    a determination that selling the Acquired Assets free and clear of all Liens other than Permitted Liens is in the best interest of each Seller's Estate; and

(v)    that Purchaser shall not assume any of the Excluded Liabilities.

(b)    If the Approval Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), each party hereto agrees to use commercially reasonable efforts to obtain an expedited resolution of such appeal; provided, however, that nothing herein shall preclude the parties hereto from consummating the Transactions if the Approval Order shall have been entered and has not been stayed in which event Purchaser shall be able to assert the benefits of §363(m) of the Bankruptcy Code.

### 6.4    Access to Facilities, Personnel, and Information.

(a)    Prior to the Closing, each Seller shall permit representatives of Purchaser to have reasonable access during regular business hours and upon reasonable notice, and in a manner so as not to interfere with the normal business operations of such Seller, to all premises, property, books, records (including Tax records), Contracts, and documents of or pertaining to the Business which are under such Seller's control (provided that any representatives of Purchaser shall be subject to the confidentiality obligations under the Confidentiality Agreement or otherwise agree in writing to be bound by the terms of such Confidentiality Agreement applicable to Purchaser thereunder).

(b)    From the Closing Date through and including the second anniversary of the Closing Date, Purchaser shall grant each Seller, each Trustee, and their respective representatives reasonable access to the books and records transferred to Purchaser pursuant to this Agreement during regular business hours and upon reasonable notice for the purpose of allowing such Seller or its successor, such Trustee, or their respective representatives to perform the duties necessary for the liquidation of each Debtor's Estate.    To the extent reasonably required by any Seller, Purchaser shall make one or more of the Transferred Employees available to such Seller to assist in such Seller's wind-down of its Estate provided that such access does not unreasonably interfere with the conduct of the Business by Purchaser.

### 6.5    Further Assurances.    Purchaser and each Seller agree to take such further actions and execute such other documents as may be reasonably required to fulfill the conditions to Closing and, after Closing, to fully effect the transactions contemplated by this Agreement and the Ancillary Agreements and further secure to each party the rights intended to be conferred hereby and thereby.

### 6.6    Employee Matters.

(a)    Purchaser shall make offers of employment to all employees of each Seller effective as of the Closing, subject to Purchaser's right to require successful completion of customary employee background checks and drug testing prior to offering employment to

any such employee (such employees who are hired by Purchaser, the "Transferred Employees"). Each Seller shall terminate the employment of all Transferred Employees employed by such Seller as of immediately prior to the Closing and reasonably assist Purchaser in effecting the change of employment of such Transferred Employees as of the Closing in an orderly fashion. Purchaser's obligations under this Agreement are not conditioned upon any particular employees agreeing to employment with Purchaser.

(b)     Purchaser may, to the extent permitted by Law, replace benefits provided with respect to a Transferred Employee under any Employee Benefit Plan assumed by Purchaser pursuant to Section 2.1 with benefits provided under an employee benefit plan maintained by Purchaser, provided that Purchaser shall recognize the service of Transferred Employees prior to the Closing Date as service with Purchaser in connection with any employee pension benefit plan and employee welfare benefit plan and policy (including vacations and severance policies) maintained by Purchaser which is made available following the Closing Date by Purchaser for purposes of any waiting period, vesting, eligibility and benefit entitlement (provided that Purchaser is not required to count such service of the Transferred Employees prior to the Closing Date in calculating the amount of that employee's benefit under Purchaser's plan or policy and provided further that such crediting shall not result in the duplication of benefits with respect to any Transferred Employee). In addition, Purchaser shall (i) waive, or cause its insurance carriers to waive, all limitations as to pre-existing conditions, if any, with respect to participation and coverage requirements applicable to Transferred Employees under any employee welfare benefit plan (as defined in §3(1) of ERISA) which is made available to Transferred Employees following the Closing Date by Purchaser and (ii) provide credit to Transferred Employees for any co-payments, deductibles and out-of-pocket expenses paid by such employees under the employee benefit plans, programs and arrangements of any Seller during the portion of the relevant plan year including the Closing Date.

(c)     Purchaser and each Seller agree to use the alternative procedure set forth in Revenue Procedure 2004-53 with respect to wage reporting for the Transferred Employees. Each Seller, as the predecessor employer, shall have no employment tax reporting responsibilities for the Transferred Employees following the Closing.

(d)     Purchaser and each Seller shall execute all documents and take all actions necessary to transfer the Employee Benefit Plans and their related liabilities to Purchaser as provided hereunder. Each Seller shall provide Purchaser with all documents, employee data or other information relating to such Employee Benefit Plans, provided that Purchaser shall execute any confidentiality documents or other similar agreements as necessary to comply with applicable laws protecting the confidentiality of such documents, data and information.

(e)     Nothing in this Agreement shall constitute any commitment, Contract or understanding (expressed or implied) of any obligation on the part of Purchaser to a post-Closing employment relationship of any fixed term or duration or upon any terms or conditions other than those that Purchaser may establish pursuant to individual offers of employment. Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Purchaser to terminate, reassign, promote or demote any of the Transferred Employees after the

19

Closing or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, future benefits, other compensation or terms or conditions of Purchaser's employment of such employees.

(f)     If any of the arrangements described in this Section 6.6 are determined by any Governmental Body to be prohibited by applicable Law, Purchaser and Sellers shall modify such arrangements to as closely as possible reflect their expressed intent and retain the allocation of economic benefits and burdens to the parties contemplated herein in a manner that is not prohibited by applicable Law.

(g)     Notwithstanding anything in this Section 6.6 to the contrary, nothing contained herein, whether express or implied, shall be treated as an amendment or other modification of any Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its affiliates, or shall limit the right of Purchaser to amend, terminate or otherwise modify any Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its affiliates following the Closing Date. If (i) a party other than the parties hereto makes a claim or takes other action to enforce any provision in this Agreement as an amendment to any Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its affiliates, and (ii) such provision is deemed to be an amendment to such Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its affiliates even though not explicitly designated as such in this Agreement, then, solely with respect to the Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its affiliates at issue, such provision shall lapse retroactively and shall have no amendatory effect with respect thereto.

6.7     **Tax Matters**.

(a)     All sales, use, transfer, stamp, conveyance, value added or other similar Taxes, duties, excises or governmental charges imposed by any Tax authority, domestic or foreign, and all recording or filing fees, notarial fees and other similar costs of Closing will be borne by Purchaser.

(b)     Purchaser and Sellers shall negotiate in good faith, on or prior to the Closing Date, an allocation of the Purchase Price among the Acquired Assets. Purchaser and Sellers shall each file all Tax returns (and IRS Form 8594, if applicable) on the basis of such agreed upon allocation, as it may be amended, and no party shall thereafter take a Tax return position inconsistent with such allocation unless such inconsistent position shall arise out of or through an audit or other inquiry or examination by the Internal Revenue Service or other Governmental Body responsible for Taxes.

6.8     **Transition Services Agreement.**  At the Closing, Sellers and Purchaser shall execute and deliver to one another a transition services agreement in the form of Exhibit B attached hereto (the "Transition Services Agreement").

6.9     **Directors and Officers Liability Coverage.**  At the Closing, Purchaser shall cause the issuer of the directors and officers liability insurance policy currently in effect with respect to Sellers (the "D&O Insurer") to issue and deliver to Sellers a fully-paid and unlimited

extended reporting endorsement ("Tail Coverage") with respect to such policy, for the risks and in the amounts currently reflected in such policy.  Seller shall cooperate with Purchaser to any reasonable extent in the process of obtaining such Tail Coverage, provided however that all premiums therefor shall be paid by Purchaser.

6.10   **Transaction-Related Documents**.  In light of the fact that all Transaction-Related Documents are excluded assets, and notwithstanding any other provision hereof, each Seller and its designated representative shall have the right to cause the removal of any and all Transaction-Related Documents which may exist in any of the files of such Seller or on any of its computer systems.  The parties hereto acknowledge that notwithstanding the foregoing, certain Transaction-Related Documents may inadvertently be or remain resident in the files or computer systems of a Seller following the Closing.  Accordingly, Purchaser covenants and agrees that it shall not seek to access, review or copy any of such Transaction-Related Documents which may remain in any of the files of a Seller or on any of its computer systems, including without limitation its back-up, business continuity or archive systems, at any time, and shall promptly delete or destroy any of such Transaction-Related Documents of which it may become aware.  In addition, at the written request of any Seller from time to time for so long as the Chapter 11 Case shall not have been discharged, Purchaser shall permit any Seller and its designated representatives reasonable access to Purchaser's facilities and systems, including without limitation its back-up, business continuity or archive systems, upon reasonable notice and during business hours, as necessary to access Transaction-Related Documents or other Acquired Assets for the limited purpose of removing or destroying any such Transaction-Related Documents or otherwise taking action necessary or appropriate in connection with the Chapter 11 Case, and shall cooperate with any Seller in connection therewith, and each Seller agrees to exercise such right in a manner reasonably designed to protect the confidentiality of Purchaser's information and to minimize interference with the operation of its business.

## ARTICLE VII
## TERMINATION; EFFECT OF TERMINATION

7.1   **Termination**.  This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)   by mutual consent of Purchaser and Sellers;

(b)   by Purchaser or any Seller in the event the Closing has not occurred (other than through failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before [●];

(c)   by any Seller if, incident to the Bid Procedures Order, such Seller accepts and closes on a competing bid for the purchase of all or part of the Acquired Assets;

(d)   by Purchaser if (i) any Seller shall file a motion to sell all or part of the Acquired Assets to a third party other than Purchaser and shall thereafter consummate such sale, or (ii) any Seller's Chapter 11 Case is converted to one under Chapter 7 of the Bankruptcy Code; or

(e)     by the non-breaching party upon a material breach of any provision of this Agreement or the Transition Services Agreement (including without limitation Purchaser's failure to pay any amount due from Purchaser under the Transition Services Agreement), provided that such breach has not been waived by the non-breaching party and has continued after notice to the breaching party by the non-breaching party without cure for a period of five (5) Business Days (provided that the non-breaching party shall have an immediate right to terminate if the breaching party has willfully breached any provision of this Agreement or the Transition Services Agreement, which breach is not cured).

7.2     **Effect of Termination**. If this Agreement is terminated pursuant to Section 7.1, (a) Purchaser shall have no Liability or obligations under this Agreement except for the possible forfeiture of the Deposit on the terms and conditions set forth in Section 7.3, and (b) no Seller shall have any Liabilities under this Agreement; provided, however, that the obligations in Sections 8.2 shall survive.

7.3     **Deposit**. If any Seller terminates this Agreement pursuant to Section 7.1(e) with respect to a breach by Purchaser, then the Deposit shall be forfeited to Hobbico, as agent for Sellers. If this Agreement is terminated pursuant to Section 7.1 for any other reason, the Deposit shall be returned to Purchaser.

## ARTICLE VIII
## GENERAL PROVISIONS

8.1     **"As Is", "Where Is", and "With all Faults" Transaction.**  PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN ARTICLE IV, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS, INCLUDING (A) FINANCIAL PROJECTIONS, REVENUES, PROFITS OR INCOME TO BE DERIVED OR COSTS OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE ACQUIRED ASSETS, (B) THE PHYSICAL CONDITION OF ANY ACQUIRED ASSETS, (C) THE ENVIRONMENTAL CONDITION OR OTHER MATTERS RELATING TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, (D) THE ZONING OF THE REAL PROPERTY, (E) THE VALUE OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF, (F) THE TRANSFERABILITY OF THE ACQUIRED ASSETS, (G) THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, (H) TITLE TO ANY OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF, (I) THE MERCHANTABILITY OR FITNESS OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF FOR ANY PARTICULAR PURPOSE, OR (J) ANY OTHER MATTER OR THING RELATING TO THE ACQUIRED ASSETS OR ANY PORTION THEREOF.  PURCHASER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF ALL ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS PURCHASER DEEMS NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION IV, PURCHASER IS

DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, PURCHASER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

8.2 **Transaction Expenses**. Except as expressly provided for herein, each party shall pay all fees, costs and expenses incurred by it with respect to this Agreement, whether or not the transactions contemplated by this Agreement are consummated.

8.3 **Certain Interpretive Matters and Definitions**. Unless the context requires, (a) references to the plural include the singular and references to the singular include the plural, (b) references to any gender includes the other gender, (c) the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation", (d) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, and (e) all references to Sections, Articles, Exhibits or Schedules are to Sections, Articles, Exhibits or Schedules of or to this Agreement.

8.4 **Termination of Representations and Warranties**. The representations and warranties of the parties set forth in this Agreement shall terminate and be of no further force or effect after the Closing.

8.5 **Amendment**. This Agreement may be amended or modified in whole or in part at any time by an agreement in writing among the parties.

8.6 **Waiver**. The waiver by a party of a breach of any covenant, agreement, condition or undertaking contained herein shall be made only by a written waiver in each case. No waiver of any breach of any covenant, agreement, condition or undertaking contained herein shall operate as a waiver of any prior or subsequent breach of the same covenant, agreement, condition or undertaking or as a waiver of any breach of any other covenant, agreement, condition or undertaking.

8.7 **Notices**. All notices, requests and other communications hereunder will be deemed to have been duly given if delivered personally, by an established overnight delivery company, or by certified or registered mail, postage prepaid, return receipt requested, as follows:

(a)   If to any Seller:        Mr. Thomas O'Donoghue
                               Chief Restructuring Officer
                               [name of particular Seller]
                               c/o Hobbico, Inc.
                               2904 Research Road
                               Champaign, Illinois 61822

      with a copy to:          Bruce A. Fox, Esq.
                               Neal, Gerber & Eisenberg LLP
                               2 North LaSalle Street, Suite 1700
                               Chicago, Illinois 60602

23

(b)     If to Purchaser:        [●]

with a copy to:        [●]

or to such other address as may hereafter be designated by a party by the giving of notice in accordance with this Section 8.7.  All notices, requests or other communications shall be deemed given when actually delivered if delivered personally or by an established overnight delivery company or upon actual receipt if delivered by certified or registered mail, postage prepaid, return receipt requested.

8.8    **Jurisdiction**.  The parties agree that the Bankruptcy Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or breach hereof.

8.9    **Governing Law**.  To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of laws.

8.10    **Damages**.    NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS, LOSS OF PRODUCTION OR OTHER DAMAGES ATTRIBUTABLE TO BUSINESS INTERRUPTION) ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT.

8.11    **Time is of the Essence**.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

8.12    **Severability**.  If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby.

8.13    **Titles and Headings**.  Titles and headings of sections of this Agreement are for convenience of reference only and shall not affect the construction of any provision of this Agreement.

8.14    **Assignment; Successors and Assigns**.  This Agreement and the rights, duties and obligations hereunder may not be assigned by any party without the prior written consent of the other party, and any attempted assignment without consent shall be void.  Subject to this Section 8.14, this Agreement and the provisions hereof shall be binding upon each of the parties, their successors and permitted assigns.

8.15    **No Third-Party Rights**.  The parties do not intend to confer any benefit hereunder on any Person other than the parties hereto.

24

8.16    **Confidentiality Agreement**.  The parties acknowledge that the Confidentiality Agreement dated as of [●], between Purchaser and Hobbico (the "Confidentiality Agreement") shall remain in full force and effect during the term specified therein.

8.17    **Entire Agreement**.    This Agreement, the Ancillary Agreements and the Confidentiality Agreement constitute the entire agreement between the parties regarding the subject matter hereof and no extrinsic evidence whatsoever may be introduced in any proceeding involving this Agreement, the Ancillary Agreements or the Confidentiality Agreement.

8.18    **Execution of this Agreement**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.  The exchange of copies of this Agreement and of signature pages by electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties transmitted by electronic transmission shall be deemed to be their original signatures for all purposes.

*(Signatures appear on following page)*

25

IN WITNESS WHEREOF, the parties have caused their duly authorized officers to execute this Agreement as of the day and year first written above.

**SELLERS:**

HOBBICO, INC.,
                                            an Illinois
corporation

By:_____
Name:_____
Title:_____


TOWER HOBBIES, INC.,
                                            an Illinois
corporation

By:_____
Name:_____
Title:_____


GREAT PLANES MODEL MANUFACTURING,
                                            an Illinois
corporation

By:_____
Name:_____
Title:_____


UNITED MODEL, INC.,
                                            an Illinois
corporation

By:_____
Name:_____
Title:_____


REVELL INC.,
                                            an Illinois
corporation

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

By:_____
Name:_____
Title:_____


ESTES-COX CORP.,                                    a Delaware
corporation

By:_____
Name:_____
Title:_____


ARIAL R/C INC.,                                    a California
corporation

By:_____
Name:_____
Title:_____


ARRMA DURANGO LIMITED,                             a company
organized under the laws of the United
    Kingdom


By:_____
Name:_____
Title:_____


**PURCHASER:**

[●]
                                                   a [●]

By:_____
Name:_____
Title:_____


[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

# EXHIBIT A

**Proposed Bidding Procedures Order**

## EXHIBIT B

**Form of Transition Services Agreement**

## Schedule 1.1

**Permitted Liens**

## SCHEDULE 2.1(k)

**Other Acquired Assets**

**SCHEDULE 2.2(o)**

**Other Excluded Assets**

## SCHEDULE 2.3

**Other Assumed Liabilities**

## SCHEDULE 4.3

### No Defaults

**SCHEDULE 4.4**

**Governmental and Other Consents**

# EXHIBIT B

**Form of Transition Services Agreement**

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "Agreement") is made and entered into as of the ___ day of April, 2018, by and among (i) Estes Industries, LLC, a Delaware limited liability company ("Purchaser"), (ii) Estes-Cox Corp., a Delaware corporation ("Seller"), and (iii) Hobbico, Inc., an Illinois corporation which is the owner of all outstanding equity in Seller ("Hobbico"). (Purchaser, Seller and Hobbico are individually referred to herein as a "Party", and are collectively referred to herein as the "Parties").

## RECITALS:

WHEREAS, pursuant to that certain Asset Purchase Agreement dated as of March [___], 2018 (the "Purchase Agreement") by and between Purchaser and Seller, Seller has agreed to sell and assign to Purchaser, and Purchaser has agreed to purchase and assume from Seller, certain assets and liabilities, all as more fully described therein;

WHEREAS, in connection with the transaction contemplated by the Purchase Agreement, upon the terms and subject to the conditions set forth in this Agreement, for a limited period of time after the closing under the Purchase Agreement (the "Closing"): (a) Seller and Hobbico have agreed to provide, or cause to be provided, to Purchaser certain transitional services as described in Exhibit A attached hereto (the "Seller Services"); and (b) Purchaser has agreed to make available to Hobbico, its subsidiaries, and any successors in interest to the businesses currently operated by any of them (collectively, the "Hobbico Parties") certain transitional services as described in Exhibit B attached hereto (the "Purchaser Services"); and

WHEREAS, it is a condition to each of Seller's and Purchaser's obligations to consummate the Closing that they shall have entered into and delivered this Agreement.

NOW, THEREFORE, in consideration of the premises and covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties each agree as follows:

1. Seller Services.

(a) Throughout the period commencing at the Closing and continuing thereafter for a period of ninety (90) days (the "Services Period"), Hobbico shall provide the Seller Services to Purchaser, or shall cause one or more of the other Hobbico Parties to provide the Seller Services to Purchaser, on the other terms and conditions set forth in this Agreement.

(b) Purchaser shall compensate Hobbico for the Seller Services as provided on Exhibit A hereto.

(c) If any of the Hobbico Parties is given access to any of Purchaser's computer or electronic systems or data storage in connection with its provision of the Seller Services or its receipt of any of the Purchaser Services, then such Hobbico Party shall use such access solely for the purposes of performing such Seller Services or receiving the Purchaser Services and will not attempt to access such computer or electronic systems or data storage

other than those specifically required to perform the Seller Services or receive such Purchaser Services.

(d)     Seller and Hobbico shall, and shall cause the other Hobbico Parties to, use commercially reasonable efforts to ensure that all employees, agents or other individuals associated with such Hobbico Party shall, while at Purchaser's facilities, (i) comply with the personnel, operational, safety and security procedures, policies, rules, and regulations applicable to Purchaser's employees and agents and (ii) otherwise conduct themselves in a professional and businesslike manner.

2.     Purchaser Services.

(a)     Throughout the Services Period, Purchaser shall provide the Purchaser Services to each of the Hobbico Parties on the other terms and conditions set forth in this Agreement.

(b)     Hobbico shall compensate Purchaser for the Purchaser Services as provided on Exhibit B hereto.

(c)     If Purchaser is given access to any of the computers or electronic systems or data storage of any of the Hobbico Parties in connection with Purchaser's provision of the Purchaser Services or its receipt of any of the Seller Services, then Purchaser shall use such access solely for the purposes of performing such Purchaser Services or receiving such Seller Services and will not attempt to access such computer or electronic systems or data storage other than those specifically required to perform such Purchaser Services or receive such Seller Services.

(d)     Purchaser shall use commercially reasonable efforts to ensure that all employees, agents or other individuals associated with Purchaser shall, while at any Hobbico Party's facilities, (i) comply with the personnel, operational, safety and security procedures, policies, rules, and regulations applicable to such Hobbico Party's employees and agents and (ii) otherwise conduct themselves in a professional and businesslike manner.

3.     Billing and Payment.

(a)     Each of Hobbico with respect to any Seller Services and Purchaser with respect to any Purchaser Services (each, a "Providing Party") shall invoice the other such Party (each, a "Recipient Party") on a monthly basis with respect to all Seller Services or Purchaser Services, as applicable, provided during each calendar month occurring in whole or in part during the Services Period.  Each such invoice shall be delivered to the Recipient Party within thirty (30) days following the close of the calendar month in which such services were performed, and the Recipient Party shall pay each such invoice to the Providing Party within 30 days of receipt thereof.  Unless otherwise designated from time to time by the Providing Party, all such payments shall be paid by wire transfer in accordance with the instructions provided by the Providing Party in such invoice.

(b)     All fees and other charges set forth on Exhibit A and Exhibit B hereto are exclusive of applicable taxes, assessments, surcharges or similar charges assessed by any

governmental entity (collectively, "Applicable Taxes"). Each Recipient Party shall be liable for all Applicable Taxes included on an invoice from a Providing Party, excluding any taxes or other charges (i) based on the net income of such Providing Party, or (ii) covered by a tax exemption that a party has demonstrated through a tax exemption certificate or other appropriate documents.

(c)    A Recipient Party shall submit any dispute regarding an invoice from a Providing Party (including any claim that particular services have not been provided as required by this Agreement) to the applicable Providing Party in reasonable detail, in writing, within 30 days of the date of the invoice in question. The applicable Parties shall use their commercially reasonable efforts to resolve the disputed invoice by negotiations within 30 days of the notice of the dispute. If the dispute cannot be resolved in this manner, it shall be settled pursuant to Section 15 hereof. A Recipient Party may withhold payment of the disputed amount of any invoice; provided that such Recipient Party shall pay the undisputed amount of the invoice.

4.    Termination of Other Parties' Duties to Provide Services. At any time during the Services Period, (i) Purchaser may terminate Seller's and Hobbico's duty to provide, or cause to be provided, the Seller Services to Purchaser by delivery of written notice thereof to Hobbico, and Purchaser shall not have any duty to make any payment to Hobbico with respect to Seller Services performed thereafter, and (ii) Hobbico may terminate Purchaser's duty to provide Purchaser Services to the Hobbico Parties by delivery of written notice thereof to Purchaser, and Hobbico shall not have any duty to make any payment to Purchaser with respect to Purchaser Services performed thereafter. No such notice of the termination of a Party's duties hereunder shall relieve any Party of payment obligations hereunder with respect to services performed prior to the date of the delivery of such notice.

5.    Confidentiality.

(a)    In connection with their respective performance under this Agreement, Purchaser or a Hobbico Party, as the case may be (a "Receiving Party") may be supplied with materials and information concerning Purchaser or a Hobbico Party, as the case may be (a "Disclosing Party") which is non-public, confidential or proprietary in nature ("Confidential Information"). Confidential Information includes (i) information transmitted in written, oral, magnetic form or any other medium, (ii) all copies and reproductions, in whole or in part, of such information and (iii) all summaries, analyses, compilations, studies, notes or other records which contain, reflect, or are generated from such information. Confidential Information does not include information that: (A) has become part of the public domain through no act or omission of the Receiving Party; (B) was developed independently by the Receiving Party; or (C) is or was lawfully and independently provided to the Receiving Party prior to disclosure hereunder from a third party who is not and was not subject to an obligation of confidentiality or otherwise prohibited from transmitting such information.

(b)    Purchaser agrees, with respect to Confidential Information which it receives from a Hobbico Party, and Seller and Hobbico agree, with respect to Confidential Information received by any Hobbico Party from Purchaser, that such Confidential Information shall be used solely for the purpose of performing obligations under this Agreement, and each such Party further agrees that during the Services Period, and for a period of two years

following the expiration or termination of the Services Period, such Party shall not disclose any of the Confidential Information of the Disclosing Party now or hereafter received or obtained by it without the Disclosing Party's prior written consent, and Seller and Hobbico shall be responsible for any such disclosure by any Hobbico Party to the same extent as if such disclosure had been made by Seller or Hobbico. Notwithstanding the foregoing, a Receiving Party may disclose any such Confidential Information to its affiliates, representatives, agents, accountants, attorneys and other confidential advisors (collectively, "Advisors") who need to know the Confidential Information for the purpose of assisting the Receiving Party in performing its obligations under this Agreement. The Receiving Party agrees to be responsible for any breach of this Agreement by its Advisors, and the Receiving Party agrees that its Advisors shall be advised by the Receiving Party of the confidential nature of such information and shall agree to hold such information in strictest confidence in accordance with the terms of this Section 5. If Seller or Hobbico is the Receiving Party, then it may disclose such Confidential Information to any other Hobbico Party which needs to know the Confidential Information for the purpose of assisting Hobbico in performing its obligations under this Agreement. Seller and Hobbico shall be responsible for any breach of this Agreement by any Hobbico Party, and agree that each Hobbico Party that shall be afforded access to any of Purchaser's Confidential Information shall be advised by Hobbico of the confidential nature of such information and shall agree to hold such information in strictest confidence in accordance with the terms of this Section 5.

(c)    Each Receiving Party acknowledges and agrees that any Confidential Information of a Disclosing Party, in whatever form, is the sole property of the Disclosing Party. Each Receiving Party agrees that it shall, upon the request of and as directed by the Disclosing Party, either return all such Confidential Information to the Disclosing Party or shall destroy all such Confidential Information and provide an officer's certificate certifying to such destruction.

(d)    If a Receiving Party or any of its Advisors is legally compelled (whether by deposition, interrogatory, request for documents, subpoena, civil investigation, demand or similar process) to disclose any Confidential Information of a Disclosing Party, then the Receiving Party shall immediately notify the Disclosing Party in writing of such requirement so that the Disclosing Party may seek a protective order or other appropriate remedy and/or waive compliance with the provisions hereof. The Receiving Party shall use commercially reasonable efforts to obtain or assist the Disclosing Party in obtaining any such protective order. Failing the entry of a protective order or the receipt of a waiver hereunder, the Receiving Party may disclose, without liability hereunder, that portion (and only that portion) of the Confidential Information of the Disclosing Party that the Receiving Party has been advised by written opinion of counsel, reasonably acceptable to the Disclosing Party, that the Receiving Party is legally compelled to disclose; provided that the Receiving Party agrees to use commercially reasonable efforts to obtain assurance that confidential treatment shall be accorded such Confidential Information by the person or persons to whom it was disclosed.

(e)    Each Receiving Party acknowledges that all Confidential Information of the Disclosing Party is considered to be proprietary and of competitive value, and in many instances constitutes trade secrets. Accordingly, each Receiving Party agrees that because of the unique nature of such Confidential Information, any breach of this Section 5 would cause

the Disclosing Party irreparable harm, and money damages and other remedies available at law in the event of a breach would not be adequate to compensate the Disclosing Party for any such breach.  Accordingly, any such Disclosing Party shall be entitled to equitable relief, including injunctive relief and specific performance, as a remedy for any such breach without the requirement of posting a bond or other security.  Such relief shall be in addition to, and not in lieu of, all other remedies available at law or in equity to the Disclosing Party.

6.    Limitation of Liability.  In no event shall any Party be liable to any other Party for damages or losses of any kind in an amount in excess of the aggregate fees actually received by such Party hereunder.  In addition, in no event shall a Party have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple, whether based on statute, contract, tort or otherwise, and whether or not arising from another Party's sole, joint, or concurrent negligence, strict liability, criminal liability or other fault.

7.    Termination of a Party's Own Duty to Provide Services.  A Party may terminate its own duty to provide services hereunder as follows:

(a)    If Purchaser shall be in default of any of its material obligations hereunder and such default shall remain uncured twenty (20) days following Hobbico's delivery to Purchaser of written notice thereof clearly identifying the factual basis for such assertion of default, then Hobbico may terminate its obligations pursuant to Section 1 above effective immediately upon delivery to Purchaser of written notice thereof.

(b)    If Hobbico shall be in default of any of its material obligations hereunder and such default shall remain uncured five (5) business days following Purchaser's delivery to Hobbico of written notice thereof clearly identifying the factual basis for such assertion of default, then Purchaser may terminate its obligations pursuant to Section 2 above effective immediately upon delivery to Hobbico of written notice thereof.

8.    Notices.  All notices provided for hereunder shall be in writing and shall be deemed duly given (a) in the case of delivery by hand, when delivered by hand, (b) in the case of delivery by a standard overnight carrier, upon the date of delivery indicated in the records of such carrier, (c) in the case of a facsimile transmission, when received by recipient in legible form (with machine confirmation), or (d) in the case of delivery by certified mail with return receipt requested, three days after being deposited in the United States mail, postage prepaid, addressed as follows:

(a)    If to Seller:        Mr. Thomas O'Donoghue
                            Chief Restructuring Officer
                            Estes-Cox Corp.
                            c/o Hobbico, Inc.
                            2904 Research Road
                            Champaign, Illinois  61822

(b)    If to Hobbico:    Mr. Thomas O'Donoghue
Chief Restructuring Officer
Hobbico, Inc.
2904 Research Road
Champaign, Illinois 61822

(c)    If to Purchaser:    Estes Industries, LLC
13111 Moss Ranch Lane
Fairfax, Virginia 22033

Any Party may change its address by written notice to the other Parties in accordance with this Section 8.

9.    Relationship of the Parties.    The Parties agree that in performing their responsibilities pursuant to this Agreement they are in the position of independent contractors. This Agreement is not intended to create, nor does it create, a partnership, joint venture or any association for profit among any of the Parties.

10.    Force Majeure.    No Party shall be liable to any other Party for any failure of performance hereunder due to causes beyond such Party's reasonable control (an "Event of Force Majeure"), including acts of God, fire, explosion, vandalism, cable cut, storm or other catastrophes, national emergency, insurrections, riots, wars or strikes, lock-outs, work stoppages or other labor disputes, or any law, order, regulation, direction, action or request of any government or authority or instrumentality thereof. During any period when performance of a Party's obligation is prevented by an Event of Force Majeure, that obligation shall be suspended; provided that the Party whose performance is suspended shall resume performance as soon as reasonably possible upon cessation of the period of the Event of Force Majeure and the other Party shall not be liable to pay for services that are not provided as a result of an Event of Force Majeure.

11.    Assignment.    This Agreement shall be binding upon, and inure to the benefit of, the Parties and their respective successors and permitted assigns. This Agreement and any rights and obligations hereunder shall not be assignable or transferable by any Party (including by operation of law in connection with a merger or sale of stock, or sale of substantially all the assets, of such Party or any one or more of its owners) without the prior written consent of the other Parties, and any purported assignment without such consent shall be void and without effect.

12.    Subcontracting.    Except as otherwise provided herein, no Party shall subcontract any of its obligation under this Agreement to any person or entity other than its affiliates without the express written consent of the applicable other Party. Any such permitted subcontractor hereunder shall execute a non-disclosure agreement which protects Confidential Information of the Parties and sets out obligations equivalent to those under Section 5 of this Agreement. A Party subcontracting work hereunder shall be responsible for the performance and conduct of its subcontractors.

13.    <u>Waivers</u>.  No Party will be deemed to have waived any of its rights, powers or remedies hereunder unless such Party approves such waiver in writing.  Any delay, waiver, or omission by a party to exercise any right or power arising from any breach or default in any of the terms, provisions, or covenants of this Agreement will not be construed to be a waiver by that Party of any subsequent breach or default of the same or other terms, provisions or covenants.

14.    <u>Entire Agreement; Amendments</u>.  The Exhibits attached hereto are incorporated into and made a part of this Agreement by reference as if fully set forth herein.  This Agreement, including the Exhibits attached hereto, constitutes the entire agreement among the Parties relating to the subject matter hereof, and all prior negotiations and understandings, whether oral or written, are superseded hereby.  No modification or amendment of this Agreement will be effective unless and until set forth in writing and signed by the Parties.

15.    <u>Governing Law; Venue</u>.  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  Any dispute arising out of or related to this Agreement will be filed and maintained in the United States Bankruptcy Court for the District of Delaware in connection with Case No. 1:18-bk-10055 (the "<u>Chapter 11 Case</u>") or, if the Chapter 11 Case shall no longer have jurisdiction over such matter, then in any other state or federal court residing in Cook County, Illinois.

16.    <u>Compliance with Applicable Laws</u>.  Each Party will comply with all applicable laws in the performance of its obligations under this Agreement.

17.    <u>Severability</u>.  If any provision of this Agreement or portion thereof is held invalid, illegal, void or unenforceable by reason of any rule of law, administrative or judicial provision or public policy, all other provisions of this Agreement will nevertheless remain in full force and effect to the extent such remaining provisions accurately reflect the intent of the parties.

18.    <u>Expenses</u>.    Except as otherwise specifically provided herein, each Party will bear its own legal, accounting and other costs, including taxes, if any, in connection with this Agreement and the transactions contemplated herein.

19.    <u>Headings and Construction</u>.  No rule of construction will be applied to the disadvantage of a Party because that Party was responsible for the preparation of this Agreement or any part hereof.  The Article and Section headings in this Agreement are for convenient reference only, and will be given no substantive or interpretive effect.  With respect to all terms used in this Agreement, words used in the singular include the plural, and words used in the plural include the singular.  The word "including" means "including, without limitation," and the words "herein", "hereby", "hereto" and "hereunder" refer to this Agreement as a whole.  Unless the context otherwise requires, references herein: (a) to Articles, Sections and Exhibits mean the Articles and Sections of, and the Exhibits attached to, this Agreement; (b) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time, to the extent provided by the provisions thereof and by this Agreement; and (c) to a statute or a regulation mean such statute or regulation as amended from time to time.

20.    <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, all of which together will constitute one original document.

[Signature page follows]

IN WITNESS WHEREOF, the Parties have caused this Transition Services Agreement to be duly executed by their duly authorized representatives as of the date first set forth above.

**ESTES INDUSTRIES, LLC**

By:_____
Name:
Title:

**ESTES-COX CORP.**

By:_____
Name:
Title:

**HOBBICO, INC.**

By:_____
Name:
Title:

## EXHIBIT A

## SELLER SERVICES

The parties acknowledge that Hobbico currently provides certain centralized information technology services for itself and its subsidiaries. At or prior to the Closing, Purchaser and Hobbico shall cooperate, acting reasonably and in good faith, to prepare a detailed and technical written statement of the Seller Services necessary to permit Purchaser to enjoy the continuing benefit of such technology services throughout the Services Period. Such written statement shall be attached to this Agreement, and shall become a part of this Exhibit A.

Purchaser shall compensate Hobbico for such Seller Services in such amount as Hobbico shall reasonably determine to be the direct cost of such Seller Services, as supported by reasonable documentary evidence thereof.

**EXHIBIT B**

**PURCHASER SERVICES**

The Parties acknowledge that Seller currently (i) uses its account number on Target Corporation's Partners Online supply chain portal for purposes of receiving purchaser orders from Target Corporation on behalf of Hobbico's subsidiary, Revell, Inc. ("Revell"), and for issuing invoices to Target Corporation for products shipped by Revell pursuant to such purchase orders, (ii) collects payment from Target Corporation with respect to such invoices, (iii) remits such funds collected from Target Corporation to Revell, and (iv) performs similar services for Revell with respect to amounts sold by Revell to Fry's Electronics and certain other customers. At or prior to the Closing, Purchaser and Hobbico shall cooperate, acting reasonably and in good faith, to prepare a detailed and technical written statement of the Purchaser Services necessary to permit Revell to enjoy the continuing benefit of such services throughout the Services Period. Such written statement shall be attached to this Agreement, and shall become a part of this Exhibit B.

Hobbico shall compensate Purchaser for such Purchaser Services in such amount as Purchaser shall reasonably determine to be the direct cost of such Purchaser Services, as supported by reasonable documentary evidence thereof.

**DISCLOSURE SCHEDULES**

**BY AND BETWEEN**

**ESTES-COX CORP.**
as Seller

**AND**

**ESTES INDUSTRIES LLC**
as Purchaser

**March 23, 2018**

**SCHEDULES**

| | |
|---|---|
| 1.1(i) | Certain Causes of Action Against Transferred Employees |
| 1.1(ii) | Certain Permitted Liens |
| 1.1(iii) | Prepaid Expenses |
| 1.1(iv) | Specified Commercial Tort Claims |
| 2.1(a) | Real Property |
| 2.1(b) | Personal Property |
| 2.1(c) | Accounts Receivable |
| 2.1(d) | Inventory |
| 2.1(e) | Purchased Causes of Action |
| 2.1(g) | Intellectual Property |
| 2.1(h) | Executory Contracts and Unexpired Leases |
| 2.1(i) | Governmental Authorizations |
| 2.1(j) | Employee Benefit Plans |
| 2.2(b) | Bank Accounts |
| 2.2(c) | Certain Excluded Contracts |
| 2.2(r) | Other Excluded Assets |
| 2.3(a) | Certain Excluded Liabilities Under Assigned Contracts |
| 2.3(d) | Certain Assumed Post-Petition Liabilities |
| 2.3(f) | Certain Assumed Employee Obligations |
| 2.3(h) | Other Assumed Liabilities |
| 2.4(i) | Other Excluded Liabilities |
| 3.3(c) | Relinquishment Letters |
| 4.3 | Identified Defaults |
| 4.4 | Consents |
| 6.7(a) | Transferred Employees |

## **SCHEDULE 1.1(i)**

**Certain Causes of Action Against Transferred Employees**

None.

## SCHEDULE 1.1(ii)

**Certain Permitted Liens**

None.

## SCHEDULE 1.1(iii)

## Prepaid Expenses

| Description of goods or services | Supplier of goods or services | | $ |
|---|---|---|---|
| Penrose water assessment | Beaver Park Water Inc. | $ | 3,195.83 |
| COMPUTER SUPPORT FEES | Fujitsu Glovia/Extol/Magento | $ | 35,133.92 |
| PREPAID INSURANCE | AFCO / USI Insurance | $ | 27,716.28 |
| PREPAID INSURANCE - HEALTH | Anthem Blue Cross / Blue Shield | $ | 16,062.79 |
| PREPAID WORKERS' COMP INSURANCE | Pinnacol Assurance | $ | 10,369.05 |
| Materials - Wadding | Veritiv Operating Company | $ | 13,248.00 |
| Finished Goods | Youli Plastic Manufacture | $ | 49,097.00 |
| Finished Goods | Youli Plastic Manufacture | $ | 46,377.00 |
| (i) Goods and Services that have been paid to third parties as of 3/20/18 | | $ | 201,199.87 |
| Lighting Central | Ignitor Wire | $ | 2,533.80 |
| Precision Products Group | Tubes | $ | 2,221.27 |
| Precision Products Group | Tubes | $ | 18,460.00 |
| Precision Products Group | Tubes | $ | 10,950.00 |
| (ii) Goods and Services that will have been paid to third parties as of 3/20/18 | | $ | 34,165.07 |
| Total - Prepaid Expenses - paid now and by closing | | $ | 235,364.94 |

## SCHEDULE 1.1(iv)

## Specified Commercial Tort Claims

Any and all Commercial Tort Claims of Seller and its successors and assigns (or any of them) arising out of, or related to, that certain litigation between Hobbico, Inc. and Arrma Durango Ltd., on the one hand as defendants, and Traxxas, L.P., on the other hand as plaintiff, filed in the District Court for the Eastern District of Texas (Marshall Division), Case No. 2:16-cv-768-JRG-RSP, and any other litigation with Traxxas, L.P. or any of its affiliates (collectively, the "Traxxas Litigation").[1]

Any and all Commercial Tort Claims of Seller and its successors and assigns (or any of them) arising out of, or related to, Seller's failure to (i) schedule in that certain Third Amended and Restated Credit Agreement, dated as of July 11, 2014 (the "Credit Agreement") among Seller, certain of its Affiliates, Wells Fargo Bank, National Association, a national banking association, in its capacity as administrative agent (the "Administrative Agent"), and certain lenders thereunder (the "Lenders"), and any other Loan Documents (as such term is defined in the Credit Agreement), (ii) disclose or otherwise make Administrative Agent and the Lenders (or any of them) aware of, or (iii) take other required action under the Loan Documents due to the existence of, the Traxxas Litigation, or any action or omission of any director, officer, employee, agent, or representative of Seller in connection therewith or relating thereto.

---

[1] Note that Seller is not a party to the Traxxas Litigation

## SCHEDULE 2.1(a)

### Real Property

<u>Locations and Legal Descriptions of Real Property located in Fremont County, CO:</u>

Parcel A:

    Lots 1 and 2 in Estes Subdivision No. 1

Parcel B:

    Lots 1 through 6, inclusive, in Estes Subdivision No. 2

Parcel C:

    Lots 1 and 2, Estes Subdivision No. 3

Parcel D:

    All that part of Section 8 and 9, Township 19 South, Range 68 West of the 6th P.M., Beaver Land and Irrigation Company Plat No. 1, described as follows:

    All of the following described tracts or portion of tracts lying North of U.S. Highway No. 50;

    Tracts 1, 2, 3, E ½ of Tract 4, S ½ of Tract 13, Tracts 14, 15, 16, 17 and that part of Tracts 18, 19, 20 and 32 North of said Highway in Section 8;

    Tracts 22, 23, 24 and 27 and that part of Tracts 25 and 26 lying North of said Highway in Section 9;

    Together with that portion of 12th Street between Tracts 13, 14, 15, 16 and Tracts 17, 18, 19 and 20 in Section 8 as vacated by Resolution recorded March 5, 1970 in Book 521', page 226, Reception No. 381108.

Parcel E:

    The following described property in said Section 8, lying South of U.S. Highway No. 50: That part of Tracts 8, 9, 10 and 11 and the West ½ of Tract 12 lying South of said Highway;

    The West ½ of Tracts 54, 59 and all of Tracts 23, 24, 25, 26, 55, 56, 57 and 58.

Parcel F:

    A strip of land 50 feet in width, 25 feet on either side of the following described centerline: Commencing at the Northwest corner of the Southwest quarter of the Northwest quarter, Section 9, Township 19 South, Range 68 West of the 6th Principal Meridian; Thence South 89° 56' 15" East along the East-West centerline of said Northwest quarter, Section 9, a distance of 25.00 feet to the

point of beginning, being a point on the East right-of-way line of "H" Street extended; Thence continuing South 89° 56' 55" East along said centerline common to the centerline of 12th Street, being 25.00 feet South of the South line of Tract 9 and 25.00 feet North of the North line of Tract 24, a distance of 648.00 feet to a point of terminus located on the East line of Tracts 9 and 24 extended. (Being that portion of 12th Street as vacated by Resolution No. 93 Series of 1989 recorded January 26, 1990 in Book 943, page 160 at Reception No. 566621 and Plat of Estes Industries Vacation recorded January 26, 1990 at Reception No. 566622)

Parcel G:

Lot 3, 13th Street Lot Line Adjustment

# SCHEDULE 2.1(b)

## Personal Property

**Group:  15410 Estes Auto**

| | |
|---|---|
| 22949 | Auto/Trucks FMV 011510 |
| 22979 | 2007 GMC |
| | 2001 Ford pickup truck |

**Group:  15440 Estes Mach & Equip**

| | |
|---|---|
| 22936 | Avaya telephone system, various make/model |
| 22950 | Mach & Equip FMV 011510 |
| 22978 | Ariens Lawn Tractor |
| 22981 | R & D Compressor |
| 23012 | CK3X Scanners |
| 23019 | CANON COPIER IR2525 |

canon copier irc5250
xerox7845 copier
4x laser printers
2x large format inkjet printers
intermec wireless access points w/ barcode
scanners (6), spare batteries and chargers
barcode label printer (x3)
shipping label printers (6)
3d printer

various machine tools, including:
paint booth
table saw
laser cutter
milling machine
lathe

Critical manufacturing equipment:
Powder mixer
automated engine machine (x6)
cylindrical printer (x2)
blister sealer
wire welder/starter machine (x3)
spin dryer (x2)
wadding cutter/bagger
sidepouch bag sealer
thrust stand w/ computer & spares (x3)

**Group:  15470 Estes Tool, Die&Mol**

| | |
|---|---|
| 22918 | Saturn V Tooling |

| | |
|---|---|
| 22919 | Split Rings 080425 |
| 22920 | Split Rings 080427 |
| 22921 | Printed Parachutes |
| 22922 | Lil Joe Apollo Caps Repair |
| 22923 | PIN 55 Tube Adapter |
| 22924 | 1460 Eliminator Tooling |
| 22925 | Engine Adapters Tooling |
| 22926 | 3224 Tooling |
| 22927 | LED Ebeam Short Dome Tool |
| 22928 | Mod Tube Adapter 56 Yellow |
| 22929 | PNC & Fins |
| 22930 | Fat Jax Fin Unit Tooling |
| 22931 | Nitro Fin Unit Tooling |
| 22932 | Sky Duster Fin Unit Tooling |
| 22933 | 1335 Mosquito BT Slot Tool |
| 22952 | Tooling FMV 011510 |
| 22961 | 3223 Xarconian |
| 22962 | Tube Cutter |
| 22963 | 3224 Tooling |
| 22964 | Ultimate Tube Marking Guide |
| 22965 | 7219 Tooling |
| 22966 | Sonic Igniters |
| 22967 | Trilingual Changeover |
| 22968 | 4530 4531 4532 Tooling |
| 22969 | Pro Series Tooling |
| 22970 | European Changes |
| 22971 | ZT Model Balsa Glider |
| 22972 | 4011 Foam Glider |
| 22973 | 4013 Foam Glider |
| 22985 | 3224 TOOLING |
| 22986 | Trilingual Changeover |
| 22987 | New Launch Pad Prototype |
| 22988 | Pro Series Tooling |
| 22989 | 1425 Manta II Glider |
| 22990 | Crayon Series Tooling |
| 22991 | 2476 Tooling |
| 22992 | 7225 Tooling |
| 22993 | 1900 Air Rocket |
| 22994 | Stomp Rocket |

| | |
|---|---|
| 22995 | Marvel Large Foam Glider |
| 23000 | Air Powered Drawing - Brian S |
| 23001 | Kick Dis |
| 23002 | Altimeter |
| 23003 | 248X Series Tooling |
| 23004 | PS II Launch Controller |
| 23005 | PS II Plastic Parts |
| 23006 | BT60 Elliptical Fins |
| 23007 | Large Foam Airplane |
| 23008 | New Launch Controller |
| 23014 | ENG BLISTER HEAT SEAL TOOL ENGRG |
| 23016 | 2014 ARF FIN & NOSE CONE TOOLING |
| 23017 | TOOLING 248X SERIES |
| 23018 | TOOLING MODIFY E LAUNCH PAD |
| 23021 | 54MM BULKHEAD 40% GLASS FILLED TOOLING |
| 23022 | 2416 TOOLING |
| 23023 | 1916 A/R HELI TOOLING |
| 23024 | 7240 HONEST JOHN TOOLING |
| 23025 | 7227 LITTLE JOE 2 TOOLING |
| 23026 | 7246 SHUTTLE 9 CAV MOLD |
| 23027 | 7247 NIKE SMOKE PNC60NC BLOW MOLD |
| 23028 | AIR RKT MODIFY TOOLING |
| 23029 | 2-PK ENGINE TOOLING ALLOYD MACH PNC5 4-CAV TOOL 100040 |

**Group:  15490 Estes Comp Hardware**

| | |
|---|---|
| 22953 | Comp Hdwr FMV 011510 |
| 22956 | 3 Dell latitude laptops |
| 22998 | 19 Dell laptops |
| | 42U server rack |
| | 25U server rack |
| | SmartUPS (x3) |
| | Tape drive |
| | 4x servers w/ 18 disk drives |
| | network switch (x8) |
| | network router w/ firewall |
| | various spare computer parts, used for support as needed |
| | Dell projector |

**Group:  15495 Estes Comp Software**

| | |
|---|---|
| 22941 | CAD Solidwork |
| 22942 | Adobe CS5 Update |
| 22943 | New R & D Software |
| 22954 | Comp Software FMV 011510 |
| 22958 | Upgrade New Website |
| 22959 | New R&D Software |
| 22960 | Software Upgrade |
| 22996 | CAD Solidworks |
| 23010 | 3D Software Upgrade |
| 23020 | NI DEVELOPER SUITE CORE |

## SCHEDULE 2.1(c)

### Accounts Receivable

A full digital accounts receivable file, dated as of a date which is no more than 10 days prior to the date of execution hereof and organized by customer, is being separately provided to Purchaser as Schedule 2.1(c).

**SCHEDULE 2.1(d)**

**Inventory**

A full digital inventory file, dated as of a date which is no more than 10 days prior to the date of execution hereof and organized by SKU numbers, is being separately provided to the Purchaser as Schedule 2.1(d) contemporaneously with the execution hereof.

## SCHEDULE 2.1(e)

**Purchased Causes of Action**

No currently identified Purchased Causes of Action.

## SCHEDULE 2.1(g)

## Intellectual Property

### Domain Names

centurims.com
esteseducator.com
estesrockets.com
facebook.com/estesrockets/
youtube.com/user/EstesModelRockets

### Trademarks

| Trademark | Country Name | Application. No./ Filing Date | Reg. No./ Reg. Date |
|---|---|---|---|
| 1406 ALPHA III | Canada | 1136768 09-Apr-2002 | TMA638893 03-May-2005 |
| ALPHA | United States of America | 75/578600 28-Oct-1998 | 2356848 13-Jun-2000 |
| ALPHA III | United States of America | 73/693757 05-Nov-1987 | 1491347 07-Jun-1988 |
| ASTROCAM | United States of America | 73/693759 05-Nov-1987 | 1492404 14-Jun-1988 |
| BIG BERTHA | United States of America | 75/204296 26-Nov-1996 | 2116170 25-Nov-1997 |
| BLAST-OFF | United States of America | 73/694014 06-Nov-1987 | 1495958 12-Jul-1988 |
| CENTURI | United States of America | 85/014440 15-Apr-2010 | 4339076 21-May-2013 |
| COX HOBBIES | United States of America | 73/093885 19-Jul-1976 | 1131659 11-Mar-1980 |
| E2X | United States of America | 74/291414 02-Jul-1992 | 1754052 23-Feb-1993 |
| EAGLE | United States of America | 73/265588 09-Jun-1980 | 1174390 20-Oct-1981 |
| ELECTRON BEAM | United States of America | 73/693704 05-Nov-1987 | 1492994 21-Jun-1988 |
| ESTES | Canada | 430278 27-Sep-1978 | TMA245209 23-May-1980 |
| ESTES | Denmark | VA 092671990 04-Dec-1990 | VR 112941992 11-Dec-1992 |
| ESTES | European Community | 000159004 01-Apr-1996 | 000159004 07-Jan-1999 |
| ESTES | Germany | C26962 07-Feb-1978 | 990641 19-Sep-1979 |
| ESTES | India | 2132243 19-Apr-2011 | 2132243 08-Mar-2013 |
| ESTES | Ireland | 90/4712 09-Aug-1990 | 139600 10-Mar-1993 |
| ESTES | Japan | M62-088936 15-Aug-1987 | 2278325 31-Oct-1990 |
| ESTES | Korea | 40-2008-16613 04-Apr-2008 | 40-0779366 12-Feb-2009 |
| ESTES | Korea | 40-2008-16614 04-Apr-2008 | 40-0799367 12-Feb-2009 |

| Trademark | Country Name | Application. No./ Filing Date | Reg. No./ Reg. Date |
|---|---|---|---|
| ESTES | Norway | 906478 10-Dec-1990 | 152674 08-Oct-1992 |
| ESTES | Singapore | S5292/90 26-Jul-1990 | T9005292A 26-Jul-1990 |
| ESTES | Singapore | S5293/90 26-Jul-1990 | T9005293Z 26-Jul-1990 |
| ESTES | Switzerland | 5859/1990 06-Aug-1990 | 384072 06-Aug-1990 |
| ESTES | Taiwan | 103006213 05-Feb-2014 | 1669661 01-Oct-2014 |
| ESTES | United States of America | 76/459508 21-Oct-2002 | 3059270 14-Feb-2006 |
| ESTES | United States of America | 72/338653 23-Sep-1969 | 921049 28-Sep-1971 |
| ESTES and Design  | Australia | 957425 12-Jun-2003 | 957425 17-Dec-2003 |
| ESTES and Design  | Australia | 486583 06-May-1988 | 486583 15-Jan-1990 |
| ESTES and Design  | Australia | 484739 06-Apr-1988 | 484739 15-Jan-1990 |
| ESTES and Design  | Canada | 1182291 20-Jun-2003 | TMA646516 24-Aug-2005 |
| ESTES and Design  | China | 9878947 23-Aug-2011 | 9878947 20-Nov-2012 |
| ESTES and Design  | European Community | 003206059 16-Jun-2003 | 003206059 08-Oct-2004 |
| ESTES and Design  | France | 920548 14-Apr-1988 | 1460435 |
| ESTES and Design  | Hong Kong | 14-May-1998 | 199907205AA 09-Jun-1999 |
| ESTES and Design  | India | 2132244 19-Apr-2011 | 2132244 08-Mar-2013 |
| ESTES and Design  | Italy | 40852-C/88 24-May-1988 | 1297196 11-Oct-1989 |
| ESTES and Design  | Japan | S62-043476 20-Apr-1987 | 2284659 30-Nov-1990 |
| ESTES and Design  | Korea | 2008-0016611 04-Apr-2008 | 40-0779364 12-Feb-2009 |
| ESTES and Design  | Korea | 2008-0016612 04-Apr-2008 | 40-0779365 12-Feb-2009 |

| Trademark | Country Name | Application. No./ Filing Date | Reg. No./ Reg. Date |
|---|---|---|---|
| ESTES and Design  | Mexico | 45493 15-Jul-1988 | 359681 22-Feb-1989 |
| ESTES and Design  | South Africa | 2003-10028 18-Jun-2003 | 2003/10028 20-Feb-2008 |
| ESTES and Design  | South Africa | 2003/10029 18-Jun-2003 | 2003/10029 20-Feb-2008 |
| ESTES and Design  | Taiwan | 103006214 05-Feb-2014 | 01669662 01-Oct-2014 |
| ESTES and Design  | Thailand | 1041300 16-May-2016 | |
| ESTES and Design  | United States of America | 76/477639 20-Dec-2002 | 2873421 17-Aug-2004 |
| ESTES and Design  | United States of America | 76/459510 21-Oct-2002 | 3024077 06-Dec-2005 |
| E-Z FLYERS | Canada | 0639141 23-Aug-1989 | TMA374295 12-Oct-1990 |
| E-Z FLYERS | United States of America | 73/7177716 21-Mar-1988 | 1510280 25-Oct-1988 |
| E-Z LAUNCH | United States of America | 78/585281 11-Mar-2005 | 3140436 05-Sep-2006 |
| FLASH | United States of America | 75/204625 26-Nov-1996 | 2156334 12-May-1998 |
| HI-FLIER | United States of America | 76/201871 30-Jan-2001 | 2729944 24-Jun-2003 |
| NO. 2 ESTES SKY WRITER | United States of America | 76/294027 02-Aug-2001 | 2805392 13-Jan-2004 |
| ODYSSEY | United States of America | 77/479457 20-May-2008 | 4782119 28-Jul-2015 |
| PHOENIX BIRD | United States of America | 77/434363 28-Mar-2008 | 3857286 05-Oct-2010 |
| PORTA-PAD | United States of America | 73/694036 06-Nov-1987 | 1492409 14-Jun-1988 |
| PROTO X | Bolivia | SM00674-2016 12-Feb-2016 | 168403-C 13-Sep-2016 |
| PROTO X | Bolivia | SM00672-2016 12-Feb-2016 | 168401-C 13-Sep-2016 |
| PROTO X | Bolivia | SM00673-2016 12-Feb-2016 | 168402-C 13-Sep-2016 |
| PROTO X | Brazil | 910666741 23-Feb-2016 | |
| PROTO X | Brazil | 910666725 23-Feb-2016 | |
| PROTO X | Brazil | 910666660 23-Feb-2016 | |
| PROTO X | Chile | 1192518 22-Feb-2016 | 1217843 23-Aug-2016 |
| PROTO X | Chile | 1192517 22-Feb-2016 | 1228176 22-Nov-2016 |
| PROTO X | Chile | 1192516 22-Feb-2016 | 1228175 22-Nov-2016 |

| Trademark | Country Name | Application. No./ Filing Date | Reg. No./ Reg. Date |
|---|---|---|---|
| PROTO X | Mexico | 1711534 09-Feb-2016 | 1639407 16-May-2016 |
| PROTO X | Mexico | 1711535 09-Feb-2016 | 1639408 16-May-2016 |
| PROTO X | Paraguay | 1605417 08-Feb-2016 | |
| PROTO X | Paraguay | 1605419 08-Feb-2016 | |
| PROTO X | Paraguay | 1605418 08-Feb-2016 | |
| PROTO X | United States of America | 86/737494 26-Aug-2015 | |
| SCREAMING EAGLE | United States of America | 73/693705 05-Nov-1987 | 1491346 07-Jun-1988 |
| SIZZLER | Australia | 801557 26-Jul-1999 | 801557 17-Nov-2000 |
| SIZZLER | Canada | 1023477 23-Jul-1999 | TMA553258 02-Nov-2001 |
| SIZZLER | European Community | 001250398 22-Jul-1999 | 001250398 26-Sep-2000 |
| SIZZLER | United States of America | 73/693761 05-Nov-1987 | 1491348 07-Jun-1988 |
| TEE DEE | Canada | 639134 23-Aug-1989 | TMA374294 12-Oct-1990 |
| WINGS (stylized) **WINGS** | United States of America | 73/137106 10-Aug-1977 | 1086533 28-Feb-1978 |
| X-15 | United States of America | 73/693869 06-Nov-1987 | 1508384 11-Oct-1988 |

<u>Trade Names and Unregistered Trademarks</u>

Estes Industries

Copyrights

| Title | Copyright Number | Date |
|---|---|---|
| 1974 MODEL ROCKETS CATALOG & 2 OTHER TITLES; TEXTUAL WORKS. | V3491D585 | 2002 |
| AEROTEK: MODEL ROCKET ALTITUDE PREDICTION KIT | TX 2-578-287 | |
| AEROTREK : MODEL ROCKET ALTITUDE PREDICTION TOOLKIT. | TX0002578287 | 1988 |
| AEROTREK: MODEL ROCKET ALTITUDE PREDICTION TOOLKIT. | TX0002578287 | 1988 |
| ASTROCAD: PERFORMANCE ANALYSIS FOR MODEL ROCKETS. | TX0002637985 | 1987 |
| ASTROCAD : PERFORMANCE ANALYSIS FOR MODEL ROCKETS. | TX0002637985 | 1987 |
| ASTROCAD: PERFORMANCE ANALYSIS FOR MODEL ROCKETS | TX 2-637-985 | |
| CENTURI FLYING MODEL ROCKETS : CATALOG NO. 74-75. | VA0000885981 | 3/3/1998 |
| CENTURI FLYING MODEL ROCKETS: CATALOG NO. 74-75 | VA 885-981 | |
| CENTURI FLYING MODEL ROCKETS (CATALOG NO. 74-75) / BY CENTURI ENGINEERING COMPANY. VA 885-981. | V3423D222 | 1998 |
| CENTURI FLYING MODEL ROCKETS / BY CENTURI ENGINEERING COMPANY. VA 885-981. | V3423D223 | 1998 |
| CENTURI FLYING MODEL ROCKETS : CATALOG NO. 74-75. | VA0000885981 | 1974 |
| CENTURI FLYING MODEL ROCKETS: CATALOG NO. 74- 75 & 21 OTHER TITLES. | V3490D273 | 2002 |
| COUNTDOWN : MATHEMATICS AND MODEL ROCKETRY / BY WILLIAM E. SCHALL | TX0001054661 | 1/29/1982 |
| COUNTDOWN : MATHEMATICS AND MODEL ROCKETRY / BY WILLIA M E. SCHALL. | TX0001054661 | 1981 |
| COUNTDOWN: MATHEMATICS AND MODEL ROCKETRY; TEXTUAL WORK / TX 1-054-661 (1982) | V3282P512 | 1996 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1985 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1984 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1985 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1984 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1983 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1983 |
| ESTES EDUCATOR NEWS, FEB84. CREATED 1983; PUB. 1983-09-26 | TX0001578473 | 5/13/1985 |
| ESTES EDUCATOR NEWS, ISSUES REGISTERED: SEP83. CREATED 1983; PUB. 1983-09-26 | TX0001578471 | 5/13/1985 |
| ESTES EDUCATOR NEWS, NOV83. CREATED 1983; PUB. 1983-11-25 | TX0001578472 | 5/13/1985 |
| ESTES EDUCATOR NEWS, SEP84. CREATED 1983; PUB. 1983-09-26 | TX0001578475 | 5/13/1985 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1991 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1986 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1987 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1989 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1988 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1990 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1991 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1990 |

| Title | Copyright Number | Date |
|---|---|---|
| ESTES EDUCATOR NEWS. | CSN0058892 | 1989 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1988 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1987 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1986 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1991 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1990 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1989 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1988 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1987 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1986 |
| ESTES EDUCATOR NEWS. ISSUES REGISTERED: APR84. CREATED 1984; PUB. 1984-04-06 | TX0001578474 | 5/13/1985 |
| ESTES EDUCATOR NEWS. JUN86. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-04-18 | TX0002021283 | 3/17/1987 |
| ESTES EDUCATOR NEWS. MAR85. CREATED 1985; PUB. 1985-03-04 | TX0001578477 | 5/13/1985 |
| ESTES EDUCATOR NEWS. MAR87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB.1987-03-04 | TX0002146005 | 5/26/1987 |
| ESTES EDUCATOR NEWS. MAR88. CREATED 1988; PUB. 1988-02-19 | TX0002531093 | 4/14/1989 |
| ESTES EDUCATOR NEWS. MAR89. CREATED 1989; PUB. 1989-03-21 | TX0002531091 | 4/14/1989 |
| ESTES EDUCATOR NEWS. MAR90. CREATED 1990; PUB. 1990-02-16; REG. 1990-12-06 | TX0002954867 | 12/6/1990 |
| ESTES EDUCATOR NEWS. MAY85. (C.O. CORRESPONDENCE.) CREATED 1985; PUB. 1985-04-28 | TX0001578468 | 5/13/1985 |
| ESTES EDUCATOR NEWS. MAY87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB.1987-04-13 | TX0002146004 | 5/26/1987 |
| ESTES EDUCATOR NEWS. MAY88. CREATED 1988; PUB. 1988-04-22 | TX0002531094 | 4/14/1989 |
| ESTES EDUCATOR NEWS. MAY89. CREATED 1989; PUB. 1989-04-21 | TX0002550422 | 5/9/1989 |
| ESTES EDUCATOR NEWS. MAY90. CREATED 1990; PUB. 1990-04-13; REG. 1990-12-06 | TX0002954866 | 12/6/1990 |
| ESTES EDUCATOR NEWS. NOV84. CREATED 1984; PUB. 1984-11-16 | TX0001578476 | 5/13/1985 |
| ESTES EDUCATOR NEWS. NOV85. CREATED 1985; PUB. 1985-10-24 | TX0001790707 | 4/4/1986 |
| ESTES EDUCATOR NEWS. NOV86. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-10-29 | TX0002021282 | 3/17/1987 |
| ESTES EDUCATOR NEWS. NOV87. CREATED 1987; PUB. 1987-10-23 | TX0002230396 | 1/21/1988 |
| ESTES EDUCATOR NEWS. NOV88. CREATED 1988; PUB. 1988-10-21 | TX0002531098 | 4/14/1989 |
| ESTES EDUCATOR NEWS. NOV89. CREATED 1989; PUB. 1989-10-10 | TX0002954865 | 12/6/1990 |
| ESTES EDUCATOR NEWS. SEP85. CREATED 1985; PUB. 1985-08-23 | TX0001797530 | 4/4/1986 |
| ESTES EDUCATOR NEWS. SEP86. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-08-27 | TX0002175313 | 1/16/1987 |
| ESTES EDUCATOR NEWS. SEP87. CREATED 1987; PUB. 1987-08-28 | TX0002230395 | 1/21/1988 |
| ESTES EDUCATOR NEWS. SEP88. CREATED 1988; PUB. 1988-08-26 | TX0002531095 | 4/14/1989 |
| ESTES EDUCATOR NEWS. SEP89. CREATED 1989; PUB. 1989-08-18 | TX0002954868 | 12/6/1990 |
| ESTES EDUCATOR NEWS. SEP90. APPL. AUTHOR: ESTES INDUSTRIES, EMPLOYER FOR HIRE. | TX0002981599 | 12/6/1990 |
| 01-21 | TX0002531092 | 4/14/1989 |
| ESTES EDUCATOR NEWS. WINTER 90. CREATED 1990; PUB. 1990-10-19; REG. 1990-12-06; | TX0002954864 | 12/6/1990 |

| Title | Copyright Number | Date |
|---|---|---|
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1990 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1989 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1991 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1988 |
| ESTES FLYING MODEL ROCKET CATALOG., 1989. CREATED 1989; PUB. 1989-01-06 (IN NOTICE: 1988) | TX0002533547 | 4/14/1989 |
| ESTES FLYING MODEL ROCKET CATALOG., ISSUES REGISTERED: 1988. CREATED 1988; PUB. 1988-01-15 | TX0002533548 | 4/14/1989 |
| ESTES FLYING MODEL ROCKET CATALOG., ISSUES REGISTERED: 1989. CREATED 1989; PUB. 1989-01-01 (IN NOTICE: 1988) | TX0002955302 | 12/6/1990 |
| ESTES FLYING MODEL ROCKET CATALOG., ISSUES REGISTERED: 1990. CREATED 1990; PUB. 1990-01-01 (IN NOTICE: 1989) | TX0002955301 | 12/6/1990 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR ... [ET AL.]. | CSN0058893 | 1984 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, FALL 84. CREATED 1984; PUB. 1984-09-04 | TX0001578470 | 5/13/1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, ISSUES REGISTERED: FALL 85. APPL. TITLE: MODEL ROCKET NEWS. CREATED 1985; PUB. 1985-09-06 | TX0001790704 | 4/4/1986 |
| EDITOR, ISSUES REGISTERED: SPRING 84. CREATED 1984; PUB. 1984-04-14 | TX0001578467 | 5/13/1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, WINTER 84. CREATED 1984; PUB. 1984-11-14 | TX0001578469 | 5/13/1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, WINTER 85. CREATED 1985; PUB. 1985-11-14 | TX0001790705 | 4/4/1986 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SGACE / [ROBERT CANNON. EDITOR ... ET AL.]. | CSN0058893 | 1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., FALL 87. CREATED 1987; PUB. 1987-08-24 | TX0002230394 | 1/21/1988 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.], FALL 88. CREATED 1988; PUB. 1988-10-07 | TX0002531096 | 4/14/1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.], FALL 89. CREATED 1989; PUB. 1989-08-18 | TX0002981603 | 12/6/1990 |
| PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., ISSUES REGISTERED: SPRING 87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB.1987-03-13 | TX0002146003 | 5/26/1987 |

| Title | Copyright Number | Date |
|---|---|---|
| PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., ISSUES REGISTERED: SPRING 88. (C.O. CORRESPONDENCE.) CREATED 1988; PUB.1988-03-11 | TX0002520115 | ######## |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., ISSUES REGISTERED: SPRING 89. CREATED 1989; PUB. 1989-04-14 | TX0002534831 | 4/14/1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., SPECIAL ED. 87-88. CREATED 1987; PUB. 1987-09-04 | TX0002230398 | 1/21/1988 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., SUMMER 87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB. 1987-05-28 | TX0002229725 | 8/20/1987 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., WINTER 87. CREATED 1987; PUB. 1987-11-01 | TX0002534822 | 4/14/1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., WINTER 88. CREATED 1988; PUB. 1988-11-23 | TX0002531097 | 4/14/1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., WINTER 89. CREATED 1989; PUB. 1989-10-27 | TX0002981604 | 12/6/1990 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]. | CSN0058893 | 1988 |
| ESTES MODEL ROCKET NEWS MAGAZINE. | CSN0058893 | 1986 |
| ESTES MODEL ROCKET NEWS MAGAZINE., FALL 86. CLAIMANT: ESTES EDUCATOR NEWS (C.O.CORRESPONDENCE.) CREATED 1986; PUB. 1986-08-21; (INNOTICE: ESTES INDUSTRIES) | TX0002021284 | 3/17/1987 |
| ESTES MODEL ROCKET NEWS MAGAZINE., ISSUES REGISTERED: SPRING 86. CLAIMANT: ESTES INDUSTRIES. (C.O.CORRESPONDENCE.) CREATED 1986; PUB. 1986-03-14 | TX0002146002 | 5/26/1987 |
| ESTES INDUSTRIES. CREATED 1986; PUB.1986-03-14 (IN NOTICE: 1985) | TX0001790706 | 4/4/1986 |
| ESTES MODEL ROCKET NEWS MAGAZINE., WINTER 86. CLAIMANT: ESTES INDUSTRIES. APPL. AUTHOR: ROBERTL. CANNON FOR ESTES INDUSTRIES, EMPLOYER FOR HIRE. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-10-28 | TX0002021281 | 3/17/1987 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR … ET AL.]. | CSN0058893 | 1987 |

| Title | Copyright Number | Date |
|---|---|---|
| 1974 MODEL ROCKETS CATALOG & 2 OTHER TITLES; TEXTUAL WORKS. | V3491D585 | 2002 |
| AEROTEK: MODEL ROCKET ALTITUDE PREDICTION KIT | TX 2-578-287 | |
| AEROTREK : MODEL ROCKET ALTITUDE PREDICTION TOOLKIT. | TX0002578287 | 1988 |
| AEROTREK: MODEL ROCKET ALTITUDE PREDICTION TOOLKIT. | TX0002578287 | 1988 |
| ASTROCAD: PERFORMANCE ANALYSIS FOR MODEL ROCKETS. | TX0002637985 | 1987 |
| ASTROCAD : PERFORMANCE ANALYSIS FOR MODEL ROCKETS. | TX0002637985 | 1987 |
| ASTROCAD: PERFORMANCE ANALYSIS FOR MODEL ROCKETS | TX 2-637-985 | |
| CENTURI FLYING MODEL ROCKETS : CATALOG NO. 74-75. | VA0000885981 | 3/3/1998 |
| CENTURI FLYING MODEL ROCKETS: CATALOG NO. 74-75 | VA 885-981 | |
| CENTURI FLYING MODEL ROCKETS (CATALOG NO. 74-75) / BY CENTURI ENGINEERING COMPANY. VA 885-981. | V3423D222 | 1998 |
| CENTURI FLYING MODEL ROCKETS / BY CENTURI ENGINEERING COMPANY. VA 885-981. | V3423D223 | 1998 |
| CENTURI FLYING MODEL ROCKETS : CATALOG NO. 74-75. | VA0000885981 | 1974 |
| CENTURI FLYING MODEL ROCKETS: CATALOG NO. 74- 75 & 21 OTHER TITLES. | V3490D273 | 2002 |
| COUNTDOWN : MATHEMATICS AND MODEL ROCKETRY / BY WILLIAM E. SCHALL | TX0001054661 | 1/29/1982 |
| COUNTDOWN : MATHEMATICS AND MODEL ROCKETRY / BY WILLIA M E. SCHALL. | TX0001054661 | 1981 |
| COUNTDOWN: MATHEMATICS AND MODEL ROCKETRY; TEXTUAL WORK / TX 1-054-661 (1982) | V3282P512 | 1996 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1985 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1984 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1985 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1984 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1983 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1983 |
| ESTES EDUCATOR NEWS, FEB84. CREATED 1983; PUB. 1983-09-26 | TX0001578473 | 5/13/1985 |
| ESTES EDUCATOR NEWS, ISSUES REGISTERED: SEP83. CREATED 1983; PUB. 1983-09-26 | TX0001578471 | 5/13/1985 |
| ESTES EDUCATOR NEWS, NOV83. CREATED 1983; PUB. 1983-11-25 | TX0001578472 | 5/13/1985 |
| ESTES EDUCATOR NEWS, SEP84. CREATED 1983; PUB. 1983-09-26 | TX0001578475 | 5/13/1985 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1991 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1986 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1987 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1989 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1988 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1990 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1991 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1990 |

| Title | Copyright Number | Date |
|---|---|---|
| ESTES EDUCATOR NEWS. | CSN0058892 | 1989 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1988 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1987 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1986 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1991 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1990 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1989 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1988 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1987 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1986 |
| ESTES EDUCATOR NEWS. ISSUES REGISTERED: APR84. CREATED 1984; PUB. 1984-04-06 | TX0001578474 | 5/13/1985 |
| ESTES EDUCATOR NEWS. JUN86. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-04-18 | TX0002021283 | 3/17/1987 |
| ESTES EDUCATOR NEWS. MAR85. CREATED 1985; PUB. 1985-03-04 | TX0001578477 | 5/13/1985 |
| ESTES EDUCATOR NEWS. MAR87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB.1987-03-04 | TX0002146005 | 5/26/1987 |
| ESTES EDUCATOR NEWS. MAR88. CREATED 1988; PUB. 1988-02-19 | TX0002531093 | 4/14/1989 |
| ESTES EDUCATOR NEWS. MAR89. CREATED 1989; PUB. 1989-03-21 | TX0002531091 | 4/14/1989 |
| ESTES EDUCATOR NEWS. MAR90. CREATED 1990; PUB. 1990-02-16; REG. 1990-12-06 | TX0002954867 | 12/6/1990 |
| ESTES EDUCATOR NEWS. MAY85. (C.O. CORRESPONDENCE.) CREATED 1985; PUB. 1985-04-28 | TX0001578468 | 5/13/1985 |
| ESTES EDUCATOR NEWS. MAY87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB.1987-04-13 | TX0002146004 | 5/26/1987 |
| ESTES EDUCATOR NEWS. MAY88. CREATED 1988; PUB. 1988-04-22 | TX0002531094 | 4/14/1989 |
| ESTES EDUCATOR NEWS. MAY89. CREATED 1989; PUB. 1989-04-21 | TX0002550422 | 5/9/1989 |
| ESTES EDUCATOR NEWS. MAY90. CREATED 1990; PUB. 1990-04-13; REG. 1990-12-06 | TX0002954866 | 12/6/1990 |
| ESTES EDUCATOR NEWS. NOV84. CREATED 1984; PUB. 1984-11-16 | TX0001578476 | 5/13/1985 |
| ESTES EDUCATOR NEWS. NOV85. CREATED 1985; PUB. 1985-10-24 | TX0001790707 | 4/4/1986 |
| ESTES EDUCATOR NEWS. NOV86. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-10-29 | TX0002021282 | 3/17/1987 |
| ESTES EDUCATOR NEWS. NOV87. CREATED 1987; PUB. 1987-10-23 | TX0002230396 | 1/21/1988 |
| ESTES EDUCATOR NEWS. NOV88. CREATED 1988; PUB. 1988-10-21 | TX0002531098 | 4/14/1989 |
| ESTES EDUCATOR NEWS. NOV89. CREATED 1989; PUB. 1989-10-10 | TX0002954865 | 12/6/1990 |
| ESTES EDUCATOR NEWS. SEP85. CREATED 1985; PUB. 1985-08-23 | TX0001797530 | 4/4/1986 |
| ESTES EDUCATOR NEWS. SEP86. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-08-27 | TX0002175313 | 1/16/1987 |
| ESTES EDUCATOR NEWS. SEP87. CREATED 1987; PUB. 1987-08-28 | TX0002230395 | 1/21/1988 |
| ESTES EDUCATOR NEWS. SEP88. CREATED 1988; PUB. 1988-08-26 | TX0002531095 | 4/14/1989 |
| ESTES EDUCATOR NEWS. SEP89. CREATED 1989; PUB. 1989-08-18 | TX0002954868 | 12/6/1990 |
| ESTES EDUCATOR NEWS. SEP90. APPL. AUTHOR: ESTES INDUSTRIES, EMPLOYER FOR HIRE. | TX0002981599 | 12/6/1990 |
| 01-21 | TX0002531092 | 4/14/1989 |
| ESTES EDUCATOR NEWS. WINTER 90. CREATED 1990; PUB. 1990-10-19; REG. 1990-12-06; | TX0002954864 | 12/6/1990 |

| Title | Copyright Number | Date |
|---|---|---|
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1990 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1989 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1991 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1988 |
| ESTES FLYING MODEL ROCKET CATALOG., 1989. CREATED 1989; PUB. 1989-01-06 (IN NOTICE: 1988) | TX0002533547 | 4/14/1989 |
| ESTES FLYING MODEL ROCKET CATALOG., ISSUES REGISTERED: 1988. CREATED 1988; PUB. 1988-01-15 | TX0002533548 | 4/14/1989 |
| ESTES FLYING MODEL ROCKET CATALOG., ISSUES REGISTERED: 1989. CREATED 1989; PUB. 1989-01-01 (IN NOTICE: 1988) | TX0002955302 | 12/6/1990 |
| ESTES FLYING MODEL ROCKET CATALOG., ISSUES REGISTERED: 1990. CREATED 1990; PUB. 1990-01-01 (IN NOTICE: 1989) | TX0002955301 | 12/6/1990 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR ... [ET AL.]. | CSN0058893 | 1984 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, FALL 84. CREATED 1984; PUB. 1984-09-04 | TX0001578470 | 5/13/1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, ISSUES REGISTERED: FALL 85. APPL. TITLE: MODEL ROCKET NEWS. CREATED 1985; PUB. 1985-09-06 | TX0001790704 | 4/4/1986 |
| EDITOR, ISSUES REGISTERED: SPRING 84. CREATED 1984; PUB. 1984-04-14 | TX0001578467 | 5/13/1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, WINTER 84. CREATED 1984; PUB. 1984-11-14 | TX0001578469 | 5/13/1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, WINTER 85. CREATED 1985; PUB. 1985-11-14 | TX0001790705 | 4/4/1986 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SGACE / [ROBERT CANNON. EDITOR ... ET AL.]. | CSN0058893 | 1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., FALL 87. CREATED 1987; PUB. 1987-08-24 | TX0002230394 | 1/21/1988 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., FALL 88. CREATED 1988; PUB. 1988-10-07 | TX0002531096 | 4/14/1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., FALL 89. CREATED 1989; PUB. 1989-08-18 | TX0002981603 | 12/6/1990 |
| PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., ISSUES REGISTERED: SPRING 87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB.1987-03-13 | TX0002146003 | 5/26/1987 |

| Title | Copyright Number | Date | Current Value |
|---|---|---|---|
| PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., ISSUES REGISTERED: SPRING 88. (C.O. CORRESPONDENCE.) CREATED 1988; PUB.1988-03-11 | TX0002520115 | ######## | UNKNOWN |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., ISSUES REGISTERED: SPRING 89. CREATED 1989; PUB. 1989-04-14 | TX0002534831 | 4/14/1989 | UNKNOWN |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., SPECIAL ED. 87-88. CREATED 1987; PUB. 1987-09-04 | TX0002230398 | 1/21/1988 | UNKNOWN |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., SUMMER 87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB. 1987-05-28 | TX0002229725 | 8/20/1987 | UNKNOWN |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., WINTER 87. CREATED 1987; PUB. 1987-11-01 | TX0002534822 | 4/14/1989 | UNKNOWN |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., WINTER 88. CREATED 1988; PUB. 1988-11-23 | TX0002531097 | 4/14/1989 | UNKNOWN |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., WINTER 89. CREATED 1989; PUB. 1989-10-27 | TX0002981604 | 12/6/1990 | UNKNOWN |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS. AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]. | CSN0058893 | 1988 | UNKNOWN |
| ESTES MODEL ROCKET NEWS MAGAZINE. | CSN0058893 | 1986 | UNKNOWN |
| ESTES MODEL ROCKET NEWS MAGAZINE., FALL 86. CLAIMANT: ESTES EDUCATOR NEWS (C.O.CORRESPONDENCE.) CREATED 1986; PUB. 1986-08-21; | TX0002021284 | 3/17/1987 | UNKNOWN |
| ESTES MODEL ROCKET NEWS MAGAZINE., ISSUES REGISTERED: SPRING 86. CLAIMANT: ESTES INDUSTRIES. (C.O.CORRESPONDENCE.) CREATED 1986; PUB. 1986-03-14 | TX0002146002 | 5/26/1987 | UNKNOWN |
| ESTES INDUSTRIES. CREATED 1986; PUB.1986-03-14 (IN NOTICE: 1985) | TX0001790706 | 4/4/1986 | UNKNOWN |
| ESTES MODEL ROCKET NEWS MAGAZINE., WINTER 86. CLAIMANT: ESTES INDUSTRIES. APPL. AUTHOR: ROBERTL. CANNON FOR ESTES INDUSTRIES, EMPLOYER FOR HIRE. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-10-28 | TX0002021281 | 3/17/1987 | UNKNOWN |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR … ET AL.]. | CSN0058893 | 1987 | UNKNOWN |

| Title | Copyright Number | Date |
|---|---|---|
| ESTES MODEL ROCKETRY EDUCATOR NEWS | TX 2-560-652 | |
| ESTES MODEL ROCKETRY EDUCATOR NEWS | TX 2-560-652 | |
| ESTES MODEL ROCKETRY EDUCATOR NEWS., 32637 | TX0002560652 | 5/9/1989 |
| ESTES NEWS. | CSN0073590 | 1987 |
| ESTES NEWS. | CSN0073590 | 1989 |
| ESTES NEWS. | CSN0073590 | 1988 |
| ESTES NEWS. | CSN0073590 | 1989 |
| ESTES NEWS. | CSN0073590 | 1.988 |
| ESTES NEWS. | CSN0073590 | 1987 |
| ESTES NEWS. | CSN0073590 | 1988 |
| ESTES NEWS., FALL 87. CREATED 1987; PUB. 1987-09-25 | TX0002230397 | 1/21/1988 |
| ESTES NEWS., ISSUES REGISTERED: SPRING 88. CREATED 1988; PUB. 1988-05-01 | TX0002441186 | ######## |
| ESTES NEWS., ISSUES REGISTERED: SPRING 89. CREATED 1989; PUB. 1989-06-05 | TX0002593042 | 7/10/1989 |
| ESTES NEWS., ISSUES REGISTERED: SUMMER 87. CREATED 1987; PUB. 1987-07-28 | TX0002143015 | 8/25/1987 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1983 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1983 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1984 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1985 |
| ESTES EDUCATOR NEWS / [BOB CANNON. I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1985 |
| ESTES EDUCATOR NEWS I [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1984 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1986 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1987 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1988 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1989 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1990 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1991 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1988 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1989 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1990 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1991 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR ... [ET AL.]. | CSN0058893 | 1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDIT OR ... [ET AL.]. | CSN0058893 | 1984 |

| Title | Copyright Number | Date |
|---|---|---|
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDIT OR ... [ET AL.]. | CSN0058893 | 1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE I [ROBERT CANNON, EDITOR ... ET AL.]. | CSN0058893 | 1991 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PU BLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBER T CANNON, EDITOR ... ET AL.]. | CSN0058893 | 1987 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PU BLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBER T CANNON, EDITOR ... ET AL.]. | CSN0058893 | 1988 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PU BLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBER T CANNON, EDITOR ... ET AL.]. | CSN0058893 | 1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PU BLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBER T CANNON, EDITOR ... ET AL.]. | CSN0058893 | 1991 |
| ESTES MODEL ROCKET NEWS MAGAZINE. | CSN0058893 | 1986 |
| ESTES NEWS. | | |
| ESTES NEWS. | CSN0073590 | 1987 |
| ESTES NEWS. | CSN0073590 | 1988 |
| ESTES NEWS. | CSN0073590 | 1989 |
| ESTES ROCKET LABS - 3 EASY STEPS! | TXU001670101 | 2008 |
| ESTES/COX PRODUCT CATALOG | VA 940-020 | |
| ESTES/COX PRODUCT CATALOG | VA 940-020 | |
| ESTES/COX PRODUCT CATALOG. ISSUES REGISTERED: 1998. CREATED 1997; PUB. 1998-01-29 | VA0000940020 | 9/16/1998 |
| ESTES/COX PRODUCT CATALOG. | CSN0126578 | 1998 |
| ESTES/COX PRODUCT CATALOG. | CSN0126578 | 1999 |
| FLIGHT : AERODYNAMICS OF MODEL ROCKETS I BY BOB CANNON [I.E. ROBERT CANNON] AND MIKE DORFFLER. | TX0002052444 | 1986 |
| FLIGHT : AERODYNAMICS OF MODEL ROCKETS / BY BOB CANNON [ I.E. ROBERT CANNON] AND MIKE DORFFLER. | TX0002052444 | 1986 |
| FLY A KITE! | TX0001133732 | 1982 |
| FLY A KITE! | TX0002139329 | 1982 |
| FLY A KITE! | TX0001133732 | 1982 |
| FLY A KITE! | TX0002139329 | 1982 |
| IN SEARCH OF SGACE : INTRODUCTION TO MODEL ROCKETRY / BY BOB CANNON [I.E. ROBERT CANNON] AND MIKE DORFTLER. | TX:0002149740 | 1986 |
| IN SEARCH OF SPACE : INTRODUCTION TO MODEL ROCKETRY / BY BOB CANNON [I.E. ROBERT CANNON] AND MIKE DORFFLER. | TX0002149740 | 1986 |
| KITE FLYING : TEACHER'S GUIDE / BY ROBERT L. CANNON. | TX0002259329 | 1985 |
| KITE FLYING TEACHER'S GUIDE : CATALOG NO. 84,719 / BY, | TX0001133733 | 4/21/1983 |

| Title | Copyright Number | Date |
|---|---|---|
| ESTES EDUCATOR NEWS. | CSN0058892 | 1989 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1988 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1987 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1986 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1991 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1990 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1989 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1988 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1987 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1986 |
| ESTES EDUCATOR NEWS. ISSUES REGISTERED: APR84. CREATED 1984; PUB. 1984-04-06 | TX0001578474 | 5/13/1985 |
| ESTES EDUCATOR NEWS. JUN86. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-04-18 | TX0002021283 | 3/17/1987 |
| ESTES EDUCATOR NEWS. MAR85. CREATED 1985; PUB. 1985-03-04 | TX0001578477 | 5/13/1985 |
| ESTES EDUCATOR NEWS. MAR87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB.1987-03-04 | TX0002146005 | 5/26/1987 |
| ESTES EDUCATOR NEWS. MAR88. CREATED 1988; PUB. 1988-02-19 | TX0002531093 | 4/14/1989 |
| ESTES EDUCATOR NEWS. MAR89. CREATED 1989; PUB. 1989-03-21 | TX0002531091 | 4/14/1989 |
| ESTES EDUCATOR NEWS. MAR90. CREATED 1990; PUB. 1990-02-16; REG. 1990-12-06 | TX0002954867 | 12/6/1990 |
| ESTES EDUCATOR NEWS. MAY85. (C.O. CORRESPONDENCE.) CREATED 1985; PUB. 1985-04-28 | TX0001578468 | 5/13/1985 |
| ESTES EDUCATOR NEWS. MAY87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB.1987-04-13 | TX0002146004 | 5/26/1987 |
| ESTES EDUCATOR NEWS. MAY88. CREATED 1988; PUB. 1988-04-22 | TX0002531094 | 4/14/1989 |
| ESTES EDUCATOR NEWS. MAY89. CREATED 1989; PUB. 1989-04-21 | TX0002550422 | 5/9/1989 |
| ESTES EDUCATOR NEWS. MAY90. CREATED 1990; PUB. 1990-04-13; REG. 1990-12-06 | TX0002954866 | 12/6/1990 |
| ESTES EDUCATOR NEWS. NOV84. CREATED 1984; PUB. 1984-11-16 | TX0001578476 | 5/13/1985 |
| ESTES EDUCATOR NEWS. NOV85. CREATED 1985; PUB. 1985-10-24 | TX0001790707 | 4/4/1986 |
| ESTES EDUCATOR NEWS. NOV86. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-10-29 | TX0002021282 | 3/17/1987 |
| ESTES EDUCATOR NEWS. NOV87. CREATED 1987; PUB. 1987-10-23 | TX0002230396 | 1/21/1988 |
| ESTES EDUCATOR NEWS. NOV88. CREATED 1988; PUB. 1988-10-21 | TX0002531098 | 4/14/1989 |
| ESTES EDUCATOR NEWS. NOV89. CREATED 1989; PUB. 1989-10-10 | TX0002954865 | 12/6/1990 |
| ESTES EDUCATOR NEWS. SEP85. CREATED 1985; PUB. 1985-08-23 | TX0001797530 | 4/4/1986 |
| ESTES EDUCATOR NEWS. SEP86. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-08-27 | TX0002175313 | 1/16/1987 |
| ESTES EDUCATOR NEWS. SEP87. CREATED 1987; PUB. 1987-08-28 | TX0002230395 | 1/21/1988 |
| ESTES EDUCATOR NEWS. SEP88. CREATED 1988; PUB. 1988-08-26 | TX0002531095 | 4/14/1989 |
| ESTES EDUCATOR NEWS. SEP89. CREATED 1989; PUB. 1989-08-18 | TX0002954868 | 12/6/1990 |
| ESTES EDUCATOR NEWS. SEP90. APPL. AUTHOR: ESTES INDUSTRIES, EMPLOYER FOR HIRE. | TX0002981599 | 12/6/1990 |
| 01-21 | TX0002531092 | 4/14/1989 |
| ESTES EDUCATOR NEWS. WINTER 90. CREATED 1990; PUB. 1990-10-19; REG. 1990-12-06; | TX0002954864 | 12/6/1990 |

| Title | Copyright Number | Date |
|---|---|---|
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1990 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1989 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1991 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1988 |
| ESTES FLYING MODEL ROCKET CATALOG., 1989. CREATED 1989; PUB. 1989-01-06 (IN NOTICE: 1988) | TX0002533547 | 4/14/1989 |
| ESTES FLYING MODEL ROCKET CATALOG., ISSUES REGISTERED: 1988. CREATED 1988; PUB. 1988-01-15 | TX0002533548 | 4/14/1989 |
| ESTES FLYING MODEL ROCKET CATALOG., ISSUES REGISTERED: 1989. CREATED 1989; PUB. 1989-01-01 (IN NOTICE: 1988) | TX0002955302 | 12/6/1990 |
| ESTES FLYING MODEL ROCKET CATALOG., ISSUES REGISTERED: 1990. CREATED 1990; PUB. 1990-01-01 (IN NOTICE: 1989) | TX0002955301 | 12/6/1990 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR ... [ET AL.]. | CSN0058893 | 1984 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, FALL 84. CREATED 1984; PUB. 1984-09-04 | TX0001578470 | 5/13/1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, ISSUES REGISTERED: FALL 85. APPL. TITLE: MODEL ROCKET NEWS. CREATED 1985; PUB. 1985-09-06 | TX0001790704 | 4/4/1986 |
| EDITOR, ISSUES REGISTERED: SPRING 84. CREATED 1984; PUB. 1984-04-14 | TX0001578467 | 5/13/1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, WINTER 84. CREATED 1984; PUB. 1984-11-14 | TX0001578469 | 5/13/1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, WINTER 85. CREATED 1985; PUB. 1985-11-14 | TX0001790705 | 4/4/1986 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SGACE / [ROBERT CANNON. EDITOR ... ET AL.]. | CSN0058893 | 1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., FALL 87. CREATED 1987; PUB. 1987-08-24 | TX0002230394 | 1/21/1988 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., FALL 88. CREATED 1988; PUB. 1988-10-07 | TX0002531096 | 4/14/1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., FALL 89. CREATED 1989; PUB. 1989-08-18 | TX0002981603 | 12/6/1990 |
| PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., ISSUES REGISTERED: SPRING 87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB.1987-03-13 | TX0002146003 | 5/26/1987 |

| Title | Copyright Number | Date |
|-------|------------------|------|
| PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., ISSUES REGISTERED: SPRING 88. (C.O. CORRESPONDENCE.) CREATED 1988; PUB.1988-03-11 | TX0002520115 | ######## |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., ISSUES REGISTERED: SPRING 89. CREATED 1989; PUB. 1989-04-14 | TX0002534831 | 4/14/1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., SPECIAL ED. 87-88. CREATED 1987; PUB. 1987-09-04 | TX0002230398 | 1/21/1988 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., SUMMER 87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB. 1987-05-28 | TX0002229725 | 8/20/1987 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., WINTER 87. CREATED 1987; PUB. 1987-11-01 | TX0002534822 | 4/14/1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., WINTER 88. CREATED 1988; PUB. 1988-11-23 | TX0002531097 | 4/14/1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., WINTER 89. CREATED 1989; PUB. 1989-10-27 | TX0002981604 | 12/6/1990 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS. AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]. | CSN0058893 | 1988 |
| ESTES MODEL ROCKET NEWS MAGAZINE. | CSN0058893 | 1986 |
| ESTES MODEL ROCKET NEWS MAGAZINE., FALL 86. CLAIMANT: ESTES EDUCATOR NEWS (C.O.CORRESPONDENCE.) CREATED 1986; PUB. 1986-08-21; (INNOTICE: ESTES INDUSTRIES) | TX0002021284 | 3/17/1987 |
| ESTES MODEL ROCKET NEWS MAGAZINE., ISSUES REGISTERED: SPRING 86. CLAIMANT: ESTES INDUSTRIES. (C.O.CORRESPONDENCE.) CREATED 1986; PUB. 1986-03-14 | TX0002146002 | 5/26/1987 |
| ESTES INDUSTRIES. CREATED 1986; PUB.1986-03-14 (IN NOTICE: 1985) | TX0001790706 | 4/4/1986 |
| ESTES MODEL ROCKET NEWS MAGAZINE., WINTER 86. CLAIMANT: ESTES INDUSTRIES. APPL. AUTHOR: ROBERTL. CANNON FOR ESTES INDUSTRIES, EMPLOYER FOR HIRE. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-10-28 | TX0002021281 | 3/17/1987 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR … ET AL.]. | CSN0058893 | 1987 |

| Title | Copyright Number | Date |
|---|---|---|
| 1974 MODEL ROCKETS CATALOG & 2 OTHER TITLES; TEXTUAL WORKS. | V3491D585 | 2002 |
| AEROTEK: MODEL ROCKET ALTITUDE PREDICTION KIT | TX 2-578-287 | |
| AEROTREK : MODEL ROCKET ALTITUDE PREDICTION TOOLKIT. | TX0002578287 | 1988 |
| AEROTREK: MODEL ROCKET ALTITUDE PREDICTION TOOLKIT. | TX0002578287 | 1988 |
| ASTROCAD: PERFORMANCE ANALYSIS FOR MODEL ROCKETS. | TX0002637985 | 1987 |
| ASTROCAD : PERFORMANCE ANALYSIS FOR MODEL ROCKETS. | TX0002637985 | 1987 |
| ASTROCAD: PERFORMANCE ANALYSIS FOR MODEL ROCKETS | TX 2-637-985 | |
| CENTURI FLYING MODEL ROCKETS : CATALOG NO. 74-75. | VA0000885981 | 3/3/1998 |
| CENTURI FLYING MODEL ROCKETS: CATALOG NO. 74-75 | VA 885-981 | |
| CENTURI FLYING MODEL ROCKETS (CATALOG NO. 74-75) / BY CENTURI ENGINEERING COMPANY. VA 885-981. | V3423D222 | 1998 |
| CENTURI FLYING MODEL ROCKETS / BY CENTURI ENGINEERING COMPANY. VA 885-981. | V3423D223 | 1998 |
| CENTURI FLYING MODEL ROCKETS : CATALOG NO. 74-75. | VA0000885981 | 1974 |
| CENTURI FLYING MODEL ROCKETS: CATALOG NO. 74- 75 & 21 OTHER TITLES. | V3490D273 | 2002 |
| COUNTDOWN : MATHEMATICS AND MODEL ROCKETRY / BY WILLIAM E. SCHALL | TX0001054661 | 1/29/1982 |
| COUNTDOWN : MATHEMATICS AND MODEL ROCKETRY / BY WILLIA M E. SCHALL. | TX0001054661 | 1981 |
| COUNTDOWN: MATHEMATICS AND MODEL ROCKETRY; TEXTUAL WORK / TX 1-054-661 (1982) | V3282P512 | 1996 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1985 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1984 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1985 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1984 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1983 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1983 |
| ESTES EDUCATOR NEWS, FEB84. CREATED 1983; PUB. 1983-09-26 | TX0001578473 | 5/13/1985 |
| ESTES EDUCATOR NEWS, ISSUES REGISTERED: SEP83. CREATED 1983; PUB. 1983-09-26 | TX0001578471 | 5/13/1985 |
| ESTES EDUCATOR NEWS, NOV83. CREATED 1983; PUB. 1983-11-25 | TX0001578472 | 5/13/1985 |
| ESTES EDUCATOR NEWS, SEP84. CREATED 1983; PUB. 1983-09-26 | TX0001578475 | 5/13/1985 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1991 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1986 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1987 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1989 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1988 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1990 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1991 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1990 |

| Title | Copyright Number | Date |
|---|---|---|
| ESTES EDUCATOR NEWS. | CSN0058892 | 1989 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1988 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1987 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1986 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1991 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1990 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1989 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1988 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1987 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1986 |
| ESTES EDUCATOR NEWS. ISSUES REGISTERED: APR84. CREATED 1984; PUB. 1984-04-06 | TX0001578474 | 5/13/1985 |
| ESTES EDUCATOR NEWS. JUN86. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-04-18 | TX0002021283 | 3/17/1987 |
| ESTES EDUCATOR NEWS. MAR85. CREATED 1985; PUB. 1985-03-04 | TX0001578477 | 5/13/1985 |
| ESTES EDUCATOR NEWS. MAR87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB.1987-03-04 | TX0002146005 | 5/26/1987 |
| ESTES EDUCATOR NEWS. MAR88. CREATED 1988; PUB. 1988-02-19 | TX0002531093 | 4/14/1989 |
| ESTES EDUCATOR NEWS. MAR89. CREATED 1989; PUB. 1989-03-21 | TX0002531091 | 4/14/1989 |
| ESTES EDUCATOR NEWS. MAR90. CREATED 1990; PUB. 1990-02-16; REG. 1990-12-06 | TX0002954867 | 12/6/1990 |
| ESTES EDUCATOR NEWS. MAY85. (C.O. CORRESPONDENCE.) CREATED 1985; PUB. 1985-04-28 | TX0001578468 | 5/13/1985 |
| ESTES EDUCATOR NEWS. MAY87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB.1987-04-13 | TX0002146004 | 5/26/1987 |
| ESTES EDUCATOR NEWS. MAY88. CREATED 1988; PUB. 1988-04-22 | TX0002531094 | 4/14/1989 |
| ESTES EDUCATOR NEWS. MAY89. CREATED 1989; PUB. 1989-04-21 | TX0002550422 | 5/9/1989 |
| ESTES EDUCATOR NEWS. MAY90. CREATED 1990; PUB. 1990-04-13; REG. 1990-12-06 | TX0002954866 | 12/6/1990 |
| ESTES EDUCATOR NEWS. NOV84. CREATED 1984; PUB. 1984-11-16 | TX0001578476 | 5/13/1985 |
| ESTES EDUCATOR NEWS. NOV85. CREATED 1985; PUB. 1985-10-24 | TX0001790707 | 4/4/1986 |
| ESTES EDUCATOR NEWS. NOV86. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-10-29 | TX0002021282 | 3/17/1987 |
| ESTES EDUCATOR NEWS. NOV87. CREATED 1987; PUB. 1987-10-23 | TX0002230396 | 1/21/1988 |
| ESTES EDUCATOR NEWS. NOV88. CREATED 1988; PUB. 1988-10-21 | TX0002531098 | 4/14/1989 |
| ESTES EDUCATOR NEWS. NOV89. CREATED 1989; PUB. 1989-10-10 | TX0002954865 | 12/6/1990 |
| ESTES EDUCATOR NEWS. SEP85. CREATED 1985; PUB. 1985-08-23 | TX0001797530 | 4/4/1986 |
| ESTES EDUCATOR NEWS. SEP86. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-08-27 | TX0002175313 | 1/16/1987 |
| ESTES EDUCATOR NEWS. SEP87. CREATED 1987; PUB. 1987-08-28 | TX0002230395 | 1/21/1988 |
| ESTES EDUCATOR NEWS. SEP88. CREATED 1988; PUB. 1988-08-26 | TX0002531095 | 4/14/1989 |
| ESTES EDUCATOR NEWS. SEP89. CREATED 1989; PUB. 1989-08-18 | TX0002954868 | 12/6/1990 |
| ESTES EDUCATOR NEWS. SEP90. APPL. AUTHOR: ESTES INDUSTRIES, EMPLOYER FOR HIRE. | TX0002981599 | 12/6/1990 |
| 01-21 | TX0002531092 | 4/14/1989 |
| ESTES EDUCATOR NEWS. WINTER 90. CREATED 1990; PUB. 1990-10-19; REG. 1990-12-06; | TX0002954864 | 12/6/1990 |

| Title | Copyright Number | Date |
|---|---|---|
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1990 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1989 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1991 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1988 |
| ESTES FLYING MODEL ROCKET CATALOG., 1989. CREATED 1989; PUB. 1989-01-06 (IN NOTICE: 1988) | TX0002533547 | 4/14/1989 |
| ESTES FLYING MODEL ROCKET CATALOG., ISSUES REGISTERED: 1988. CREATED 1988; PUB. 1988-01-15 | TX0002533548 | 4/14/1989 |
| ESTES FLYING MODEL ROCKET CATALOG., ISSUES REGISTERED: 1989. CREATED 1989; PUB. 1989-01-01 (IN NOTICE: 1988) | TX0002955302 | 12/6/1990 |
| ESTES FLYING MODEL ROCKET CATALOG., ISSUES REGISTERED: 1990. CREATED 1990; PUB. 1990-01-01 (IN NOTICE: 1989) | TX0002955301 | 12/6/1990 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR ... [ET AL.]. | CSN0058893 | 1984 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, FALL 84. CREATED 1984; PUB. 1984-09-04 | TX0001578470 | 5/13/1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, ISSUES REGISTERED: FALL 85. APPL. TITLE: MODEL ROCKET NEWS. CREATED 1985; PUB. 1985-09-06 | TX0001790704 | 4/4/1986 |
| EDITOR, ISSUES REGISTERED: SPRING 84. CREATED 1984; PUB. 1984-04-14 | TX0001578467 | 5/13/1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, WINTER 84. CREATED 1984; PUB. 1984-11-14 | TX0001578469 | 5/13/1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR, WINTER 85. CREATED 1985; PUB. 1985-11-14 | TX0001790705 | 4/4/1986 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SGACE / [ROBERT CANNON. EDITOR ... ET AL.]. | CSN0058893 | 1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.], FALL 87. CREATED 1987; PUB. 1987-08-24 | TX0002230394 | 1/21/1988 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.], FALL 88. CREATED 1988; PUB. 1988-10-07 | TX0002531096 | 4/14/1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.], FALL 89. CREATED 1989; PUB. 1989-08-18 | TX0002981603 | 12/6/1990 |
| PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.], ISSUES REGISTERED: SPRING 87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB.1987-03-13 | TX0002146003 | 5/26/1987 |

| Title | Copyright Number | Date |
|---|---|---|
| PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., ISSUES REGISTERED: SPRING 88. (C.O. CORRESPONDENCE.) CREATED 1988; PUB.1988-03-11 | TX0002520115 | ######## |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., ISSUES REGISTERED: SPRING 89. CREATED 1989; PUB. 1989-04-14 | TX0002534831 | 4/14/1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., SPECIAL ED. 87-88. CREATED 1987; PUB. 1987-09-04 | TX0002230398 | 1/21/1988 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., SUMMER 87. (C.O. CORRESPONDENCE.) CREATED 1987; PUB. 1987-05-28 | TX0002229725 | 8/20/1987 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., WINTER 87. CREATED 1987; PUB. 1987-11-01 | TX0002534822 | 4/14/1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., WINTER 88. CREATED 1988; PUB. 1988-11-23 | TX0002531097 | 4/14/1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]., WINTER 89. CREATED 1989; PUB. 1989-10-27 | TX0002981604 | 12/6/1990 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS. AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR ... ET AL.]. | CSN0058893 | 1988 |
| ESTES MODEL ROCKET NEWS MAGAZINE. | CSN0058893 | 1986 |
| ESTES MODEL ROCKET NEWS MAGAZINE., FALL 86. CLAIMANT: ESTES EDUCATOR NEWS (C.O.CORRESPONDENCE.) CREATED 1986; PUB. 1986-08-21; (INNOTICE: ESTES INDUSTRIES) | TX0002021284 | 3/17/1987 |
| ESTES MODEL ROCKET NEWS MAGAZINE., ISSUES REGISTERED: SPRING 86. CLAIMANT: ESTES INDUSTRIES. (C.O.CORRESPONDENCE.) CREATED 1986; PUB. 1986-03-14 | TX0002146002 | 5/26/1987 |
| ESTES INDUSTRIES. CREATED 1986; PUB.1986-03-14 (IN NOTICE: 1985) | TX0001790706 | 4/4/1986 |
| ESTES MODEL ROCKET NEWS MAGAZINE., WINTER 86. CLAIMANT: ESTES INDUSTRIES. APPL. AUTHOR: ROBERTL. CANNON FOR ESTES INDUSTRIES, EMPLOYER FOR HIRE. (C.O. CORRESPONDENCE.) CREATED 1986; PUB. 1986-10-28 | TX0002021281 | 3/17/1987 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBERT CANNON, EDITOR … ET AL.]. | CSN0058893 | 1987 |

| Title | Copyright Number | Date |
|---|---|---|
| ESTES MODEL ROCKETRY EDUCATOR NEWS | TX 2-560-652 | |
| ESTES MODEL ROCKETRY EDUCATOR NEWS | TX 2-560-652 | |
| ESTES MODEL ROCKETRY EDUCATOR NEWS., 32637 | TX0002560652 | 5/9/1989 |
| ESTES NEWS. | CSN0073590 | 1987 |
| ESTES NEWS. | CSN0073590 | 1989 |
| ESTES NEWS. | CSN0073590 | 1988 |
| ESTES NEWS. | CSN0073590 | 1989 |
| ESTES NEWS. | CSN0073590 | 1.988 |
| ESTES NEWS. | CSN0073590 | 1987 |
| ESTES NEWS. | CSN0073590 | 1988 |
| ESTES NEWS., FALL 87. CREATED 1987; PUB. 1987-09-25 | TX0002230397 | 1/21/1988 |
| ESTES NEWS., ISSUES REGISTERED: SPRING 88. CREATED 1988; PUB. 1988-05-01 | TX0002441186 | ######## |
| ESTES NEWS., ISSUES REGISTERED: SPRING 89. CREATED 1989; PUB. 1989-06-05 | TX0002593042 | 7/10/1989 |
| ESTES NEWS., ISSUES REGISTERED: SUMMER 87. CREATED 1987; PUB. 1987-07-28 | TX0002143015 | 8/25/1987 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1983 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1983 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1984 |
| ESTES EDUCATOR NEWS / [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1985 |
| ESTES EDUCATOR NEWS / [BOB CANNON. I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1985 |
| ESTES EDUCATOR NEWS I [BOB CANNON, I.E. ROBERT L. CANNON, EDITOR ... ET AL.]. | CSN0058892 | 1984 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1986 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1987 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1988 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1989 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1990 |
| ESTES EDUCATOR NEWS. | CSN0058892 | 1991 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1988 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1989 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1990 |
| ESTES FLYING MODEL ROCKET CATALOG. | CSN0081984 | 1991 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDITOR ... [ET AL.]. | CSN0058893 | 1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDIT OR ... [ET AL.]. | CSN0058893 | 1984 |

| Title | Copyright Number | Date |
|---|---|---|
| ESTES MODEL ROCKET NEWS MAGAZINE / ROBERT CANNON, EDIT OR ... [ET AL.]. | CSN0058893 | 1985 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE I [ROBERT CANNON, EDITOR ... ET AL.]. | CSN0058893 | 1991 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PU BLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBER T CANNON, EDITOR ... ET AL.]. | CSN0058893 | 1987 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PU BLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBER T CANNON, EDITOR ... ET AL.]. | CSN0058893 | 1988 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PU BLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBER T CANNON, EDITOR ... ET AL.]. | CSN0058893 | 1989 |
| ESTES MODEL ROCKET NEWS MAGAZINE : DEDICATED TO AND PU BLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE / [ROBER T CANNON, EDITOR ... ET AL.]. | CSN0058893 | 1991 |
| ESTES MODEL ROCKET NEWS MAGAZINE. | CSN0058893 | 1986 |
| ESTES NEWS. | | |
| ESTES NEWS. | CSN0073590 | 1987 |
| ESTES NEWS. | CSN0073590 | 1988 |
| ESTES NEWS. | CSN0073590 | 1989 |
| ESTES ROCKET LABS - 3 EASY STEPS! | TXU001670101 | 2008 |
| ESTES/COX PRODUCT CATALOG | VA 940-020 | |
| ESTES/COX PRODUCT CATALOG | VA 940-020 | |
| ESTES/COX PRODUCT CATALOG. ISSUES REGISTERED: 1998. CREATED 1997; PUB. 1998-01-29 | VA0000940020 | 9/16/1998 |
| ESTES/COX PRODUCT CATALOG. | CSN0126578 | 1998 |
| ESTES/COX PRODUCT CATALOG. | CSN0126578 | 1999 |
| FLIGHT : AERODYNAMICS OF MODEL ROCKETS I BY BOB CANNON [I.E. ROBERT CANNON] AND MIKE DORFFLER. | TX0002052444 | 1986 |
| FLIGHT : AERODYNAMICS OF MODEL ROCKETS / BY BOB CANNON [ I.E. ROBERT CANNON] AND MIKE DORFFLER. | TX0002052444 | 1986 |
| FLY A KITE! | TX0001133732 | 1982 |
| FLY A KITE! | TX0002139329 | 1982 |
| FLY A KITE! | TX0001133732 | 1982 |
| FLY A KITE! | TX0002139329 | 1982 |
| IN SEARCH OF SGACE : INTRODUCTION TO MODEL ROCKETRY / BY BOB CANNON [I.E. ROBERT CANNON] AND MIKE DORFTLER. | TX:0002149740 | 1986 |
| IN SEARCH OF SPACE : INTRODUCTION TO MODEL ROCKETRY / BY BOB CANNON [I.E. ROBERT CANNON] AND MIKE DORFFLER. | TX0002149740 | 1986 |
| KITE FLYING : TEACHER'S GUIDE / BY ROBERT L. CANNON. | TX0002259329 | 1985 |
| KITE FLYING TEACHER'S GUIDE : CATALOG NO. 84,719 / BY, | TX0001133733 | 4/21/1983 |

| Title | Copyright Number | Date |
|---|---|---|
| KITE LLYING TEACHER'S GUIDE : CATALOG NO. 84.719 / BV ROBERT L. CANNON. | TX0001133733 | 1982 |
| KITE FLYING : TEACHER'S GUIDE / BY ROBERT L. CANNON. | TX0002259329 | 1985 |
| KITE FLYING TEACHER'S GUIDE : CATALOG NO. 84,719 / BY ROBER T L. CANNON. | TX0001133733 | 1982 |
| LET'S GO FLY A KITE! / BY ROBERT L. CANNON., | TX0000620756 | 11/7/1980 |
| CANNON. | TX0001133734 | 4/21/1983 |
| LET'S GO FLY A KITE! : CATALOG NO. 84.717C / BV ROBERT L. CANNON. | TX0001133734 | 1982 |
| LET'S GO FLV A KITE! / BY ROBERT L. CANNON. | TX0000620756 | 1980 |
| LET'S GO FLV A KITE! / BY ROBERT L. CANNON. | TX0002259328 | 1985 |
| LET'S GO FLY A KITE! / BY ROBERT L. CANNON. | TX0000620756 | 1980 |
| LET'S GO FLY A KITE! / BY ROBERT L. CANNON. | TX0002259328 | 1985 |
| NON. | TX0001133734 | 1982 |
| MODEL ROCKET NEWS : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE., FALL 90. CREATED 1990; PUB. 1990-08-17 | TX0002981602 | 12/6/1990 |
| MODEL ROCKET NEWS : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE., ISSUES REGISTERED: SPRING 90. CREATED 1990; PUB. 1990-03-16 | TX0002981600 | 12/6/1990 |
| MODEL ROCKET NEWS : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE., SUMMER 90. CREATED 1990; PUB. 1990-05-04 | TX0002981601 | 12/6/1990 |
| MODEL ROCKETRY : THE APACE AGE TEACHING AID : A TEACHER'S GUIDE / BY ROBERT L. CANNON., | TX0003038456 | 12/6/1990 |
| MODEL ROCKETRY : THE EDUCATIONAL SPACE-AGE HOBBY., | TX0002561340 | 4/14/1989 |
| MODEL ROCKETRY: THE EDUCATIONAL SPACE-AGE HOBBY | TX 2-561-340 | |
| MODEL ROCKETRY: THE EDUCATIONAL SPACE-AGE HOBBY | TX 2-561-340 | |
| MODEL ROCKETRY: THE SPACE AGE TEACHING AID : A TEACHER'S GUIDE / BV ROBERT L CANNON. | TX0003038456 | 1990 |
| MODEL ROCKETRY : THE APACE AGE TEACHING AID : A TEACHER' S GUIDE / BY ROBERT L. CANNON. | TX0003038456 | 1990 |
| PHVSICS OF MODEL ROCKETRY. | TX0002208022 | 1987 |
| PHYSICS OF MODEL ROCKETRY. | TX0002208022 | 1987 |
| ROCKETRY SCIENCE KIT PROJECT MANUAL | TX 2-550-423 | |
| ROCKETRY SCIENCE KIT PROJECT MANUAL | TX 2-550-423 | |
| ROCKETRY SCIENCE KIT PROJECT MANUAL., | TX0002550423 | 5/9/1989 |
| ROCKETS & 21 OTHER TITLES. | V3488D368 | 2002 |
| ROCKETS! / PRODUCED BY OMEGA FILMS., | PA0000164667 | 1/28/1983 |
| ROCKETS! / PRODUCED BV OMEGA FILMS. | PA0000164667 | 1982 |
| 8), | VA0000939843 | 9/14/1998 |
| SCIENCE AND MODEL ROCKETS CURRICULUM (GRADES 5,6,7 & 8: NO. 2847 | VA 939-843 | |
| SCIENCE AND MODEL ROCKETS CURRICULUM (GRADES 5,6,7 & 8: NO. 2847) | VA 939-843 | |
| SCIENCE AND MODEL ROCKETS CURRICULUM (GRADES 5.6.7 & 8:NO.2847) | VA 939-843 | |

| Title | Copyright Number | Date |
|---|---|---|
| KITE LLYING TEACHER'S GUIDE : CATALOG NO. 84.719 / BV ROBERT L. CANNON. | TX0001133733 | 1982 |
| KITE FLYING : TEACHER'S GUIDE / BY ROBERT L. CANNON. | TX0002259329 | 1985 |
| KITE FLYING TEACHER'S GUIDE : CATALOG NO. 84,719 / BY ROBER T L. CANNON. | TX0001133733 | 1982 |
| LET'S GO FLY A KITE! / BY ROBERT L. CANNON., | TX0000620756 | 11/7/1980 |
| CANNON. | TX0001133734 | 4/21/1983 |
| LET'S GO FLY A KITE! : CATALOG NO. 84.717C / BV ROBERT L. CANNON. | TX0001133734 | 1982 |
| LET'S GO FLV A KITE! / BY ROBERT L. CANNON. | TX0000620756 | 1980 |
| LET'S GO FLV A KITE! / BY ROBERT L. CANNON. | TX0002259328 | 1985 |
| LET'S GO FLY A KITE! / BY ROBERT L. CANNON. | TX0000620756 | 1980 |
| LET'S GO FLY A KITE! / BY ROBERT L. CANNON. | TX0002259328 | 1985 |
| NON. | TX0001133734 | 1982 |
| MODEL ROCKET NEWS : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE., FALL 90. CREATED 1990; PUB. 1990-08-17 | TX0002981602 | 12/6/1990 |
| MODEL ROCKET NEWS : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE., ISSUES REGISTERED: SPRING 90. CREATED 1990; PUB. 1990-03-16 | TX0002981600 | 12/6/1990 |
| MODEL ROCKET NEWS : DEDICATED TO AND PUBLISHED FOR ESTES ROCKETEERS, AMERICA'S FUTURE IN SPACE., SUMMER 90. CREATED 1990; PUB. 1990-05-04 | TX0002981601 | 12/6/1990 |
| MODEL ROCKETRY : THE APACE AGE TEACHING AID : A TEACHER'S GUIDE / BY ROBERT L. CANNON., | TX0003038456 | 12/6/1990 |
| MODEL ROCKETRY : THE EDUCATIONAL SPACE-AGE HOBBY., | TX0002561340 | 4/14/1989 |
| MODEL ROCKETRY: THE EDUCATIONAL SPACE-AGE HOBBY | TX 2-561-340 | |
| MODEL ROCKETRY: THE EDUCATIONAL SPACE-AGE HOBBY | TX 2-561-340 | |
| MODEL ROCKETRY: THE SPACE AGE TEACHING AID : A TEACHER'S GUIDE / BV ROBERT L CANNON. | TX0003038456 | 1990 |
| MODEL ROCKETRY : THE APACE AGE TEACHING AID : A TEACHER' S GUIDE / BY ROBERT L. CANNON. | TX0003038456 | 1990 |
| PHVSICS OF MODEL ROCKETRY. | TX0002208022 | 1987 |
| PHYSICS OF MODEL ROCKETRY. | TX0002208022 | 1987 |
| ROCKETRY SCIENCE KIT PROJECT MANUAL | TX 2-550-423 | |
| ROCKETRY SCIENCE KIT PROJECT MANUAL | TX 2-550-423 | |
| ROCKETRY SCIENCE KIT PROJECT MANUAL., | TX0002550423 | 5/9/1989 |
| ROCKETS & 21 OTHER TITLES. | V3488D368 | 2002 |
| ROCKETS! / PRODUCED BY OMEGA FILMS., | PA0000164667 | 1/28/1983 |
| ROCKETS! / PRODUCED BV OMEGA FILMS. | PA0000164667 | 1982 |
| 8), | VA0000939843 | 9/14/1998 |
| SCIENCE AND MODEL ROCKETS CURRICULUM (GRADES 5,6,7 & 8: NO. 2847 | VA 939-843 | |
| SCIENCE AND MODEL ROCKETS CURRICULUM (GRADES 5,6,7 & 8: NO. 2847) | VA 939-843 | |
| SCIENCE AND MODEL ROCKETS CURRICULUM (GRADES 5.6.7 & 8:NO.2847) | VA 939-843 | |

| Title | Copyright Number | Date |
|-------|------------------|------|
| SCIENCE AND MODEL ROCKETS CURRICULUM (GRADES 5, 6, 7 & 8 : NO. 2847. | VA0000939843 | 1992 |
| THE PHYSICS OF MODEL ROCKETRY., | TX0002208022 | 8/20/1987 |
| TR-8 MODEL ROCKET TECHNICAL REPORT : MODEL ROCKETRY STUDY GUIDE. | TX0002259327 | 1985 |
| TR-8 MODEL ROCKET TECHNICAL REPORT : MODEL ROCKETRY STUDY GUIDE., | TX0002259327 | 8/20/1987 |
| TR-8 MODEL ROCKET TECHNICAL REPORT : MODEL ROCKETRY STUDY GUIDE., | TX0002259327 | 1985 |

## SCHEDULE 2.1(h)

## Executory Contracts and Unexpired Leases

| Contract ID | Counterparty | Type of Contract | Cure Amount |
|---|---|---|---|
| 7003 | ACE HARDWARE CORPORATION | Customer/Supplier Agreement | |
| 7004 | AMAZON.COM INC. | Customer/Supplier Agreement | |
| 7005 | AMAZON.COM.CA, INC. | Customer/Supplier Agreement | |
| 7006 | BENNYS INC DBA STEWART DISTRIBUTING | Customer/Supplier Agreement | |
| 7007 | BI-MART CORPORATION | Customer/Supplier Agreement | |
| 7008 | BLAIN'S FARM & FLEET | Customer/Supplier Agreement | |
| 7009 | CABELA'S | Customer/Supplier Agreement | |
| 7010 | DO IT BEST CORPORATION | Customer/Supplier Agreement | |
| 7011 | FRED MEYER, INC | Customer/Supplier Agreement | |
| 7012 | FRY'S ELECTRONICS | Customer/Supplier Agreement | |
| 7013 | JENSEN DISTRIBUTION SERVICES | Customer/Supplier Agreement | |
| 7014 | MEIJER, INC. | Customer/Supplier Agreement | |
| 7015 | MID-STATES DISTR COMPANY | Customer/Supplier Agreement | |
| 7016 | MILITARY MODEL | Customer/Supplier Agreement | |
| 7017 | MMP, LLC | Customer/Supplier Agreement | |
| 7018 | SUPERVALU | Customer/Supplier Agreement | |
| 7019 | TARGET NORTHERN OPER.CTR. | Customer/Supplier Agreement | |
| 7020 | Target.com, a Div of Target Corp. | Customer/Supplier Agreement | |
| 7021 | TOYS 'R' US | Customer/Supplier Agreement | |
| 7022 | TRUE VALUE COMPANY | Customer/Supplier Agreement | |
| 7023 | UNITED HARDWARE DISTR CO. | Customer/Supplier Agreement | |
| 7024 | WALMART | Customer/Supplier Agreement | |
| 7065 | AEROMODELLI LTDA | Distribution | |
| 7072 | ARTSKIN SRL | Distribution | |
| 7073 | CLICKTALE | Distribution | |
| 7074 | DAWN TRADING | Distribution | |
| 7075 | EIJI SATO | Distribution | |
| 7076 | ESBAS / SPACE CAMP - TURKEY | Distribution | |
| 7064 | GAMETEC SA. | Distribution | |
| 7077 | HOBBIES AUSTRALIA | Distribution | |
| 7066 | HOBBY CENTER | Distribution | |
| 7078 | HOBBY CENTER | Distribution | |
| 7071 | INNOVATION COMPUTERS | Distribution | |
| 7079 | JAPAN ASSOC. OF ROCKETRY | Distribution | |
| 7080 | LOGIC RC, LTD | Distribution | |

| Contract ID | Counterparty | Type of Contract | Cure Amount |
|---|---|---|---|
| 7067 | LUIS GONZAGA OBREGON ZETINA | Distribution | |
| 7069 | MPM SA S.A. | Distribution | |
| 7068 | PELIKAN DANIEL | Distribution | |
| 7081 | R4SKY | Distribution | |
| 7082 | REVELL GmbH | Distribution | |
| 7083 | SPREE TRADING, LLC | Distribution | |
| 7084 | TREVOR BRINGANS, LTD | Distribution | |
| 7070 | ZALAQUETT Y AVENDANO LIMITADA | Distribution | |
| 7025 | Veritiv | Equipment | |
| 7026 | AFCO | Financing | |
| 7027 | Fireman's Fund Ins Co | Insurance | |
| 7028 | First Mercury Ins Co | Insurance | |
| 7029 | Navigators | Insurance | |
| 7030 | Pinnacol Assurance | Insurance | |
| 7031 | Trade Risk Guaranty Brokerage Services, LLC | Insurance | |
| 7032 | Verlan Fire Ins Co | Insurance | |
| 7033 | Kuebix | IT Software License | |
| 7034 | Magento | IT Software License | |
| 7035 | Thomson Reuters | IT Software License | |
| 7036 | TOPS Software Corporation | IT Software Maintenance | $450.00 |
| 7037 | EXTOL | IT Software Support | $248.65 |
| 7038 | Fujitsu Glovia, Inc. | IT Software Support | |
| 7039 | 1 World Sync | IT Subscription | |
| 7040 | CommerceHub | IT Subscription | $65.00 |
| 7041 | ShipWorks | IT Subscription | |
| 7042 | UL Information & Insights Inc DBA The Wercs | IT Subscription | |
| 7043 | unleaded | IT Website Hosting | |
| 7044 | Avalara | IT Website Support | |
| 7045 | Miller Enterprises | Land Lease | |
| 7046 | AeroTech Division of RCS Rocket Motor Companies | Licensing | |
| 7047 | Johnson Research & Development Co. (licensee is Hobbico, Inc.) | Licensing | |
| 7048 | Leisure Inc dba WhiteBoard Product Solutions | Licensing | $107.37 |
| 7049 | Victoria G. Dorffler (beneficiary to Michael Dorffler, deceased) | Licensing | $39.59 |
| 7050 | Banghart-Corin & Associates | Manufacturing Representative | $739.67 |
| 7051 | BDC Group, Inc. | Manufacturing Representative | $1,647.44 |
| 7052 | Besco Associates | Manufacturing Representative | $2,800.65 |
| 7053 | CDZ Sales, Inc | Manufacturing Representative | $80.20 |
| 7054 | Chapman-Bingham Assoc Inc | Manufacturing Representative | |

| Contract ID | Counterparty | Type of Contract | Cure Amount |
|---|---|---|---|
| 7055 | Intermarket Enterprises | Manufacturing Representative | |
| 7056 | M squared sales | Manufacturing Representative | |
| 7057 | Strategic Marketing Partners, Inc. | Manufacturing Representative | |
| 7058 | Terry Toy's Inc | Manufacturing Representative | |
| 7059 | The O'Keefe Company | Manufacturing Representative | $119.79 |
| 7060 | Toyco Inc. | Manufacturing Representative | |
| 7061 | National Association of Rocketry | Print Advertising | $510.00 |
| 7062 | ChemTel Inc | Service Subscription | |
| 7063 | CSC | Statutory Representation | |
| | | **TOTAL** | **$6,808.36** |

<u>**SCHEDULE 2.1(i)**</u>

**Governmental Authorizations**

1.      Colorado Department of Public Health and Environment (CDPHE) Water Quality Control Division Stormwater Discharge Permit (COR900026)

2.      US Dept. of Transportation Pipeline and Hazardous Materials Safety Administration Authorization to use – DOT- Special Permit 7887

3.      Natural Resources Canada, Explosives Regulatory Division: Approval of Estes model rocket motors and igniters

4.      European Union (EU) or Community European (CE) includes 28 European countries currently – Approvals of all Estes model rocket engines through size D

5.      US Dept. of Labor, Mine, Safety and Health Administration – Contractor ID: ZKE allowing participation in mining activities at Mine ID No.: 05-00037

## SCHEDULE 2.1(j)

### Employee Benefit Plans

| Type of Benefit | Insurance Carrier/ Third Party Administrator | Description |
|---|---|---|
| Health Care Insurance | Anthem Blue Cross Blue Shield | Health insurance, company pays a portion |

**SCHEDULE 2.2(b)**

**Bank Accounts**

| Account Held By | Last Four Digits | Bank | Address | Type of Account |
|---|---|---|---|---|
| Estes-Cox Corp | 8006 | Wells Fargo, N.A. | P.O. Box 63020 San Francisco, CA 94163 | Collection Account with DACA |
| Estes-Cox Corp | 1522 | Wells Fargo, N.A. | P.O. Box 63020 San Francisco, CA 94163 | Operating Account |
| Estes-Cox Corp | 0872 | Wells Fargo, N.A. | P.O. Box 63020 San Francisco, CA 94163 | Controlled Disbursement Account |

## <u>SCHEDULE 2.2(c)</u>

**Certain Excluded Contracts**

None.

## **SCHEDULE 2.2(r)**

### **Other Excluded Assets**

None.

## **SCHEDULE 2.3(a)**

**Certain Excluded Liabilities Under Assigned Contracts**

None.

## SCHEDULE 2.3(d)

### Certain Assumed Post-Petition Liabilities

| | |
|---|---|
| UTILITY | 18,608.22 |
| REGULATORY | 13,500.00 |
| PRODUCT (DEVELOPMENT) | 6,450.00 |
| COMMISSIONS | 6,483.75 |
| SUPPLIES Office/Whse | 3,136.74 |
| MAINTENANCE (FACILITIES) | 2,116.02 |
| PEOPLE (TEMP EMPL) | 2,001.67 |
| SHIPPING | 1,151.78 |
| TAXES (SALES) | 1,146.50 |
| IT COSTS | 851.95 |
| Miscellaneous | <u>833.54</u> |
| **Estimated Total** | **56,280.18** |

## <u>SCHEDULE 2.3(f)</u>

### Certain Assumed Employee Obligations

**Estes Department list as of 3/13/18**

|   | Last Name | First Name | Job Title | Bi-weekly Pay | Employer's SS/Med | total w/ER tax |
|---|---|---|---|---|---|---|
| 1 | Jones | Diane | Estes Assembler | | | |
| 2 | Jones | Jacqueline | Estes Assembler | | | |
| 3 | Limberis | Kathleen | Estes Assembler | | | |
| 4 | Conner | Zoe | Estes Mail Center Coord | | | |
| 5 | Atkins | Stephen | Estes Warehouse Associate | | | |
| 6 | Lewis | Karen | Estes Assembler | | | |
| 7 | Reichert | Stephen | Estes Janitor | | | |
| 8 | Bilger | Gregory | Estes Engine Maker | | | |
| 9 | Bowman | Ryan | Estes QA Technician | | | |
| 10 | Miller | John | Estes Engine Maker | | | |
| 11 | Neish | Edson | Estes Engine Maker | | | |
| 12 | Ontiveros | Bonifacio | Estes Engine Maker | | | |
| 13 | Back | Jody | Estes MH/Order Puller | | | |
| 14 | States | Gary | Estes Engine Maker | | | |
| 15 | Swartz | Christine | Estes CS Rep | | | |
| 16 | Lee | Victoria | Estes Ship/Assembly Supv | | | |
| 17 | Alire | Frederick | Estes Engine Mfging Sup | | | |
| 18 | DelVecchio | David | Estes Machine Shop Mgr | | | |
| 19 | Everhart | Angela | Estes Product Manager | | | |
| 20 | Reichert | Marla | Estes Shipping Manager | | | |
| 21 | Huber | Nancy | Estes Purchasing Mgr | | | |
| 22 | Roberts | Mary | Estes Tech Services Mgr | | | |
| 23 | Boren | John | Estes Designer II | | | |
| 24 | Shaw | Linda | Estes Controller | | | |
| 25 | Fritz | Michael | Estes Prod Dev Div Dir | | | |
| 26 | Lane | Dean | Estes Systems Div Dir | | | |
| 27 | Mauss | James | Div VP General Mgr Estes | | | |
| | | | Totals: | $ 58,502.70 | $ 4,475.46 | $ 62,978.16 |

| Name | Dept | Sen Date | YOS | Net Post petition PTO Hours | Net PTO Value |
|------|------|----------|-----|------|------|
| Alire, Frederick J | Estes | 2/2/1987 | 30 | 53.95 | |
| Atkins, Stephen A. | Estes | 3/19/2012 | 5 | -4.92 | |
| Back, Jody L | Estes | 3/8/2010 | 7 | 4.58 | |
| Bilger, Gregory C | Estes | 9/15/1992 | 25 | 14.09 | |
| Boren, John G | Estes | 5/30/2010 | 7 | 18.71 | |
| Bowman, Ryan J. | Estes | 7/22/1996 | 21 | 5.59 | |
| Conner, Zoe A. | Estes | 11/7/2011 | 6 | 21.58 | |
| Delvecchio, David C | Estes | 6/7/1976 | 41 | -8.05 | |
| Everhart, Angela C | Estes | 12/10/2007 | 10 | 10.71 | |
| Fritz, Michael R | Estes | 11/24/2003 | 14 | 34.71 | |
| Huber, Nancy J | Estes | 1/15/1996 | 22 | 37.95 | |
| Jones, Diane E | Estes | 3/7/1979 | 38 | 5.59 | |
| Jones, Jacqueline K | Estes | 9/18/1978 | 39 | 43.09 | |
| Lane, Dean M | Estes | 1/25/1993 | 25 | -22.05 | |
| Lee, Victoria L | Estes | 3/8/2010 | 7 | -57.29 | |
| Lewis, Karen L. | Estes | 8/6/2012 | 5 | 10.08 | |
| Limberis, Kathleen D | Estes | 2/22/1973 | 44 | 35.59 | |
| Mauss, James A | Estes | 8/26/1997 | 20 | -58.05 | |
| Miller, John E | Estes | 11/10/1986 | 31 | -16.91 | |
| Neish, Edson P | Estes | 11/9/2009 | 8 | 40.08 | |
| Ontiveros, Bonifacio M | Estes | 3/9/1992 | 25 | 33.09 | |
| Reichert, Marla G. | Estes | 8/1/1994 | 23 | 29.95 | |
| Roberts, Mary I | Estes | 1/16/1976 | 42 | -66.05 | |
| Shaw, Linda F. | Estes | 5/5/2014 | 3 | 0.00 | |
| States, Gary L. | Estes | 12/2/2013 | 4 | 11.99 | |
| Swartz, Christine E | Estes | 7/6/1992 | 25 | -15.91 | |
| | | | | 162.10 | $ 11,237.43 |

**SCHEDULE 2.3(h)**

**Other Assumed Liabilities**

Any obligation which Seller may have or incur for the payment of transfer fees or any similar fees to Fujitsu Glovia, Inc. in connection with Seller's assumption and assignment to Purchaser of Seller's rights under that certain Software License, Support Service and Professional Services Agreement between Seller and Fujitsu Glovia, Inc. or its predecessors in interest, consisting of a series of Software & Support Services Orders, Professional Services Orders, Amendments and Addenda, and the governing Terms & Conditions, originally entered into on or about March 31, 1997 and amended several times since then (most recently on February 14, 2018) (collectively, the "Fujitsu Glovia Agreement"), to the extent that the Fujitsu Glovia Agreement shall have been designated by Purchaser as an Assigned Contract.

## SCHEDULE 2.4(l)

## Other Excluded Liabilities

Any Liability which Seller has or may have pursuant to that certain Agreement dated September 1, 2008 by and between Seller and Jim Mauss (the "Mauss Agreement"), which the parties acknowledge shall not be deemed or construed to be an Assigned Contract. Without limiting the generality of the foregoing, in no event shall Purchaser be deemed or construed to have any obligation to Jim Mauss in the nature of separation pay, whether pursuant to the Mauss Agreement or otherwise.

## SCHEDULE 3.3(c)

### Relinquishment Letters

1.  US Department of Transportation Pipeline and Hazardous Materials Safety Administration EX numbers (135 EX #s, to be listed in letter)

## <u>SCHEDULE 4.3</u>

**Identified Defaults**

None.

## SCHEDULE 4.4

**Consents**

None.

## SCHEDULE 6.7(a)

### Transferred Employees

Alire, Frederick J
Atkins, Stephen A.
Back, Jody L
Bilger, Gregory C
Boren, John G
Bowman, Ryan J.
Conner, Zoe A.
Delvecchio, David C
Everhart, Angela C
Fritz, Michael R
Huber, Nancy J
Jones, Diane E
Jones, Jacqueline K
Lane, Dean M
Lee, Victoria L
Lewis, Karen L.
Limberis, Kathleen D
Mauss, James A
Miller, John E
Neish, Edson P
Ontiveros, Bonifacio M
Reichert, Marla G.
Reichert, Stephen
Roberts, Mary I
Shaw, Linda F.
States, Gary L.
Swartz, Christine E